UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DISTRICT

| | |
|---|---|
| SALA NAAMBWE and YVETTE NIMENYA, <br><br> Plaintiffs, <br><br> vs. <br><br> SMITHFIELD FOODS, INC., <br><br> Defendant. | **Case No.: 4:17-cv-04123-LLP** <br><br> **PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS** |

Come now Plaintiffs Sala Naambwe and Yvette Nimenya and respectfully submit this Responsive Statement of Material Facts pursuant to Fed. R. Civ. P. 56 and D.S.D. Civ. L.R. 56.1(b) as the non-moving parties' response to Defendant Smithfield Foods, Inc.'s Statement of Material Facts (Doc. # 32). The citations in the Plaintiffs' responses below refer to the exhibits attached to the Affidavit of Stephanie Pochop, which is filed contemporaneously with Plaintiffs' Supplemental Statement of Material Facts in opposition to the Defendant's pending Motion for Summary Judgment.

**PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

1. *Smithfield owns a pork processing plant in Sioux Falls, where Nimenya and Naambwe have worked since 2011 and 2013, respectively. (Declaration of Scott Reed ["Reed Decl."] ¶ 2.)*

   **Plaintiffs concur with Defendant's statement in numbered Paragraph 1 of its Statement of Material Facts.**

2. *Nimenya originally is from Rwanda, and Naambwe originally is from the Democratic Republic of Congo. (Deposition of Yvette Nimenya ["Nimenya Dep."] 12:15-18;*

*Deposition of Sala Naambwe ["Naambwe Dep."] 50:6-12.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 2 of its Statement of Material Facts.**

3. *Since 2014, both Plaintiffs have worked on the day shift in Department 19, Smoked Meats Wash. (Nimenya Dep. 26:8-10; Reed Decl. ¶ 2.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 3 of its Statement of Material Facts.**

4. *The 52-day shift workers in Department 19 perform tasks on five different production lines, on which hams are packaged into casings, hung on "trees" (stands), and sent to the smokehouse or deli department. (Deposition of Gary Loger ["Loger Dep."] 39:4-40:12.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 4 of its Statement of Material Facts.**

5. *Separately, not on a moving production line, Department 19 also processes ribs and other meats designated for Arby's and other customers. (Loger Dep. 40:13-16; Declaration of Gary Loger ["Loger Decl."] ¶¶ 5-7.) The ribs and meat pieces come to the department in large vats. Employees use hooks to remove the meat pieces from the vats, place them on a table, and hang them on trees. Once hung, the meat is taken for further processing or distribution. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 5 of its Statement of Material Facts.**

6. *In 2016 and 2017, Gary Loger and Russ Hultman were the two supervisors in Department 19. (Naambwe Dep. 108:21-109:2; Nimenya Dep. 33:10-21.) The supervisors reported to David Hillberg, Operations Manager. (Reed Dep. 11:22-23.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 6 of its Statement of Material Facts.**

7. *Hourly employees at the plant are members of United Food and Commercial Workers Local 304A. (Reed Decl. ¶ 6.)*

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 7 of its Statement of Material Facts.**

8. *Employees may bid for open positions, which are posted in the plant; if they are awarded the position, they "own" that job. (Reed Decl. ¶ 6; Loger Dep. 41:6-42:1; Loger Decl. ¶¶ 8-9.) Employees who do not have "bid" jobs are considered to be on "open work" – they are assigned to temporarily vacant positions in their departments as needed. (Id.)*

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 8 of its Statement of Material Facts.**

9. *Nimenya has always had a bid job on the "Honey Line." (Nimenya Dep. 23:18- 25:5.) Naambwe was on open work until late 2017. (Naambwe Dep. 133:19-21.)*

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 9 of its Statement of Material Facts.**

10. *On the Honey Line, workers prepare hams to be placed into nets (called "socks"). The socks are placed on a "horn" and opened wide enough for the ham to slide in. The sock is then clipped. (Naambwe Dep. 58:20-59:20; Nimenya Dep. 23:24-25:5.)*

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 10 of its Statement of Material Facts.**

11. *Since 2010, the Human Resources Department ("HR") at the plant has been headed by Scott Reed, Human Resources Director. (Deposition of Scott Reed ["Reed Dep."] 5:8-23,*

*9:15-21.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 11 of its Statement of Material Facts.**

12. *Among Reed's direct reports are two Human Resources Managers, Carrie Moate and Monica Derby. (Reed Dep. 9:15-21.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 12 of its Statement of Material Facts.**

13. *Reed has overall responsibility at the plant for promoting compliance with, and providing guidance and education on, Smithfield's anti-discrimination and anti-retaliation policies. (Reed Dep. 15:4-16:2.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 13 of its Statement of Material Facts.**

14. *Smithfield's anti-discrimination, anti-harassment and anti-retaliation policies are found in the plant's employee handbook (Reed Dep. 15:4-16:2; Dep. Ex. 2), in the Smithfield Code of Conduct (Id., Dep. Ex. 3), and in the union contract (Reed Decl. ¶ 6.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 14 of its Statement of Material Facts.**

15. *The Code of Conduct is reviewed during orientation with all new employees, and each year salaried staff must certify that they have read it. (Reed Dep. 15:14-24.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 15 of its Statement of Material Facts.**

16. *New hire orientation also includes a video about sexual harassment. (Naambwe Dep. 124:6-19; Nimenya Dep. 37:12-38:25.)*

4

**Plaintiffs concur with Defendant's statement in numbered Paragraph 16 of its Statement of Material Facts.**

17. *Smithfield maintains a hotline which employees may call at any time to report (anonymously, if they wish) concerns about illegal conduct, including harassment, discrimination and retaliation. (Reed Dep. 8:2-7, Dep. Ex. 3.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 17 of its Statement of Material Facts.**

18. *All employees at the plant receive annual training on the subjects of harassment, discrimination, retaliation, and respectful workplace conduct, and Reed also provides such training to individuals and departments on an ad hoc basis. (Reed Dep. 15:18-16:12.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 18 of its Statement of Material Facts.**

19. *At the start of Plaintiffs' employment, both signed forms acknowledging their receipt of the employee handbook, the Code of Conduct, and training relating to sexual harassment. (Dep. Exs. 1, 19.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 19 of its Statement of Material Facts.**

20. *The Human Resources department maintains an open-door policy, and employees are free to bring questions and concerns there from 7 am to 5 pm, consistent with their obligation to be at their work stations on time. (Reed Dep. 12:12-22, 31:16-32:1.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 20 of its Statement of Material Facts.** As long as it is an authorized area, employees can go anywhere in the

plant on their breaks. (Tab D: Reed Depo at 40)  The HR office is an authorized common area in the plant that employees are authorized to go to. (Tab D:  Reed Depo at 41; Tab F: Derby Depo at 11)  John Morrell HR managers are supposed to have an open door. (Tab F: Derby Depo at 25, 29-30)  Employees are told that an HR employee will make themselves available if an employee comes to the HR office with a question or concern. (Tab F: Derby Depo at 28; Tab E: Moate Depo at 9-10)  Smithfield represents that "[w]e are doing everything we can to make speaking up easy to do and have provided various ways for anyone to raise a question or concern. " (Tab M: Code of Conduct)

21.  *The employee handbook requires employees to be at their work stations on time, and to notify supervisors if they will be late to work or returning from a break. (Reed Decl. ¶ 8, Ex. C.)*

   **Plaintiffs concur with Defendant's statement in numbered Paragraph 21 of its Statement of Material Facts.**

22.  *The employee handbook contains a set of work rules, for which ranges of disciplinary action are prescribed. Disciplinary action ultimately is left to management's discretion. (Reed Decl. ¶ 9, Ex. C.)*

   **Plaintiffs concur with Defendant's statement in numbered Paragraph 22 of its Statement of Material Facts.**

23.  *On February 19 or 20, 2016, a co-worker of Plaintiffs' named Scott Genzler made reprehensible, racist comments to them and to another co-worker named Lorena Morales while they all worked on the Honey Line. (Naambwe Dep. 56:21-57:14, 59:21-60:21, 68:16-73:10; Nimenya Dep. 60:5-18, 61:13-62:24, 65:25-70:22, 72:7-76:18, 77:14-78:1; Deposition of Lorena Morales ["Morales Dep."] 23:14-27:2; 34:25-36:4.) No*

*supervisor was present at the time.  (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 23 of its Statement of Material Facts but dispute that it is a complete statement of the material facts.**  Genzler was angry at Naambwe and Ninmenya and said, "Bitch, open the fucking socks like this" as he tried to tell them to do something.  (Tab A: Naambwe Depo at 60; Tab B: Nimenya Depo at 66)   He swore at them again.  (Tab A: Naambwe Depo at 60)  Genzler said, "If you don't want to work a job, you have to go back to your fucking country Africa." (Tab A: Naambwe Depo at 68; Tab B: Nimenya Deo at 68)  Naambwe and Ninmenya were visibly frightened and started to talk and pray with each other in Swahili.  (Tab A: Naambwe Depo at 69; Tab B: Nimenya Depo at 69; Tab C: Morales Depo at 25)   Genzler then told them, "Stop speaking fucking – your language, speak fucking English."  (Tab A: Naambwe Depo at 69; Tab B: Nimenya Depo at 69)  Naambwe responded that it was a free country and she could speak whatever language she wanted.   (Tab A: Naambwe Depo at 70) As their shift finally ended, Naambwe heard Genzler telling co-workers that he had done it because of "these two monkeys," referring to  her and Ninmenya.  (Tab A: Naambwe Depo at 73; Tab C: Morales Depo at 25)

24. *Genzler also pushed hams down the line too fast, so that one glanced Morales on the hip and another fell on Naambwe's toes.  (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 24 of its Statement of Material Facts.**

25. *The following day, Naambwe, Nimenya and Morales reported this incident to one of the department supervisors, Russ Hultman. (Naambwe Dep. 76:17-79:24; Nimenya Dep.*

*81:20-84:7; Deposition of Russ Hultman ["Hultman Dep."] 19:15-24, 21:4-22:8.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 25 of its Statement of Material Facts.** Naambwe was upset about the comment and promptly told the union steward about the incident that day. (Tab A: Naambwe Depo at 74, 76)   The union steward said he would pass the incident to the supervisor.  (Tab A: Naambwe Depo at 76)

26. *Hultman called the three women and Genzler into his office and asked the women to explain fully what had happened. (Id.) He asked Genzler if this was true, and Genzler admitted that it was. (Id.) Hultman responded that the matter would be taken up with Human Resources on Monday. (Id.)*

    **Plaintiffs dispute that Defendant's statement in numbered Paragraph 26 of its Statement of Material Facts is a complete statement of the material facts.**  In addition to the three women, two union stewards, Tom Anderson and Tom Zuraff, were present at the meeting as well.  (Tab A: Naambwe Depo at 77, 78, 79; Tab B: Nimenya Depo at 81-82) Naambwe and Ninmenya explained what they had experienced the day before.  (Tab A: Naambwe Depo at 79)  Hultman asked Genzler if their description was true, and Genzler said it was. (Tab A: Naambwe Depo at 79)  Hultman said then that the matter needed to go to HR on Monday.  (Tab A: Naambwe Depo at 79, 80; Tab B: Nimenya Depo at 83)

27. *On Monday, Plaintiffs and Morales decided to go to Human Resources themselves during their first break, before Hultman had had an opportunity to communicate with Human Resources about the incident. (Naambwe Dep. 81:11-82:13; Nimenya Dep. 84:8-85:5; Morales Dep. 27:3-29:14, 36:21-38:16; Hultman Dep. 22:22-23:5.)*

    **Plaintiffs dispute Defendant's statement in numbered Paragraph 27 of its Statement**

**of Material Facts.** When their shift started on Monday morning, Hultman did not say anything to the three employees about the incident. (Tab A: Naambwe Depo at 82) As a result, during their first scheduled morning break, Naambwe, Ninmenya and Morales went to the HR office. (Tab A: Naambwe Depo at 81) They did not tell Hultman they were going because they thought he knew that they would be going to HR. (Tab A: Naambwe Depo at 82, 90-91; Tab B: Nimenya Depo at 84) Additionally, they did not have to tell him they were going to HR as employees can go anywhere in the plant on their breaks. (Tab D: Reed Depo at 40) The HR office is an authorized common area in the plant that employees are authorized to go to. (Tab D: Reed Depo at 41; Tab F: Derby Depo at 11) Naambwe, Ninmenya and Morales were in compliance with the SPEAK UP! policy when they had gone to report discrimination at HR during their break. (Tab M: Code of Conduct; Tab D: Reed Depo at 37)

28. *The three women left without notifying a supervisor that they might be back from break late because they were reporting the incident to HR. (Id.; Reed Dep. 37:19-38:4; Reed Decl. ¶ 8, Ex. C.)*

**Plaintiffs dispute that Defendant's statement in numbered Paragraph 29 of its Statement of Material Facts is a complete statement of the material facts.** They did not tell Hultman they were going because they thought he knew that they would be going to HR. (Tab A: Naambwe Depo at 82, 90-91; Tab B: Nimenya Depo at 84) They were in compliance with the SPEAK UP! policy that HR employees train employees about. (Tab M: Code of Conduct)

29. *The three women were still in HR when break ended and production started up again, and because of their absence the line was idle for a period of time. (Nimenya Dep. 85:6-*

*88:12; Naambwe Dep. 82:4-7, 94:4-95:8.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 30 of its Statement of Material Facts.**

30. *Hultman learned the women were in Human Resources, and went there to instruct them to return to the line. (Nimenya Dep. 85:6-88:12; Naambwe Dep. 82:4-7, 94:4-95:8; Hultman Dep. 25:4-26:9; Deposition of Carrie Moate ["Moate Dep."] 26:2-27:6, 66:7-68:2.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 30 of its Statement of Material Facts.**

31. *Without knowing the reason for the three women being in Human Resources, Moate advised Hultman that they could be given disciplinary action for not being on the production line at the designated time, which is a violation of the company's attendance rules. (Moate Dep. 18:22-20:24, 34:8-25; Reed Decl. ¶ 8, Ex. C.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 31 of its Statement of Material Facts.** Hultman told Moate that the women were there because Genzler had called them "bitches." (Tab E: Moate Depo at 20) This would have been a reportable incident under the SPEAK UP! Policy. (Tab M) However Hultman chose not to tell Moate about the meeting on Saturday when Genzler had had admitted to swearing and using racial slurs toward the women. (Tab E: Moate Depo at 22-23) Moate called this "misinformation" from Hultman. (Tab E: Moate Depo at 69) Hultman had a duty to report discriminatory behavior accurately. (Tab D: Reed Depo at 57, 77) Hultman violated Smithfield's reporting policy by inaccurately reporting the Genzler incident to HR. (Tab D: Reed Depo at 58)

32. *When Naambwe, Nimenya and Morales returned to Department 19, Hultman issued them verbal warnings for not returning to the line on time after their break. (Hultman Dep. 26:12-20, 27:2-6, 29:4-30:7; Moate Dep. 30:2-23.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 32 of its Statement of Material Facts.** The three women each received a written disciplinary warning from Moate which was delivered by Hultman. (Tab B: Nimenya Depo at 90, 96; Tab C: Morales Depo at 29) When Naambwe returned from HR, Hultman came up to her and handed a written warning. (Tab A: Naambwe Depo at 96) The warnings were for being off the line, wasting time. (Tab E: Moate Depo at 34)

33. *Hultman also issued Genzler a written warning for his abusive conduct. (Id.; Dep. Ex. 42.)*

**Plaintiffs dispute that Defendant's statement in numbered Paragraph 33 of its Statement of Material Facts is a complete statement of the material facts.** Even though Hultman could have immediately disciplined Genzler for an obvious violation of the Smithfield anti-discrimination policy, he did not do so. (Tab H:  Loger Depo at 33-35; Tab F: Derby Depo at 55-56; Tab D: Reed Depo at 75, 80) Genzler was not disciplined until after the plaintiffs were disciplined for being in the HR office. (Tab R, p. 2: Moate 2/26/16 email) After Hultman disclosed that Genzler had used racial slurs and threatening behavior toward the women, Moate instructed that Genzler needed to be disciplined. (Tab R, p. 2: Moate 2/26/16 email) On Monday afternoon, Hultman issued Genzler a written warning for "Rule #15 using profane language." (Tab O:  2/22/16 Genzler discipline) This discipline was issued by Moate with Reed's approval through the HR department. (Tab O: Reed Depo at 80, 84; Tab G:  Hultman Depo at 29)

34. *Each of the disciplinary actions were consistent with the company's work rules and the range of discipline for each offense. (Reed Decl. ¶ 9; Ex. C thereto.)*

   **Plaintiffs dispute Defendant's statement in numbered Paragraph 34 of its Statement of Material Facts.** Reed admits that the disciplinary action Anderson received for allegedly swearing is very different than the disciplinary action that Genzler received for admittedly swearing. (Tab D: Reed Depo at 126) He also admits that the 3-day suspension that Naambwe has received for a violation of Rule #15 is harsher than the written warning that Genzler received for actual violation of Rule #15. (Reed Depo at 126)

35. *Morales testified that Genzler later "humbly apologized" for his behavior in front of the department. (Morales Dep. 30:7-18.)*

   **Plaintiffs dispute that Defendant's statement in numbered Paragraph 35 of its Statement of Material Facts is material.** Immediately after the incident, the parties' co-worker Kaufman told Genzler he should apologize. He refused. (Tab J: Kaufman Depo at 6) By the time they got back to work, Genzler was laughing at Naambwe and Ninmenya for getting disciplined for trying to report him. (Tab A: Naambwe Depo at 99; Tab B: Namenya Depo at 88)

36. *Reed first learned of these events the following Thursday, when a union steward named Tom Anderson brought them to his attention (Reed Dep. 35:11-36:4), and then took the following steps:*

   a. *Met with Hultman and Moate, and had Moate prepare a written summary of events. (Reed Dep. 64:15-67:10, Dep. Ex. 48)*

   b. *Met with Naambwe and Genzler to independently investigate the incident, and*

*reviewed all notes and emails relating to the incident. (Reed Dep. 64:15-67:10, Dep. Ex. 48)*

c.  *Called a meeting with the Union's president, secretary-treasurer and business agent, along with Hultman's managers, and proposed that Genzler be suspended. The Union pushed back on this, arguing that Genzler could not be disciplined twice for the same offense. (Reed Dep. 64:15-67:10, Dep. Ex. 48; Moate Dep. 65:12-66:4)*

d.  *Reviewed Genzler's file and approved the recommendation of the plant manager and safety leadership to remove Genzler from a plant safety committee (the PIT Committee) comprised of managers and hourly employees. (Reed Dep. 64:15-67:10; Dep. Ex. 48.)*

e.  *Instructed Hultman to cancel the verbal warnings issued to the three women and report back to him once he had notified the women that the warnings had been canceled. Hultman did so. (Reed Dep. 64:15-67:10; Hultman Dep. 48:24-50:23; Dep. Exs. 8, 48.)*

f.  *Reviewed with Hultman his (Reed's) and the company's expectations regarding the importance of reporting incidents fully, completely and on a timely basis, and reinforced the importance of respectful workplace communications among employees. (Reed Dep. 64:15-67:10.)*

g.  *Reviewed with Moate the importance of obtaining all relevant information prior to making recommendations for disciplinary action. (Reed Dep. Reed Dep. 64:15-67:10.)*

h.  *Came to an agreement with senior operations managers and the union on a*

*strategy for keeping closer tabs on Department 19; all would make more frequent visits to the department. (Reed Dep. 64:15-67:10; Dep. Ex. 48.)*

i.    *Instructed Moate to follow up with the three women the following week to ensure there had been no further misconduct. Moate did so on April 4, 2016, and the three women told her there had been no other problems with Genzler. (Reed Dep. 64:15- 67:10; Dep. Exs. 9, 48; Naambwe Dep. 106:12-22.)*

j.    *Met with Genzler and the Union president together, and in that meeting told Genzler that any repeat of his conduct would result in loss of employment. (Reed Dep. 64:15- 67:10; Dep. Ex. 48.)*

k.    *Instructed Hultman and his manager, Hillberg, to meet with Department 19 and go over the company's expectations with respect to courtesy and respect in the workplace. (his meeting took place on March 8, 2016 and is memorialized in Dep. Ex. 50.) (Reed Dep. 64:15-67:10; Dep. Exs. 48, 50.)*

l.    *Spoke to Department 19 himself on October 4, 2016, at which time he gave a presentation on respectful workplace conduct, and reviewed Smithfield's anti-harassment and anti-discrimination policies. (Reed Dep. 47:9-19; Reed Decl. ¶ 10, Ex. D.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 36 of its Statement of Material Facts.** Reed met with Thomas Anderson on Thursday because Anderson was complaining that the women had been disciplined. (Tab D: Reed Depo at 42)   This was when Reed first learned that Genzler had said more than "bitches" to the plaintiffs. (Tab D:  Reed Depo at 36) If there is a manager who is not enforcing company policy, HR managers are supposed to inform Reed. (Tab E:  Moate Depo at 16; Tab D:  Reed

14

Depo at 13) Moate did not report to Reed until he asked as a result of Anderson's complaint, and only then did she tell Hillman and Reed that Hultman had been inaccurate about (failing to) report a racial discrimination claim. (Tab E: Moate Depo at 31-32, 52) Even though Reed recognized that Hultman had not been accurate in his report to HR about the Genzler incident, Reed instructed Hultman to document the facts of the incident and interact with the plaintiffs about it. (Tab D: Reed Depo at 83-84; Tab R: Reed notes from 2/29/16; Tab Q: Hultman 3/3/16 email to Reed) Reed admits that Genzler's disciplinary action was insufficient considering that he admitted to overt discriminatory behavior. (Tab D: Reed Depo at 65)

Reed claims he wanted Genzler to get more discipline but he couldn't do that because of "double jeopardy" under the union contract since Moate had already issued the disciplinary action based upon Hultman's inaccurate claim that Genzler had (only) used the word "bitches" to his co-workers. (Tab D: Reed Depo at 67) Anderson disputes that the union contract created "double jeopardy" that would have prevented Reed from appropriately disciplining Genzler. (Tab K: Anderson Depo at 24) During his process, Reed did not document that he learned that Hultman violated Smithfield's reporting policy by inaccurately reporting the Genzler incident to HR. (Tab D: Reed Depo at 58) He learned that Moate failed to properly investigate the three women's claims when she saw them in HR before she approved a disciplinary action. (Tab D: Reed Depo at 73, 75) Reed knew that Moate failed to properly investigate the facts of Genzler's actions before she approved a disciplinary action for him. (Tab D: Reed Depo at 76) Reed knew that Moate failed to report that Hultman had inaccurately reported a race discrimination complaint to HR. (Tab D: Reed Depo at 76) Reed did not

issue any disciplinary warning to Moate. (Reed Depo at 76) Reed declined to discipline Hultman for his inaccurate report;  instead, Reed  "reviewed expectations about reporting" with Hultman.  (Tab D: Reed Depo at 74, 76)   Hultman and Moate received very different disciplinary treatment than the Plaintiffs.

37. *According to both Plaintiffs and Morales, they never again experienced any other race-based conduct like Genzler's (from Genzler or anyone else).* (Naambwe Dep. 112:17-23, 268:14-47; Nimenya Dep. 54:8-14, 106:6-9; Morales Dep. 30:24-31:1.)

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 37 of its Statement of Material Facts insofar as they were not subject to more racial slurs.**

38. *Plaintiffs concede that their compensation has never been reduced during their employment at Smithfield; rather, it has increased regularly as prescribed by the union contract. (Naambwe Dep. 268:18-21; Nimenya Dep. 26:8-25, 31:4-32:21.)*

    **Plaintiffs dispute that Defendant's statement in numbered Paragraph 38 of its Statement of Material Facts is a complete statement of material fact.**  Naambwe was suspended from work in a retaliatory disciplinary action in December 2016. (Tab P: 12/08/16 disciplinary actions)  Even after this discipline was reduced in 2018, her pay was not restored.  (Tab D:  Reed Depo at 121)

39. *Naawmbe and Nimenya alleges that lead employee Lisa Christion has assigned them to work alone on a production process for Arby's/ribs, when normally two or more people perform that task together. (Nimenya Dep. 111:21-120:3; Naambwe Dep. 191:16-195:17, 229:17-232:23; 233:23-235:6.)*

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 39 of its Statement of Material Facts.**

40. *Naambwe filed a union grievance in which she protested her assignment to this job on August 22, 2016. (Naambwe Dep. 191-195, 229-233; Dep. Ex. 21.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 40 of its Statement of Material Facts.**

41. *Arby's/ribs tasks sometimes are assigned to one person at a time. (Loger Decl. ¶ 6; Deposition of Lisa Christion ["Christion Dep."] 38:19-40:3.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 41 of its Statement of Material Facts.** Plaintiffs are only aware of themselves being assigned this difficult task that requires assistance. (Tab B: Nimenya Depo at 111-12, 113, 117; Tab W: Anderson 2/15/17 statement)

42. *The following people have performed Arby's/ribs task alone: Lisa Christion, Becky Kaufman, Wally Mohammed, Fernando Peleon, Gloria Knorr. (Id.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 42 of its Statement of Material Facts.** Plaintiffs are only aware of themselves being assigned this difficult task that requires assistance. (Tab B: Nimenya Depo at 111-12, 113, 117; Tab W: Anderson 2/15/17 statement)

43. *Sometimes one person is assigned to do all of the Arby's-related tasks: taking meat from the vats, putting the meat on trees, and moving the trees away. (Loger Decl. ¶ 6.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 43 of its Statement of Material Facts, but dispute that anyone but the Plaintiffs were assigned to perform this task alone.** (Tab B: Nimenya Depo at 111-12, 113, 117; Tab W: Anderson 2/15/17 statement)

44. *As a lead employee, Lisa Christion is not a supervisor. She has no power to hire, fire or*

*make disciplinary decisions. (Reed Decl. ¶ 6; Christion Dep. 43:9-19.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 44 of its Statement of Material Facts.** Christion has the title of "lead" in the department, which means that she fills in for supervisors when they are not present.  (Tab I: Christion Depo at 6)

45. *Christion was not involved in the Genzler incident. (See Undisputed Material Facts 23-33, 36 and all record citations in support thereof.)*

**Plaintiffs concur with Defendant's numbered Paragraph 45 of its Statement of Material Facts.**

46. *Naambwe believes that Christion has been loud and rude to many employees over the years, and in fact is better now than she used to be. (Naambwe Dep. 15:18-16:22, 19:10-20:13, 27:7-28:19, 30:12-33:10, 36:2-17.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 46 of its Statement of Material Facts.**  Plaintiffs and several other employees filed a complaint that Christion was harassing them in April of 2018.  (Tab AA: 4/18 written complaint)

47. *HR Manager Monica Derby conducted an investigation into Naambwe's August 2016 grievance about the Arby's work assignment, together with Union representative B.J. Motley. (Deposition of Monica Derby ["Derby Dep."] 48:18-51:13; Declaration of Monica Derby ["Derby Decl."] ¶¶ 2-10; Exs. A-C.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 47 of its Statement of Material Facts.**

48. *Payroll and time records from Department 19 for August 22, 2016 established that seven people were on leave that day, and nine people left only 15 minutes before Naambwe did*

*– because they had greater seniority, were not on open work, and were permitted to go home when they finished their bid job duties. (Derby Decl. ¶ 5, Exs. A-C.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 48 of its Statement of Material Facts.** No other employees were assigned to work the Arby's line alone regardless of the staffing. (Tab B: Nimenya Depo at 111-12, 113, 117; Tab W: Anderson 2/15/17 statement)

49. *On August 22, 2016, one person left Department 19 hour before anyone else. (Id.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 49 of its Statement of Material Facts.** No other employees were assigned to work the Arby's line alone regardless of the staffing. (Tab B: Nimenya Depo at 111-12, 113, 117; Tab W: Anderson 2/15/17 statement)

50. *Human Resources managers, operations managers and Union representatives met with Naambwe on September 12, 2016 to explain their investigation findings. (Derby Decl. ¶ 6, Ex. B.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 50 of its Statement of Material Facts.**

51. *Derby's notes reflect that, at this meeting, managers attempted to assure Naambwe she was not being singled out, and to urge her to bring further concerns to Hillberg, Loger or the Union steward. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 51 of its Statement of Material Facts insofar this statement summarizes what Derby wrote in her notes.**

52. *Derby spoke to Naambwe about moving to another department if she was unhappy in*

*Department 19, but Naambwe did not wish to do so. (Derby Decl. ¶ 9.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 52 of its Statement of Material Facts.** Naambwe loves her department and her work there.  (Tab A: Naambwe Depo at 147) Department 19 is a preferable department at John Morrell because it has steady work and workers don't get shifted from job to job or sent home. (Tab C:  Morales Depo at 7)  Other departments have longer or shorter shifts.  (Tab C: Morales Depo at 8)

53. *Gary Loger was not involved in the Genzler incident. (Loger Dep. 43:2-5; See also, Undisputed Material Facts 23-33, 36 and all record citations in support thereof.)*

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 53 of its Statement of Material Facts.**

54. *Naambwe concedes that Loger has used rough language and been harsh to her and other employees from the start of her employment. (Naambwe Dep. 106:23-107:17; Dep. Ex. 9.)*

    **Plaintiffs dispute that Defendant's statement in numbered Paragraph 54 of its Statement of Material Facts is a complete statement of the material facts.**  (Tab S: 3/4/16 email from Moate to Reed) Loger testified that he had used the f-word at work and there was a complaint about it. (Tab H: Loger Depo at 28) The result of the investigation was that he got a warning, not a disciplinary action even though this was a violation of Smithfield policy.  (Tab H: Loger Depo at 29)

55. *Naambwe concedes that she does not know why Loger would pick on her. (Naambwe Dep. 229:6-16.)*

    **Plaintiffs concur with Defendant's statement in numbered Paragraph 55 of its**

**Statement of Material Facts.**

56. *Loger assigned Naambwe was assigned to a job spraying the Arby's meat because she would not select the only other open position available that day. (Loger Dep. 36:20-38:15.)*

     **Plaintiffs dispute Defendant's statement in numbered Paragraph 56 of its Statement of Material Facts.** Loger approached Naambwe who was assigned to work a job with Olgadez, and Olgadez had complained about Naambwe not doing a job right.   (Tab H: Loger Depo at 57)  Loger told her about Olgadez complaint and he asked her if she understood his directive; she shrugged her shoulders.  (Tab H:  Loger Depo at 57)  Loger escalated it because she would only shrug, and so he removed her from the line and assigned her to another job.  (Tab H: Loger Depo at 37-38, 58)  The job he assigned her to was a particularly dirty, sticky job where she would be spraying meat with Genzler. (Tab A:  Naambwe Depo at 206, 208)  Loger admits that she had never been assigned to do that job before in her career at Department 19.  (Tab H: Loger Depo at 37)

57. *Genzler also was assigned to the job of spraying the Arby's meat along with Naambwe. (Naambwe Dep. 207:1-208:7.)*

     **Plaintiffs concur with Defendant's statement in numbered Paragraph 57 of its Statement of Material Facts.**

58. *In August 2016, Naambwe told HR Manager Monica Derby that she suspected Loger and Christion were mean to her because they shared an office with her former supervisor, James Sibert. (Derby Decl. ¶¶ 7-8, Ex. C.)*

     **Plaintiffs concur with Defendant's statement in numbered Paragraph 58 of its Statement of Material Facts.**

59. *In December 2016, Naambwe received disciplinary action after getting into an argument with Loger over her work assignment. (Naambwe Dep. 218:20-229:5; Loger Dep. 83:7-84:25; Reed Dep. 108:17-111:25; Reed Decl. ¶¶ 15-21, Ex. F.)*

**Plaintiffs dispute that Defendant's statement in numbered Paragraph 59 of its Statement of Material Facts.**   Even though Naambwe had been performing a job that she had picked on Monday, Loger reassigned her job to Moraeles in the middle of the week. (Tab A:  Naambwe Depo at 220)  While Morales does have seniority, she also has a bid job, an assigned job. (Tab A:  Naambwe Depo at 220)  He sent Naambwe to another line and pointed out that he should not be able to bump her in the middle of the week. (Tab A:  Naambwe Depo at 221**)**  She finally told him that she would do the job he gave to her. (Tab A:  Naambwe Depo at 220)   Loger was swearing and yelling at her standing very close to her. (Tab A: Naambwe Depo at 221, 227-28)   While she denies she called him a "racist", she did say that he was harassing her. (Tab A: Naambwe Depo at 221)  The next day, Naambwe was suspended for three days for calling Loger a racist and she also received a 7-day suspension for attendance. (Tab A: Naambwe Depo at 225; Tab P:  12/06/16 disciplinary actions)  She questioned the attendance discipline because it was written in pen rather than on the usual computerized sheet. (Tab A:  Naambwe Depo at 226)

60. *Naambwe had selected a position that Monday morning, but because the Deli line was down, four more senior employees were sent to Department 19 to work. Morales, who has more seniority that Naambwe, took Naambwe's position, and Loger offered Naambwe one of the remaining available jobs. (Loger Dep. 83:7-84:25; Reed Dep. 109:13-23, 111:4-14; Reed Decl. ¶¶ 15-20, Ex. F thereto; Naambwe Dep. 220:3-22.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 60 of its Statement of Material Facts.** While Morales has seniority in the department, Morales also has a bid job. (Naambwe Depo at 221)   When a job is bid, that employee owns the job. (Loger Depo at 41) Loger could not move a person out of a bid job, and additionally Naambwe was supposed to be able to pick her jobs as result of an agreement with Smithfield from her prior grievance. (Tab A: Naambwe Depo at 221) Loger moved her out of her picked job anyway, and Naambwe fomally said she would go where he assigned her. (Tab A: Naambwe Depo at 221)   Naambwe then told Loger that he was harassing her after he yelled at her. (Tab A: Naambwe Depo at  221, 227-28)

61. *This type of bumping is a routine occurrence. (Loger Decl. ¶ 9.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 61 of its Statement of Material Facts.** Morales had a bid job, which means she owned her job. (Tab H: Loger Depo at 41)  Additionally Naambwe had picked her job on Monday, which was what Smithfield allowed her to do a resolution to her prior grievance about unfair work assignments. (Tab A: Naambwe Depo at 221; Tab E: Moated Depo at 49)  Neither Morales or Naambwe should have been moved in the middle of the week. (Tab A: Naambwe Depo at 221)

61. *Naambwe admits that Morales has higher seniority than she does. (Naambwe dep. 220:3-11).*

**Plaintiffs dispute that Defendant's statement in numbered Paragraph 61 (sic) of its Statement of Material Facts is a material fact.** Morales had a bid job, which means she owned her job. (Tab H: Loger Depo at 41)  Additionally Naambwe had picked her job on Monday, which was what Smithfield allowed her to do a resolution to her prior

grievance about unfair work assignments. (Tab A: Naambwe Depo at 221; Tab E: Moate Depo at 49) Neither Morales or Naambwe should have been moved in the middle of the week. (Tab A: Naambwe Depo at 221)

62. *Naambwe argued with Loger about her job assignment, causing production to be delayed for 7 or 8 minutes. (Loger Dep. 83:7-84:25; Reed Dep. 109:13-23, 111:4-14; Reed Decl. ¶¶ 15-20, Ex. F.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 62 of its Statement of Material Facts.** Loger approached Naambwe, hollering and swearing, and removed her from the job she had selected on Monday; he moved Morales into that job even though Morales has her own bid job that she owns. (Tab A: Naambwe Depo at 221; Tab E: Moate Depo at 49) In this scenario, it was Loger who delayed the line.

63. *The following day, Loger again offered Naambwe one of two available positions, and she again argued with him, insisting that he return her to the job she'd had the week before. (Id.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 63 of its Statement of Material Facts.** Pursuant to an agreement with the union to resolve her grievabce about unfair treatment in job assignments, Naambwe was supposed to be able to pick a job on Monday. (Tab A: Naambwe Depo at 209-210, 221, 227-28)

64. *The exchange, which was taking place in front of other employees, became heated. Loger clearly heard Naambwe call him a racist. (Id.; Loger Dep. 89:22-90:12.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 64 of its Statement of Material Facts.** While she denies that called Loger a "racist", Naambwe did say that he was harassing her and that he treated her like a slave. (Tab A: Naambwe Depo at 221,

227)

65. *During the investigation of this incident, Tom Zuroff, a union steward, corroborated that Naambwe had called Loger a racist. (Reed Decl. ¶ 19, Ex. F.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 65 of its Statement of Material Facts insofar as this statement reflects what Zuroff said he heard.**

66. *After conducting an investigation, Reed decided to give Naambwe a three-day suspension for violation of Work Rule 15, because he believed Naambwe had argued with Loger to the point where production was delayed, and escalated the argument with her disrespectful and inflammatory statements. (Reed Dep. 110:11-111:25; Dep. Ex. 31; Reed Decl. ¶ 20, Ex. F.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 66 of its Statement of Material Facts only insofar as this statement reflects what Reed has claimed.** Naambwe was suspended for three days for using "profane" language in calling Loger a racist. (Tab P: 12/06/16 disciplinary actions) On the same day, Naambwe also received a 7-day suspension for attendance which she claims was not accurate (and which she questions since Loger was in charge of her attendance record). (Tab A: Naambwe Depo at 226; Tab P: 12/08/16 disciplinary actions) Loger admits that he has never seen anyone disciplined like Naambwe was on 12/06/16. (Tab H: Loger Depo at 65, 66) The same day, Reed issued a 3-day suspension to Anderson for a Rule #15 violation and for a violation of Rule #29 – which was making false statements during an investigation because of Anderson's objection to the way Naambwe's discipline was handled. (Tab V: Anderson disciplinary action 12/06/16) Anderson testified that he believed he was

disciplined in retaliation for being involved with Naambwe and Ninmenya's complaint about Genzler.  (Tab K:  Anderson Depo at 14)   He also noted that he got a 3-day suspension for allegedly using an "f" word while Genzler got a written warning for overt racist comments.  (Tab K:  Anderson Depo at 24) Reed admits that the disciplinary action Anderson received for allegedly swearing is very different than the disciplinary action that Genzler received for admittedly swearing.  (Tab D:  Reed Depo at 126)  He also admits that the disciplinary action that Naambwe has received for violation of Rule #15 is harsher than the written warning that Genzler received.  (Reed Depo at 126)

69. *Naambwe also got a 7-day suspension for attendance violations, but the two suspensions were served concurrently, and part of the suspension was deemed to be an "at work" suspension. (Reed Dep. Reed Dep. 112:1-115:22.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 69 (sic) of its Statement of Material Facts**.

70. *Naambwe's grievance over this incident was held in abeyance by the union for many months, and was resolved in January 2018 when the suspension was reduced to a written warning. (Dep. Exs. 32, 56; Reed Dep. 120:6-12:1, 165:5-166:22.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 70 of its Statement of Material Facts.**  Plaintiffs do not know when or why the discipline was reduced:  the notation in her disciplinary record is not dated and is signed by Smithfield rather than the union. (Tab P. p 2: Reduced 12/08/16 disciplinary sheet)  Even though it was reduced to a written warning,  Naambwe's pay was not restored.  (Tab D:  Reed Depo at 121)

71. *When Reed advised Naambwe of the disciplinary action, he offered her the opportunity to move to another department so that she would not have to work with Loger, an*

*opportunity Naambwe declined. (Reed Decl. ¶ 21, Ex. F.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 71 of its Statement of Material Facts but dispute that it is a complete statement of the material facts.** Naambwe loved her department and her work there. (Tab A: Naambwe Depo at 147) Moreover Department 19 was a very good department to work in with security and hours that other departments did not have, so this was equivalent to asking her to take a material change in job duties as a result of her protected activity. complaints. (Tab C: Morales Depo at 7-8)

72. *In December 2014, Naambwe complained that a co-worker in Department 19, Juan Ogaldez, had gestured toward his penis and looked at her, which she interpreted as a request that she touch his penis. Ogaldez denied this. (Naambwe Dep. 128:24-130:24, 141:6-14, 143:25- 144:11, 151:5-11; Reed Decl. ¶¶ 4-5, Ex. B; Moate Decl. ¶¶ 3-8; Ex. A; Loger Dep. 79:5-80:17; Loger Decl. ¶¶ 3-4, Ex. A.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 72 of its Statement of Material Facts.**

73. *Loger, Moate and Reed conducted an investigation into this incident, and could not corroborate that Ogaldez had engaged in this behavior. Loger Dep. 50:3-6, 79:5-80:17; Loger Decl. ¶¶ 3-4, Ex. A; Reed Dep. 93:14- 94:9; Reed Decl. ¶¶ 4-5, Ex. B; Moate Decl. ¶¶ 3-9; Ex. A.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 73 of its Statement of Material Facts.** Another employee, Morales, had also witnessed Olgadez behavior but during the investigation, she was never asked about it. (Tab C: Morales Depo at 19, 20)

74. *Ogaldez accused Naambwe of working too slowly, and of throwing meat at him, all of which Naambwe denied. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 74 of its Statement of Material Facts.**

75. *At the conclusion of the investigation, Naambwe was given the option of transferring to another department or staying in Department 19, with the understanding that she might sometimes have to work with Ogaldez. She chose to stay in Department 19. (Id.; Naambwe Dep. 147:15-20.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 75 of its Statement of Material Facts.** To resolve the 2014 sexual harassment complaint, Reed told Naambwe that she and Olgadez would not have to work together any longer, and that they would be assigned to different lines in the department. (Tab A: Naambwe Depo at 146) Naambwe's union representative, Ian Strum, confirmed to her that this was the deal that had been negotiated. (Tab A: Naambwe Depo at 151, 152, 156) There are at least 5-7 different "lines" where employees in Department 19D can work so it is possible for employees on the same day shift in the department not to work near each other. (Tab H: Loger Depo at 46-47) After the complaint in 2014, Naambwe and Olgadez did not work together in Department 19D until after her EEOC mediation was scheduled in March 2017. (Tab A: Naambwe Depo at 152) Before March 2017, if Naambwe went into an area in the department where Olgadez was working, Loger would kick her out of the area. (Tab A: Naambwe Depo at 150)

76. *Both employees were counseled about respectful conduct going forward. (Reed Decl. ¶ 5, Ex. B.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 76 of its Statement of Material Facts as Defendant does not seem to differentiate between victim and harasser when the Plaintiffs have reported discriminatory treatment.**

77. *In April 2016, the Union raised a concern on Naambwe's behalf that Loger was forcing her to work with Ogaldez in contravention of a promise allegedly made to her in 2014 that she would never have to work with or near Ogaldez again. (Naambwe Dep. 146:13-25, 147:22-148:16; Reed Dep. 92:9-93:5, 94:11-24; Reed Decl. ¶¶ 11-15, Ex. E.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 77 of its Statement of Material Facts but disputes that it is a complete statement of the material facts.** When Naawmbe was assigned to work with Olgadez in 2017, she complained to Reed that Loger and Hultman were assigning her to work with Olgadez again and reported that she was uncomfortable. (Tab A: Naambwe Depo at 157, 159, 165-66) She reported that she believed this was retaliation. (Tab D: Reed Depo at 110; Tab A: Naambwe Depo at 168)

78. *Reed immediately looked into this allegation and reviewed his notes of the December 2014 incident. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 78 of its Statement of Material Facts.** Reed told Naambwe that he did not have written proof that she didn't have to work with Olgadez after the 2014, and he advised Naambwe that she would now be required to work with Olgadez. (Tab A: Naambwe Depo at 165-66) Their work assignments made it so that Olgadez and Naawmbe had to stand so close that they touched each other. (Tab B: Nimenya Depo at 133; Tab H: Loger Depo at 88)

79. *The contemporaneous documentation of this incident did not memorialize a promise that*

*Naambwe would never have to work with Ogaldez again. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 79 of its Statement of Material Facts only insofar as Smithfield does not have any written documentation of its agreement with Naambwe.** To resolve the 2014 sexual harassment report, Reed told Naambwe that she and Olgadez would not have to work together any longer, and that they would be assigned to different lines in the department. (Tab A: Naambwe Depo at 146) Naambwe's union representative, Ian Strum, confirmed to her that this was the deal that had been negotiated. (Tab A: Naambwe Depo at 151, 152, 156) There are at least 5-7 different "lines" where employees in Department 19D can work so it is possible for employees on the same day shift in the department not to work near each other. (Tab H: Loger Depo at 46-47) After the complaint in 2014, Naambwe a and Olgadez did not work together in Department 19D until after her EEOC mediation session was set in March of 2017. (Tab A: Naambwe Depo at 152)

80. *The contemporaneous documentation of this incident reflected that Ogaldez and Naambwe were told they would have to continue to work together occasionally. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 80 of its Statement of Material Facts only insofar as it reflects what Smithfield chose to document.**

81. *Naambwe concedes that Ogaldez did nothing inappropriate to her after the December 2014 incident. (Naambwe Dep. 150-151; Reed Decl. ¶ 13, Ex. E.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 81 of its Statement of Material Facts.** Both Olgadez and Naambwe were unhappy about being forced to work together. (Tab A: Naambwe Depo at 168, 172) It made Naambwe feel like she was

30

trash. (Tab A: Naambwe Depo at 173)   Olgadez complained about Naambwe's

performance and it caused a confrontation between Loger and Naambwe. (Tab H: Loger

Depo at 57)

82. *Occasionally Naambwe chose work assignments that brought her into close contact with*

*Ogaldez. (Loger Dep. 50:13-52:15, 53:25-54:7, 56:13-57:3, 87:19-89:1; 57:5-58:1,*

*80:18-82:19; Dep. Ex. 45.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 82 of its Statement**

**of Material Facts.** Both Olgadez and Naambwe were unhappy about being forced to

work together. (Tab A: Naambwe Depo at 168, 172) It made Naambwe feel like she was

trash. (Tab A: Naambwe Depo at 173)  Naawmbe tried to take out a  protection order so

she would not have to work near Olgadez. (Tab X)

83. *Although Naambwe conceded Ogaldez had done nothing improper since the one*

*(uncorroborated) incident in 2014, she obtained a civil protective order against him in*

*March 2017 in which she asked that Ogaldez be ordered to stay 100 miles away from*

*her. (Naambwe Dep. 172:11-20, 173:20-174:11; Dep. Ex. 20; Dep. Ex. 20.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 83 of its Statement**

**of Material Facts.** Naambwe attempted to take out a protection order against Olgadez

because she was afraid of him in the workplace. (Tab A:  Naambwe Depo at 172; Tab X:

3/31/17 protection order from HR file) The protection order states that Naambwe was

being forced to work with Olgadez and that when he worked next to her, she felt "scared

and shocked and ill." (Tab Y, p. 3:  3/31/17 protection order filing)

84. *In the protective order, Naambwe did not say that Ogaldez did anything improper after*

*2014. (Dep. Ex. 20.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 84 of its Statement of Material Facts.** The protection order states that Naambwe was being forced to work with Olgadez and that when he worked next to her, she felt "scared and shocked and ill." (Tab Y, p. 3: 3/31/17 protection order filing)

85. *As a result, Ogaldez feared to come to work and was fired for attendance violations. (Naambwe Dep. 172:11-20, 173:20-174:11; Dep. Ex. 20.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 85 of its Statement of Material Facts is a material fact.** Loger called Olgadez at home and asked what the deal was; Olgadez told him he wasn't coming to work because of the protective order. (Tab G: Loger Depo at 86)

86. *At around that time, Naambwe was diagnosed with paranoia and PTSD. (Naambwe Dep. 264:17-266:9.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 86 of its Statement of Material Facts.**

87. *Naambwe admits she gave her health care providers false information about Ogaldez: that he "regularly" sexually assaulted her (id. 178:12-23); that, in March 2017, he tried to coerce her into touching his genitals and stabbed her with something in the back (id. 178:24- 179:20 ); that a man at work was placing "witchcraft spells" on her (id. 178:24-179:20); and that the man who harassed her had been fired for sexual assault and this created less stress for her (id. 176:20-178:11).*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 87 of its Statement of Material Facts.** Plaintiff reported this information to her doctor as she understood and she did not write her medical records.

88. *Naambwe filed another union grievance on July 21, 2017, based on an incident in which Hultman tapped her on the shoulder and asked her, "What are you going to do now that your partner is gone?" (Naambwe Dep. 252:20-253:19; Reed Dep. 96:23-97:12, 163-64, 176:15- 177:9; Hultman Dep. 35:1-36:8; Reed Decl. ¶ ¶ 24-26.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 88 of its Statement of Material Facts.**

89. *Hultman was referring to Tom Anderson, whom he mistakenly believed to have bid out of the department. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 89 of its Statement of Material Facts.**

90. *Reed immediately investigated this complaint, resolved the grievance in favor of Naambwe, and disciplined Hultman for this conduct. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 90 of its Statement of Material Facts.**

91. *Reed's contemporaneous notes reflect that he and Operations Manager Garney Henle met with Naambwe and Motley to explain the disciplinary action that had been taken, and to assure Naambwe they agreed that Hultman's conduct was inappropriate. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 91 of its Statement of Material Facts.**

92. *In September 2017, Naambwe again complained again about Hultman, accusing him of intentionally spraying her with water and then intentionally pressing his body against her "booty" when he walked through a tight spot on the line behind her. (Naambwe Dep. 253:22- 259:22; Hultman Dep. 37:16-38:8; Reed Dep. 104:11-107:5; Reed Decl. ¶¶ 27-*

*28, Ex. G.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 92 of its Statement of Material Facts.**

93. *Reed investigated this incident.  (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 93 of its Statement of Material Facts.**

94. *After his investigation, Reed concluded that Hultman sprayed the women with water accidentally, and impolitely did not apologize. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 94 of its Statement of Material Facts.**

95. *Reed could not corroborate Naambwe's allegation that Hultman intentionally pushed or ground himself against her. (Id.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 95 of its Statement of Material Facts.**  Hultman told Loger that he had not intended to touch Naambwe and had only touched her because he was trying to get by her in a tight space. (Tab H: Loger Depo at 76-77)

96. *Hultman denied that he had pushed or ground himself against Naambwe. (Id.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 96 of its Statement of Material Facts.**  Hultman told Loger that he had not intended to touch Naambwe and had only touched her because he was trying to get by her in a tight space. (Tab H: Loger Depo at 76-77)  Reed believed Hultman's version over Naambwe even though he knew that Hultman had been inaccurate about reporting to HR before. (Tab D: Reed Depo at 105)

97. *Hultman was sent for additional management training after this incident. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 97 of its Statement of Material Facts.**

98. *Naambwe testified that she believes Hultman might "do something to her," such as shoot her with a gun. (Naambwe Dep. 262:13-263:2.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 98 of its Statement of Material Facts.**

99. *In December 2017, Naambwe got into an altercation with Townsend, and complained that he had taken a photograph of her with his cell phone. She said she was afraid he might kill her. (Reed Dep. 135:23-138:9; Reed Decl. ¶ 29, Ex. I.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 99 of its Statement of Material Facts.**

100. *Townsend denied this, said Naambwe had "flipped him off," and complained that everyone in the department was scared of Naambwe because she threatened to take people to personnel if they made her angry. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 100 of its Statement of Material Facts insofar as it may reflect what Townsend stated in defense of Naambwe's complaint about him.**

101. *Reed interviewed Townsend, Naambwe and four other workers in the department, could not corroborate either Naambwe's or Townsend's contentions, and neither employee was disciplined. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 101 of its Statement of Material Facts insofar as it restates the conclusion that Smithfield**

**reached.**

102. *When he spoke to Naambwe, Reed reiterated the company policy prohibiting photo-taking in the plant, and Naambwe assured him she was aware of the policy and had never violated it.  (Id.)*

> **Plaintiff dispute Defendant's statement in numbered Paragraph 102 of its Statement of Material Facts**.  Reed has acknowledged that the actual policy in the plant is different than the written policy that prohibits the use of phones in the plant.   (Tab D:  Reed Depo at 137)

103. *After this incident, Amanda Avila complained to HR that Naambwe had taken her photograph at work several times. (Reed Dep. Reed Dep. 160:10-161:3; Reed Decl. ¶ 30, Ex. J.)*

> **Plaintiffs concur with Defendant's statement in numbered Paragraph 103 of its Statement of Material Facts but dispute that it is a complete statement of the material facts.**  Naambwe was photographing Hultman and Avila together in Department 19 after Hultman had been transferred to a different department in part because of the conflict he had with the Plaintiffs. (Tab D:  Reed Depo at 129)  Hultman had not been happy about the transfer. (Tab D:  Reed Depo at 131) She felt he was there to intimidate her.  (Tab D:  Reed Depo at 133, 135)  Reed investigated by asking Hultman if he was there to intimidate Naambwe and he said no.  (Tab D:  Reed Depo at 133)

104. *Naambwe claimed to be taking photographs to document the fact that Hultman was in her department "staring at" her and because she thought he might "do something" to her, like shoot her with a gun. (Naambwe Dep. 262:5-263:2; Reed Dep. 136:1-3.)*

> **Plaintiffs concur with Defendant's statement in numbered Paragraph 104 of its**

**Statement of Material Facts.**

105. *Reed gave Naambwe received a verbal warning because she lied to him when she told him she had never taken photographs at work, and because she refused to refrain from doing so in the future. (Reed Dep. 160:10-161:3; Reed Decl. ¶ 30, Ex. J.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 105 of its Statement of Material Facts but dispute that this is a policy that is enforced against any other employees in the workplace.** Reed has acknowledged that the actual policy in the plant is different than the written policy that prohibits use of phones in the plant. (Tab D:  Reed Depo at 137)

106. *Naambwe filed another grievance as a result of this disciplinary action.  (Reed Dep. 161:8-163:5; Dep. Ex. 54.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 106 of its Statement of Material Facts.**

107. *The union acceded to the discipline after learning about Naambwe's untruthfulness and refusal to commit to following the rules regarding photograph-taking on the production floor. (Id.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 107 of its Statement of Material Facts only insofar as the grievance was not successful.**

108. *Naambwe testified that, on one occasion, her daughter Maggie tried to reach her to tell her that her son was ill, but HR would not deliver a message to her. (Naambwe Dep. 181:4-191:15.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 108 of its Statement of Material Facts.**

109. *Because Naambwe did not bring this issue to any manager or to HR, no investigation could be conducted, and Smithfield has no information about this incident. (Reed Decl. ¶ 22.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 109 of its Statement of Material Facts.**

110. *Naambwe could not identify the individual to whom her daughter tried to deliver a message. (Naambwe Dep. 190:3-8.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 110 of its Statement of Material Facts.**

111. *In violation of Smithfield policy, Naambwe and Nimenya testified that they took photographs of themselves and other employees while at work on the production floor, supposedly at the behest of the EEOC mediator before whom the parties appeared. (Naambwe Dep. 182:24-183:17; Nimenya Dep. 129:2-1331:17.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 111 of its Statement of Material Facts.** They agree that the EEOC mediator recommended that they take photographs to document their workplace complaints but deny that the written Smithfield policy about photographs in the workplace is the company policy. Reed has acknowledged that the actual policy in the plant is different than the written policy that prohibits people from using their phones in the plant. (Tab D: Reed Depo at 137)

112. *Tom Anderson works in the pickle room, and Naambwe concedes she visited him there to tell him about the unfair treatment she believes she received. (Naambwe Dep. 242:7-247:7.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 112 of its**

Statement of Material Facts.

113. *The "no entry" sign was placed on the pickle room door when food was found in that location, and it was suspected Anderson was eating there, or allowing others to do so. (Reed Decl. ¶ 23.)*

**Plaintiffs dispute that Defendant's statement in numbered Paragraph 113 of its Statement of Material Facts is a material fact.**

114. *The pickle room is a food production area, and employees who do not work in that area are not authorized to be there. (Id.)*

**Plaintiffs dispute that Defendant's statement in numbered Paragraph 114 of its Statement of Material Facts is a material fact.**

115. *Naambwe concedes that Avila might have been authorized to go into the pickle room for some reason: "She might be because she was getting inside there every day." (Naambwe Dep. 247.)*

**Plaintiffs dispute that Defendant's statement in numbered Paragraph 115 of its Statement of Material Facts is a material fact.**

116. *Naambwe argues that parties are held and photographs are taken in the label room, whereas she got punished for taking a photograph and was chastised by Loger for chewing gum on the production floor. (Naambwe Dep. 247-250.)*

**Plaintiffs concur with Defendant's statement in numbered Paragraph 116 of its Statement of Material Facts.**

117. *Naambwe acknowledges that there is no raw meat in the label room. (Naambwe Dep. 247:8-250:9.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 117 of its**

**Statement of Material Facts is a material fact.**

118. *The label room is not considered part of the production floor. (Reed Dep. 33.)*

**Plaintiffs dispute Defendant's statement in numbered Paragraph 118 of its**

**Statement of Material Facts is a material fact.**

Dated this 2nd day of August, 2018.

JOHNSON POCHOP & BARTLING

/s/ Stephanie E. Pochop
Stephanie E. Pochop
405 Main St. | PO Box 149
Gregory, SD 57533
(605) 835-8391
stephanie@rosebudlaw.com
*Attorneys for Plaintiff's Sala Naambwe and*
*Yvette Nimenya*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of August, 2018, she electronically filed and served a true and correct copy of this Plaintiff's Responsive Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment with the Clerk of Courts using the CM/ECF system which will automatically send email notification of such filing to the following counsel:

>
> Lisa Hansen Marso
> 300 S. Main Avenue | P.O. Box 5015
> Sioux Falls, SD  57117
> BOYCE LAW FIRM
> (605) 336-2424
> lkmarso@boycelaw.com
> *Attorney for Defendant*
>
> - AND -
>
> Susan F. Wiltsie
> Andrea R. Calem
> 2200 Pennsylvania Avenue, M.W.
> Washington, D.C. 20037
> HUNTON & WILLIAMS LLP
> (202) 955-1546
> swiltsie@hunton.com
> acalem@hunton.com
> *Attorneys for Defendant*

and that such service was by the e-mail listed above.

/s/ Stephanie E. Pochop
Stephanie E. Pochop