*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*

Scott Reed

June 1, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



App. Tab

**D**

Min-U-Script® with Word Index

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 5

1   A   I'm a Canadian citizen.
2   Q   Oh, okay.
3   A   Became a US citizen in 2014.
4   Q   Congratulations.
5   A   Thank you.
6   Q   Where did you get your undergraduate in sociology?
7   A   The University of Saskatchewan as well.
8   Q   And an overview of your work history?
9   A   Worked a few years at a potash mine as a miner/laborer.
10      I worked at an industrial chemical plant as a
11      production operator.  I was involved as a union rep and
12      union leader for a number of years.  I was promoted
13      into a HR role in a pulp and paper mill.  Had a number
14      of plant and regional HR roles.
15          I was moved into operations in a plant manager
16      role, managed a plywood plant.  I was moved down -- in
17      Saskatchewan.  I was moved down to south Georgia and
18      managed two engineered wood products plants.  Moved to
19      Louisiana, managed a oriented strand board plant.  And
20      then was recruited to come up to Smithfield --
21      John Morrell in Sioux Falls.
22   Q   When did you come to John Morrell?
23   A   2010.
24   Q   And so can you just describe for me what the -- did
25      Smithfield buy out or merge with John Morrell?  How is

Page 6

1      that described?
2   A   Smithfield was a number of independent operating
3      companies.  John Morrell was one of those companies.
4      There was Armour, Eckrich, Curly's, Cudahy, Farmland.
5      The business model was set up that these companies
6      operated as independent operating companies with their
7      own president/financials.  There was a Smithfield as
8      well.
9          They merged under -- and continue to migrate under
10      the One Smithfield structure.  The transition is
11      ongoing.
12   Q   So in terms of, like, from a management perspective, is
13      it a deal where it's the same company, it's just under
14      one big umbrella instead of --
15   A   It's a very different company.  It went from a
16      decentralized structure with independent operating
17      companies to a very centralized structure.  You know,
18      for example, on the HR side, I believe there was
19      approximately 16 different payroll systems and
20      migrating that into one -- we continue to migrate that
21      into one payroll system.
22   Q   How about in terms of HR policies on employee
23      responsibilities and behavior in regard to
24      discrimination and harassment?  Did that change?
25   A   Yes.  We continued to see the -- the pulling together

Page 7

1      of the HR policies into one policy.  The code of
2      conduct and the training and expectations to comply
3      with that code of conduct continue to become elevated.
4   Q   So when did the code of conduct become enacted?
5   A   This edition I believe is 2015.
6   Q   Was there a code of conduct before 2015?
7   A   Yes.
8   Q   Is it essentially the same code of conduct?
9   A   Similar, yes.
10   Q   What would be the major differences?
11   A   Well, for example, if you look at the language in the
12      labor agreement, the language in the employee handbook,
13      and the language in the code of conduct, they're all
14      similar and the messages are very similar.  But that
15      would be an example.
16   Q   Has the Speak Up program been in effect for -- since
17      before 2015?
18   A   It was -- as far as I'm aware, it was introduced in
19      2015, and it continues to be reinforced and expanded,
20      not only -- for example, this year there was a very
21      strong push around the Speak Up and food safety, any
22      kind of food-safety-type issues.  So it continues to
23      gain traction.
24   Q   Can you give me your summary description of what the
25      Speak Up program for Smithfield employees is supposed

Page 8

1      to mean?
2   A   Certainly.  If you see something that's not right,
3      whether it's behaviors, actions, safety, food safety,
4      any ethical dilemmas, is to speak up and notify the
5      appropriate folks, whether it's internally or through
6      the hotline, ethics hotline.  The simplicity of it is
7      speak up and do the right thing.
8   Q   I noticed from the acknowledgment of sexual harassment
9      training that you have new employees sign -- I'm
10      looking at Exhibit 1, which was signed by Yvette back
11      in 2011 -- I don't think it's here.
12   A   Yeah.
13   Q   I just wanted to ask you --
14   A   I'm familiar with it.
15   Q   The policy that -- acknowledgment that employees are --
16      they're required to sign this to be eligible to work at
17      John Morrell, right?
18   A   As part of the orientation, yes, there's a packet
19      provided to all new employees that contains the code of
20      conduct and other material.
21   Q   So even back in 2011 employees were instructed to,
22      quote, if I feel I am being harassed, I have the right
23      and responsibility to communicate this directly to my
24      production manager, Rosalynn Johnson or Scott Reed?
25   A   Correct.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 9

1 Q   And so there were three options that employees were
2     told that they could report or speak up to?
3 A   Correct.  At that time as well, there was a -- and
4     there still is today -- a hotline.
5 Q   And Rosalynn Johnson was the employee relations
6     manager; she was located in the HR office?
7 A   Correct.
8 Q   Is there still a position like that?
9 A   When Rosalynn left the company, we changed the role and
10    responsibility, and Monica Derby was recruited to fill
11    that expanded role.
12 Q   And then your office, as the human resources director,
13    was also located in the human resources department?
14 A   Correct.
15 Q   Can you walk me through just a general overview of your
16    progression in terms of job positions at
17    John Morrell/Smithfield Foods?
18 A   Certainly.  In 2010, I was recruited into the role that
19    I currently have.
20 Q   Okay.  And your title?
21 A   It's HR director.
22 Q   What's the difference between the HR director and the
23    HR manager?
24 A   The HR manager -- there's two.  Simplicity:  Monica
25    Derby focuses on all things salaried as well as

Page 10

1     supports the administrative functions of HR.  The staff
2     report to her, HR coordinators.
3         Carrie does not have any direct reports and her
4     focus is all things hourly.  And we do have staff that
5     support the recruiting of hourly as well.
6 Q   Who is --
7 A   Ellen Buskoltz.
8 Q   Anybody else?
9 A   Well, we have a lady that supports the benefits
10    administration.
11 Q   Who is that?
12 A   Sheila Rozeboom.
13        We have three HR coordinators.
14 Q   And what are their jobs?
15 A   Two of them support the customer service window.  Third
16    is a backup.  They do a lot of the HR transactions,
17    from setting up employee files, administrating employee
18    files, I-9s, transfers, promotions, pay.
19 Q   What does the other one do?
20 A   She supports the training records and the safety
21    department.
22 Q   Who are these three people?
23 A   Kim Bennett, Ashley Gutierrez, Stacie Stange.  And the
24    safety department reports to myself.
25 Q   That was my other question, is if you could explain the

Page 11

1     hierarchy of reporting within the HR department.
2 A   Certainly.  My direct reports include Monica, Carrie,
3     Ellen.  On the workers' comp side, health services,
4     there's Jim Fleming.  Jim has a staff of three nurses,
5     an industrial athletic trainer, and a workers' comp
6     administrator.  The plant safety director, Ken Winter,
7     reports to me.  Ken has three safety managers reporting
8     to him, as well as the plant environmental manager.
9     The security manager of the plant reports to me.  He
10    has 10 security officers and some contract security
11    supporting the security group.  I report to the plant
12    manager/general manager, Mark Wiggs.
13 Q   And where does David Hillberg fit into the chain of
14    command in your world as HR director?
15 A   David does not report through HR.  David Hillberg is
16    the plant manager at another plant currently.  He was
17    promoted and relocated, gosh, a year and a half ago.
18    His role was the operations manager on the packaged
19    meat side, smoked meats.
20 Q   What would his primary job duties be with regard to the
21    hourly employees that worked there?
22 A   The supervisors -- for example, Gary and Russ --
23    reported to Dave.
24 Q   Is he responsible to enforce Smithfield policies and
25    procedures in his role?

Page 12

1 A   Yes.
2 Q   Is he responsible to supervise and evaluate his
3     managers about how they are performing in terms of
4     enforcing Smithfield policies?
5 A   Yes.
6 Q   Did your HR managers who testified yesterday accurately
7     describe that Carrie and Monica primarily deal with HR
8     issues, front line to hourly employees and you're the
9     person who deals with HR issues involving policy
10    enforcement or discipline for your managerial staff?
11        MS. CALEM:  Object to the form.
12        THE WITNESS:  There's three lines of -- three
13    tiers of service in our department.  The first level
14    tier is provided by the admin coordinators.  They do
15    the intake at the customer service window, and, based
16    on the intake, they're able to address and respond to
17    the needs of a large percentage of the employees that
18    come to that window.
19        If there's something that they cannot handle,
20    they'll direct it to the appropriate person, whether
21    it's benefits, Carrie, which is primarily hourly, and
22    Monica, which is primarily salaried.
23        Does that answer your question?
24 BY MS. POCHOP:
25 Q   If an employee comes and has a complaint about a

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 13

1     manager's behavior --
2 A  Uh-huh.
3 Q  -- who is the HR person who would be responsible to
4     address that issue?
5 A  That would come either through myself or through Carrie
6     or Monica, but, ultimately, any complaints about
7     managers need to come across my desk.
8 Q  And do you have to report to anybody about how to
9     address manager complaints?
10 A  Yes.  That procedure and the expectations has evolved
11     over time as well.  When we were John Morrell, and up
12     until recently, any manager performance issues were
13     managed in-house, in the plant.
14        Recently, we also, depending on the severity of
15     the concern and the actions, do receive support from
16     our corporate HR group.
17        The reporting structure on the HR side has
18     changed.  Up until this last year, I reported solely to
19     the plant manager, and now I have a dual reporting
20     where I report to the corporate HR group as well as the
21     HR -- or, sorry, the plant manager.
22 Q  What was the reason for that change?
23 A  It was part of the -- it was a One Smithfield -- part
24     of the One Smithfield.  The decision was made that the
25     HR functions would report through a centralized HR VP

---

Page 14

1     versus through the -- through plants.
2        So I'm one of the ones that has a dual reporting.
3     I report to the plant on the safety, environmental,
4     security, and on the workers' comp, I report up through
5     the workers' comp, and on the HR, through the HR side.
6 Q  Have any of the managers that we have discussed and who
7     have been involved with Sala and Yvette's reports and
8     complaints to HR been -- have you had to consult with
9     your corporate HR?
10 A  Yes --
11 Q  Which ones?
12 A  -- as well as legal.
13        At the point that the NLRB charge was filed, then
14     at that point any correspondence, dialogue, events were
15     reported up through our legal and corporate HR.
16 Q  Prior to the filing of the NLRB complaint, was
17     corporate HR involved in any of the -- the evaluation
18     or investigation into management response to these
19     complaints?
20 A  I don't recall if they were notified or not.
21 Q  Do you agree with me that Smithfield Foods promises
22     workers like Sala and Yvette that they will have a
23     workplace that is free of harassment, discrimination,
24     and retaliation?
25        MS. CALEM:  Object to the form.

---

Page 15

1        THE WITNESS:  Smithfield is committed to that
2     goal, yes.  Committed, yes.
3 BY MS. POCHOP:
4 Q  And in terms of their commitment to a workplace that is
5     free of discrimination, harassment, and retaliation,
6     what is your role?
7 A  My role is to comply with the expectations of
8     Smithfield, promote compliance as well as provide
9     guidance to the facility and provide education to
10     supervisors and managers on the code of conduct and
11     policy.
12 Q  What are your job duties in regard to promoting the
13     code of conduct?
14 A  We make sure, as part of our new employee orientation
15     for hourly and salaried, that it's reviewed.  Employees
16     are provided with a copy.  On all salaried staff, I do
17     a review of the code of conduct with them during their
18     new employee orientation.  There is annual training
19     that is provided in the plant, as part of our monthly
20     safety training, on our expectations around
21     harassment/discrimination.
22        In addition, Smithfield requires salaried staff to
23     review and sign off annually on the code of conduct,
24     that they've read it and understand it.
25        I have also been required to provide training.

---

Page 16

1     Smithfield has rolled out -- in addition to the annual
2     training, they've rolled out in the last couple years
3     two additional training sessions for salaried staff
4     reinforcing respectful communications, a
5     harassment-free workplace.  I'm just in the process of
6     completing -- I've completed seven sessions.  I've got
7     one more that's currently in place where we continue to
8     elevate the standard.
9        I've also provided additional training above and
10     beyond what's required to salaried staff on respectful
11     workplace, respectful communications and our
12     expectations.
13 Q  How does enforcing your harassment, discrimination, and
14     retaliation policies -- let me ask it this way:
15     Managers are required, just like your salaried staff,
16     to comply with your discrimination policy?
17 A  Correct.
18        MS. CALEM:  Object to the form.  I don't get the
19     distinction between managers and salaried staff.
20 BY MS. POCHOP:
21 Q  Well, is there a distinction?  I guess that's a good
22     question.
23 A  I've worked for different organizations that have
24     different definitions.  Even within Smithfield there's
25     some different definitions on what's a manager and

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 17

1   salaried staff.
2        There's two definitions of salaried staff.  We
3   commonly use salaried exempt and salaried nonexempt.
4   Supervisors are all salaried exempt, and I think
5   supervisors that supervise supervisors/managers are
6   also salaried exempt.
7   Q  Are all of them expected to comply with Smithfield's
8      sexual harassment, retaliation, and discrimination
9      policies?
10  A  Yes.
11  Q  Are they required to comply with them?
12  A  Yes.
13  Q  Does Smithfield promise its hourly employees that its
14     managers are going to follow all policies and
15     procedures related to sexual harassment,
16     discrimination, and retaliation complaints?
17        MS. CALEM: Object to the form.
18        THE WITNESS: Smithfield is committed to comply,
19     yes.
20  BY MS. POCHOP:
21  Q  Your handbook says things like -- from your CEO, that I
22     promise you're not going to be retaliated against if
23     you speak up, right?
24        MS. CALEM: Object to the form.  That document
25     speaks for itself.

---

Page 18

1        THE WITNESS: Yeah, that's what the document says.
2     Yes.
3   BY MS. POCHOP:
4   Q  Is it your responsibility to make sure that the
5      promises made by Smithfield's senior management, its
6      CEO and president, are complied with?
7   A  Yes.
8   Q  Does every manager have the obligation to see that
9      Smithfield's code of conduct and workplace rules are
10     followed by managers?
11        MS. CALEM: Object to the form.
12        THE WITNESS: Yes.
13  BY MS. POCHOP:
14  Q  Is it permissible under Smithfield policy for managers
15     to overlook violations of the code of conduct?
16        MS. CALEM: Object to the form.
17        THE WITNESS: Overlook?  No.  They're required to
18     report.
19  BY MS. POCHOP:
20  Q  And who are they required to report to?
21  A  As of today they're required to report any violations
22     of the law or the code of conduct around harassment,
23     discrimination, and retaliation to HR.
24  Q  Was that the policy in effect in February of 2016?
25  A  The message has been made very clear as of recently

---

Page 19

1   that that is the expectation.
2   Q  What message was made -- what was the specific message?
3   A  That they're required to report to HR any concerns or
4      violations.
5   Q  When was that made clear?
6   A  In the -- this year it's been made very clear.
7   Q  Why was that clarification provided?
8   A  I don't know the reason why.
9   Q  That was triggered by someone in the company higher
10     than you?
11  A  Yes.
12  Q  Has that always been the policy at Smithfield Foods and
13     John Morrell?
14        MS. CALEM: Object to the form.
15        THE WITNESS: As mentioned earlier, the transition
16     from independent operating companies to One Smithfield
17     continues, and Smithfield has continued to elevate the
18     expectations in this area.
19  BY MS. POCHOP:
20  Q  Do you have any training in the medical field?
21  A  No.  Formal?  No.
22  Q  I'm just asking because I observed, as did my clients
23     yesterday, that you have spent a lot of time during our
24     depositions reviewing, highlighting, and making notes
25     on Sala's medical records, right?

---

Page 20

1        MS. CALEM: I'm going to object to the form of
2     that.  What he does during in his private time is not
3     relevant at all to this questioning.
4        MS. POCHOP: Well, the judge can decide that.
5   BY MS. POCHOP:
6   Q  So you can answer it, Mr. Reed.
7   A  Making notes on Sala's medical records?  I'm making --
8      highlighting on notes of the documents that were
9      provided by legal.
10        MS. CALEM: I would also like to point out that
11     those medical records were produced in discovery and
12     there's absolutely no reason why Mr. Reed should not
13     review them.
14        MS. POCHOP: That's fine.
15  BY MS. POCHOP:
16  Q  I'm just wondering, you did spend --
17  A  I've reviewed the information that was provided, but as
18     far as highlighting, I don't believe I've
19     highlighted --
20  Q  Yesterday, for example, basically all afternoon you
21     were reading Sala's medical records, right?
22        MS. CALEM: Objection to the form.
23        THE WITNESS: No, that's not true.
24  BY MS. POCHOP:
25  Q  Because you have -- you're aware that there's a

---

**Paramount Reporting ~ Audrey M. Barbush, RPR**
**605.321.3539 ~ audrey@paramountreporting.com**

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 33

```
 1   BY MS. POCHOP:
 2   Q   Is that the responsibility of you and the other
 3       employees in the HR department?
 4   A   That's one of our duties, yes.
 5   Q   And does Smithfield tell employees -- and, in fact,
 6       does -- let me ask it this way:  Has Smithfield's CEO
 7       and president promised employees that they will not be
 8       retaliated against if they make a report of
 9       discrimination?
10   A   Yes.
11   Q   Harassment, the same question --
12   A   Yes.
13   Q   -- are they promised that they're going to be
14       protected?
15   A   Yes.
16   Q   And is the duty of -- first of all, is that within
17       your job duty to make sure that that promise is
18       enforced?
19   A   Yes.
20   Q   Is it Carrie Moate's job duty to make sure that the
21       promise that an employee makes a report or complaint
22       under the policy will be protected from retaliation?
23   A   It's the responsibility of every Smithfield manager.
24   Q   It's a specific responsibility of Smithfield HR
25       managers, right?
```

---

Page 34

```
 1           MS. CALEM:  Objection to the form.
 2           THE WITNESS:  It is, and it's also communicated as
 3       a responsibility of every manager, yes.
 4   BY MS. POCHOP:
 5   Q   Is there a policy that requires an employee that they
 6       have to get managerial approval to be able to go to the
 7       HR department?
 8   A   No.
 9   Q   And, in fact, it's true, isn't it, that the handbook
10       and the code of conduct book all are designed to tell
11       employees that if they want to go to HR to report a
12       complaint, they actually have a responsibility to do
13       that?
14   A   That is correct.
15   Q   Is there an unwritten rule at Smithfield in Sioux Falls
16       that employees have to get permission from a manager to
17       be able to go to the HR department to speak up?
18   A   No.
19   Q   I'd like to now talk about your involvement in the
20       Scott Genzler incident.
21           You were the HR director who would have been
22       directly overseeing how the Scott Genzler complaint was
23       handled from the top of the HR department; is that
24       true?
25   A   As of -- from the point I became aware of it, yes.
```

---

Page 35

```
 1   Q   Were you also previously involved in Sala's complaint
 2       about Juan sexually harassing her in the workplace,
 3       from an HR perspective?
 4   A   Yes.
 5   Q   So you had awareness about the complaint with Juan and
 6       how that impacted Sala's work environment?
 7           MS. CALEM:  Object to the form of the question.
 8           THE WITNESS:  Yes, I was involved in the incident
 9       investigation.
10   BY MS. POCHOP:
11   Q   And at what point in the complaint that Sala, Yvette,
12       and Lorena Morales tried to report about Scott Genzler
13       did you become involved?
14   A   At what point?
15   Q   Yes.
16   A   I received a voice mail on Tuesday from an individual.
17       I didn't know who it was from.  It was a garbled voice
18       mail.
19           On Wednesday I had James Seibert, a supervisor in
20       packaged meats, come to my office and listen to the
21       voice mail.  I suspected the voice mail may have been
22       from Tom Anderson.  James confirmed that he believed it
23       was Tom Anderson.
24           Again, the content of it I could not understand,
25       or the name.  I asked James to send Tom over, and I met
```

---

Page 36

```
 1       with Tom on Thursday.  This was the Thursday following
 2       the incident on Monday.
 3           Tom shared with me what happened in detail, and
 4       that's when I first became aware of the incident.
 5   Q   So Carrie Moate had not contacted you to let you know
 6       that Russ had been in her office and that there was a
 7       discipline issue with Scott Genzler?
 8   A   No.
 9   Q   And you only found out about that because of, it sounds
10       like, kind of a garbled voice mail?
11   A   Correct.
12   Q   Is that consistent with your chain of command and
13       policy and procedure in your HR department?
14   A   No.
15   Q   Because if I'm understanding this -- and just -- like,
16       in some ways I just want to know if I'm thinking about
17       this properly.  Okay?
18           My understanding of your policy and procedure
19       would be that when Carrie found out that Russ had been
20       materially inaccurate about what had happened with
21       Scott, Yvette, Sala, and Lorena, would she have had an
22       obligation to report that to you?
23           MS. CALEM:  Object to the form.
24           THE WITNESS:  I expect that serious violations of
25       policy and procedures or issues involving salaried
```

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 37

1  staff are reported to me, yes.
2  BY MS. POCHOP:
3  Q  And this might be easier if you tell me what -- how
4     this report should have been handled under your
5     policies and procedures.
6        Let's start from the time that Russ is made aware
7     that Scott has made a serious violation -- he's
8     seriously violated the harassment and discrimination
9     policy.
10 A  Our code of conduct requires that incidents like this
11    be investigated and that action -- in a prompt manner,
12    and that efforts are taken to immediately stop that
13    behavior and address it.  I believe the parties did
14    that.  I don't believe they did it in a way that I
15    expected it to be done.
16 Q  Well, Sala, Yvette, and Lorena were all following
17    company policy when they reported this to Russ,
18    correct?
19 A  They did the right thing by reporting it, and they were
20    following procedures, yes.  We had some discussions
21    that would have been -- the procedure is also to notify
22    their supervisor that they were delayed or not going to
23    be back on time.
24 Q  Well, how would they know that in advance?
25       MS. CALEM: Object to the form.

---

Page 38

1        THE WITNESS: I think it's a reasonable
2     expectation to say that they were reporting this issue
3     to HR and that they didn't know when they would be
4     back.
5  BY MS. POCHOP:
6  Q  In some ways, one of the things that they wanted to
7     report to HR was that they wanted to report about what
8     Russ had done when he received the complaint, right?
9        MS. CALEM: Objection to the form.  Calls for
10    speculation.
11       THE WITNESS: I don't know.
12 BY MS. POCHOP:
13 Q  Were your HR directors correct yesterday when they said
14    that the only sexual harassment complaint that they've
15    received and processed is the one between Sala and
16    Juan?
17 A  I think you're referring to the HR managers --
18 Q  Yeah.
19 A  -- not the directors.
20 Q  Sorry.
21 A  I don't know what Monica's dealt with outside of
22    Smithfield.  As far as complaints that have gone to the
23    EEOC or external, I think that's correct.  I'm not sure
24    they fully understood the question.  There has been
25    complaints that they have participated in the

---

Page 39

1     investigations, or perhaps even led, where -- an
2     example would be where a female's complained that a
3     male has been harassing them or hitting on them.  I
4     believe that to be the case.
5  Q  Have there been any other complaints about race
6     discrimination that your HR department has addressed --
7     investigated and addressed besides Sala and Yvette's
8     complaint?
9  A  Yes, I have.
10 Q  How many race discrimination complaints have you been
11    involved in?
12 A  A few.  One I can think of was an individual applied
13    for a job in our -- he was working on the production
14    floor, applied for a job in accounting, and claimed
15    that he was not awarded the job because of his race.
16    That's an example.
17 Q  Have you had any other incidents where an employee or a
18    manager has made overtly racist remarks?
19 A  Yes.
20 Q  Can you give me some -- tell me about which other
21    managers have been involved in those types of cases.
22 A  Manager?  I'll give you an example of -- recently there
23    was an example of two production -- or, sorry, two
24    sanitation employees got into an argument over tools
25    and made inappropriate comments to each other around

---

Page 40

1     race.  That actually escalated to the point of
2     workplace violence.
3  Q  Any other ones?
4  A  I'm sure there's a few more.  Oh, another example --
5     yes.  A salaried nonexempt security officer was
6     harassing a female employee while on duty, trying to
7     get her phone number.
8  Q  You were assuming that employees would know, if they
9     were going to go to your HR department to report
10    discrimination and harassment, that they would be gone
11    more than their break time?
12       MS. CALEM: Object to the form.
13       THE WITNESS: Yes, I would assume that if a
14    complaint was to be filed -- or brought forward, sorry,
15    that it would take some time to resolve and
16    investigate.
17 BY MS. POCHOP:
18 Q  Do employees need to get permission to go anywhere in
19    the plant when they're on break?
20 A  Employees are only authorized to be in the areas -- the
21    common areas, break rooms, welfare areas, and the areas
22    that they have work responsibilities.
23       For example, a person from the stockyards would
24    not be authorized to go into a ready-to-eat area
25    because of concerns of cross-contamination.

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 41

1  Q  Sure. Is the HR department one of the common areas
2     that any employee is permitted to go to during their
3     break?
4  A  Yes.
5  Q  Is requiring employees to say, I'm going to the HR
6     department during my break, consistent with the
7     company's open door policy?
8        MS. CALEM: Object to the form.
9        THE WITNESS: Yes. They can come any time. If
10    they're leaving their work area, they need to make sure
11    they secure permission to leave their work area, or
12    notify.
13 BY MS. POCHOP:
14 Q  Have you learned, during the course of the depositions
15    in this case, that you have employees who do not report
16    obvious violations of this harassment and
17    discrimination policy out of fear?
18       MS. CALEM: Object to the form.
19       THE WITNESS: I've heard that statement, yes.
20 BY MS. POCHOP:
21 Q  Are you going to make any changes because of the
22    testimony from the witnesses that you've heard in this
23    case that they don't report sexual harassment because
24    they're afraid of getting into trouble?
25       MS. CALEM: Object to the form.

---

Page 42

1        THE WITNESS: Any investigation, whether it's
2     health, safety, property damage, this incident, I
3     always feel it's important to capture learnings from
4     them, yes.
5  BY MS. POCHOP:
6  Q  So what are you going to do with the information that
7     you have learned? Because we've heard a witness
8     testify that she didn't report sexual harassment
9     because she was afraid of getting into trouble, right?
10       MS. CALEM: Object to the form. Lack of
11    foundation.
12 BY MS. POCHOP:
13 Q  You were present for the Lisa Christion deposition,
14    weren't you?
15       MS. CALEM: Object to the form.
16       THE WITNESS: Yes.
17 BY MS. POCHOP:
18 Q  And she testified that she had not reported sexual
19    harassment because she was afraid of getting into
20    trouble?
21       MS. CALEM: Object to the form.
22       THE WITNESS: Yes.
23 BY MS. POCHOP:
24 Q  She also described that she overhears conversations
25    that violate both your sexual harassment policy and

---

Page 43

1     your race discrimination policy in the workplace?
2        MS. CALEM: Object to the form.
3        THE WITNESS: Yeah, I'm not sure if that's what
4     she said, but there's some concerns that came up, yes.
5  BY MS. POCHOP:
6  Q  And she's a lead person who has had all this training
7     about speaking up, hasn't she?
8        MS. CALEM: Object to the form.
9        THE WITNESS: She received the same training that
10    all of our employees received, yes.
11 BY MS. POCHOP:
12 Q  You also heard Lorena Morales testify that she has
13    heard racist comments in the workplace. That was --
14    that's an accurate summary of some of her testimony,
15    isn't it?
16       MS. CALEM: Object to the form.
17       THE WITNESS: Yes.
18 BY MS. POCHOP:
19 Q  And she also explained that she didn't report even
20    though she's had all of the Speak Up training?
21       MS. CALEM: Object to the form.
22       THE WITNESS: Lorena was also involved in
23    reporting the Scott Genzler incident.
24 BY MS. POCHOP:
25 Q  And what happened to Lorena when she did actually go

---

Page 44

1     report?
2        MS. CALEM: Object to the form.
3  BY MS. POCHOP:
4  Q  She received a discipline in response to her effort to
5     go to HR?
6        MS. CALEM: Object to the form.
7  BY MS. POCHOP:
8  Q  The discipline was the first thing that happened to
9     Lorena when she did have the courage to go to HR?
10       MS. CALEM: Object to the form.
11 BY MS. POCHOP:
12 Q  That's true, isn't it?
13       MS. CALEM: Objection.
14       THE WITNESS: No. She came to HR. She was
15    instructed to go back to work, and she was disciplined,
16    as per her testimony, for not notifying that she'd be
17    away from the work area.
18 BY MS. POCHOP:
19 Q  Have you learned anything in this case that you can do
20    to change the work environment so that employees are
21    not afraid to speak up according to your policies?
22       MS. CALEM: Object to the form.
23       THE WITNESS: Again, any incident investigation,
24    you look to capture learnings and grow from it, and
25    yes.

---

Sala Naambwe and Yvette Nimenya v.                                        Scott Reed
Smithfield Foods, Inc.                                                    June 1, 2018

---

**Page 45**

1 BY MS. POCHOP:
2 Q  So what have you learned, personally, from hearing
3     employees -- four employees, plus a union
4     representative, saying that people violate your sexual
5     harassment policy and your prohibition against
6     discriminatory comments and profane language fairly
7     regularly in your work environment and no one reports
8     these?
9        MS. CALEM: Object to the form.
10       THE WITNESS: It's not true that nobody reports
11    these.  We get reports and follow up all the time.
12 BY MS. POCHOP:
13 Q  That isn't really what your HR managers testified to,
14    though, yesterday, is it?
15       MS. CALEM: Object to the form.
16       THE WITNESS: I'm not sure they fully understood
17    the question, but --
18 BY MS. POCHOP:
19 Q  That isn't what they testified about, that they get
20    these all the time and they're used to dealing with
21    race discrimination complaints?
22       MS. CALEM: Object to the form.
23       THE WITNESS: Again, I don't believe they
24    understood the question clearly.
25

---

**Page 46**

1 BY MS. POCHOP:
2 Q  But that was the answer that they gave, both of them?
3 A  Based on what they understood, yes.
4 Q  So what I'd like to know, Mr. Reed, is what you are
5     going to do with the information that you have received
6     during these depositions that -- first of all, what are
7     you going to do about the fact that people in your
8     plant are violating your discrimination policy and are
9     not being reported by managers?
10       MS. CALEM: Object to the form.
11       THE WITNESS: The learnings for me, to date, is
12    to continue to make sure that the expectations are
13    crystal clear.  I think that we have to continue to
14    reinforce that.  I know over the last few years I've
15    put a fair bit of time into meeting with managers,
16    looking them in the eye -- and supervisors --
17    explaining the policy.  I'm in the process of doing
18    that again now.
19       I'm committed to doing that on the plant floor
20    with all employees so they hear it from me, that these
21    are our expectations and that we will not tolerate any
22    illegal activity.  We expect compliance with our
23    policy, and if they have concerns, to come forward.
24 BY MS. POCHOP:
25 Q  So one of the things that you're doing is meeting

---

**Page 47**

1     directly with managers?
2 A  Correct.
3 Q  Anything else?
4 A  Again, as far as learnings, we need to get out and talk
5     to the employees, make sure that they clearly
6     understand it, from me, what the expectations are and
7     how we're there to support compliance and enforcement
8     of our code of conduct.
9 Q  So what do you do so that employees hear that directly
10    from you?
11       MS. CALEM: Object to the form.
12       THE WITNESS: When -- I can give you an example.
13    For example, in October of 2016, I believe, I attended
14    a department 19 staff meeting up in the 7th floor
15    training room, where Yvette and Sala were present and
16    sitting in the front row, and made it very clear what
17    our expectations are and what our policies are around
18    respect in the workplace, a harassment-free workplace.
19    Done that with a number of departments.
20 BY MS. POCHOP:
21 Q  Is one of the impacts on the work environment, when
22    employees and managers aren't following your
23    discrimination policies, that it creates distrust among
24    your workers?
25       MS. CALEM: Object to the form.  Calls for

---

**Page 48**

1     speculation.
2        THE WITNESS: Certainly what was acceptable in the
3     workplace 10 years ago is not acceptable today.  What
4     was acceptable 20 years ago may not have been
5     acceptable 10 years ago.  And it's important we
6     continue to elevate the standards in our facility, and
7     that's very important to me, not only from a
8     harassment-free workplace but also from a safe
9     workplace.  A tremendous amount of effort has been put
10    into improving safety in the plant as well, protecting
11    our workers and our employees from injury.
12 BY MS. POCHOP:
13 Q  Do you believe that failing to follow discrimination
14    policies at Smithfield creates distrust among your
15    workers?
16 A  Oh.
17       MS. CALEM: Object to the form.
18       THE WITNESS: Failure to follow any policy or
19    procedure can create distrust.
20 BY MS. POCHOP:
21 Q  Do you believe that failure to follow your
22    discrimination policies at Smithfield has a negative
23    impact on an employee's job performance?
24       MS. CALEM: Object to the form.  Calls for
25    speculation, incomplete hypothetical.

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

**Page 49**

1    THE WITNESS: If that happens, yes.
2  BY MS. POCHOP:
3   Q  Do you believe that failure to comply with Smithfield's
4      discrimination policy is hurtful to the individual
5      employees that are affected by the noncompliance?
6       MS. CALEM: Object to the form.
7       THE WITNESS: It can be.
8  BY MS. POCHOP:
9   Q  Do you believe that failure to follow Smithfield
10     policies and procedures impacts your ability to retain
11     employees?
12      MS. CALEM: Object to the form.
13      THE WITNESS: Yes.
14  BY MS. POCHOP:
15   Q  Do you believe that an impact of failure to comply with
16     Smithfield harassment and discrimination policies has
17     the impact of escalating into further violence in the
18     workplace?
19      MS. CALEM: Object to the form.
20      THE WITNESS: It has that potential.
21  BY MS. POCHOP:
22   Q  Is a consequence of failure to comply with Smithfield's
23     discrimination policies damage to the company
24     reputation?
25      MS. CALEM: Object to the form.

---

**Page 50**

1    THE WITNESS: Can you repeat that, please.
2  BY MS. POCHOP:
3   Q  Is a consequence of a failure to comply with
4      Smithfield's discrimination policies damage to the
5      company's reputation?
6       MS. CALEM: Object to the form.
7       THE WITNESS: Yes.
8  BY MS. POCHOP:
9   Q  It obviously creates legal risks for the company?
10      MS. CALEM: Object to the form.
11      THE WITNESS: Yes.
12  BY MS. POCHOP:
13   Q  As indicated by us being here today, right?
14   A  Yes.
15   Q  Is there a positive that you can see out of Sala and
16     Yvette's efforts to protect their legal rights to be
17     free from discrimination and retaliation in a legal
18     sense for the company?
19      MS. CALEM: Object to the form.
20      THE WITNESS: Yeah, I'm always the optimist.
21     There's a silver lining in every cloud.
22  BY MS. POCHOP:
23   Q  I'm glad that you see that that way, and I'm wondering
24     what you think the silver lining in this case is.
25   A  Well, I know my staff will grow from the experience of

---

**Page 51**

1    being in a deposition and --
2   Q  How?
3   A  Understanding the process and the importance of the
4      work that they do every day.
5   Q  Are you going to make any procedural changes about how
6      discrimination or retaliation complaints are addressed
7      in your HR department?
8   A  Certainly will be continuing to enforce what my
9      expectations are.
10   Q  In what ways?
11   A  Reviewing them, making sure people understand them --
12   Q  Who?
13   A  -- reinforce --
14      My staff.
15   Q  Anybody in specific?
16   A  I think this is important for all my staff to
17     understand. It's not one where you just say this
18     person or that person. It's everybody.
19   Q  Are there any particular procedural changes that you
20     intend to make as a result of your involvement in this
21     case?
22      MS. CALEM: Object to the form.
23      THE WITNESS: Yeah. I think upon the conclusion
24  of this exercise, we will review and pull together,
25  evaluate learnings and implement them just like we do

---

**Page 52**

1    with any investigation.
2  BY MS. POCHOP:
3   Q  I'm wondering about any specific --
4   A  Specific?
5   Q  -- learnings that you've had.
6       MS. CALEM: Object to the form.
7       THE WITNESS: We provide employees the code of
8      conduct and review it upon hire, we review it annually,
9      but there's a few individuals that weren't familiar
10     with the code of conduct. So, making that more
11     accessible to folks.
12  BY MS. POCHOP:
13   Q  What individuals did you think weren't familiar with
14     the code of conduct?
15   A  There was some question whether Sala and Yvette had
16     seen the code of conduct in their testimony.
17   Q  Anybody else in your company that, during the course of
18     this deposition, you wondered about their understanding
19     of the code of conduct?
20      MS. CALEM: Object to the form of the question.
21      THE WITNESS: Yes. Russ Hultman.
22  BY MS. POCHOP:
23   Q  In what ways do you think that Russ's testimony
24     indicates that he needs a better understanding of your
25     code of conduct?

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 57

1    name. I'm not even sure if she knew Scott's name or
2    not at that time.
3    BY MS. POCHOP:
4    Q   Did you hear any testimony from Carrie about what your
5        manager represented to her about the reason that the
6        employees were in the HR department in the first place?
7    A   Yeah, there was mention of the word bitch.
8    Q   Did you hear her testimony that she did not think that
9        that was an accurate representation of the information
10       that Russ had about what the reason for the report was?
11   A   Yes.
12   Q   Would you agree with your HR manager that when Russ
13       Hultman told Carrie Moate that these three women were
14       at the HR department to make a report about another
15       employee, that he was materially inaccurate in
16       suggesting that they were there because Scott had
17       called somebody a bitch?
18       MS. CALEM: Object to the form.
19       THE WITNESS: Russ did not disclose the entire
20       context of the incident.
21   BY MS. POCHOP:
22   Q   Did Russ have an obligation as a manager, under the
23       Speak Up and Do the Right Thing policies, to accurately
24       disclose to Carrie why Lorena, Sala, and Yvette would
25       be in the HR department filling out an incident form?

Page 58

1        MS. CALEM: Object to the form.
2        THE WITNESS: Yes.
3    BY MS. POCHOP:
4    Q   Has Russ ever been disciplined for his failure to
5        follow that policy?
6    A   No. In reviewing what happened, there was -- again,
7        parties took action to stop the behavior and address it
8        in compliance with the law. I don't -- as far as did
9        they do it in a manner that met my expectations or --
10       no. Dave Hillberg, Carrie, and Russ did not
11       communicate amongst themselves to the extent that I
12       believe they should have.
13   Q   Have either Carrie -- has Carrie been investigated or
14       disciplined about her failure to meet your
15       expectations?
16   A   I met with all three of those individuals and walked
17       through the incident and provided coaching and
18       reinforced expectations with them as to what I would
19       like to have seen happen.
20   Q   Did Russ's reaction as a manager, when Sala, Yvette,
21       and Lorena reported that they had been subject to or
22       heard racist remarks in the workplace, meet Smithfield
23       policy?
24       MS. CALEM: Object to the form.
25       THE WITNESS: I think in their minds, to the low

Page 59

1        end of the standard, yes. To where I believe it should
2        be, no.
3    BY MS. POCHOP:
4    Q   What about according to the training and the actual
5        language of the policy, did Russ's behavior meet
6        Smithfield policy?
7    A   To the minimum standards at that time, perhaps.
8    Q   How does meeting with an -- well, tell me how he met
9        the minimum standards.
10   A   Again, there was actions taken to investigate, stop,
11       and -- stop the behavior and discipline Scott.
12       Supervisors have the ability to issue disciplines up to
13       the level of verbal and written warnings. Suspensions
14       need to go through HR and above.
15   Q   Is it your understanding that the chronology is that
16       Scott made racist and threatening, intimidating,
17       bullying remarks in the workplace to Sala and Yvette?
18   A   Absolutely, yes, they're inappropriate.
19   Q   And they're obvious violations of company harassment
20       policy, the way your supervisors and managers and
21       employees are trained every year?
22   A   Correct.
23   Q   Is it your understanding of the facts that the next
24       thing that happened was that Sala, Yvette, and Lorena
25       reported that they had been subject to a violation of

Page 60

1        the discrimination policy to Russ Hultman?
2    A   Yes.
3    Q   And, again, that's consistent with the training that
4        they receive about Speak Up --
5    A   Yes.
6    Q   -- and they actually reported that directly to their
7        manager the following day?
8    A   Uh-huh.
9    Q   Is it your understanding of the facts that the next
10       thing that happened was that Russ had a meeting between
11       Sala, Yvette, Lorena, and Scott in his office or in
12       department 19 on Saturday?
13   A   Yes.
14   Q   And that during that meeting he became aware that Scott
15       had made racist remarks to Sala and Yvette by calling
16       them monkeys?
17   A   Yes.
18   Q   That he had hollered at them and used profanity toward
19       them?
20   A   Yes.
21   Q   That he had frightened them and that they were upset --
22   A   Yes.
23   Q   -- by Scott's behavior. Yes?
24   A   Yes.
25   Q   Is it your understanding that Russ was aware that Scott

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 61

1     had also said they needed to go back to their own
2     country?
3   A  Yes.
4   Q  That's a violation -- another violation of the
5     discrimination policy, right?
6   A  Yes.
7   Q  Is it a violation of the company policy that he
8     hollered at them because they were speaking to each
9     other in Swahili?
10  A  It was inappropriate.
11  Q  Well, you, yourself, have told Yvette that she should
12    speak in English in the workplace, haven't you?
13       MS. CALEM: Object to the form.
14       THE WITNESS: Well, if it's related to a work -- I
15    don't recall saying that.
16  BY MS. POCHOP:
17  Q  There isn't any policy or procedure at Smithfield that
18    requires employees communicating with each other in
19    their common language to speak English, is there?
20       MS. CALEM: Object to the form.
21       THE WITNESS: No. There is specific jobs that
22    require a basic understanding of reading and writing in
23    English to perform those jobs. But as far as
24    communications, no.
25

Page 62

1   BY MS. POCHOP:
2   Q  Right. And if two employees both speak Swahili and
3     they want to communicate with each other in Swahili,
4     there's nothing wrong with that, is there?
5   A  No, absolutely not.
6   Q  And, in fact, telling them that they need to speak
7     English when they communicate with each other is
8     contrary to the company's diversity and affirmative
9     action recruitment efforts, isn't it?
10       MS. CALEM: Object to the form.
11       THE WITNESS: From a recruitment perspective -- I
12    don't see the correlation to recruitment, but, no,
13    individuals are free to speak their language in the
14    workplace.
15  BY MS. POCHOP:
16  Q  So the notes that we have of the reaction -- that
17    Russ's reaction on Saturday was that there was no
18    action taken other than having a meeting with Scott,
19    Yvette, and Sala?
20       MS. CALEM: Object to the form.
21       THE WITNESS: Yeah, it was my understanding that
22    they were to report -- there was a plan to report it to
23    HR on Monday.
24  BY MS. POCHOP:
25  Q  And is it also your understanding that Russ thought

Page 63

1     that the issue had been resolved on Saturday?
2   A  I still am confused around that statement.
3   Q  It's documented in company records about Russ's
4     reaction to this report?
5   A  Uh-huh. I'm confused about that.
6   Q  Because -- are you confused about why that statement is
7     in your records, or are you confused about why Russ
8     would not have a -- why he would think that simply
9     having a meeting about that behavior would resolve the
10    issue?
11       MS. CALEM: Object to the form.
12       THE WITNESS: Yeah, I really don't know what that
13    means.
14  BY MS. POCHOP:
15  Q  Was Russ's reaction to not take any further action and
16    say, I thought the matter was resolved, consistent with
17    Smithfield disciplinary policy?
18  A  No.
19  Q  Do you know why your notes, your company notes, like
20    Exhibit 49, and the notes that I believe you kept from
21    the Genzler report, indicate that Russ thought that
22    having the meeting had resolved the complaint?
23  A  As far as these notes, I did try to find where these
24    notes came from, and I believe --
25  Q  Exhibit 49?

Page 64

1   A  Yeah.
2   Q  Are these yours?
3   A  These notes were -- I believe they were submitted to
4     the NLRB.
5   Q  From whom?
6   A  They look like a compilation of the notes that I
7     provided and other people.
8   Q  Are they accurate?
9   A  I'd have to go through each -- each one, each bullet.
10  Q  If they were submitted to the NLRB, can I assume that
11    your company would be as accurate as possible in making
12    a representation to that agency?
13  A  Yes, that would be the intent for sure, be as accurate
14    as possible.
15  Q  What did you do when you found out that Russ had
16    determined that it was sufficient to simply have a
17    meeting and not take any discipline out of this
18    issue -- out of this matter with Scott Genzler, Sala,
19    and Yvette on Saturday?
20       MS. CALEM: Object to the form.
21       THE WITNESS: When I became aware of the incident,
22    I met with Russ, met with Carrie, asked Carrie to
23    prepare a summary of events. I called a meeting with
24    the president of the union, Jim Larson, the
25    secretary-treasurer, BJ, a business agent, Ian Strum,

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 65

1    Dave Hillberg, Steve Fergen, and conducted an
2    investigation. Reviewed it, reviewed the notes. Met
3    with Scott Genzler, met with Sala. Asked Sala to come
4    up and explain what had happened in her words.
5         I believed that the discipline to Scott Genzler
6    was insufficient, I clearly believed that, for his
7    actions, and notified the union that I intended to
8    suspend him for his behavior. There was a lot of
9    resistance to that from the union. I said, well, hey,
10   we need to make sure, based on what had transpired to
11   date, that we do the right thing, and I notified the
12   union that it was -- that the warnings for Lorena,
13   Sala, and Yvette would be pulled from their file for
14   not reporting back to the line and had worked with Russ
15   to give him the opportunity to communicate that to the
16   ladies.
17        After discussions with the union, we came to an
18   agreement on a strategy, a plan of action to do the
19   right thing, in addition to removing the discipline. I
20   thought it was appropriate for Carrie to follow up with
21   Sala, Yvette, and Lorena a few days later to see how
22   they were doing, make sure they were okay, if they had
23   any other concerns.
24        Reviewed Scott Genzler's file. Scott was removed
25   from the PIT committee. Scott was also disciplined for

Page 66

1    failure to follow company procedures around proper
2    gating in/gating out. It was identified that he was
3    negligent in that area.
4         I talked directly with Scott, with the union
5    president, and reinforced that his actions and comments
6    were inappropriate, would not be tolerated, any future
7    behavior would result in his loss of employment. Scott
8    demonstrated remorse for his actions.
9         Dave Hillberg, I provided him the opportunity to
10   meet with the team, the entire team, and review
11   expectations of courtesy and respect in the workplace.
12   Instructed Dave to make additional tours of the area to
13   check up on Sala and Yvette and Lorena.
14        During the incident investigation, Tom Anderson
15   had made some concerning comments. He said that if
16   somebody said those names to him, he would be violent
17   towards them, and the union committed to follow up with
18   Tom and reinforce the importance of not having violence
19   or threats of violence in the workplace.
20        Part of the plan was for the union to spend
21   additional time in the area to make sure that the three
22   ladies were okay, that there was no follow-up concerns,
23   and to continue to check up -- both Dave and the union,
24   to check up on Mr. Genzler to make sure that his
25   behavior was not repeated.

Page 67

1    BY MS. POCHOP:
2    Q   What have you done to follow up on the reason why Russ
3        would describe this incident as -- summarize it as
4        somebody being called a bitch, to the HR manager?
5    A   Reviewed with Russ the expectation of reporting
6        incidents in a timely manner and completely -- fully
7        and completely in a timely manner; the expectations,
8        reinforced with Russ, as well as reviewed our
9        expectations around respectful conduct in the
10       workplace.
11   Q   The double jeopardy issue with Scott Genzler is a
12       direct result of Russ Hultman failing to accurately
13       provide information to the HR department, right?
14   A   Yes, I see -- I'll be honest -- I'm certainly honest --
15       I see Russ, Carrie, and Dave all had learnings from
16       this event, as well as myself.
17   Q   And Carrie testified yesterday that the discipline that
18       Scott Genzler received from Russ -- which, by the way,
19       had to be directed from HR. That's true, isn't it?
20   A   The supervisors have the discretion, on written and
21       verbal reprimands, to issue those. Suspensions and
22       above require -- are performed through the HR group.
23   Q   Right. And Russ decided to issue a written warning,
24       which is certainly within his discretion to do, on
25       Saturday at their meeting, right?

Page 68

1    A   I think he issued that on Monday, not Saturday.
2    Q   Right. But he could have issued a warning -- if all he
3        was going to do was give a written or verbal warning,
4        he could have done that on Saturday when these
5        employees first came to him?
6    A   Yes, that's the highest level of discipline that he can
7        perform.
8    Q   And, nonetheless, he opted not to do either, right?
9            MS. CALEM: Object to the form.
10           THE WITNESS: Do either?
11   BY MS. POCHOP:
12   Q   He didn't issue any discipline on Saturday?
13   A   On Saturday, no. No, he did not.
14   Q   In fact, he didn't accurately report to your HR
15       department on Monday when actually talking to the HR
16       manager about what Scott had done in the workplace.
17       That's true too, isn't it?
18   A   He didn't fully disclose the content of his email later
19       in the day, in the morning.
20   Q   And then he had -- according to the notes that your
21       company kept, he had to be instructed to issue a
22       discipline to Russ -- or to Scott?
23   A   Carrie instructed him to discipline.
24   Q   Because he still hadn't issued a discipline for an
25       obvious violation of company policy.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

**Page 69**

1    MS. CALEM: Object to the form.
2    THE WITNESS: He hadn't on Monday morning, no.
3 BY MS. POCHOP:
4 Q  Have you done any -- have you had any discussions with
5    Russ about why he would be confused about whether
6    Scott's actions would warrant a disciplinary action?
7    MS. CALEM: Object to the form.
8    THE WITNESS: Yes.  After the incident, yes.
9 BY MS. POCHOP:
10 Q  Tell me about your discussion with Russ about his
11    decision not to issue any verbal or written warning
12    until directed to do so.
13 A  Russ was waiting for guidance from HR.
14 Q  Did Russ tell you that he thought the matter had been
15    resolved on Saturday at the meeting?
16 A  No.
17 Q  So you're just assuming that Russ was waiting for a
18    directive from HR?
19 A  No.  That's what Russ told me.
20 Q  And then when Russ did issue a disciplinary action, you
21    and Carrie later discovered that it was not sufficient
22    discipline?
23 A  I can speak for myself.  I did not believe it was
24    sufficient, no.  No, I believe that Scott should have
25    been suspended.

**Page 70**

1 Q  And, in fact, it was how Russ decided to discipline for
2    this -- discipline Scott for this action that created
3    the double jeopardy issue that you later ran into with
4    the union?
5    MS. CALEM: Objection.  Asked and answered.
6    THE WITNESS: Yes.  That discipline that was
7    issued on Monday created the double jeopardy, yes.
8 BY MS. POCHOP:
9 Q  Did you have concerns -- have you had concerns about
10    how Russ is interpreting your policy when he was the
11    cause of an issue with the union about discipline
12    because of the way he decided to discipline Scott
13    Genzler?
14    MS. CALEM: Object to the form.
15    THE WITNESS: Again, I think there was learnings
16    for Dave Hillberg, Carrie, and Russ around this
17    incident and how it should have been handled.
18 BY MS. POCHOP:
19 Q  What was Dave Hillberg's learnings from the incident?
20 A  Dave -- the same for all three is that a decision
21    around discipline should not have taken place until it
22    was very clear that all three had the same set of
23    facts.  That's the learning for me.
24 Q  You told me that Russ expressed to you that he was
25    waiting for a directive from HR before issuing a

**Page 71**

1    disciplinary action?
2 A  Yes.
3 Q  And that he issued Exhibit 16 based on a directive from
4    HR?
5 A  That was my understanding from talking to Russ, is that
6    Carrie had suggested -- or told him to issue the
7    discipline.
8 Q  So the decision to issue Exhibit 16, the disciplinary
9    action that is a written warning, came from Carrie
10    Moate?
11    MS. CALEM: Object to the form.
12    THE WITNESS: Based on the information that Carrie
13    had at the time, she instructed -- I believe she
14    instructed Russ to issue discipline.
15 BY MS. POCHOP:
16 Q  And so Carrie Moate directed Russ to issue discipline
17    without having all of the material facts?
18    MS. CALEM: Object to the form.
19    THE WITNESS: Yes.
20 BY MS. POCHOP:
21 Q  Is that a violation of company disciplinary policy?
22 A  Well, at the time, I believe Carrie thought she
23    understood what the facts were.
24 Q  Does she have an obligation to investigate before
25    employees are disciplined?

**Page 72**

1    MS. CALEM: Object to the form.
2    THE WITNESS: Yes.
3 BY MS. POCHOP:
4 Q  Did she properly investigate the facts of Sala, Yvette,
5    and Lorena being in the HR department before she issued
6    or approved of a discipline for them?
7 A  No.  I don't think the situation was addressed
8    properly, no.
9 Q  She had a duty as an HR manager to actually investigate
10    the facts before she made a decision about discipline,
11    didn't she?
12    MS. CALEM: Object to the form.
13    THE WITNESS: Yes.  Carrie was leaving the
14    department at the time to complete an urgent task,
15    which is get payroll done Monday morning, and I don't
16    think she -- she did not have all the information that
17    she needed to counsel Russ.
18 BY MS. POCHOP:
19 Q  And it was her responsibility to take the time and get
20    that information rather than just issue a disciplinary
21    action for three employees who were in the HR
22    department making a complaint, right?
23    MS. CALEM: Object to the form.
24    THE WITNESS: Yes, I would expect her to have that
25    information.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 73

1 BY MS. POCHOP:
2 Q   And did Carrie also fail to properly investigate and
3       gather the material facts about Scott Genzler's
4       behavior before she made a recommendation about his
5       disciplinary action?
6 A   I thought that's what we were talking about.
7 Q   I was talking about -- let me make sure and clarify
8       this, because this one is important to me.
9 A   Uh-huh.
10 Q   Did Carrie Moate fulfill her obligations as an HR
11       manager when she directed that Lorena, Sala, and Yvette
12       should be issued a discipline for being in the HR
13       office?  Had she properly investigated that matter?
14          MS. CALEM: Object to the form.
15          THE WITNESS: No, I don't think Carrie had all the
16       information, but based on the information that she had,
17       and assuming that information was correct, then her
18       response was not improper.
19 BY MS. POCHOP:
20 Q   But isn't it her job to make sure that she has -- isn't
21       the very nature of her job as the HR manager to make
22       sure that she has all of the material facts before a
23       disciplinary action is directed by her from HR?
24 A   Again, yes, there was learnings for Dave, Carrie, and
25       Russ on this event.

---

Page 74

1 Q   And did the learnings that Carrie got from approving a
2       discipline for these three women result in any
3       disciplinary action for Carrie?
4 A   I spent time with each of the three individuals
5       coaching, reinforcing expectations, reviewing the
6       incident.
7          As far as formal documented discipline, no.
8 Q   And was it also Carrie's basic job responsibility to
9       find out all of the material facts about what Scott
10       Genzler had done before she issued a directive about
11       what his discipline should be?
12 A   Yes.
13 Q   And did Carrie fulfill her basic job duties as an HR
14       manager when she directed a written warning for him
15       based on the incident that had occurred on February 19,
16       2016?
17          MS. CALEM: Object to the form.
18          THE WITNESS: Based on the information she had,
19       she felt that was the right decision.  I don't believe
20       it was the right decision.
21 BY MS. POCHOP:
22 Q   Well, we know the information that she had was
23       materially lacking, right?
24 A   Correct.
25 Q   And we also know that it's Carrie's job to get the

---

Page 75

1       accurate information --
2 A   Correct.
3 Q   -- before a discipline?
4 A   Yes.
5 Q   That's an obligation under the union contract, correct?
6 A   Yes.
7 Q   And that is an obligation under the general Smithfield
8       policies and procedures?
9 A   Yes.
10 Q   If anyone involved in the Genzler incident was going to
11       have material facts at hand to make a decision about
12       discipline, it should have been Carrie, true?
13          MS. CALEM: Object to the form.
14          THE WITNESS: Yes.
15 BY MS. POCHOP:
16 Q   And she didn't, did she?
17 A   No.
18 Q   She didn't do it when the women were disciplined?
19          MS. CALEM: Object to the form.
20 BY MS. POCHOP:
21 Q   She didn't get the material facts before she approved a
22       discipline for these three women?
23 A   No.
24 Q   She didn't get the material facts before she approved a
25       discipline for Scott Genzler?

---

Page 76

1 A   No.
2 Q   She didn't report to you that Russ Hultman, a manager,
3       had not provided her with accurate information?
4 A   No.
5 Q   And she didn't get any disciplinary action.
6 A   No.
7 Q   Even though she failed at least three ways to fulfill
8       basic job duty as an HR manager.
9          MS. CALEM: Object to the form.
10 BY MS. POCHOP:
11 Q   She failed in three ways to fulfill her job duty in
12       this one incident, didn't she?
13 A   Yes.  And, again, I reviewed the context of that
14       failure.
15 Q   And you decided that what should happen to her for
16       failing to fulfill a basic job duty was coaching?
17 A   Yes.  Dave, Carrie, and Russ.
18 Q   Because Russ didn't ever receive a disciplinary action
19       for his failure to provide accurate information to HR,
20       did he?
21 A   Correct.
22 Q   And was that a basic responsibility that Russ has as a
23       manager, to provide accurate information about
24       discrimination in the workplace when he communicates to
25       HR managers?

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

**Page 77**

1  A  Correct.
2  Q  Was it a basic job responsibility of Russ's to
3     immediately address a complaint of race discrimination
4     in the workplace?
5  A  And I believe Russ did that.  He called the
6     investigation, collected the data, had the witnesses --
7     take their statements.
8  Q  Did Russ take a witness statement from Lorena?
9  A  I believe he had Sala review what happened.
10 Q  So did he take a witness statement from Lorena?
11 A  I don't -- I don't know.  I don't recall.
12 Q  Well, you just told me that he took witness --
13 A  Well, he gathered the individuals together to find out
14    what happened.
15 Q  Did anybody ever interview Becky Kaufman, who was also
16    a witness to this incident?
17 A  I think, talking to Sala and Scott, the facts were very
18    clear.
19 Q  Was it ever disputed that --
20 A  No, it wasn't disputed.  No.
21 Q  Sala and Yvette have been very accurate in how they
22    reported Scott's behavior, haven't they?
23 A  In this example, yes.  This is very clear.
24 Q  And Becky Kaufman -- is the answer to my question about
25    whether Becky Kaufman was ever interviewed by anybody

**Page 78**

1     in HR no?
2  A  I don't recall Becky being interviewed.
3  Q  And who would have made the determination that she
4     should not have been interviewed about her
5     observations?
6  A  Conducting the interviews, that decision is generally
7     made jointly by the HR representative in the interview
8     as well as the union person in the interviews.  We ask,
9     is there anybody else we should interview?  We talk
10    about it, and if the facts are not in dispute, we may
11    not interview additional people.
12 Q  Is Becky Kaufman obligated to report discriminatory
13    behavior under Smithfield policy?
14 A  All employees.
15 Q  Did Becky Kaufman make any report of the discriminatory
16    behavior that she had, at a minimum, witnessed on
17    February 19, 2016?
18 A  The Scott Genzler?
19 Q  Yeah, the Scott Genzler incident.
20 A  I don't know if she did or not to Russ.  I don't know.
21 Q  Well, if she did, it should be in your company minutes
22    about -- notes about your investigation, shouldn't it?
23       MS. CALEM: Object to the form.
24       THE WITNESS: If she was in HR, we would have
25    captured it, yes.

**Page 79**

1  BY MS. POCHOP:
2  Q  And whose responsibility would it be to follow up and
3     make sure that Becky understood her obligations as a
4     Smithfield employee?
5  A  Well, in this case, it became very apparent that the
6     issue -- at least on Thursday and through the follow-up
7     discussions about the circumstances and the sequence of
8     events, that if there's no dispute on the material
9     facts, I'm not sure that additional witnesses would be
10    called.
11 Q  Is Becky Kaufman trained that she has an obligation to
12    speak up and do the right thing when she witnesses
13    discrimination in the workplace?
14 A  Yes.
15 Q  Did she meet her obligation as a Smithfield employee
16    when she witnessed Scott Genzler making racist,
17    intimidating, and bullying remarks to her coworkers?
18       MS. CALEM: Object to the form.
19       THE WITNESS: Well, I think the -- well, I can
20    only make assumptions.  One assumption would be that
21    Becky was aware that the incident was being reported by
22    Sala and Yvette and Lorena.  If an event happens and a
23    hundred people witness it, I would not expect a hundred
24    people to report the event if they know the event was
25    being reported.

**Page 80**

1  BY MS. POCHOP:
2  Q  Under the training they receive, they are told that
3     it's their duty and responsibility to report it, right?
4  A  Right.
5  Q  And so what, I guess, you're telling me is that you
6     know that some employees are not going to follow what
7     your training is?
8       MS. CALEM: Object to the form.  This line of
9     questioning is sort of beating a dead horse.  It's
10    harassing.
11      THE WITNESS: I think there's also a test of
12    reasonableness.  Is it reasonable to report an incident
13    when the people directly impacted by it have already
14    reported it and that person knows that they reported
15    it?
16 BY MS. POCHOP:
17 Q  But the problem that we have is that you're relying on
18    assumptions about why Becky didn't report, right?
19 A  Yeah.  I don't know.
20 Q  You're making an assumption that Becky didn't come
21    report this violation because she thought somebody else
22    was going to do it?
23      MS. CALEM: Object to the form.  And you're making
24    the contrary assumption as a foundation of your
25    question.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

**Page 81**

1    THE WITNESS: I'm sorry.  What's the question?

2  BY MS. POCHOP:

3  Q  Is there any record that you have that Becky Kaufman

4    ever reported this obvious violation of company policy?

5  A  Not that I'm aware of.

6  Q  And whose responsibility would it be to know whether

7    Becky had made a report about an obvious violation of

8    the company discrimination policy?

9    MS. CALEM: Object to the form.  And it's sort of

10    like proving a negative.

11    THE WITNESS: So who's -- can you repeat the

12    question again?  Who's responsible --

13  BY MS. POCHOP:

14  Q  Who's responsible to know whether Becky made a report

15    or not?

16    MS. CALEM: Object to the form.

17    THE WITNESS: I'm not aware that she did.

18  BY MS. POCHOP:

19  Q  If she did, would there be a record of it?

20  A  If she did to HR, I'd expect that -- yes.

21  Q  Yes.  That's part of the documentation policy at

22    Smithfield, isn't it?

23  A  Correct.  Yes.

24  Q  It's part of the investigation policy at Smithfield,

25    isn't it?

---

**Page 82**

1    MS. CALEM: Object to the form.

2    THE WITNESS: If there's a complaint, it should be

3    documented, yes.

4  BY MS. POCHOP:

5  Q  And there's no documentation that Becky ever reported

6    the obvious policy violation?

7  A  Not that I aware of, no.

8  Q  And there's no record that anybody in management ever

9    even interviewed Becky about witnessing an obvious

10    policy violation?

11    MS. CALEM: Object to the form.

12    THE WITNESS: Not that I'm aware of, no.

13  BY MS. POCHOP:

14  Q  And isn't it a violation of your investigation policy

15    that Becky wasn't at least interviewed?

16  A  No.

17  Q  And why wouldn't she be interviewed?

18  A  As I explained before, the material facts were not in

19    dispute between Scott Genzler, Sala, and Yvette.

20  Q  Should she have been interviewed about why she didn't

21    follow company policy and speak up?

22    MS. CALEM: Object to the form.

23    THE WITNESS: No.

24  BY MS. POCHOP:

25  Q  Did you participate in the response that was presented

---

**Page 83**

1    by Smithfield Foods to the EEOC describing the material

2    facts of the Genzler complaint?

3    MS. CALEM: Object and instruct him not to answer

4    because of attorney-client privilege.

5    MS. POCHOP: Okay.

6  BY MS. POCHOP:

7  Q  Do you know what materials were provided to the EEO in

8    response to Sala and Yvette's complaint?

9  A  I have not seen the entire packet, no.

10  Q  I'm going to show you a copy of Exhibit 8 just for

11    your --

12  A  Okay.  Yep.

13  Q  This is a memo from you to Scott -- or to Russ Hultman?

14  A  Russ, yep.

15  Q  And by this time, on March 3rd, you would have been

16    aware that -- because this discipline was issued on

17    February 22, you were aware of the double jeopardy

18    problem that had arisen because of the way Scott was

19    disciplined by this point, correct?

20  A  Yes.

21  Q  And even though you knew that Russ had not been

22    accurate with Carrie by this point, you still had Russ

23    involved in documenting and making notes for your file

24    on this report of discrimination, according to

25    Exhibit 8, right?

---

**Page 84**

1  A  Yes.  I wanted to make sure that Russ closed the loop

2    on the removal of the warnings from Sala, Lorena's and

3    Yvette's file.  And I thought it was important that he

4    did that.  We had notified the union.  I didn't know if

5    the union had notified the individuals or not, but I

6    wanted to make sure that it was clearly documented that

7    Russ had met with each of them and removed the

8    discipline that he placed on their file.

9  Q  And did Russ tell you that he did that?

10  A  I received this back from Russ confirming.

11  Q  It's a handwritten note on -- is this Russ's

12    handwriting in Exhibit 8?

13  A  As far as I know, yes.

14  Q  So I'm wondering, how did this handwriting get into

15    your email?

16  A  Oh, I emailed this to Russ.  Russ printed it off and

17    filled it in.  I know that Russ -- I don't receive

18    a lot of emails from Russ, and I wanted to make it very

19    clear what I expected from him is that he meet,

20    document, so I provided this as an example of the

21    documentation I expected.

22    He printed it off and filled it in and returned it

23    to me, which was a surprise, but that's what he chose

24    to do.

25  Q  And when you received his response to your request that

---

**Paramount Reporting ~ Audrey M. Barbush, RPR**
**605.321.3539 ~ audrey@paramountreporting.com**

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 85

1  he make good notes on this matter, did you notice that
2  he doesn't even have the dates of the meetings correct?
3  A  What was said on the line on Friday, February 26th --
4  Q  Right.
5  A  -- versus the 22nd?
6  Q  19th.
7  A  Or 19th?  Oh, Monday was the 22nd.
8  Q  Right.  Did you notice that he didn't even have the
9     right dates for these meetings?
10 A  I did not.
11 Q  Did you notice that he didn't bother filling in the
12    date about when the verbal reprimand that had been
13    issued would be removed from their files?
14    MS. CALEM:  Object to the form.  That's not --
15    THE WITNESS:  Yeah, the intent was to make sure
16 that Russ had the conversation with the individuals and
17 removed the documents.
18 BY MS. POCHOP:
19 Q  Did you provide him this format about what information
20    you needed in response to Exhibit 8?
21 A  Yeah, this is my email to him on the 3rd.  It says,
22    "Please send me notes from your meeting with the
23    employees last week to close off the file.  Who's in
24    the meeting, key messages.  It is important to have
25    good notes on this.  Thank you, Russ."

---

Page 86

1  Q  Did you type up the next section that says the meeting
2     time --
3  A  Yeah.
4  Q  -- and location?
5  A  Yeah.
6  Q  Did you type in the statement that said, "Notify ladies
7     that verbal reprimand issued to," and then there's a
8     blank, "would be removed from their files"?
9  A  Yes.  That's what I wanted to make sure that he did,
10    that he had that contact with them and let them know.
11 Q  So you didn't really even know if Russ had done this;
12    you just assumed it and typed it in as an action that
13    he took?
14    MS. CALEM:  Objection to the form.
15    THE WITNESS:  No.  I instructed him -- I was
16 following up -- I previously instructed him to make
17 sure he did it, communicated to him -- because we had
18 removed the notes from their files.  We had informed
19 the union.  But, again, I wanted to make sure that Russ
20 had that contact with the three individuals and
21 communicated it to them, and I wanted Russ to document
22 that back, that he completed that task.
23 BY MS. POCHOP:
24 Q  Why were you communicating with Gary Loger about
25    suspensions?

---

Page 87

1  A  I don't know.  That looks like a -- I don't know what
2     that email --
3  Q  Why would there be an email between you and Gary Loger
4     on February 29th regarding suspensions in relation to
5     Lorena Morales, Yvette, and Sala?
6  A  I have no idea why it said suspensions.  Nobody was
7     suspended.  I know Gary was away the day that the
8     incident happened.  I may have asked Gary for
9     confirmation of -- I just don't know.  It doesn't make
10    any sense to me.
11 Q  You state in Exhibit 8, "It is important to have good
12    notes on this."
13    Why was it important to have good notes on this
14    incident?
15 A  I wanted to reinforce the importance of the actions
16 that we were taking to try and do the right thing.
17 Q  Is the fact that Russ's response doesn't even have the
18    correct dates an indication to you that you do not have
19    good notes on this event?
20    MS. CALEM:  Objection to the form.
21    THE WITNESS:  On the event of Russ communicating
22 to Sala and Yvette?
23 BY MS. POCHOP:
24 Q  On your meeting with the employees last week.
25 A  Yeah, the dates -- I'm not sure if he -- if his

---

Page 88

1  intention was that the -- I don't know what --
2  Q  As his manager, is it your responsibility to correct
3     him when he's not even providing correct incident dates
4     when you give him an explicit directive to do so?
5     MS. CALEM:  Objection to the form and the
6  assumption that he is Russ's manager.
7     THE WITNESS:  Yeah, I'm not Russ's direct manager.
8  BY MS. POCHOP:
9  Q  As the HR director, you have management responsibility
10    for how he complies with HR policies, don't you?
11 A  Yes.
12 Q  So in that context, was it your responsibility to make
13    sure that Russ provided accurate information when he
14    was relating what happened to you as an HR director?
15 A  I expected -- I would expect Russ to provide accurate
16    notes, yes.
17 Q  And he did not?
18 A  I don't understand his notes, no.  They don't make --
19 Q  There wasn't any report of anything said on the line on
20    Friday, February 26th, that I know of.  Is there some
21    other incident?
22 A  Maybe that was the date that he met with Sala and
23    Yvette.  I don't know.
24 Q  Well --
25 A  So maybe his -- I don't know what his intentions were.

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 89

1   It may be that his intentions were, as I read it, that
2   he met with the ladies on the line on Friday,
3   February 26th, and said that he'd make sure that those
4   reprimands got removed the following Monday.  I don't
5   know.
6   Q  Well, as the HR director who is now directly involved
7   in --
8   A  Yeah.
9   Q  -- the documentation, investigation, and follow-up of
10  this race discrimination claim, did you read Exhibit 8
11  when Russ provided it to you?
12  A  Yes.
13  Q  Did you follow up on what was said on the line on
14  Friday, February 26th?
15  A  Did I follow up with Russ --
16  Q  Right.
17  A  -- on this?
18     No, I did not follow up on this, not with Russ.
19  Q  Do you know if there was something that was said on the
20  line on February 26th?
21     MS. CALEM: Object to the form.
22     THE WITNESS: I don't know if that's the date
23  that -- I don't know if that's the date that he met
24  with folks.  No, I don't know.
25

Page 90

1   BY MS. POCHOP:
2   Q  Well, his handwriting says that one of the things that
3   he talked about was what was said on the line on
4   February 26th?
5   A  Yeah, I don't know -- I don't know what was said.
6   Q  And is it your responsibility as the HR manager [sic]
7   at Smithfield who is investigating this to find out if
8   there was something said on the line on Friday,
9   February 26th?
10     MS. CALEM: Object to the form.
11     THE WITNESS: In this context, I'd say no.
12  BY MS. POCHOP:
13  Q  What did you discuss with Russ when he said that "we
14  would take care of it on Monday, February 29th"?
15  A  I did not follow up with Russ on this note.
16  Q  So one way to look at this is that something happened
17  on the line on February 26th and that there would be
18  follow-up on February 29th and you don't know what that
19  is, right?
20     MS. CALEM: Object to the form.
21     THE WITNESS: No.  The other -- you know, the
22  other scenario was that he talked to them on the 26th
23  that he removed the -- that he committed to remove the
24  disciplines or get that looked after on the 29th.  I
25  don't know for sure.

Page 91

1   BY MS. POCHOP:
2   Q  And whose responsibility at Smithfield is it to know
3   that for sure about how employees are being
4   disciplined?
5      MS. CALEM: Object to the form.
6      THE WITNESS: Well, my intent with this was to
7   make sure that Russ met with the individuals and notify
8   them that the discipline was being removed from their
9   file.
10  BY MS. POCHOP:
11  Q  After the Genzler incident, there was follow-up with
12  Sala and Yvette about how their workplace was operating
13  for them from Carrie?
14  A  Yes.
15  Q  During that follow-up, Sala made reports to Carrie
16  Moate -- well, actually, it looks like she made the
17  report to you on April 4, 2016, that she was
18  complaining that she had to work with Juan Ogaldez and
19  that she had complaints about Gary.
20     MS. CALEM: Do you have an exhibit number you're
21  looking at?
22     MS. POCHOP: 28.
23  BY MS. POCHOP:
24  Q  Do you remember that?
25  A  Exhibit 28.  This is April 4th, 2016?

Page 92

1   Q  Yes.
2   A  Yes, I recall this event.
3   Q  So you were aware that Sala had -- after she made this
4   report about Scott Genzler, that she felt that she was
5   being reassigned to work with Juan Ogaldez as
6   retaliation for making a complaint?
7      MS. CALEM: Object to the form of the question.
8   Lacks foundation.
9      THE WITNESS: I did not -- Sala did put forth the
10  concern that she did not want to work with Juan.  As
11  far as that being a retaliation, I didn't understand it
12  in that context, no.
13  BY MS. POCHOP:
14  Q  She and Juan had not been required to work together for
15  at least a year and a half after their sexual
16  harassment report was addressed by Smithfield, right?
17     MS. CALEM: Objection.
18     THE WITNESS: I don't know if that's a fact or
19  not, no.
20  BY MS. POCHOP:
21  Q  Whose responsibility is it to know if that's a fact?
22     MS. CALEM: Object to the form.
23     THE WITNESS: Well, based on Sala's concern, I
24  reviewed the notes from the 2014 incident.  I didn't --
25  there was no commitment made in 2014 that they would

Paramount Reporting ~ Audrey M. Barbush, RPR
605.321.3539 ~ audrey@paramountreporting.com

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 93

1  not work together ever.
2      I reviewed that with BJ. BJ reviewed the notes
3  from the union, and he confirmed as well that those
4  notes and that commitment was not made that they would
5  never work together.
6  BY MS. POCHOP:
7  Q  Despite her complaint and her expression of concerns
8     about having to work in close physical proximity to a
9     person that she had reported for sexual harassment,
10    were you the HR manager who decided that they would be
11    able to continue to work together on the same line?
12        MS. CALEM: Object to the form. Misstates the
13    evidence in the record and the testimony.
14        THE WITNESS: The Juan Ogaldez incident, Sala
15    raised a concern that Juan had made an inappropriate
16    gesture. An investigation was conducted. And there
17    was concerns also raised that Juan was joking around,
18    that Sala and Juan were throwing meat at each other,
19    that Sala would threaten to take Juan to HR.
20        The allegations that Juan made a sexual gesture
21    were not confirmed in the incident investigation. Juan
22    stated --
23  BY MS. POCHOP:
24  Q  They ended up -- excuse me.
25      The allegations that Juan made sexual gestures and

---

Page 94

1  comments at work has been verified, though, hasn't it?
2      MS. CALEM: Objection to the form. We're talking
3  about something that happened in 2014.
4      THE WITNESS: Well, this event, Juan was adamant
5  that his -- what he did was a motion like this, hurry
6  up, hurry up, and that he makes that motion frequently
7  as part of his duties. So the allegations were not
8  substantiated in the investigation. They weren't
9  disproved either.
10  BY MS. POCHOP:
11  Q  From an HR perspective, is it a good idea, when an
12    employee feels strongly enough about having to work
13    with a person that she has accused of sexual
14    harassment -- is it a good idea to assign them to work
15    together?
16        MS. CALEM: Object to the form. Incomplete
17    hypothetical.
18        THE WITNESS: If the harassment is confirmed, no.
19    I believe reasonable steps were taken in this case to
20    minimize the times that Sala and Juan were required to
21    work together.
22        I also understand that there was times that Sala
23    volunteered or chose to work with Juan, and we're not
24    aware of any issues or concerns at this point in time.
25

---

Page 95

1  BY MS. POCHOP:
2  Q  When she took out a protection order and your HR
3     department got a copy of it, did that raise any
4     concerns that she was feeling threatened and upset
5     about having to work with the person that she had
6     accused of sexual harassment?
7  A  Yes, it raised concerns.
8  Q  And what investigation was done with Sala after you got
9     a copy of her protection order in your HR department?
10  A  We reviewed the protection order. The substance of the
11    protection order was consistent with the concerns that
12    were brought forward in the past and investigated, the
13    2014 event.
14        With protection orders, if the individuals are
15    required to work in different areas, then when Juan
16    returned to work, there would be a requirement to meet
17    with Juan and find an alternate work assignment for
18    him. Juan did not return to work.
19  Q  Did anybody investigate Sala's protection order in the
20    HR department?
21  A  We reviewed it, yes.
22  Q  Did you personally review it?
23  A  Yes.
24  Q  Is it consistent with Smithfield policy and procedure
25    that, when you receive a copy of a protection order

---

Page 96

1  between employees about workplace behavior that no one
2  asks the person -- the employee who filed the
3  protection order why they filed it?
4  A  If it's a new event, yes, we would investigate. In
5  this case, we, of course, sent a copy to our corporate
6  and legal folks, reviewed it. We didn't find anything
7  material new. The individual that the restraining
8  order was filed against did not return to work.
9  Q  Were you the person who determined that no interview
10    with Sala would be necessary?
11        MS. CALEM: Object to the form.
12        THE WITNESS: I did not believe one was required,
13    no.
14  BY MS. POCHOP:
15  Q  And do you think that your determination in that regard
16    is consistent with the way Smithfield Foods managers
17    interpret their sexual harassment policies?
18        MS. CALEM: Object to the form. Calls for
19    speculation.
20        THE WITNESS: Yes, I believe my actions were
21    consistent with Smithfield's expectations. Yes.
22  BY MS. POCHOP:
23  Q  And then there was another incident in 2017 where Russ
24    touched Sala in a way she found offensive and made a
25    comment about her having a personal relationship with

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 97

1  Tom Anderson, and you agreed with Sala that that was
2  inappropriate behavior by Russ?
3  A   Absolutely.
4  Q   And I think Russ described that he had to go to a
5  training school?
6  A   Russ was suspended. There was a grievance filed as
7  well.
8  Q   Right.
9  A   And as a result of that, Russ was sent home. I believe
10  it was myself and BJ invited Sala down to report to
11  her, you know, thank you for bringing it forward, the
12  conduct was inappropriate, and the consequences.
13  Q   And then it looks like about a month later, Sala, once
14  again, followed the policy and spoke up when she was
15  hit with a ham? Do you remember that incident?
16  A   Yes. What's the date of that incident?
17  Q   It looks like August 15, 2017.
18  A   Yeah, I don't know if there's an exhibit on that,
19  but --
20  Q   It's No. 43.
21      While you're reviewing that, let's take a little
22  break.
23      (Recess taken from 11:06 a.m. to 11:25 a.m.)
24  BY MS. POCHOP:
25  Q   The discipline that had been issued to Sala and Yvette

Page 98

1  and Lorena is the subject of this particular question.
2  Did Smithfield Foods agree to remove that
3  discipline from their record?
4  A   Yes.
5  Q   Why?
6  A   I recommended that the discipline be removed. Coming
7  back to Scott Genzler, I didn't think it was -- I would
8  have liked to have seen more stringent discipline on
9  Scott. I thought Scott should have been suspended.
10  And we met with the union, went through what's the
11  right thing to do, how do we -- how do we fix this.
12  And that was one of the recommendations and actions
13  that I took to help what I thought was to -- just to do
14  the right thing, just take it off, off their file.
15  Q   Did Carrie Moate perform her HR duties in the manner
16  expected by Smithfield Foods when she did not ask Sala,
17  Yvette, or Lorena why they were in the HR department
18  before sending them back to work?
19  A   Well, Carrie responded to a question, and I think her
20  response was appropriate for the question, is if
21  employees are off the line without authorization, they
22  can be wrote up. I mean, that's standard.
23  Q   I'm asking if she performed her HR duties in a manner
24  consistent with Smithfield policy when she did not ask
25  three employees who were in her department filling out

Page 99

1  an incident report why they were there.
2  A   Carrie's the -- you know, the tier two response. The
3  tier one response would be the gals at the window. I
4  don't know who handed the note. I expected, as I
5  mentioned earlier, that -- would have expected that all
6  the individuals involved, Dave, Carrie, and Russ, would
7  have had the same information before they made any
8  decisions.
9  Q   And what I'm specifically asking you in a yes-or-no
10  format --
11  A   Uh-huh.
12  Q   -- is, did Carrie perform her HR duties as she is
13  required to when she did not ask Sala why she was in
14  the HR department?
15  A   Based on the information that Carrie had and the
16  circumstance of her leaving to complete payroll, being
17  told that employees were off the line, the response
18  was, well, they can be wrote up, is a correct response.
19      So in that circumstance, I don't think her
20  response was inappropriate.
21  Q   Was it her responsibility to find out why the employees
22  had come to the HR department to get an incident report
23  form?
24  A   I don't know if she knew that they had filled out an
25  incident report form at that time.

Page 100

1  Q   But isn't that exactly what her job is as an HR manager
2  when people show up at the HR department and she
3  personally speaks to them?
4      MS. CALEM: Object to the form.
5      THE WITNESS: I'm not sure if she spoke to them
6  directly or not, but if a complaint comes in and that
7  complaint is addressed to Carrie, Monica, or myself,
8  then, yes, we have to do a complete -- we're expected
9  to, and the right thing to do, is an investigation.
10  BY MS. POCHOP:
11  Q   Did Carrie's failure to find out why Sala, Yvette, and
12  Lorena were in the HR department before she sent them
13  back to work comply with Smithfield Foods open door
14  complaint policy?
15  A   I'm not sure if Carrie sent them back to work or Russ
16  sent them back to work.
17  Q   Does it make a difference?
18  A   I think it does.
19  Q   Did Russ comply with the company's open door policy
20  when he had Lorena, Sala, and Yvette return to work
21  when they were in the HR department making a race
22  discrimination complaint?
23  A   The ideal situation would be that Russ, Carrie, and
24  Dave all had the same information to make the right
25  decisions. In that situation, Russ has an obligation

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 101

1  to keep the lines running, and I would expect Russ to
2  set up a time for the ladies and him to come over to
3  HR. That's what I would have expected should have
4  happened.
5  Q  Did Russ and Carrie do that at the time when they were
6  in the HR department while Lorena, Sala, and Yvette
7  were there?
8  A  No. No.
9  Q  Is that a violation of the Smithfield policies and
10  procedures for dealing with complaints of
11  discrimination?
12  A  I don't know if it's a violation of a policy, but the
13  policy required that a time is set up for them to be
14  off the line and make sure the information is shared,
15  and that's what I would expect as well.
16  Q  But that didn't happen, did it?
17  A  No, it did not happen.
18  Q  And that was Carrie's responsibility to make sure that
19  that happened since she was the HR manager involved,
20  right?
21  A  Between Carrie, Russ -- yes, that was their
22  responsibility.
23  Q  It was also Russ's responsibility?
24  A  Yes.
25  Q  And he didn't do it either?

---

Page 102

1  A  Between them, they did not, no.
2  Q  And did they receive any disciplinary action for their
3  failure to follow that part of the Smithfield policy
4  and procedure?
5  A  Carrie and Russ did not receive discipline for their
6  part in this incident investigation, no.
7  Q  And it looks like in August of 2015 Sala reported that
8  she had been hit with a ham and she thought that it had
9  been an intentional act of violence by a coworker?
10  MS. CALEM: You said August of 2015. Did you mean
11  August of 2017?
12  MS. POCHOP: 2017. Thank you.
13  BY MS. POCHOP:
14  Q  Were you the HR director who was involved in the
15  investigation of Sala's complaint that she had been
16  intentionally hit with a ham?
17  A  I reviewed the investigation.
18  Q  And what was the outcome of that investigation?
19  A  My understanding, there was a piece of equipment down
20  on the line, there was work being performed on the line
21  that required work to be performed outside the regular
22  procedures. There was some safety issues identified.
23  One of the safety issues was related to having to toss
24  hams back up to the front of the line, and as a result
25  of that investigation, the procedure was amended to

---

Page 103

1  make sure that that act of having to toss or push the
2  hams back up to the front of the line was stopped. So
3  that safety issue was stopped.
4  Q  So that would have been a legitimate safety issue that
5  Sala had spoken up about?
6  A  Yes.
7  Q  Who was the employee who was alleged to have thrown the
8  ham?
9  A  I don't recall the employee's name.
10  Q  I mean, that's an allegation of workplace violence if
11  it's true, isn't it?
12  A  It's possible. It's also possible that it was just an
13  unsafe practice that was in place.
14  Q  Well, it looks like Dakota Mills investigated to
15  determine whether this was an intentional act, right?
16  A  Let's see. Broken machine was -- fixing or being
17  fixed. One ham passed. Wasn't clipping. People were
18  hanging. Ham was thrown and struck her chest.
19  Q  I'm looking at an August 16, 2017 email from Dakota
20  Mills to you that says, quote, the only indication that
21  it wasn't intentional came from the written statement
22  of the employee who tossed the ham, end quote.
23  MS. CALEM: That's not an exhibit, so if you'd
24  like to question him about it, perhaps you should make
25  it an exhibit.

---

Page 104

1  BY MS. POCHOP:
2  Q  Well, what I want to know is was -- in your mind, was
3  this ham incident investigated as a potential
4  intentional act of violence?
5  A  Yes.
6  Q  And was the conclusion of the investigation that the
7  only indication that it wasn't intentional was from the
8  employee who tossed the ham, if you recall?
9  A  I don't recall the other findings other than that I
10  know that there was a practice that was amended.
11  Q  And then in September of 2017 there was another
12  incident between Russ and Sala that resulted in a union
13  grievance about an allegation that he had sprayed water
14  on her and had made physical contact with her in a way
15  that she thought was harassing.
16  Does that square with your recollection?
17  A  Yes. I think it was defined as a sexual assault in
18  some of the correspondence.
19  Q  Okay. And is it true that Russ represented to
20  Smithfield human resources managers that he didn't
21  touch Sala?
22  A  I believe that's correct, he indicated he did not
23  believe he touched her.
24  Q  And did you hear a witness testify in this case that
25  what Russ told him about the event was that he didn't

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

| Page 105 |
| --- |

1    mean to touch her?
2  A   I recall a witness saying that she did not observe Russ
3     touching Sala.  The circumstance as I recall, the line
4     was down, maintenance had been working on it, Russ was
5     working to get the line started back up, he had
6     hosed -- spraying the area down from a sanitation
7     perspective, got a couple of -- got some overspray on a
8     couple of individuals.  There was a yell.  He walked
9     by, talked to -- didn't say excuse me to Sala.  Sala
10     mentioned if he would have said excuse me, it would
11     have been fine, but she didn't like Russ coming up
12     behind her.
13  Q   Is the bottom line that you believed that -- Russ's
14     version of what had happened over Sala's version that
15     he had offensively touched her in the workplace?
16  A   No.  There's also -- the statements from the witnesses
17     were also important.
18  Q   I mean, Russ -- you had personal experience with Russ
19     not being materially accurate during the course of a
20     discrimination investigation less -- basically a year
21     before that.
22  A   Uh-huh.
23  Q   You'd had to personally counsel him about that, right?
24  A   Correct.  Also, in the incident where Russ tapped Sala
25     on the shoulder, Russ was completely honest about what

| Page 106 |
| --- |

1     happened, acknowledged that it was a dumb thing that he
2     did and that he made a mistake.  He was very up-front
3     about that incident.
4  Q   What action was taken against Russ for -- because he
5     did admit that he had sprayed water and had not only
6     gotten water on Sala but had gotten water on another
7     employee, right?
8  A   Yes, there was some overspray.
9  Q   So what action was taken against Russ as a result of
10     that incident between him and Sala?
11  A   Can you remind me the date of that incident?
12  Q   That was in August of 2017.
13  A   If I recall correctly, we coached Russ on respectful --
14     courtesy and respect in the workplace.  It's
15     appropriate when you're coming up to somebody to say
16     excuse me, give them notice, respect their space, and
17     there was some training that Russ went to attend as
18     well.
19  Q   Is that the school -- the management school that he
20     went to?
21  A   Yes, I believe it was in Kansas City, a general
22     leadership two-day school.
23  Q   Was anybody else from Smithfield required to attend
24     that management training?
25  A   We've had other managers attend that training, yes.  On

| Page 107 |
| --- |

1     that day, I don't know particularly that session, but
2     we send a dozen or so folks to that training a year.
3  Q   What was the purpose of sending Russ to that training
4     in 2017?
5  A   To reinforce courtesy and respect in the workplace.
6  Q   I want to have you take a look at what -- this is
7     Exhibit 53 .
8         In February of 2015, according to --
9         MS. CALEM: 2017.
10  BY MS. POCHOP:
11  Q   -- February 15, 2017, there was -- is this considered a
12     grievance or a report to Smithfield about Sala being
13     treated unfairly in the workplace?
14  A   Give me a second to read it, please.
15         (Examines document.)
16         This is a note from Tom Anderson.
17  Q   Right.  Was that in Sala's file in HR?  Or where would
18     that note have come from?
19  A   This one came from Tom Anderson.
20  Q   How would Smithfield Foods have or maintain this
21     record?
22  Q   How would Smithfield retain the record?
23  A   Uh-huh.
24  A   In Tom and Sala's file.
25  Q   When Smithfield Foods obtained Thomas's statement in

| Page 108 |
| --- |

1     Exhibit 53 , did it initiate any sort of investigation
2     into his allegation of discriminatory treatment?  And
3     to be fair, he just is reporting "treated the same way
4     as other employees."  Was there any investigation into
5     Thomas's statement?
6  A   I'm not sure if the timing is the same around the
7     investigation that was conducted around Sala's using
8     her seniority to pick work.
9         Is there other exhibits related to this?
10  Q   That's what I'm wondering.  Was there any investigation
11     into the February 15, 2017 report that Sala was being
12     treated unfairly as compared to other employees?
13  A   I can't recall the exact dates.
14  Q   Should that have been investigated under Smithfield
15     policy?
16  A   Yes.
17  Q   There was an incident in December of 2016 in which Sala
18     and Gary Loger got into a workplace dispute about job
19     assignments that you were just referencing, right?
20  A   Okay.  Yep.
21  Q   And in the course of investigating that, you discovered
22     that Sala told Smithfield that Gary had said "get the
23     fuck over there" to her while Yvette, Tom Zuraff, and
24     Lorena were in the area and that she had responded by
25     saying that Gary treated her like a slave and was a

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 109

1  racist.
2      Can we just call that the December Loger incident
3  for --
4      MS. CALEM: I'm going to object on grounds of lack
5  of foundation. You seem to be reading from something
6  that we don't have, and I don't want to assume that
7  those are the facts.
8  BY MS. POCHOP:
9  Q  Do you have any recollection of that incident
10  independently?
11  A  Yes.
12  Q  So tell me what you can recall about it.
13  A  At the start of the shift, Sala had concerns about work
14  assignments. Sala was on open work. Gary indicated
15  there's a couple of jobs that are open, you can choose
16  from these jobs. Sala continued to say she wanted to
17  use her seniority, and Gary continued to respond, well,
18  here's the two jobs that are available.
19      This carried on for a period of time. The line
20  was not started up. Delayed the startup on the line.
21  Tom Anderson came over. There were some comments made.
22  Sala eventually picked an assignment and the line
23  started up.
24  Q  Did you approve the discipline that Sala received as a
25  result of her referring to Gary Loger as a racist?

Page 110

1  A  A three-day suspension? Yes.
2  Q  Was that approved by you? Was that disciplinary action
3  approved by you?
4  A  Yes.
5  Q  Did you direct that that's the disciplinary action that
6  she should receive?
7  A  I believe I signed it.
8  Q  And tell me what it is about calling a supervisor a
9  racist that would result in disciplinary action under
10  Smithfield policy.
11  A  Can I have a copy of the discipline -- the writeup?
12      What exhibit is that?
13  Q  Yeah. That is Exhibit 40 -- or 24. I'll give you a
14  copy of it. You can use mine.
15  A  Thank you.
16      MS. CALEM: Just for the record, it's also
17  Exhibit 31.
18      THE WITNESS: So three-day suspension, work rule
19  15, use of language, combative behavior, failure to
20  cooperate, excessive arguments about work assignments,
21  called supervisor racist, and then reviewed respectful
22  communications, which is the expectations, signed by
23  myself, Dave Hillberg present, and the union steward
24  was BJ Motley.
25

Page 111

1  BY MS. POCHOP:
2  Q  So what is it about calling a supervisor a racist that
3  violates Smithfield policy?
4  A  This writeup is more than just calling a supervisor
5  racist. It was around the failure to cooperate. There
6  was an effort to say, Sala, you're on open work,
7  these are the job assignments that were available,
8  which job assignment would you like. Failed to select
9  a job assignment. It delayed the startup of the line.
10  It continued to escalate to the point where, in the
11  context of it, Sala called the supervisor racist. It
12  did not need to escalate to that point. It was a
13  pretty simple task, a daily task of just starting work
14  and picking a job and working.
15  Q  And it was Gary who reported -- did he tell you about
16  what Sala had said about that she felt like he treated
17  her like a slave and that he was a racist?
18  A  I'm not sure if it was Gary or if it was Dave.
19  Q  Was there an interview with Sala about why she would
20  think that her supervisor was treating her like a slave
21  or that she would have said a word that was -- that he
22  was a racist?
23  A  We interviewed Sala.
24  Q  What was the outcome of that interview?
25  A  Sala was issued a three-day reprimand.

Page 112

1  Q  And according to Exhibit 31, she was also, on the same
2  date, issued a seven-day suspension?
3  A  Correct. My recollection is that she was absent the
4  day prior and that would have -- she had more than
5  enough occurrences to trigger a seven-day suspension
6  for attendance.
7      The way we manage our attendance policy -- and
8  this is something that I implemented -- is if an
9  individual has either a three- or a seven-day
10  suspension for attendance, we work to minimize the
11  negative impact on the employee, the workplace, and the
12  employee's family by giving the employee the remainder
13  of that day off, and that could be either the start of
14  the shift or the end of the shift, count that as day
15  one. One additional day to help address whatever
16  concerns that are keeping them from work, whether
17  it's buying an alarm clock or whatever, and the
18  remaining five days are working days. So the
19  employee's scheduled to work the remaining five days of
20  the suspension, they're paid for it, but it is
21  reflected on their file as a seven-day suspension.
22  Q  And she was apparently sent home the day that she got
23  this disciplinary action to start serving out her
24  suspension, right?
25  A  Yes. And the two suspensions were concurrent, not

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 113

1    consecutive.
2  Q  Well, the seven-day suspension says her return to work
3     date is 12-10, and the three-day suspension says her
4     return to work date is 12-12?
5  A  Correct.
6  Q  And so they were going to run back-to-back?
7  A  No.
8  Q  They weren't?
9  A  They were concurrent.  See, with the seven-day -- this
10    was 12-8-16, so that would count as day one.  12-9
11    would count as day two.  And on the seven-day, because
12    it's a working suspension, 12-10 she would return to
13    work.
14  Q  But for one of them she was to return to work on 12-10
15    and for the other one she was to return to work on
16    12-12.  So what day was she supposed to come back to
17    work?
18  A  On the 12th.
19  Q  And so the three-day suspension was not subsumed into
20    the seven-day suspension; they ran so that the
21    seven-day suspension would end on 12-12, and the
22    three-day suspension would end on 12-12, according to
23    Exhibit 24 and 31?
24  A  We'd have to check to see what day of the week 12-10
25    is.  If 12-10 is a Friday -- or, sorry, a Saturday,

Page 114

1     then Sunday would be the 11th, and Monday would be the
2     12th, and that would be a three-day --
3     three-working-day suspension.
4  Q  Well, why wouldn't you have done that when you issued
5     both of them on the same day?
6  A  The seven-day suspension for attendance, the day of the
7     discipline, which would be the 8th, counts as day one.
8     The 9th would be day two.  And on the third day they're
9     eligible to return to work.  It's a working suspension.
10       So for the three-day, work rule 15, abusive
11    language/combative behavior, the 8th would be day one,
12    the 9th would be day two, the 10th, if it was a
13    Saturday, would be day -- would not count, 11th would
14    not count.  So it would -- it's still three working
15    days.  So this should be three working days from the
16    8th.
17  Q  And so tell me why the seven-day suspension would end
18    on 12-10 then.
19  A  The return-to-work date -- seven-day suspension, the
20    first day -- the day of the suspension is counted as
21    day one, so that would be the 8th.  The second day
22    would be the 9th.  That's a day off without pay to help
23    the employee get their affairs in order.  The third day
24    is a working suspension, which would be the 10th.
25  Q  What is a working suspension?

Page 115

1  A  To minimize the effect of a seven-day or three-day
2     suspension for attendance on the employee, their
3     family, and the workplace, we've set up where, for
4     attendance disciplines, the first day is the day of the
5     suspension.  The second day is the day after the
6     suspension, a second workday, and that day is without
7     pay.  And the third and subsequent days, they're
8     scheduled to work and paid to work.  It's called a
9     working suspension.
10  Q  So for the seven-day suspension, she could have worked
11    on the 10th under her working suspension?
12  A  Correct.
13  Q  But she really wasn't permitted to return to work on
14    the 10th because she had the three-day suspension that
15    said she had to wait until the 12th to return?
16  A  Correct.  And so they -- and they were both served at
17    the same time.  So day one would be the 8th.  That
18    would be the first day of the three-day and the first
19    day for the seven-day.
20  Q  You do have the authority to have those run
21    concurrently to reduce the impact on the employee?
22  A  That's what we did.
23  Q  If I could have you look at what's been marked as
24    Exhibit 52, there is a disciplinary action that was
25    issued to Tom Anderson arising out of his participation

Page 116

1     into the investigation that -- Sala's complaint about
2     Gary Loger --
3       MS. CALEM: Do you have a copy for me?
4       MS. POCHOP: Yeah.  It's right underneath there.
5       THE WITNESS: Sorry.
6       MS. CALEM: This is 52?
7       MS. POCHOP: Yes.
8       MS. CALEM: This says it's 53.
9       MS. POCHOP: I'm looking at 52.  This is 52.
10       MS. CALEM: It was premarked.  Okay.
11  BY MS. POCHOP:
12  Q  Was Tom Anderson disciplined as a result of his
13    participation in the investigation of Sala's complaint
14    about Gary Loger using -- harassing her and using
15    profane language to her?
16  A  Can you repeat the question, please.
17  Q  Was Tom Anderson disciplined -- and, more specifically,
18    was the discipline that is reflected in Exhibit 52
19    issued to Tom Anderson by you, first of all?  Let's get
20    that far.
21  A  Yes.
22  Q  Okay.  And was Exhibit 52 the disciplinary action
23    issued to Tom Anderson because of his participation in
24    the investigation about Sala's complaint about Gary
25    Loger saying "fuck you" and assigning her to work with

**Page 117**

1    Juan?
2  A  No.
3  Q  Was there some other incident that Tom was involved in
4     where he used profane language toward a coworker?
5  A  Tom was disciplined for using profane and abusive
6     language, if I recall, towards Tom Zuraff, who was the
7     union steward in department 19.
8  Q  What did he -- what was he disciplined for saying to
9     Tom Zuraff?
10 A  Something to the effect, walked up behind Tom on the
11    line, tapped him on the shoulder, "do your fucking
12    job," and some additional comments threatening Tom
13    Zuraff.
14 Q  And he got -- you determined that he should get a
15    three-day suspension for that?
16 A  Yes.
17 Q  And then he also got -- he also violated another rule
18    here, which is making false statements during an
19    incident investigation.
20 A  Correct.
21 Q  And he got a three-day suspension from you in that
22    regard?
23 A  Correct.
24 Q  And then when I look over here, he had a total of
25    three days suspended.

**Page 118**

1  A  They were run concurrent as well.
2  Q  So you can decide to have the suspensions run
3     concurrently?
4  A  Yes.
5  Q  And the false statements made during an incident
6     investigation, tell me what the false statements were
7     that he was disciplined for.
8  A  Certainly.  Tom denied swearing, cursing at Tom Zuraff.
9     The determination was that that was not true.
10 Q  And if an employee at Smithfield makes statements that
11    are not true during an incident investigation, is a
12    three-day suspension standard for that violation of
13    work rule No. 29?
14 A  It depends on the circumstances.  If the person
15    knowingly makes false statements, that would certainly
16    carry more weight than if it was just a mistake.
17 Q  Is Tom Anderson a person of color?
18 A  Yes.
19 Q  Did Russ -- did you find that Russ Hultman made false
20    statements during an incident investigation when he
21    misrepresented to Carrie Moate what Scott Genzler had
22    actually said and done on the line toward Yvette, Sala,
23    and Lorena?
24 A  I don't believe that all the information was shared.  I
25    don't believe his statement was false.

**Page 119**

1  Q  And that's a decision that you come to individually,
2     right?
3        MS. CALEM: Object to the form.
4        THE WITNESS: No.
5  BY MS. POCHOP:
6  Q  Is a coworker telling somebody to do their fucking job
7     worse than a supervisor who fails to inform an HR
8     manager of a material fact about a discrimination
9     complaint -- more serious?
10       MS. CALEM: Object to the form.  Lacks foundation,
11    incomplete hypothetical.
12       THE WITNESS: Can you repeat the question, please.
13 BY MS. POCHOP:
14 Q  Which is more serious, a supervisor that provides
15    inaccurate and omits material facts when asking HR
16    about how -- what to do about employees in terms of
17    discipline or an employee who taps another coworker on
18    the shoulder and says "do your fucking job"?
19       MS. CALEM: Same objection.
20       THE WITNESS: I think it would go back to intent.
21    If the intent was to mislead or hide facts, that would
22    be more serious than if the intent was otherwise.
23 BY MS. POCHOP:
24 Q  Exhibit 41 --
25       MS. POCHOP: And, I'm sorry, I accidentally marked

**Page 120**

1     on this.  I just wrote No. 31 on top of it, so we'd
2     probably want to clean that up later.
3  BY MS. POCHOP:
4  Q  But I'd ask you to take a look at Exhibit 41 , and if
5     you'd pull out Exhibit 32 at the same time.
6     So Exhibit 32 shows that, after she received the
7     discipline on December 8th, Sala filed a grievance, a
8     formal grievance, to inform the company that she felt
9     that she was not being treated fairly.  That's what
10    Exhibit 32 is, right?
11 A  Yes.
12 Q  And the supervisor's answer at the first step was dated
13    the next day.  And who is the supervisor who denied the
14    grievance?
15 A  I'm guessing that is Dave Hillberg's signature, but I'm
16    not 100 percent sure.
17 Q  And then it was submitted to the second step grievance,
18    and was it resolved at the second step of the
19    grievance?
20 A  I don't believe it was resolved until January of this
21    year.
22 Q  January of 2018?
23 A  Oh, sorry.  (Examines document.)
24       THE WITNESS: What's the number of this one, the
25    grievance?

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 121

1    MS. CALEM: 31. 31 is the grievance.
2    THE WITNESS: No, the actual grievance number.
3    104?
4    MS. CALEM: 104/16.
5    THE WITNESS: Yeah, through the grievance process,
6    this was reduced from a three-day suspension to a
7    written reprimand.
8  BY MS. POCHOP:
9  Q  When was it reduced to a written reprimand?
10 A  I believe it was January of this year.
11 Q  January of 2018?
12 A  I believe so.
13 Q  The grievance is dated December 9th of 2016.
14 A  Correct.
15 Q  And why would it take two years to reduce the
16    disciplinary action pursuant to the grievance?
17 A  The union held this grievance in abeyance for an
18    extended period of time.
19 Q  And tell me where in Smithfield Foods' records it says
20    that this grievance is being held in abeyance.
21 A  The grievance file would have those records.
22 Q  Are they here?  Do you have them?
23 A  I believe -- yes.
24 Q  Were they produced in discovery?
25    MS. CALEM: They were not part of the personnel

---

Page 122

1    file, and no discovery request was ever made.
2  BY MS. POCHOP:
3  Q  When would Sala have been informed that, in January of
4    2018, her grievance about her 2016 suspension was
5    reduced to a written warning?
6  A  It's the union's responsibility to communicate with
7    individuals the status of their grievance.
8  Q  Did you direct any supervisor to make sure that Sala
9    knew her grievance had been successful two years later?
10 A  No.  Again, it's the union's responsibility to
11    communicate the status of the grievance with their
12    membership.
13 Q  Was she paid for her days that she had been suspended
14    in January of 2018?
15 A  The settlement agreement was that the reduction would
16    take place without pay.  That was the agreement with
17    the union.
18 Q  Why did Smithfield ultimately agree to reduce the
19    suspension?
20 A  To resolve the grievance.
21 Q  Why?
22 A  We often look at creative ways to resolve grievances.
23    This was a step that we took to compromise with the
24    union.  I believe that the behavior was inappropriate.
25    It needed to remain on her record for a period of two

---

Page 123

1    years, and the union agreed.
2  Q  Do you have any other grievance files that you have
3    possession of from Smithfield regarding Sala's
4    grievances that weren't produced in discovery?
5    MS. CALEM: I'm going to object.  There was no
6    document production request.
7    MS. POCHOP: Well, there's a Rule 26 disclosure
8    requirement, right?
9    MS. CALEM: Of course.  And we produced what we
10    had available.
11 BY MS. POCHOP:
12 Q  When did you get the grievance -- I mean, because the
13    union is a party to all of these grievances -- or the
14    company is a policy [sic] to all of these grievances.
15    You have always had possession of those documents,
16    correct?
17 A  The grievance files?
18 Q  Yeah.
19 A  Yes.  Yeah, the grievance files are maintained
20    separately from the employee's personnel file.
21 Q  Is it unusual for a grievance to -- I'm misspeaking
22    when I say two years.  I guess it's just over a year,
23    because the discipline was in 2016, and it was reduced
24    in 2018, in January, right?
25 A  I believe that's correct, yes.

---

Page 124

1  Q  Do you know, was there any effort to make sure that
2    Sala knew that her grievance had been successfully
3    addressed --
4  A  I don't know --
5  Q  -- by Smithfield managers to the employee who was
6    complaining about it?
7  A  No.  Again, the responsibility -- it's the union's
8    responsibility to communicate that with the grievant.
9  Q  I'd ask you to take a look at Exhibit 37.  This is a
10    document written on a John Morrell employee warning,
11    right?  Sala was issued an employee warning notice in
12    Exhibit 37, right?
13 A  Yes.
14 Q  And who was the supervisor who issued it?
15 A  What it says is Sala's name, her clock number, ID,
16    date, 3-27-18, going home until investigation is
17    complete.  There's a phone number.  Will call to set up
18    a meeting, signed by Carrie Moate, and there's also a
19    note that the phone number was disconnected.
20 Q  So Carrie is the person who drafted that employee
21    warning notice and delivered it to Sala?
22 A  Yes.
23 Q  Why is she getting a warning notice for being sent home
24    during an investigation?
25 A  On occasion we will -- HR will send employees home to

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 125

1    allow the investigation -- HR time to complete the
2    investigation, interview witnesses, determine the
3    facts.
4  Q  Did the other employee receive a warning notice that
5    she was to go home during the investigation?
6  A  Referring to Abigail David?
7  Q  Yes.
8  A  I don't recall.
9  Q  Is Abegail David a person of color?
10 A  I don't believe so.
11 Q  Exhibit 38  is a disciplinary action dated 3-29-18
12    signed by you and Carrie.
13 A  That's signed by me.  I handwrote Carrie's name in the
14    Others at Meeting section.
15 Q  Oh, okay.
16 A  That's not her signature.
17 Q  And Sala received what kind of discipline at your
18    direction on 3-18 [sic]?
19 A  So the date's 3-29-18, work rule 15, use of
20    profane/abusive language, combative behavior.  I
21    believe this is the same warning that Abegail David
22    received on the same -- I can't remember if it's the
23    same date or not.  Argument with coworker, name
24    calling, inappropriate sexual comments.  Reviewed our
25    expectations, treat people with respect.  If

---

Page 126

1    disrespected, tell person to stop, notify supervisor.
2    Keep work and personal life separate.
3  Q  I want to ask you if you'd compare that with
4    Exhibit 42 .  That's the 2-22-16 disciplinary action
5    that we've discussed with Scott Genzler where he just
6    got a written warning for virtually the same
7    description of behavior, although his was racial
8    instead of --
9  A  Yes.  Scott Genzler's dated 2-22-16 and this one's
10    3-29-18.  It's two years later, yes.
11 Q  And for the record, Scott Genzler is not a person of
12    color?
13 A  Correct.
14 Q  And you would not disagree with me that Scott Genzler
15    and Sala have gotten very different discipline for this
16    violation of the same policy numbers?
17 A  Yes.  One is a written warning and the other is a
18    three-day suspension.
19 Q  And Scott Genzler also got very different discipline
20    for making racist comments and saying offensive and
21    threatening things in the workplace than Tom Anderson
22    received for a violation of the same rule number.
23    That's true, isn't it?
24 A  Yes.
25 Q  Was Russ reassigned from Sala's -- from department 19?

---

Page 127

1  A  Yes.
2  Q  Was Russ's reassignment in relation to the difficulty
3    that he had managing Sala and Yvette?
4  A  Partially, yes.
5  Q  What was the other reason for it?
6  A  The results in the department overall were below
7    expectations from a productivity perspective.
8  Q  And that's kind of one of -- that's a red flag result
9    that one can expect if a department is not run
10    according to its discrimination and retaliation policy,
11    isn't it?
12      MS. CALEM: Object to the form.
13      THE WITNESS: I'm not sure of the correlation in
14    this case.
15 BY MS. POCHOP:
16 Q  But shouldn't you be sure as the HR director?
17      MS. CALEM: Object to the form.
18      THE WITNESS: I don't know the direct correlation
19    between this event and the productivity numbers in the
20    department.  I'm sorry.  I don't know.
21 BY MS. POCHOP:
22 Q  But my question is, is it your responsibility to know
23    if racism and retaliation are impacting the
24    productivity of a department that is not performing?
25 A  Inappropriate conduct in a department can certainly

---

Page 128

1    have an impact on productivity, safety, quality.
2    I think that we both agree with that.  I want to know,
3    is it your job duty to know if that is the reason that
4    you were having a productivity problem in
5    department 19.  I'm asking about your job
6    responsibility.
7  A  Oh.  It would be partially mine, partially the
8    operations group --
9      MS. CALEM: I think the sandwiches are here.
10      (Pause in the proceedings.)
11 BY MS. POCHOP:
12 Q  So tell me about the part of the reason where Russ was
13    reassigned to a different department because of his
14    difficulty in working with Sala and Yvette.
15 A  Uh-huh.  We had provided Russ additional training, as
16    mentioned earlier --
17 Q  That's the "sent him to Kansas City" thing?
18 A  Yep.  And respectful communications.  We --
19 Q  Apparently that didn't work enough to correct his
20    behavior towards Sala and Yvette?
21      MS. CALEM: Object to the form.
22      THE WITNESS: I'm not sure how -- I'm not sure on
23    that.  I think it had a positive impact on Russ.  As
24    far as putting a new supervisor in the area, we did
25    have different supervisors come in, and part of our

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 129

1  development of our leadership is to have them learn
2  different areas as well, cross-train and address
3  change.
4  BY MS. POCHOP:
5  Q  My question is, specifically what about Russ's conflict
6  with the plaintiffs was the reason that he was
7  transferred to a different department?
8  A  That was -- that was part of the reason, yes.
9  Q  And why was that part -- what were the facts underlying
10  that part of the reason that he was transferred?
11  A  The thought process was to give Russ the opportunity to
12  work in a different department where -- and to bring a
13  supervisor in that was stronger than Russ, more
14  skilled, and have that supervisor work in the
15  department.
16  Q  And who made that determination that you needed a
17  stronger supervisor?
18  A  That determination was made by the manager of the
19  packaged meats department.
20  Q  Who?
21  A  Mike Corbett.
22  Q  Did you recommend that change?
23  A  He discussed it with me, yes.
24  Q  Did you recommend it?
25  A  I supported that change too, yes.

Page 130

1  Q  Whose idea was it to move Russ?
2  A  I can't recall whose idea it was.
3  Q  Was it yours?
4  A  It had been a topic that we had talked about.
5  Q  Who is we?
6  A  Mike and I. We go through a -- we go through -- a
7  couple of times a year, we review with each of the
8  department heads succession planning, pending
9  retirements, skill development of salaried supervisors,
10  and talk about what's the next step, what's the right
11  fit, which are the right supervisors to work together,
12  those types of discussions.
13  Q  Was Russ informed that his management of Sala and
14  Yvette was a reason that he was being moved to a
15  different department?
16  A  I wasn't involved directly in those conversations with
17  Russ.
18  Q  What's your knowledge about it?
19  A  That's possibly a topic that came up.
20  Q  Who was the person who was involved in telling him he
21  was going to be moved to a different department?
22  A  Mike Corbett.
23  Q  And did Mike know that he was being moved, in part,
24  because of his management of the plaintiffs?
25  A  Yes.

Page 131

1  Q  Was Russ upset when he was moved?
2  A  I don't know for sure.
3  Q  Who was the supervisor that was brought in to be
4  stronger and have more skills?
5  A  Robert Foos, I believe.
6  Q  And what skills and strengths did Robert have that Russ
7  did not?
8  A  There was a couple supervisors brought in. Ernest
9  Terry was brought in for a while, Robert Foos.
10  Robert Foos has worked in a number of areas. He's
11  been identified as one of our stronger supervisors on
12  the packaged meats side.
13  Q  Is he good at complying with company policy?
14  A  Yes.
15  Q  Is he good at making other employees that he supervises
16  comply with company policy?
17  A  Yes.
18  Q  Has department 19, under his management, become more
19  compliant with company policies?
20  A  To my knowledge, yes.
21  Q  Do you know if Russ -- did Russ express any concern or
22  being upset to you about being transferred out of his
23  department 19 management position?
24  A  I don't believe Russ was extremely excited about it.
25  Q  Did he express that to you?

Page 132

1  A  Not directly to me, no.
2  Q  Who did he express it to?
3  A  I don't know.
4  Q  And then in January of 2018, there was an incident
5  about Sala taking a photograph in the workplace because
6  she was photographing that Russ was back in
7  department 19 talking to one of her coworkers, right?
8  A  Yes.
9  Q  And Russ was talking to that coworker while that
10  coworker was working, right?
11  A  I don't know that. I know that Russ was talking to the
12  employee in the department, correct.
13  Q  And if Russ was talking to that employee while that
14  employee was supposed to be working on the line, would
15  that be a violation of Smithfield policy?
16  A  No.
17  Q  What would Russ have to do with coming into the
18  department to talk to a department 19 employee, do you
19  know?
20  A  No.
21  Q  Did he have any responsibilities for department 19
22  performance at that point in January of 2018?
23  A  I don't know.
24  Q  Did anybody at HR ever investigate if there was a
25  legitimate work-related purpose for Russ to be in

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

**Page 133**

1    department 19?
2  A  We asked Russ why he was down there.
3  Q  And what did Russ say?
4  A  To talk to -- is it Abegail?
5  Q  Abegail.  About what?
6  A  I don't recall what they were talking about.
7  Q  Did anybody investigate Sala's complaint that Russ was
8    coming into the department to try to intimidate her?
9  A  Yes.
10 Q  And so in the course of the investigation, would it
11   have been important to know the reason why Russ was in
12   the department?
13 A  My understanding of the events is Russ was not
14   prohibited from being in the department.  He came down
15   to talk to Abegail.  We asked him if there was any
16   reason that he would feel that his presence there would
17   intimidate or was there any intention of intimidating
18   Sala.  He said no.
19     Managers have the ability to walk around areas --
20   I'm not sure if the product from that department was
21   going to his department.  I don't know.
22 Q  Well, you did have notice that Sala had objections to
23   having Russ come back in the department because she
24   complained about that, didn't she?
25 A  Yes.  Sala also -- we had individuals also bring

---

**Page 134**

1    forward comments that Sala would be in the lunchroom
2    talking about how she got Russ booted out of the
3    department and folks -- and there's statements that she
4    was talking to other people about how that was
5    something that she had accomplished.
6  Q  Well, is it untrue?  I thought you just told me that
7    one of the reasons that he was transferred is because
8    your company manager thought that they needed a
9    different manager because of Sala's complaints.
10 A  That's one of the reasons, yes.
11 Q  So was Sala disciplined for telling employees that her
12   complaints were a reason that Russ had been removed?
13 A  No.
14 Q  And, in fact, they were true, right?
15 A  Correct.
16 Q  So what difference does that make?
17 A  I think it would depend on the context.  I understood
18   the context was -- I'm not sure without reviewing the
19   notes what the context was of the comments.
20 Q  And your context would be just your interpretation
21   anyway, right?
22     MS. CALEM: Object to the form.
23     THE WITNESS: I'd have to go back to the
24   statements and look at them and what the context.
25

---

**Page 135**

1  BY MS. POCHOP:
2  Q  Was Russ instructed to conduct his socializing outside
3    of department 19 after this January 2018 complaint?
4  A  Russ did come talk to me -- or we talked, and I said,
5    if you don't have business there, then you shouldn't --
6    you should limit your time there.  He was not
7    restricted from being there.
8  Q  Because you do have the authority to tell employees to
9    stay away from each other, don't you?
10 A  Yes.
11 Q  And, in fact, like when there was a complaint about
12   Ozie taking a photograph in the workplace, your
13   instruction was that Ozie and Sala should not be
14   working around each other.  Is that true?
15     MS. CALEM: Object to the form.  If you have
16   something that you're reading from, I think he should
17   be able to see it.
18     MS. POCHOP: I can read from my own notes, Andrea.
19   I don't have to show him my notes, and you know that.
20     MS. CALEM: Your notes?  No, of course not.
21 BY MS. POCHOP:
22 Q  So tell me.
23 A  Let me walk through my recollection --
24 Q  Yeah.
25 A  -- of the Ozie incident.

---

**Page 136**

1    Sala filed a complaint that Ozie had taken out his
2    iPad or iPhone and taken a picture of her with the
3    intent of her being killed --
4  Q  That's a really serious complaint, isn't it?
5  A  Yes.  We interviewed other individuals to see if they
6    had seen that.  We talked to Ozie.  There's allegations
7    that Sala was also taking her phone out to take
8    pictures of other people, Russ.  Ozie stated that he
9    took his phone out -- or iPad, to check the time.  He
10   did not have any -- and that he did not take any
11   photos.
12     I can't remember the rest around what the
13   statements were.
14     The conclusion was we reviewed the expectation
15   with Ozie and with Sala that phones are not to be used
16   on the production floor, not to take pictures.  I
17   believe it was respectful communications was again
18   reinforced.  Neither Ozie, nor Sala, were disciplined.
19   It was just a matter of reinforcing what the
20   expectations were.
21     The report that Ozie was taking photos and Sala
22   taking photos at that time were not substantiated.
23 Q  Is anyone allowed to have their cell phone on the
24   production floor?
25 A  Company-issued phones, yes.  Individuals can use their

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 137

1  phone if it's authorized in advance.  For example, if
2  there's a safety concern and permission is received to
3  take a photo and share that photo with the safety
4  committee or their manager, that is permitted.
5  Q  Did Ozie have permission to have his phone or iPad in
6     the production area?
7  A  The policy, as it's written, says that recording
8     devices, cell phones are not allowed on the production
9     floor.  The practice has been that employees are
10    allowed to carry their cell phones with them as long as
11    they're not using them while they're operating
12    equipment, for example, a mule, taking pictures,
13    et cetera.
14 Q  So that's a written policy that is applied differently
15    than you would see in the handbook?
16 A  Correct.
17 Q  And Ozie did not have permission to be using his phone
18    on the production line as revealed by your
19    investigation?
20 A  No.  And his statement was that he pulled it out to
21    check the time.
22 Q  There's a time clock in the department, right?
23 A  There could be.
24 Q  Is it very believable that an employee would need to
25    check the time on their phone versus the company time

---

Page 138

1     clock in the department?
2  A  It's a question.  It's a good question.
3        MS. CALEM:  And I'd like the record to reflect
4     that the plaintiffs are laughing.
5  BY MS. POCHOP:
6  Q  It's a funny question because there's -- the time clock
7     is a pretty big deal in the department floor, right?
8  A  I also see people looking at their watch when there's a
9     clock in the room just as a habit.
10 Q  Sure.  So then -- I wanted to ask you then, Yvette
11    has -- you're aware that in 2018 Yvette filed an
12    incident intake form alleging that an employee named
13    Rufus had made a comment to her about being a CCP and
14    that she was upset about that incident.
15       Were you the HR manager or director who was
16    involved in the investigation into Yvette's complaint?
17 A  Yes, I participated in that investigation.
18 Q  And was there any disciplinary action issued to Rufus
19    for making a comment or calling somebody a gossip?
20       MS. CALEM:  Object to the form.
21       THE WITNESS:  How I recall that incident, there
22    was some discussion going on, the word CCP came up.
23    Sala offered a clarification that it was a sexually
24    transmitted disease.  That's what she thought it meant.
25    During the investigation, Rufus stated that in his

---

Page 139

1     language/culture that meant gossip.
2        Some ongoing discussions.  I think at the end of
3     the meeting Yvette apologized to Rufus, Rufus
4     apologized to Yvette for their misunderstanding, and I
5     don't recall any discipline, no.
6  BY MS. POCHOP:
7  Q  Did you tell Yvette that she should talk in English to
8     not offend others?
9  A  I believe that was made -- statement was made by the
10    union rep.
11 Q  Oh, okay.  Rick, right?
12 A  Uh-huh.
13 Q  Rick --
14 A  Stokke.
15 Q  Stokke?
16 A  Yeah.
17 Q  And were you present when Rick made that suggestion?
18 A  Yes.
19 Q  Did you add anything to his suggestion?
20 A  I don't recall.  Certainly when communicating around
21    work, it's important that people communicate in a
22    language that the other person can understand, whether
23    it's Spanish, Swahili.  We have interpreters that help,
24    but if there's a common language, that helps, whatever
25    language that is.

---

Page 140

1  Q  Well, Rufus and Yvette weren't talking to each other
2     about anything at work or job duties.  Your
3     investigation showed that, didn't it?
4  A  I think there was a misunderstanding where Rufus heard
5     his name in a conversation between Sala and Yvette.
6  Q  So they weren't even talking to Rufus?
7  A  Yeah.
8  Q  I mean, there's no question that they weren't trying to
9     talk to him in Swahili, to Rufus, about a job duty --
10 A  No.
11 Q  -- during this incident?
12       So Rufus overheard this and apparently expressed
13    that he was offended by it?
14 A  Yeah, there was some miscommunication.
15 Q  And then he --
16 A  Misunderstanding.
17 Q  And he responded by calling a name?
18 A  CCP.
19 Q  Yeah.
20 A  And then it got construed to be something else.  It
21    just got blown out -- blown way out of proportion.
22 Q  And when you were present and Rick told Yvette she
23    should speak in English to not offend others, did you
24    correct Rick to say --
25 A  I don't recall --

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 141

1  Q  If you did --
2  A  -- correcting him.  I don't recall correcting him, no.
3  Q  Why would speaking in her native language to her friend
4     who speaks in that language offend anybody in the
5     workplace?
6        MS. CALEM: Object to the form.  Calls for
7     speculation.
8        THE WITNESS: I don't know.  I don't know why Rick
9     would have said that.
10 BY MS. POCHOP:
11 Q  I wanted to ask you if you saw Exhibit 47 when it was
12    posted on a bulletin board in the workplace?
13 A  I did not see that article posted on a bulletin board,
14    no.
15 Q  Would anybody have authority to post any articles on
16    the workplace bulletin boards without company
17    permission?
18 A  There's a number of different boards in the plant.  For
19    example, there's one board that the company cannot post
20    on, even though it's on the company property.  That's
21    the union's board.  There's boards designated for the
22    union.  There's boards designated by safety.  There's
23    department boards.
24       There's a number of main boards that are
25    monitored, and documents on those boards have to be

---

Page 142

1     authorized by members of management, the official
2     boards.
3        Departments have unofficial boards.  There's
4     community boards where individuals can post community
5     information.  Could be buy and sell or services.
6        I was not aware that that was posted on any board
7     in the plant until it was brought up in deposition.
8  Q  Is that a newspaper article that the company would want
9     to have posted in the workplace for any business
10    reason?
11 A  For any business reason, no.
12 Q  For any other reason?
13 A  I see no reason why I would authorize that being posted
14    on a board, no.
15 Q  We don't have a copy of this here, but this has
16    previously been marked as Exhibit 14 , and are you aware
17    of the complaint that was submitted on April 16 of 2018
18    by a number of employees in department 19 about Lisa
19    Christion being disrespectful and harassing employees
20    on the job?
21 A  Yes.
22 Q  Are you the supervisor or manager in HR responsible for
23    investigating this complaint?
24 A  I did -- I was involved in the investigation of this
25    complaint, yes.

---

Page 143

1  Q  Who did you interview to address -- is the
2     investigation over?
3  A  Yes.
4  Q  And what was the outcome of the investigation?
5  A  My recollection of the events, Candace, who is the
6     secretary-treasurer of the --
7  Q  I'm going to stop you.  I want to know the outcome of
8     the investigation that you conducted.
9  A  Certainly.  The outcome was that we met with the union,
10    asked for clarification from the union as to where this
11    document came from.  Candace, the secretary-treasurer,
12    Rick Stokke, the business agent, neither one of them
13    knew where this came from, stated they did not know.
14    Asked them if they knew what it was about.  They said
15    they did not know.  Said that we should investigate it.
16    We went to the very first name, Terry Kapsch, I
17    believe, the very first name.  Terry is the senior
18    individual in the department.  We brought Terry down.
19    We interviewed Terry.  Dave Hillberg -- or, sorry, it
20    wasn't Dave Hillberg.  Strike that.  It was -- I think
21    it was Garney Henle or Steve Fergen was present.
22    We collected information from Terry.  We pulled
23    that together, asked the -- there was some corrective
24    actions that came out.
25 Q  What was the corrective action?

---

Page 144

1  A  There was some concern about break times, accuracy of
2     punches, Lisa being loud, buckets being taken off the
3     job, the buckets that individuals would sit on on the
4     job, and some other items I can't recall.
5  Q  Were the buckets an accommodation for employees who
6     needed them?
7  A  There was some discussion that the buckets helped make
8     the job go easier.  Out of that particular item, I
9     instructed the ergo committee to do a review.  If
10    there's a need for sit-down -- or sit-stand chairs in
11    the area to make the job easier or to accommodate, then
12    we should get designated chairs installed, and I
13    authorized the department to go ahead and invest in
14    proper stools if needed, sit-stand stools.
15 Q  So who got corrective action as a result of the
16    interview that you conducted with Terry?
17 A  The corrective actions were -- or the follow-ups were
18    to coach Lisa on respectful communications, tone of
19    voice, the ergo chairs that we talked about.  There was
20    concerns about walking times.  One of the corrective
21    actions was to make sure that folks had adequate
22    walking time.
23 Q  Who got that corrective action?
24 A  The department manager.  And, again, I -- I think it
25    was Garney.

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

Page 145

1  Q  Anybody else have corrective action?
2  A  There was a couple other -- I can't remember the
3     specifics.  I'd have to pull the notes on the
4     specifics, but that's the general.
5  Q  Did Lisa receive an actual disciplinary warning or
6     coaching?
7  A  Coaching.
8  Q  And so she didn't actually get a disciplinary action
9     for any of the behavior that you found to be in
10    violation of company policy?
11 A  We asked for the specifics.  We reviewed that.  I asked
12    the union who they'd like to interview next, and they
13    said they didn't need to interview anybody else.
14 Q  So Smithfield decided not to interview any of the other
15    employees who signed a statement that said that Lisa
16    was harassing them at work?
17    MS. CALEM: Object to the form.
18    THE WITNESS: Correct.  We looked through it and
19    the corrective actions -- I'd have to get the entire
20    list of corrective actions.  One of the
21    responsibilities Garney had was to follow up, see if
22    there were any other concerns that came forward.
23 BY MS. POCHOP:
24 Q  So does the union get to dictate how Smithfield Foods
25    HR managers investigate allegations of harassment?

Page 146

1  A  No. No.  They brought forward this complaint.  They
2     didn't have any information as to what the complaint
3     was or was not about.
4  Q  Well, as an HR manager at Smithfield Foods, isn't it
5     the HR manager's job to find out why an employee is
6     complaining of harassment in the workplace, especially
7     if the union says they don't really know?
8  A  Yeah, I believe the corrective actions that were put
9     together were appropriate in this case.
10 Q  All of those corrective actions came out of
11    interviewing just one of the people who signed that
12    agreement -- or signed that complaint of harassment,
13    right?
14 A  And feedback from the department manager, and there was
15    some follow-ups that he had as well.
16 Q  So you don't really know why, for example, Yvette and
17    Sala filed a complaint about harassment by Lisa?
18 A  Yvette and Sala were not interviewed, no.
19 Q  And who made the determination that interviewing all of
20    the employees who signed a complaint -- because
21    that's what it qualifies as, it's a complaint of
22    harassment, isn't it?
23 A  Yes.
24    -- and disrespectful treatment by Lisa, which would
25    also prompt an investigation under Smithfield policies

Page 147

1     according to your handbook, correct?
2  A  The allegations are -- yes, they're very broad.
3  Q  And isn't it HR's job duties at Smithfield to find out
4     what the specifics for any employee who makes a
5     complaint and speaks out about harassment are?
6     MS. CALEM: Object to the form.
7     THE WITNESS: Yes.  In this case, again, I believe
8     that the follow-up was appropriate.
9  BY MS. POCHOP:
10 Q  Smithfield policy states that every complaint of
11    harassment will be investigated?
12 A  Correct.
13 Q  That's what you tell your employees your job duties are
14    going to be if they speak up, right?
15 A  Correct.
16 Q  And that did not happen.  Only one of the employees who
17    made this complaint was interviewed?
18    MS. CALEM: Object to the form.
19    THE WITNESS: This complaint was investigated, and
20    one individual was interviewed.
21 BY MS. POCHOP:
22 Q  We talked yesterday before the deposition that Sala and
23    Yvette both had their pay reduced because they were
24    attending the depositions in this case, specifically
25    because they were attending their own depositions that

Page 148

1     Smithfield Foods was taking.
2     Do you recall our conversation off the record
3     about that?
4  A  You mentioned there was some concerns with their time
5     cards, yes.
6  Q  And tell me what you represented to me was going to
7     happen with regard to their claim that their pay was
8     reduced for attending depositions in their
9     discrimination/retaliation case.
10 A  Right.  We also discussed this last week, that their
11    absences are excused to attend these depositions.
12    Yesterday we talked about is it an option for them to
13    use their -- I think the term was personal days, or
14    I'll use the term paid time off because it's more broad
15    and more accurately reflects the time that they have --
16    to attend this deposition.
17    I committed that, yes, if they wanted to use paid
18    time off, they could complete the request, paid time
19    off request, and there's a number of buckets that they
20    can use to select which paid time bucket, whether it's
21    longevity days or vacation days.
22    And last night, as committed, I followed up with
23    the time and attendance clerk for department 19, the
24    head of our payroll department, the department head,
25    and said you can expect that if Sala and Yvette want to

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Scott Reed
June 1, 2018

---

Page 149

1   submit paid time off requests, they'll need to complete
2   the time off request form, and they can submit it up
3   until next week, and that we can -- they're authorized
4   to make that pay retroactive for these past two weeks.
5 Q  Who was it in Smithfield Foods who would have
6     determined that they should have their pay docked
7     because they were attending the deposition that
8     Smithfield Foods had noticed for them?
9        MS. CALEM: Object to the form of the question.
10    It lacks foundation.
11 BY MS. POCHOP:
12 Q  Let me ask it -- I'll withdraw that.
13    The depositions that they didn't get paid for
14    attending were their own depositions, right?
15 A  Yes.
16 Q  And those were depositions that Smithfield Foods
17    scheduled to take for them. You know that, right?
18 A  Yes.
19 Q  Because you also -- like, you bought a videographer and
20    you got an interpreter to come for those depositions so
21    that it could happen on those dates, right?
22 A  Yes.
23 Q  And Smithfield Foods was very aware that it was going
24    to be taking its employees' depositions on those
25    specific dates?

---

Page 150

1 A  Yes.
2 Q  And they didn't really have an option of not going to
3     the depositions because they were noticed by Smithfield
4     Foods, a legal procedure?
5 A  Correct.
6 Q  And so there wasn't any mystery that they would need
7     time off to attend their depositions, was there?
8 A  No. Time was approved.
9 Q  Was the description that Lisa gave about them coming
10    down to her office and -- or going to her in the
11    department and saying, we are going to need some time
12    off for this, did she describe behavior and compliance
13    with her role as a lead in the department in providing
14    information about how they could have their depositions
15    taken by Smithfield without having a financial penalty?
16       MS. CALEM: Object to the form. Lack of
17    foundation.
18       THE WITNESS: I'm not aware what arrangements had
19    been made. This is the first time I've had any
20    questions around whether it should be paid or unpaid
21    time. I know that when we talked last week, there was
22    a question around making sure that the time was
23    approved off, and I did that. This is the first time
24    there's been any question whether this participation
25    should be paid or unpaid.

---

Page 151

1 BY MS. POCHOP:
2 Q  Well, would there be any circumstance where a notice of
3     deposition from Smithfield to its own employees would
4     not be approved time off?
5 A  I don't know. I don't know.
6 Q  From an HR perspective, if -- I mean, you have a lot of
7     experience in HR, it sounds like, from your résumé.
8     And in that context can you understand why it would
9     have a chilling effect when people who go to your HR
10    department to speak up about race discrimination end up
11    with a response that is disciplinary action?
12       MS. CALEM: Object to the form.
13       THE WITNESS: If you're referencing the discipline
14    for Yvette and Sala for being off the job, that was not
15    for reporting a concern. That was for not notifying
16    the supervisor that they'd be off the job.
17 BY MS. POCHOP:
18 Q  And, again, what policy number is that?
19 A  I'd have to review it in the handbook, being off the
20    job or away from the assigned work area without
21    authorization.
22 Q  They can go where they want in the plant in the common
23    areas on their breaks, can't they?
24       MS. CALEM: Objection. Asked and answered. We
25    spent an hour on this earlier.

---

Page 152

1        THE WITNESS: Yes.
2 BY MS. POCHOP:
3 Q  Just want to make sure I'm understanding how your
4     policies are actually carried out at Smithfield,
5     because that's really what cases of retaliation are
6     about, isn't it, about how the company follows its own
7     policies from an HR perspective?
8        MS. CALEM: Object. Object to the form, asking
9     for a legal conclusion. He's not able to give that.
10 BY MS. POCHOP:
11 Q  What's your HR training tell you about retaliation
12    cases?
13       MS. CALEM: Object to the form.
14       THE WITNESS: Retaliation is -- again, it's if a
15    person that files a complaint based on a protected
16    status and there is adverse action that is intent to be
17    hurtful or serve no useful purpose.
18 BY MS. POCHOP:
19 Q  Are you supposed to actively protect Smithfield
20    employees from retaliation in the workplace?
21       MS. CALEM: Objection. Asked and answered.
22       THE WITNESS: Yes.
23 BY MS. POCHOP:
24 Q  Are you hoping that Sala will quit her job at
25    Smithfield?

---