*Sala Naambwe and Yvette Nimenya v. Smithfield Foods, Inc.*

Carrie Moate
May 31, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

App. Tab

E

Page 5

1  you.
2  A  That means telling the truth.
3  Q  Do you have any physical reason today, any memory
4     impairment or medication or anything that affects your
5     ability to remember?
6  A  No.
7  Q  If I ask you a question that you don't understand,
8     Carrie, please go ahead and tell me. I've been asking
9     a lot of bad questions today, and it's not my intention
10    to have my questions be hard to understand, so I'll try
11    to clarify them.
12       And I should let you know that unless your
13    attorney specifically instructs you not to answer a
14    question -- she's likely to make an objection, and you
15    still -- after she makes her objection, you still have
16    the obligation to answer. The objection is for the
17    judge later. Okay?
18 A  Okay.
19 Q  How old are you?
20 A  I am 40.
21 Q  And your educational background?
22 A  I have an associate's degree and a bachelor's degree in
23    sociology and HR.
24 Q  When did you get your degree?
25 A  Just recently, actually. May of this year.

Page 6

1  Q  Where did you get your degree from?
2  A  SDSU.
3  Q  Congratulations.
4       How about your employment history?
5  A  After I graduated with my first degree, it's been
6     Smithfield since.
7  Q  And so when did you start at Smithfield?
8  A  2005.
9  Q  Can you overview your employment history before you
10    were at Smithfield?
11 A  I was a stay-at-home mom.
12 Q  Your job title at Smithfield?
13 A  HR manager.
14 Q  And can you describe for me what the primary job
15    responsibilities that you have as an HR manager are?
16 A  My primary responsibilities are employee relations,
17    working with the managers and the union on grievance
18    processes, recruiting.
19 Q  Can you describe for me what your policy is for
20    training managers at Smithfield to comply with the code
21    of conduct?
22 A  We hold an orientation class after they first start and
23    go over the policies, and then we do yearly -- an
24    annual review.
25 Q  And the annual review, is that a review of your

Page 7

1  harassment and discrimination policies?
2  A  Yes, that and the code of ethics.
3  Q  And Exhibit 3 sitting in front of you is the code of
4     ethics book, right?
5  A  Uh-huh.
6  Q  In the code of ethics book it really emphasizes the
7     Speak Up program, right?
8  A  Correct.
9  Q  Can you tell me what you tell employees about the Speak
10    Up program?
11 A  I tell employees that it's part of their responsibility
12    to speak up if they see something that is wrong out in
13    the plant or among their coworkers or managers. They
14    can come to their manager or they go to HR to report a
15    problem.
16 Q  Can you describe your own training to become an HR
17    manager at Smithfield Foods?
18 A  It was on the job.
19 Q  So, like, you don't have to -- you don't sit down with
20    any other HR people from other Smithfield plants or
21    anything like that?
22 A  No.
23 Q  Does Smithfield Foods promise to employees that they
24    will not be retaliated against if they report a policy
25    violation or have a question about a policy violation?

Page 8

1  A  Yes. We have a no retaliation policy.
2  Q  And tell me what your understanding about
3     retaliation -- what the retaliation policy is.
4  A  Retaliation would be that you discipline somebody for
5     making a complaint or filing a grievance or bringing
6     something forward, speaking up.
7  Q  Is there any other -- other than disciplinary actions,
8     is there any other actions that can constitute
9     retaliation in the workplace in violation of the
10    Smithfield Foods policy?
11 A  Yes, you could be pulled off a job, pulled to a
12    different area, demoted.
13 Q  Can you describe for me your understanding of the "do
14    the right thing" instruction in the code of conduct?
15 A  "Do the right thing" instruction?
16 Q  Do you know what that is?
17 A  Do you know what part of the policy?
18 Q  Well, I mean, you're the HR manager. Do you know what
19    the "do the right thing" policy is?
20 A  It's the Speak Up policy.
21 Q  Are employees at Smithfield told that it is their
22    responsibility to report to management when they
23    believe that there may be a violation of Smithfield
24    policy?
25 A  I'm sorry. Can you repeat the question?

Page 9

1 Q Are employees at Smithfield Foods told that they have
2   the responsibility and the duty to report when they
3   think that there is a violation of Smithfield policy?
4 A Yes.
5 Q If Smithfield employees have testified in this case
6   that they are concerned about reporting policy
7   violations that they have either experienced or
8   witnessed, is Smithfield HR doing its job?
9       MS. CALEM: Objection to the form.
10 BY MS. POCHOP:
11 Q You can answer.
12 A Oh. Well, I haven't heard that they've had any issues
13   coming forward, but I would hope that we're doing our
14   job.
15 Q I mean, what do you do as an HR manager to make sure
16   that the promise that you make to employees that they
17   should speak up and that they won't be retaliated
18   against is actually followed by HR management?
19 A We try to put as much information out there to the
20   employees that we can, whether it's posting information
21   out on bulletin boards, letting them know that we have
22   an open door policy, we try to get out to the plants
23   and visit with them.
24 Q Can you describe for me what your open door policy
25   means at Smithfield Foods?

Page 10

1 A That means they can come down and make a complaint
2   whenever they feel it's necessary.
3 Q And is that what employees are instructed?
4 A They're instructed to go to their managers first, and
5   then if they don't feel like an issue has been
6   resolved, then they can go to HR.
7 Q In Exhibit 2, which is sitting over there and is the
8   Smithfield handbook, at page 6 -- all employees are
9   required to sign off that they've read and understood
10   both the code of conduct and the Smithfield handbook,
11   right?
12 A Correct.
13 Q Just so you can follow along with me, I'm at page 6 of
14   Exhibit 2.
15   Are you supposed to do everything you can to make
16   speaking up easy to do?
17 A Yes.
18 Q And have you provided various ways for anyone to raise
19   a question or concern?
20 A Yes.
21 Q And do you tell employees, you will not be retaliated
22   against for raising a question or reporting a concern?
23 A Yes.
24 Q And is that your obligation as an HR manager to do
25   everything you can to make speaking up easy to do?

Page 11

1 A It's not just mine. It's everybody's.
2 Q But specifically for you, that's one of the central
3   charges of your job, right?
4 A It's everybody's.
5 Q And on virtually every page of your code of conduct
6   employees are instructed that speaking up is something
7   that they should be able to do?
8 A Correct.
9 Q It would be impossible to work at Smithfield Foods and
10   not get the message that you're supposed to be able to
11   speak up about policy violations?
12 A Correct.
13 Q And you're supposed to be able to go to HR and report
14   them?
15 A Correct.
16 Q It's one of the many various avenues that employees are
17   told they should use if they want to make a complaint?
18 A Correct.
19 Q And they're also told -- and you're responsible to make
20   sure that they do not feel that they are retaliated
21   against when they make a report or concern?
22 A Correct.
23 Q And that is a central part of your job duty?
24 A Mine, along with everybody else's.
25 Q But specifically as an HR manager --

Page 12

1 A Sure, yes.
2 Q -- what is your responsibility in terms of making sure
3   that employees are not retaliated against for raising
4   concerns?
5 A Getting the message out there.
6 Q And how do you do that?
7       MS. CALEM: Objection. Asked and answered.
8       THE WITNESS: By informing them of their options.
9 BY MS. POCHOP:
10 Q What do you inform them of specifically?
11 A That they can come and make a complaint.
12 Q How many sexual harassment complaints have you been
13   presented with as an HR manager at Smithfield Foods?
14 A Sexual harassment?
15 Q Uh-huh.
16 A I think one.
17 Q And who would that have been?
18 A I think it was Juan Ogaldez.
19 Q That was Sala?
20 A Yeah, and Sala.
21 Q And Yvette?
22 A Yes.
23 Q How many racial discrimination complaints have you been
24   involved with as an HR manager at Smithfield Foods?
25 A Just one.

| Sala Naambwe and Yvette Nimenya v. | Carrie Moate |
| Smithfield Foods, Inc. | May 31, 2018 |

Page 13

1  Q  And is that Sala and Yvette?
2  A  Sala and Yvette.
3  Q  And Lorena?
4  A  Correct.
5  Q  And how many employees do you have?
6  A  About 3,600.
7  Q  And out of 3,600, and you've been there for five years
8     in this job, and this is the first reports that we're
9     talking about in this lawsuit that you've had?
10 A  That is correct.
11 Q  So because you have not had experience in
12    investigating -- let's start with racial
13    discrimination. Can you tell me what the policy and
14    procedure for investigating a racial discrimination
15    complaint is supposed to be?
16       MS. CALEM: Object to the form of the question.
17       You can answer.
18       THE WITNESS: It would be the same as any other
19    complaint. You're going to take the accused and the
20    accuser's statements and look for any witnesses that
21    they have and talk to all their witnesses and go off
22    the facts that are given to you.
23 BY MS. POCHOP:
24 Q  What is your responsibility as an HR manager to
25    document a complaint of discrimination or harassment?

Page 14

1  A  Document everything, all of the facts, all of the
2     statements.
3  Q  Are you supposed to get a written statement from the
4     complaining party?
5  A  That's up to the complainant. We encourage that.
6  Q  Is there actually an incident intake form that is
7     provided to them?
8  A  Yes, there is.
9  Q  I want to make sure that we're on the same page about
10    how the policy -- what the policy at Smithfield Foods
11    is.
12       Is calling people of color monkeys, is that an
13    obvious violation of Smithfield Foods policy?
14 A  Yes.
15 Q  Is pushing food faster than your coworkers can safely
16    handle it so that food is hitting or falling on the
17    floor, is that a violation of Smithfield Foods' policy?
18 A  No.
19 Q  And why not?
20 A  It's not necessarily a violation of a policy. It might
21    be a safety concern.
22 Q  So is it a violation of a safety policy if you are
23    pushing food so fast that hams are hitting employees or
24    falling on their feet?
25 A  I guess it would depend on the context of the

Page 15

1     situation.
2  Q  And how would you determine -- what context would you
3     need to know to determine if it was a policy violation?
4  A  The events that took place.
5  Q  For example, if an employee had said, quit pushing
6     those so fast, we can't keep up?
7  A  That probably wouldn't be a violation yet.
8  Q  What would be a violation? Can you give me an example?
9  A  If somebody picked up a ham and threw it at them, now
10    that would be a violation of a policy.
11 Q  Is swearing and using foul language towards your
12    coworkers a violation of policy?
13 A  Yes.
14 Q  Is making sexual gestures towards coworkers a
15    violation?
16 A  Yes.
17 Q  Is using sexual reference and language when
18    communicating with coworkers a violation?
19 A  Yes.
20 Q  And employees are told that they are not to be talking
21    about sexual matters or even making jokes about sex
22    together at work, right?
23 A  Correct.
24 Q  How would you assess how well your Smithfield managers
25    impose that workplace requirement?

Page 16

1        MS. CALEM: Object to the form.
2        THE WITNESS: I guess I wouldn't know what their
3     thoughts are on that. I know what we do, give them
4     information on it and what they should watch for and
5     what they should look for.
6  BY MS. POCHOP:
7  Q  If you've got managers who aren't enforcing the policy
8     about professional workplace conversation, should that
9     manager be investigated and possibly disciplined?
10       MS. CALEM: Object to the form.
11       THE WITNESS: For not enforcing?
12 BY MS. POCHOP:
13 Q  Yeah.
14 A  Yes.
15 Q  Have you ever disciplined a manager for not enforcing a
16    Smithfield policy?
17 A  No, I don't perform disciplines on managers.
18 Q  Who does?
19 A  That's usually the responsibility of Scott.
20 Q  So if you hear that a manager is not enforcing a
21    policy, what's the procedure that you're supposed to
22    follow?
23 A  If there has -- if it came out in an investigation or
24    something, then I'll have my notes, and that
25    information will get given to Scott.

Page 17

1  Q  Is telling people that they should speak English at
2     work, is that a violation of Smithfield Foods' policy?
3  A  I wouldn't say it's a violation. Not appropriate, but
4     not a violation.
5  Q  And why isn't it appropriate?
6  A  Because we have a lot of different cultures and a lot
7     of diversity and we want everybody to feel welcome.
8  Q  And is it part of your code of conduct and your
9     affirmative action recruiting to welcome people of
10    other cultures?
11 A  Yes.
12 Q  Is it a violation of Smithfield Foods' policy to tell
13    people of color or who have a different nationality to
14    go back to their country?
15 A  No.
16 Q  And why is that not a violation?
17 A  Oh, I'm sorry. I misunderstood the question.
18 Q  Okay. So --
19 A  It would be a violation.
20 Q  And those would be pretty obvious violations -- that
21    would be an obvious violation?
22 A  Yes.
23 Q  Are Smithfield managers instructed that they have the
24    authority to discipline employees for admitted policy
25    violations?

Page 18

1  A  Yes.
2  Q  So, for example, if Scott Genzler told Russ Hultman
3     that he called Sala and Yvette monkeys, should Russ --
4     does Russ have the discretion to issue an immediate
5     discipline?
6  A  He does, but we'd encourage him to come to HR with
7     that.
8  Q  And, likewise, Sala, Yvette, and Lorena would be
9     encouraged to go to HR to make their report, correct?
10 A  Correct.
11 Q  I wanted to ask -- I think it's sitting over there.
12    Can you describe what the company's tolerance for
13    racial discrimination is?
14        MS. CALEM: Object to the form.
15        THE WITNESS: We don't tolerate it.
16 BY MS. POCHOP:
17 Q  Is it one of those zero tolerance policies?
18        There we go. (Indicating.)
19 A  It's not tolerated.
20 Q  Not that one. Those two on the bottom -- those two --
21 A  Okay.
22 Q  Let's pull out those two incident forms. It looks like
23    one of them -- can you tell me the number on that
24    yellow tag?
25 A  44.

Page 19

1  Q  Exhibit 44, and at the top it looks like number --
2  A  15.
3  Q  15. Okay. Are these forms that you would have
4     received on the day that Sala, Yvette, and Lorena came
5     to the HR department to report racist, bullying, and
6     harassing behavior by Scott Genzler?
7  A  Yeah. They were turned in to me, but these forms were
8     not.
9  Q  What do you mean?
10 A  They weren't turned in to me at the time that they
11    came.
12 Q  So how did you get them?
13 A  It was later in the day, they were in my mailbox.
14 Q  So did you have -- you were the HR director that
15    received their complaint?
16 A  No.
17 Q  Who was?
18 A  This, as far as I know, was the complaint.
19 Q  When they came to the HR department, did they talk to
20    anybody in HR?
21 A  I did briefly talk to them. Russ had come down looking
22    for them. He came down and asked if he had some girls
23    in the office, and I didn't know. We went and looked.
24    I saw them in the waiting room and -- he said they were
25    off the line, the line's not -- or the line's stopped,

Page 20

1     and I said, well, if they're off the line without
2     permission they could be written up for that. And then
3     we went and saw the girls in the waiting room, and I
4     said, the manager's looking for you. And then I asked
5     Russ why they were down. He said that they were down
6     over an incident that happened on Saturday. And I
7     asked what the incident was, and he said that Scott
8     Genzler had called one of them a bitch. And I asked if
9     he had been disciplined, and he said no. And I told
10    him he needed to be disciplined for it, and then I
11    left. So...
12 Q  Russ told you that the incident was that he had -- that
13    Scott Genzler had called one of the complaining
14    employees a bitch?
15 A  Correct.
16 Q  Did the three women that were at HR to speak up about
17    the discrimination they had experienced object to
18    Russ's description?
19 A  They didn't say anything.
20 Q  Did you find out later that Russ had been materially
21    inaccurate in his description of what Scott Genzler had
22    said to Yvette and Sala?
23        MS. CALEM: Object to the form.
24        THE WITNESS: Not until probably noon that day.
25

Page 21

1  BY MS. POCHOP:
2  Q   Tell me what you found out at noon that day.
3  A   That there was more than just foul language and that
4      the monkey comment was in there.
5  Q   Did you discuss with Russ how he had failed to mention
6      that Scott had admittedly called these employees of
7      color monkeys?
8  A   I don't believe I did have a discussion on that.
9  Q   Did you have any concern that Russ had described to you
10     that the only thing Scott had said was calling somebody
11     a bitch instead of mentioning overt race
12     discrimination?
13         MS. CALEM: Object to the form.
14         THE WITNESS: Yes. Yes, that was a concern.
15 BY MS. POCHOP:
16 Q   And so what did you do about your concern?
17 A   I followed up with, I believe, him and his manager to
18     find out if discipline had taken place or not.
19 Q   What did you do about Russ telling you something that
20     was materially inaccurate?
21         MS. CALEM: Object to the form.
22         THE WITNESS: I didn't report it.
23 BY MS. POCHOP:
24 Q   What?
25 A   I didn't say anything about it.

Page 22

1  Q   Russ has an obligation to be honest with you and tell
2      you the actual facts, doesn't he?
3  A   He does.
4  Q   Did he do that?
5  A   No.
6  Q   Is that a violation of his code of conduct obligation?
7  A   Yes.
8  Q   Is it your obligation to investigate that?
9  A   No.
10 Q   Do you have any obligation -- when you find out a
11     manager -- I mean, basically, he lied to you about what
12     they were down to report, right?
13         MS. CALEM: Objection to the form of the question.
14         THE WITNESS: I don't know if he meant to lie or
15     just didn't give me all the information. I can't speak
16     for him.
17 BY MS. POCHOP:
18 Q   There wasn't even a complaint that he called them a
19     bitch, was there?
20 A   I believe that was in their statement. After Scott met
21     with them, I think that was in there.
22 Q   The only thing he said that had happened was that Scott
23     had called somebody a bitch?
24 A   Correct.
25 Q   And so when you found out around noon that it was

Page 23

1      actually calling them monkeys, telling them to go back
2      to their country, telling them to speak their own
3      language and swearing at them and using the F-word to
4      them, what did you do -- what did you say to Russ about
5      why he had not told you that when he was in your office
6      and they were in your office?
7  A   I don't believe I followed up with Russ. I believe I
8      followed up with his manager.
9  Q   Who is?
10 A   It would have been Dave Hillberg.
11 Q   And what did you tell Dave?
12 A   I think I just asked what had happened with the
13     situation.
14 Q   Did you tell Dave, Russ came down here and told me that
15     the only thing Scott said was bitch, and it was
16     actually racial discrimination?
17 A   I probably did. I don't recall, though.
18 Q   Did you document that anywhere?
19 A   No. It was a verbal conversation.
20 Q   Isn't it your obligation as an HR manager to document
21     when you make a report of a manager violating
22     Smithfield's code of conduct?
23 A   Yeah.
24 Q   Why didn't you follow your own policy?
25 A   I believe I was allowing his manager to take care of

Page 24

1      it, but --
2  Q   Were you worried that you'd get in trouble if you
3      documented that about a manager?
4  A   No.
5  Q   So if you didn't have to worry about your own outcome
6      for making a report -- I mean, you didn't actually
7      follow the Speak Up policy, did you?
8  A   It wasn't intentional.
9  Q   But you didn't follow the Speak Up policy.
10 A   Again --
11         MS. CALEM: Objection to the form.
12 BY MS. POCHOP:
13 Q   It's a yes or no answer.
14         MS. CALEM: Objection to the form.
15         THE WITNESS: No, did not.
16 BY MS. POCHOP:
17 Q   And you're the person who trains people that they have
18     to follow the Speak Up policy, right?
19 A   I don't do the training, no. But, yes, I'm an example.
20 Q   It's your job duty to follow and be an example of the
21     Speak Up policy?
22 A   Correct.
23 Q   Can you explain to me why you don't have to follow the
24     policy that you instruct your employees they have to
25     follow?

Page 25

1   MS. CALEM: Objection to the form.
2   THE WITNESS: I don't have any exception.
3   BY MS. POCHOP:
4   Q  Were you disciplined for not following the Speak Up
5      policy and reporting a supervisor's failure to follow
6      the code of conduct?
7   A  Well, we wouldn't discipline anybody for not following
8      the Speak Up policy. That's --
9   Q  Well, you were the person who recommended that Sala,
10     Yvette, and Lorena should be disciplined for being in
11     the HR office, right?
12     MS. CALEM: Objection. Misstates testimony.
13     THE WITNESS: Correct. Uh-huh.
14  BY MS. POCHOP:
15  Q  And did you -- when you saw them in the office, did you
16     say to either of the three women that were there
17     completing a form, what are you guys doing here?
18     Anything like that?
19  A  No.
20  Q  You just saw three people in your office, in the HR
21     office, with an incident form, and said, go back to
22     work?
23     MS. CALEM: Objection. Misstates testimony.
24     THE WITNESS: No.
25

Page 26

1   BY MS. POCHOP:
2   Q  Tell me what you did when you saw these three women in
3      your office.
4      MS. CALEM: Objection to the form. Misstates
5      testimony. Lacks foundation.
6      MS. POCHOP: I'm not even restating form. I'm
7      asking her what she did when she saw these three women
8      in her office.
9      MS. CALEM: Well, they weren't in her office.
10     MS. POCHOP: HR department.
11     THE WITNESS: There was probably six other people
12     in the waiting room too. It was a place that everybody
13     goes to fill out forms for address changes, phone
14     number changes, W-2s. There's always people in that
15     office, so it's not unusual.
16  BY MS. POCHOP:
17  Q  So it's not unusual for you to see people in there and
18     not even ask why they're there?
19  A  That is correct.
20  Q  And just say, go back to work?
21     MS. CALEM: Objection to the form.
22     THE WITNESS: I never said that.
23     MS. CALEM: Misstates testimony --
24  BY MS. POCHOP:
25  Q  What did you say?

Page 27

1   MS. CALEM: -- lacks foundation.
2   THE WITNESS: The only thing I said at any point
3   was that their managers were looking for them.
4   BY MS. POCHOP:
5   Q  Did you ask them why they were there?
6   A  No.
7   Q  How is your treatment of them when they are in the HR
8      department and you know that there is a Speak Up policy
9      that is on every single page of your code of conduct
10     and is reiterated in your employee handbook as one of
11     the most important things that they need to do as
12     employees -- how is saying you need to go back to work
13     consistent with your obligation as an HR manager?
14     MS. CALEM: Objection. Misstates testimony, lacks
15     foundation. She testified she did not say that.
16     THE WITNESS: I did not say that.
17  BY MS. POCHOP:
18  Q  How is not asking them why they are there consistent
19     with your Speak Up policy?
20  A  Because I don't ask everybody that comes in the office
21     why they're there. We have two other women that work
22     the front window.
23  Q  Did you go talk to them to find out if they knew why
24     these three women were in the office with an incident
25     intake report form?

Page 28

1   A  No.
2   Q  I mean, so you didn't know if they had been subject to
3      a physical assault, a verbal assault, or anything when
4      you said "your supervisor is looking for you"?
5   A  No.
6   Q  And is that consistent with the Smithfield code of
7      conduct?
8   A  We don't normally go asking people every time they come
9      in the office if there's an issue. That's for them to
10     speak up and tell us if there's an issue.
11  Q  So in addition to showing up at the HR department and
12     getting an incident intake report form, employees
13     actually have to also speak up to you personally?
14  A  No.
15     MS. CALEM: Objection to the form of the question.
16     It's argumentative and it misstates her testimony
17     intentionally.
18  BY MS. POCHOP:
19  Q  Well, I'm just trying to understand what your
20     obligation is as an HR manager when you tell people
21     that work for Smithfield that it's their responsibility
22     and their duty to report policy violations. Right?
23     MS. CALEM: Objection to the form of the question.
24     THE WITNESS: It is their responsibility, yes.
25

Page 29

BY MS. POCHOP:
1  
2  Q  And you tell them that they should come to the HR
3     department any time they have a question or comment?
4  A  Correct.
5  Q  And then when they actually do come to the HR
6     department, what is the policy supposed to be?
7        MS. CALEM: Objection to the form.
8        THE WITNESS: Then they would notify somebody at
9     the front window that they have a complaint that they
10    would like to make.
11 BY MS. POCHOP:
12 Q  And then they would get an incident report form?
13 A  Yep.
14 Q  Did you observe that they had incident report forms in
15    their hands?
16 A  No.
17 Q  And so when you saw the incident report forms, was
18    that -- did you say at noon that day?
19 A  Yeah.
20 Q  They were in your mailbox?
21 A  Correct.
22 Q  Had Sala, Yvette, and Lorena already been disciplined
23    by that point?
24 A  Correct.
25 Q  Had Scott been disciplined at that point?

Page 30

1  A  Correct.
2  Q  Who was the person -- well, let me show you what's been
3     marked as Exhibit 16.
4        Was Scott -- well, sorry.  Here, I'll hand you one
5     that doesn't have my handwriting on the bottom of it.
6     Here's Exhibit 16.
7        Was this discipline for using profane language
8     that was issued to Scott Genzler for -- because you
9     were told he called somebody a bitch?
10 A  I believe that's what he issued it for.
11 Q  Did he get any further discipline when you found out
12    that he had actually made racist remarks?
13 A  No.  We attempted to overturn it, but the union was
14    adamant that we couldn't do a different discipline.
15 Q  So he was never actually disciplined for calling people
16    monkeys and telling them to go back to their country,
17    right?
18 A  He was.
19 Q  How was he disciplined for that?
20 A  This would be under the same work rules.
21 Q  But this was for calling somebody a bitch.
22 A  But it would be under the same amount of discipline,
23    whether it was harassment or profane language.
24 Q  I'm going to show you what has been marked as
25    Exhibit 8.  I'm kind of surprised to find out that what

Page 31

1     Russ told you was that Scott had called somebody a
2     bitch, because I don't see that in your notes that were
3     made to the file in this case anywhere.
4        Did you document that?
5  A  This?
6  Q  That what Russ told you was that Scott had called
7     somebody a bitch.
8  A  No, I didn't put the exact verbiage down.
9  Q  And why would you not put the exact verbiage down?
10    Isn't that an important part of documentation from an
11    HR standpoint?
12 A  Yeah, during an investigation, I guess it would be.
13 Q  Were you doing an investigation?
14 A  At the time I wrote the notes, no.  I was just
15    submitting a timeline.
16 Q  Did anybody do an investigation and make notes about
17    what had happened and how it had transpired?
18 A  I believe Russ did an investigation.
19 Q  Russ, the person who told you inaccurate information?
20 A  Correct.
21 Q  And I'm looking here -- I mean, did -- Dave knew that
22    Russ -- because you informed Dave, apparently orally,
23    Dave knew that Russ had not been accurate in his
24    description of what had happened between Genzler and
25    the plaintiffs in this case?

Page 32

1  A  I believe I did tell him.
2  Q  Did you tell Scott Reed that Russ had not been accurate
3     in his representation to you about what had happened
4     between Genzler and the plaintiffs?
5  A  Yes.
6  Q  And what was Scott's reaction?
7  A  He met with Russ, I believe, and Sala and Yvette.
8  Q  I see on Exhibit 8, on March 3rd here, Scott is asking
9     Russ and cc'ing you to send me your notes from the
10    meeting with the employees to close off the file.
11       Why was the file being closed off, do you know?
12 A  No, I don't.
13 Q  He wanted to know who was in the meeting and the key
14    messages, and it says, "It's important to have good
15    notes on this."
16       What's your understanding of why it was important
17    to have good notes on this?
18 A  I don't know.  Probably the context of what happened
19    and that we wanted to make sure that it was corrected.
20 Q  And the smoked meat wash office notes -- handwritten
21    notes that are written on this email, were those
22    written by Russ?
23 A  Yes.
24 Q  Are they kept -- were they in his personnel file or
25    Sala and Yvette's personnel file?  Or where was this

| Sala Naambwe and Yvette Nimenya v. | Carrie Moate |
|---|---|
| Smithfield Foods, Inc. | May 31, 2018 |

**Page 33**

1  note kept?
2  A  I don't know.
3  Q  Is the information that Russ provided in Exhibit 8, in
4     the handwritten note, is that accurate?
5        MS. CALEM: Objection to the form.
6        THE WITNESS: I wouldn't know.
7  BY MS. POCHOP:
8  Q  Well, the disciplinary action that was issued for
9     calling them a bitch is dated February 22.  So is there
10    another incident that happened on February 26th?
11 A  No.  The date -- yeah, the dates don't look correct.
12 Q  Is Russ obligated to be accurate in the representations
13    that he makes to HR about disciplinary action?
14       MS. CALEM: Objection to the form.  Asked and
15    answered.
16 BY MS. POCHOP:
17 Q  Is he?
18 A  We would like him to, yes.
19 Q  Did you notice that the dates were wrong?
20 A  I don't remember.
21 Q  Do you know why Gary Loger's February 29th email that's
22    attached there references suspensions?
23 A  No, I do not.
24 Q  Did you actually write the disciplinary actions that
25    were issued to Sala, Yvette, and Lorena on February 22?

**Page 34**

1  A  No.
2  Q  Who would have known that they were going to be
3     disciplined for being in the HR office?
4        MS. CALEM: Objection to the form.
5        THE WITNESS: As far as I know, me, Russ, and
6     whoever the union steward was.
7  BY MS. POCHOP:
8  Q  They were disciplined for being in the HR office
9     instead of being on the line, right?
10 A  No.
11 Q  What were they disciplined for?
12 A  They were disciplined for not being -- for being off
13    the line and the line was stopped, without permission.
14 Q  Is there anywhere in the code of conduct, the employee
15    handbook, or the union handbook where it says that
16    employees have to get permission to go speak up and
17    report policy violations to HR?
18       MS. CALEM: Objection to the form.
19       THE WITNESS: It's always been a practice that
20    they have to have permission to be off the line.
21 BY MS. POCHOP:
22 Q  I'm asking if it's in the policies anywhere.
23 A  I know there's a work rule on it, about being off the
24    line, wasting time.  That's the work rule that they got
25    written up for.

**Page 35**

1  Q  Well, if they're reporting discrimination, they're not
2     really wasting time, are they?
3        MS. CALEM: Objection to the form.
4        THE WITNESS: We didn't know they were reporting
5     discrimination at that time.
6  BY MS. POCHOP:
7  Q  And is it your job to know that they were reporting
8     discrimination at that time?
9        MS. CALEM: Objection to the form.
10       THE WITNESS: If I would have had the information,
11    then, yes, it would have been.
12 BY MS. POCHOP:
13 Q  Were your staff members supposed to -- that work in the
14    HR department, were they supposed to find out?
15 A  No.
16 Q  And as an HR manager, when you see them -- I'm just
17    trying to understand why you wouldn't ask why they were
18    there.
19       MS. CALEM: Objection to the form.  Asked and
20    answered.  Harassing the witness at this point.
21 BY MS. POCHOP:
22 Q  You can answer it, if you can, if you have an
23    explanation for that.
24       MS. CALEM: She has given you an explanation, and
25    you are harassing her by repeating the question.

**Page 36**

1     You can answer again if you would like to.
2        THE WITNESS: Again, because there's always people
3     in the waiting room for various reasons, we don't stop
4     and ask everybody why they're there.  It's an active
5     waiting room.
6  BY MS. POCHOP:
7  Q  So some people in the HR waiting room never do get to
8     say why they're there?
9        MS. CALEM: Objection.  That misstates her
10    testimony.
11       THE WITNESS: No.  They can come to the window at
12    any time and say why they're there.
13 BY MS. POCHOP:
14 Q  Do you know -- so if Scott Genzler found out that Sala,
15    Yvette, and Lorena had been disciplined when they went
16    to report him, is that information that he would
17    normally be able to find out about?
18       MS. CALEM: Objection to the form.
19       THE WITNESS: No.
20 BY MS. POCHOP:
21 Q  Would Scott ever know -- have any legitimate reason to
22    know that a disciplinary action had been issued for
23    them being in the HR department?
24 A  No.
25       MS. CALEM: Just let me just object to the form.

| Sala Naambwe and Yvette Nimenya v. | Carrie Moate |
|---|---|
| Smithfield Foods, Inc. | May 31, 2018 |

**Page 37**

1  They were not disciplined for being in the HR
2  department, as we've repeatedly established.
3  BY MS. POCHOP:
4  Q  Was the discipline that they received on February 22nd
5     ultimately revoked?
6  A  Yes.
7  Q  If it was appropriate discipline, why was it revoked?
8  A  You'd have to ask Scott on that one.
9  Q  Do you know?
10 A  It was appropriate discipline, so -- from what I
11    understand is that they wanted to remove it because the
12    discipline wasn't harsh enough for Scott.
13 Q  After this incident, were you instructed that you
14    needed to change any of your procedures as an HR
15    manager?
16 A  I was not instructed, but after the incident I have
17    changed it myself.
18 Q  What is it? How have you changed it?
19 A  Just to ask more questions of the managers.
20 Q  Did you receive a copy of a protection order that Sala
21    took out against a coworker?
22 A  Yes.
23 Q  How did you get that document?
24 A  Juan delivered it to HR.
25 Q  When you got that document from Juan, did you initiate

**Page 38**

1  an investigation into the allegations contained in the
2  protection order petition?
3  A  I think an investigation had already been done on that
4     incident.
5  Q  Did you do anything to investigate the protection order
6     once you received it?
7  A  I followed up with Sala's supervisor to let him know
8     that there was one, a protection order out there, but I
9     believe Juan was terminated at that time too.
10 Q  And why was Juan terminated?
11 A  Three no-call/no-show.  He wouldn't come to work
12    because of the protection order.
13 Q  Did you ever contact Sala to find out why she had tried
14    to get a protection order against a coworker?
15 A  No, I don't believe so.
16 Q  And can you explain what your thinking was about why
17    you wouldn't ask Sala why she was seeking a protection
18    order?
19 A  From the information that was in the report, it was
20    from an incident that was investigated previously.
21 Q  Did it indicate to you that there might be ongoing
22    issues when you saw that there was a protection order
23    request?
24 A  Not from what was in the information.
25 Q  And did you do anything to follow up and find out if

**Page 39**

1  that was an accurate assumption that you were making?
2  A  I did not personally, no.
3  Q  Did anybody in HR?
4  A  I'm not sure.
5  Q  Isn't that your responsibility as an HR manager to
6     know?
7     MS. CALEM: Objection to the form.
8     THE WITNESS: Yes.
9  BY MS. POCHOP:
10 Q  A protection order is for somebody who feels
11    threatened, right?
12 A  Correct.
13 Q  And there's zero tolerance for threatening behavior at
14    Smithfield Foods among employees --
15 A  Uh-huh.
16 Q  -- right?
17 A  Correct.
18 Q  And yet you just looked at the petition and assumed
19    that it had been resolved.
20    MS. CALEM: Objection to the form. That's just a
21    statement.
22    THE WITNESS: Do you have a question?
23 BY MS. POCHOP:
24 Q  Yeah. Did you do anything to follow up when you got a
25    copy of the protection order?

**Page 40**

1  A  Yes. I had contacted the manager and let him know it
2     was there. But, like I said, Juan was discharged
3     already at that time. He was no longer employed.
4  Q  Did you have any -- did you make any effort to discuss
5     with Sala why she was feeling threatened enough to try
6     to take out a protection order?
7  A  No.
8  Q  Is your behavior consistent with the Speak Up
9     obligation that your code of conduct tells employees
10    that they have?
11    MS. CALEM: Objection to the form.
12    THE WITNESS: It was presented to Scott Reed.
13 BY MS. POCHOP:
14 Q  How was it presented to Scott Reed?
15 A  I gave him the information on the protection order.
16 Q  When did you do that?
17 A  After I got it.
18 Q  Is that the manager that you're talking about, or are
19    you talking about Sala's manager?
20 A  No, I contacted Sala's manager too.
21 Q  So you also contacted Scott and said, hey, there's a
22    protection order?
23 A  Correct.
24 Q  And why did you do that?
25 A  Just so he knows that it's there.

| Sala Naambwe and Yvette Nimenya v. | Carrie Moate |
|---|---|
| Smithfield Foods, Inc. | May 31, 2018 |

Page 41

1   Q   So if it was important enough to go show it to Scott --
2       do you know if Scott called Sala in to find out why she
3       took out a protection order?
4   A   I don't know.
5   Q   Did you ever have any follow-up after this protection
6       order was filed with Scott?
7   A   I don't recall.
8   Q   Is it a violation of Smithfield Foods' policy to
9       call -- if an employee thinks somebody's calling them a
10      sexual name?
11          MS. CALEM: Objection to the form.  Do you
12      understand that?
13          THE WITNESS: No, I don't.
14  BY MS. POCHOP:
15  Q   Are you the HR manager who received Yvette's complaint
16      that an employee called Rufus was calling her CCP?
17  A   Yes.
18  Q   And she reported to you that she believed that was a
19      sexual -- that name had a sexual connotation?
20  A   She said that she thought it meant a sexual transmitted
21      disease.
22  Q   Did you look up to see if there is a sexual connotation
23      to the word CCP?
24  A   No, I did not research the word.
25  Q   Do you know that it does have a sexual connotation?

Page 42

1           MS. CALEM: Objection.
2           THE WITNESS: No, I do not.
3   BY MS. POCHOP:
4   Q   I Googled it, and it's certified cock pleaser is what a
5       CCP is.
6           MS. CALEM: You know, I'm going to object to that
7       statement.  You're now testifying.  I also Googled it,
8       by the way, and it says gossip.
9           MS. POCHOP: Did you see the certified cock
10      pleaser definition?
11          MS. CALEM: I did not.
12  BY MS. POCHOP:
13  Q   So is it appropriate, whether it's certified cock
14      pleaser or gossip, was Rufus's comment to Yvette a
15      violation of Smithfield's code of conduct?
16  A   I guess if it was sexually, then, yeah, that would be a
17      violation.  Calling -- saying somebody gossips wouldn't
18      be.
19  Q   Was there any discipline taken against Rufus for this
20      incident that Yvette reported?
21  A   No.  There were no witnesses to anything or any of the
22      statements that had taken place.
23  Q   Were you the supervisor who was involved in issuing a
24      disciplinary action to Sala on December 8th, 2016?  I'm
25      going to show you what's been -- I think over there in

Page 43

1       that pile is Exhibit 41 that you can look at -- here's
2       a copy of Exhibit 31 and Exhibit 41.
3           Were you the HR manager that was involved in the
4       decision to issue those disciplinary actions?
5   A   These ones?
6   Q   Yes.
7   A   No.
8   Q   Do you know how they came to be issued?
9   A   Not in detail, no.
10  Q   Do you know -- well, what do you know about them?
11  A   Well, it looks like a couple of them are for her
12      attendance, and the other one I'm not really familiar
13      with.
14  Q   So if I'm understanding the context of this correctly,
15      Scott received a written warning for calling people
16      monkeys, using swear words, intimidating them and
17      telling them to go back to their country and to speak
18      English, and Sala received a three-day suspension for
19      being combative and using the word racist to Gary
20      Loger?
21          MS. CALEM: Objection to the form.  She said she
22      was not involved in this incident and does not know the
23      details.
24  BY MS. POCHOP:
25  Q   Those documents were in Sala's personnel file, right?

Page 44

1           MS. CALEM: Objection to the form.
2           THE WITNESS: I would assume so.
3   BY MS. POCHOP:
4   Q   Do you know why the disciplinary action was revoked?
5   A   It was reduced for a grievance, it looks like.
6   Q   Do you know when that was done?
7   A   No, I'm not sure.
8   Q   If a grievance is -- have you ever had any other
9       grievances, been involved with any other grievances
10      that have been revoked?
11  A   Yes.
12  Q   And when they're revoked, are they supposed to be
13      removed from the employee's record?
14  A   Well, this one wasn't revoked.  It was just reduced to
15      a written.
16  Q   Oh, okay.  And if it's reduced to a written, should
17      that be reflected in the employee's record?
18  A   It is.
19          (Exhibit 51 is marked for identification.)
20  BY MS. POCHOP:
21  Q   I'm going to show you what's been marked as Exhibit 51.
22      This is a copy of a standard Smithfield absence
23      reporting record, right?
24  A   Yep.
25  Q   And when I look at this report, which according to the

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Carrie Moate
May 31, 2018

Page 45

1    date, the print date on the bottom of it, it looks like
2    it was printed on January 10 of 2018, right?
3  A  Yeah.
4  Q  And this is the document that would be used at HR to
5    determine the next step in employee discipline in the
6    step policy?
7  A  Yes.
8  Q  At least as of January 10, 2018, the Smithfield record
9    still showed that Sala had received a three-day
10   suspension for abusive language, combative behavior,
11   failure to cooperate, and called supervisor racist?
12 A  Uh-huh. Correct.
13 Q  And so your Smithfield record is inaccurate?
14 A  It may not have been resolved at that time, but --
15   I guess, this is 2016? Maybe.
16 Q  Can you explain why your record in 2018 does not
17   reflect Exhibit 41, which says that that disciplinary
18   action was reduced?
19      MS. CALEM: Object to the form.
20      THE WITNESS: I would have to go back and look at
21   the grievance, when it was filed, when it was settled.
22   Sometimes they do last quite some time.
23 BY MS. POCHOP:
24 Q  What is the policy to advise an employee when their
25   grievance is successful?

Page 46

1  A  The union will usually provide an answer for them.
2  Q  Is there any obligation by the Smithfield employees who
3    issued the disciplinary action?
4  A  No.
5  Q  What happens to people who don't have a union
6    representative?
7      MS. CALEM: Objection to the form.
8      THE WITNESS: Well, if they aren't being
9    represented by the union, then they wouldn't file a
10   grievance.
11 BY MS. POCHOP:
12 Q  Were you one of the people from HR who thought that
13   Sala was having a personal relationship with Tom
14   Anderson?
15 A  No.
16 Q  Did you tell anybody that Sala and Tom Anderson were
17   having a personal relationship?
18 A  No.
19 Q  If they were, would that be some violation of any
20   policy?
21 A  No.
22 Q  Is there any reason why it would be relevant to
23   anything in relation to Sala's employment?
24 A  No.
25      MS. POCHOP: I think I'm just about done, but --

Page 47

1    oh. No. I want to mark these and ask her about these.
2  BY MS. POCHOP:
3  Q  I'm going to ask you to take a look at what is
4    Exhibit 48. If you could identify that document
5    for me.
6  A  (Examines document.)
7  Q  Are you the author of Exhibit 48?
8  A  No -- oh, parts of it, it looks like.
9  Q  Are the parts that you contributed accurate about what
10   you would have documented about the race discrimination
11   complaint and the reprisal grievance?
12 A  I'm sorry. Can you rephrase the question?
13 Q  Is this an accurate document of your notes?
14 A  Yes.
15 Q  I also wanted to have you take a look at --
16      I'm going to -- well, I'll wait for Andrea --
17      MS. CALEM: Huh?
18      MS. POCHOP: I was just showing her another
19   exhibit, and it's the 3-18 notes.
20      MS. CALEM: Can we just stop for five minutes --
21   or two minutes so I can just make sure I have all the
22   exhibits.
23      (Recess taken from 4:10 p.m. to 4:18 p.m.)
24 BY MS. POCHOP:
25 Q  Take a look at Exhibit 48, now that we got it cleaned

Page 48

1    up without my notes on it. It includes on page 2 and 3
2    the -- if I'm understanding correctly, the notes on
3    page 1 and to the middle of page 2 are Scott's notes?
4  A  Correct.
5  Q  Did you have any input into that outline or those
6    notes? Did you edit them or do anything like that?
7  A  No.
8  Q  And then on page 2 and 3, there's your -- there's an
9    email chain that was directly to you.
10 A  Correct.
11 Q  Are those complete copies of the emails that you would
12   have had about this incident?
13 A  Correct.
14 Q  So it looks like on page 3 of Exhibit 48, that at 10:30
15   Russ Hultman emailed you and Dave Hillberg and had an
16   explanation for why Scott Genzler was -- or that Scott
17   Genzler was using profane language?
18 A  Correct.
19 Q  And did you receive this email from Russ before or
20   after Sala, Yvette, and Lorena had been disciplined?
21 A  After.
22 Q  And so at 10:30 it looks like Russ wrote to you and
23   said they were -- if they can't do their fucking job,
24   get off the line, and called them monkeys.
25 A  Correct.

Page 49

1  Q  And then he said that he got everybody in his office
2     and they talked about what happened, right?
3  A  Right.
4  Q  So at 10:30 you knew that Scott had done more than just
5     called somebody a bitch?
6  A  No. I didn't know this until almost after noon.
7  Q  And then at 11:00 Dave emails to you and says, "Give
8     Russ a call, and if you would like to set up some time
9     to investigate what happened with Sala/Yvette and
10    Scott, we can send them over."
11 A  Correct.
12 Q  So why would it even be a question about whether you
13    would need to investigate what happened? I mean,
14    because what --
15 A  Well, because of what he wrote in the email.
16 Q  But wouldn't what Russ wrote in his email require you
17    to do an investigation?
18 A  Well, after I found out they were already disciplined,
19    there wasn't much we could do for reissuing discipline.
20 Q  So when you testified earlier -- and then your next
21    email, which is at 12:15 says, "Send me a follow-up
22    after you have met and disciplined on this."
23 A  It's before I talked to them.
24 Q  But I assume you would have read your -- I mean, your
25    12:15 email refers to Russ's 10:30 email, right?

Page 50

1  A  Right.
2  Q  And so apparently, then, you did know that Scott had
3     made racial comments when he was going to be
4     disciplined?
5  A  I don't understand the question.
6  Q  Well, you say, "Please send me a follow-up after you
7     have met and disciplined on this."
8  A  Uh-huh.
9  Q  Right?
10 A  Right.
11 Q  And so apparently Scott had not been disciplined yet?
12 A  He had, but --
13 Q  He got a written warning?
14 A  Uh-huh. Yes.
15 Q  And then on February 26 you made a timeline of events?
16 A  Correct.
17 Q  And according to your timeline, you observed the
18    employees in the waiting room filling out paperwork?
19 A  I didn't observe them. I just -- that's what they were
20    doing when I went to the waiting room.
21 Q  And it says you are the person who informed Russ the
22    girls -- I'm assuming that you mean Sala, Yvette, and
23    Lorena --
24 A  Correct.
25 Q  -- could be written up for being away from the line

Page 51

1     without permission?
2  A  Correct.
3  Q  And Russ told you he believed that the issue had been
4     dealt with on Saturday, right?
5  A  Yes.
6  Q  And so Russ -- Russ, who knew that Scott had called
7     coworkers monkeys and swore at them, did not issue any
8     written discipline for an obvious violation of the code
9     of conduct.
10       MS. CALEM: Objection to the form. It misstates
11    testimony and the record.
12       THE WITNESS: Is that -- I'm sorry. Is that a
13    question?
14 BY MS. POCHOP:
15 Q  Yeah, it is a question.
16 A  What was the question?
17 Q  He told you he believed that he'd dealt with the issue
18    on Saturday, right?
19 A  That was his statement, yes.
20 Q  And that meant that he did not issue any discipline?
21 A  He had not.
22 Q  And can you explain to me how a manager at Smithfield
23    would know that there was a gross violation of the code
24    of conduct about race discrimination and not -- and
25    believe it was appropriate to not document it or issue

Page 52

1     any discipline?
2  A  I don't know what his thoughts were.
3  Q  Is that -- is his belief that he could just deal with
4     this issue without any documentation or discipline --
5        MS. CALEM: Objection. It calls for speculation.
6  Q  -- is that consistent with your Smithfield training
7     that you provide to your managers?
8        MS. CALEM: Objection to the form. Lacks
9     foundation. We don't know what he was thinking.
10       THE WITNESS: It's not consistent with training,
11    no.
12 BY MS. POCHOP:
13 Q  Was Russ ever -- did you ever report to anybody that
14    Russ had essentially overlooked a racial discrimination
15    event?
16 A  Yes, I talked to his manager, Dave.
17 Q  And so you, in addition to saying that he just told you
18    that he had called them a bitch was inaccurate, you
19    also told Dave that Russ had represented that just
20    talking about this without documenting it or
21    disciplining was appropriate?
22       MS. CALEM: Objection to the form.
23       THE WITNESS: I was -- I don't know if he had
24    documented or disciplined. I have no idea if he took
25    notes.

Page 53

BY MS. POCHOP:

Q  Well, what did you tell Dave about Russ expressing to you that he thought the issue had been dealt with when he met with folks on Saturday?
A  I don't believe that came up in the conversation.
Q  Well, you knew on February 22nd that Russ hadn't disciplined Scott, according to your email at 12:10 [sic] where you're saying, "Please send me a follow-up after you guys have met and disciplined on this."
A  I didn't know if he had or hadn't at that time. From what I understood, he had not.
Q  So was there any follow-up that you're aware of with Russ for failing to address one of your explicit conduct rules?
A  Yes. I believe Scott met with him.
Q  Scott Reed?
A  Uh-huh.
Q  And did Scott tell you this?
A  No. It's just from reviewing documents.
Q  And you had to tell Russ that -- Russ was told that Scott needed to be disciplined and, if he needed help, to give you a call.
A  Correct.
Q  Did you have to explain to Russ why Scott should be disciplined?

Page 54

A  No.
Q  And even after you told Russ that Scott needed to be disciplined, the discipline that Russ opted to issue was the written warning --
A  Correct.
Q  -- which was for calling --
A  Profane language.
Q  -- calling these women a bitch?
A  That's what I believe he intended it for.
Q  I don't see any documentation in here anywhere else where you suggested that any further discipline should be issued.
A  No, I believe it was passed on to Scott after that.
Q  And then you say, "I informed Dave that Scott needed to be disciplined for the behavior."
A  Correct.
Q  Why -- first, tell me your conversation with Dave.
A  I don't recall the details. I just know that I had told him that Russ had stopped down and said that there was an incident where an employee called another employee a bitch and that he needed to be disciplined.
Q  Why would there be any question for Dave about whether Scott should be disciplined for making racist remarks to coworkers?
    MS. CALEM: Objection to the form. Argumentative.

Page 55

    THE WITNESS: He's the operations manager.
BY MS. POCHOP:
Q  Right. He's, like, technically your supervisor even, right?
A  No.
Q  Different chain of command?
A  Yes. He's Russ's supervisor.
Q  He's Russ's supervisor. He's also bound by the code of conduct?
A  Yes.
Q  He also has the managers training about the --
A  Yes.
Q  -- code of conduct and the workplace policies?
A  Yes.
Q  Then you said you asked for follow-up on the outcome. Did you get follow-up on the outcome?
A  No.
Q  If you ask for follow-up on the outcome from a manager about a race discrimination claim, as an HR manager, are you entitled to have follow-up?
A  Yes.
Q  What did you do when you did not have any follow-up?
A  I believe that's when I called and contacted them to find out what happened.
Q  And who did you call and contact?

Page 56

A  Dave.
Q  And tell me about your discussion.
A  I don't recall all the details. I just know that he was disciplined.
Q  And then the next document that I'd like to take --
    MS. POCHOP: Have I passed Exhibit 49 over to you?
    MS. CALEM: Yes.
BY MS. POCHOP:
Q  I'm wondering if you've seen Exhibit 49 before, which is a summary of events.
A  Possibly.
Q  My main question is if you're the author of Exhibit 49.
A  I don't recall. (Examines document.) I don't know.
Q  What is the purpose of Exhibit 49?
A  I believe it's a -- it was for the EEOC.
Q  If it was for the EEOC, you -- whoever wrote this said, Russ explained the employees were down at HR over an incident that happened on Saturday and that another employee had used profane language, no specific language disclosed.
    Is that accurate, according to your testimony, where you said today that he told you that Scott had called someone a bitch?
A  No.
Q  Do you know why this representation to the EEOC is not

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Carrie Moate
May 31, 2018

Page 69

1  thoughts were on that.
2  BY MS. POCHOP:
3  Q  Well, he got a discipline for calling somebody a bitch,
4     and then when you wanted to add more discipline because
5     you later found out that it had been racial remarks,
6     that -- am I right in understanding that's why there
7     wasn't further discipline?
8  A  It wouldn't have been on top of the initial. It would
9     have been the other one removed and a new one issued.
10 Q  And the reason that there was a double jeopardy problem
11    with that proposal about removing one and reissuing or
12    giving a different one is what?
13 A  The reason for wanting to reissue?
14 Q  Right.
15 A  Because there was misinformation, yes.
16 Q  And that was from Russ?
17 A  Yes.
18 Q  And Russ -- is it true that Russ did not discipline
19    Scott and told you that he thought the matter had been
20    resolved on Saturday?
21       MS. CALEM: Objection to the form.
22       THE WITNESS: As of Saturday he had not
23    disciplined.
24 BY MS. POCHOP:
25 Q  And he did tell you directly, didn't he, that he

Page 70

1     thought that the matter had been resolved by his
2     meeting with Scott, Yvette, Sala, and Lorena?
3  A  He just said that he thought the issue had been
4     resolved.
5  Q  But it was obvious to everyone else in Smithfield
6     management that it should have resulted in disciplinary
7     action against Scott?
8  A  Yes.
9  Q  And did anybody -- do you have any idea -- did you ever
10    talk to Russ about how he did not realize that this
11    should have resulted in disciplinary action from the
12    start?
13       MS. CALEM: Objection to the form.
14       THE WITNESS: No, never had discussion.
15       MS. CALEM: Let me just follow up once more --
16       MS. POCHOP: I have a few more here.
17       MS. CALEM: Oh, sorry.
18 BY MS. POCHOP: (Continuing)
19 Q  Whose responsibility at Smithfield is it to inform an
20    employee when Smithfield's disciplinary action has been
21    rescinded, revoked, or removed?
22 A  If it's done by the HR group, then it would be ours.
23    If it's done by the union, it would be -- through a
24    grievance process, it would be the union's.
25 Q  The union gets to decide whether --

Page 71

1  A  To inform the employee --
2  Q  Yeah.
3  A  -- that a discipline's been removed --
4  Q  Yeah.
5  A  -- or through a grievance process? Yes, the union
6     would.
7  Q  So there isn't any obligation of any Smithfield manager
8     to make sure an employee understands what their
9     disciplinary status is?
10       MS. CALEM: Objection to the form.
11       THE WITNESS: If we are the ones that actually
12    remove it, we will inform them, yes.
13       MS. POCHOP: Now I'm done.
14       MS. CALEM: Okay.
15          FURTHER EXAMINATION
16 BY MS. CALEM:
17 Q  When Russ said he thought the issue had been resolved,
18    did you understand that he meant that he thought that
19    the matter was closed, or is there another -- was there
20    another interpretation?
21       MS. POCHOP: I'm going to object as it calls for
22    speculation, but you can answer.
23       THE WITNESS: I'm not really sure what he meant by
24    the comment.
25

Page 72

1  BY MS. CALEM:
2  Q  So it's possible, isn't it, that he simply meant he
3     thought the going to human resources part of it had
4     been resolved on Saturday?
5  A  It's possible.
6       MS. CALEM: All right. Nothing further.
7       MS. POCHOP: Nothing else.
8       MS. CALEM: Carrie, you're going to read the
9     deposition and sign it, okay? When it comes out in
10    transcript form, you'll have the pleasure of reading
11    through it and making any corrections you deem
12    necessary. Okay? And we'll work on that together.
13       THE WITNESS: All right.
14       MS. CALEM: Thank you for your time.
15       (Whereupon, at 4:55 p.m. the deposition was
16    concluded.)