*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*

Monica Derby
May 31, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

**App. Tab**

**F**

Page 5

1  makes an objection to one of my questions, unless she
2  instructs you specifically "don't answer that," you
3  just proceed with your answer. Okay? Because the
4  objections are for the judge later.
5  A  Okay. Yes.
6  Q  And then the final thing is, I like to know what it
7     means to you when somebody says that your testimony is
8     under oath.
9  A  That it's -- so if it's under oath, it's just saying
10    that I'm giving a truthful statement. It will come
11    back and be reviewed.
12 Q  For background information about yourself, can you tell
13    me your age?
14 A  Yep. I'm 40 years old.
15 Q  And your educational background?
16 A  I got my bachelor's -- or I got an associate's degree
17    at Minnesota West in Pipestone, Minnesota. Went to
18    SDSU. Got my bachelor's degree in 2008. Then I went
19    to USD and got my master's degree there. I did start a
20    PhD program at SDSU, then I started working, so it just
21    got to be too much, so I'm on hold with that.
22 Q  What's your master's in?
23 A  I got a master's in administrative studies with a
24    concentration in HR and leadership.
25 Q  And, likewise, your PhD subject?

Page 6

1  A  Going into sociology for that one.
2  Q  Your employment history, if you could just give me
3     background about where you've worked.
4  A  Yes. I worked at Royal River Casino prior to this in
5     their HR division as HR director, and then I was with
6     Good Samaritan Society in Pipestone, long-term care
7     facility, and I worked there as an HR director as well.
8        Prior to that, I worked at Ellison Meat Company.
9     It's a small meatpacking plant, and I worked there for,
10    I think it was two years, so -- I was going to school.
11 Q  Sounds like you have really significant training about
12    enforcement of human relations policies?
13 A  Yes.
14 Q  In general terms about human relations policies, is
15    there some standard about how you instruct managers
16    that they should deal with the employees? And I'm
17    going to give you this backdrop -- this is a long
18    question.
19 A  Okay.
20 Q  The backdrop is, is the person who was just offering
21    her testimony expressed pretty significant frustration
22    with the fact that she has sensitivity about her weight
23    and that when people say things about her weight, it's
24    clearly bothering her a lot. And my understanding
25    about HR training is that managers and employees are

Page 7

1  supposed to be instructed that you don't ever know that
2  people are sensitive about their personal life things,
3  you don't know people's backgrounds, and that you
4  should treat everyone like they might have something
5  that they're sensitive about in their background.
6     Is that -- am I accurate about what the standard
7  for human relations professionals is as far as training
8  managers and employees?
9     MS. CALEM: I'm going to object to the form. If
10 you understand the question, you can answer it.
11    THE WITNESS: Maybe if you want to repeat it a
12 little bit or kind of --
13 BY MS. POCHOP:
14 Q  Sure. What does your education tell you about what you
15    should teach managers when they are addressing
16    employees at work in terms of professional treatment?
17 A  One would be respectful communications.
18 Q  What does that mean in an educational sense?
19 A  You know, not using derogatory comments. You know,
20    speaking to them in private. Don't, you know, discuss
21    their personal nature. You know, really focus on the
22    work side of things.
23 Q  Are you supposed to assume that people might have
24    things in their background that you just don't know
25    that make them sensitive about things like race?

Page 8

1  A  Should we assume?
2  Q  Yeah.
3  A  You know, I don't think we should assume anyone's
4     background.
5  Q  Are you supposed to approach people like they might be
6     sensitive about sexual comments at work?
7  A  Yes, you should approach everyone on the sensitive
8     side. I mean, just, you know, saying the right things,
9     doing the right things.
10 Q  Because I know doing the right thing is one of the
11    terms that's used in the code of conduct, and so I was
12    wondering what "doing the right thing" at Smithfield
13    Foods means when it comes to dealing with employees in
14    terms of sexual comments.
15 A  So if we are aware of those, it would be reviewing that
16    concern, doing an investigation when those are brought
17    forward.
18 Q  How many employees do you have out at Smithfield Foods?
19 A  We have about 3,400.
20 Q  And how many managers do you have at Smithfield Foods?
21 A  Specific managers? Like, which type of managers?
22 Q  Like how many -- of your employee base, how many
23    managers are supervising 3,400 employees?
24 A  So on the front line floor, that would be -- about 64
25    would be our production supervisors.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Monica Derby
May 31, 2018

Page 9

1  Q  How many in total?
2  A  We have 234 salaried staff varied at different levels.
3  Q  How many departments are there?
4  A  I believe we have 10 divisions.
5  Q  And in terms of your job duties at Smithfield Foods,
6     can you describe what that is?
7  A  Yes.  I work with the salaried recruitment.  I work
8     with the affirmative action plan.  I back up Carrie and
9     Scott if there's things that come forward with
10    employees.  I provide assistance leadership to the
11    other HR coordinators there, you know, data entry,
12    assist where needed.
13 Q  Can you walk me through what positions you have held
14    and job titles you've had at Smithfield Foods?
15 A  HR manager.
16 Q  And how many HR managers are there?
17 A  There would be two.  There would be myself and Carrie
18    Moate.
19 Q  For the entire plant?
20 A  Yes.
21 Q  Where is the HR department located in the Smithfield
22    plant?
23 A  It is located right on-site there.
24 Q  Is it kind of central to the departments or --
25 A  It's more towards -- it's not central to how the

Page 10

1     building lays out.  But, yes, it's central in regards
2     between our DC building and our plant building, so it
3     would be right across the street.  It's not a road,
4     excuse me.  A walkway.
5  Q  So your job duty is primarily in terms of recruitment?
6  A  I work a lot with our recruitment, but also making
7     sure, you know, we're following EEO and everything like
8     that for our recruitment activities, backing up, you
9     know, our team members.
10 Q  Who is the affirmative action officer at the plant
11    that's designated?
12 A  So I would be the designated officer there.
13 Q  You are the affirmative action officer?
14 A  Yes.
15 Q  How long have you held that position?
16 A  Since I started there.
17 Q  And what are your job duties as the affirmative action
18    officer?
19 A  My job duties would make sure we are, you know,
20    advertising correctly, definitely with our recruitment,
21    our promotions, our trainings and that, you know,
22    things are not discriminatory.
23 Q  I see that Smithfield is committed to a diverse
24    workplace?
25 A  Yes.

Page 11

1  Q  As the affirmative action officer, you're the person
2     who would probably know what percentage of your
3     employees qualify as -- for affirmative action status;
4     is that right?
5  A  Yes.
6  Q  So how many of your hourly employees qualify as diverse
7     employees?
8     MS. CALEM: Object to the form.  Go ahead.
9     THE WITNESS: About 82 percent of our employees.
10 BY MS. POCHOP:
11 Q  And how about your managers?
12 A  We're sitting at 30 percent.
13 Q  Is that something that you're working on?
14 A  Yes.
15 Q  Why is that important?
16 A  Because diversity is very important, and bringing a
17    diverse workforce at all levels, and it's meeting our
18    goals and objectives of the affirmative action plan.
19 Q  What is the company's goal in terms of diverse
20    management?
21 A  Our goal is to add more diversity amongst our
22    management team.
23 Q  Are you trying to roughly reflect the diversity in your
24    workforce or --
25 A  Yes, and our community.

Page 12

1  Q  So in terms of 82 percent of your population qualifies
2     under the standard of diverse employees, what is the --
3     I mean, are a lot of those folks English second
4     language?
5  A  I'm going to say yes.  Yes.
6  Q  Is that something that you assess in terms of providing
7     training and handbooks and materials for your
8     employees?
9  A  No.
10 Q  How do you assure that your employees are understanding
11    what the Smithfield policies and procedures are?
12 A  Upon hire, at that time, you know, being able to
13    complete the application and any preemployment forms at
14    that time, one of our policies is they need to be able
15    to understand English.
16 Q  Is there a requirement that you speak English at
17    Smithfield Foods?
18 A  Yes, in order to -- I mean, speak and understand and
19    read.
20 Q  Are they required to speak English while they're at
21    work?
22 A  Are they required?
23 Q  Yeah.
24 A  No.
25 Q  Would it be a violation of Smithfield policy for

Page 13

1 somebody to say, you have to speak English when you're
2 here?
3     MS. CALEM: Objection to the form.
4 BY MS. POCHOP:
5 Q Is there a policy that says that people have to speak
6   English while they're on Smithfield job duties?
7 A No.
8 Q Would that be a violation of Smithfield's diversity
9   policy if that were required?
10     MS. CALEM: Objection. Form.
11 BY MS. POCHOP:
12 Q You can answer.
13 A Can you repeat that, please.
14 Q Would it be a violation of Smithfield's diversity
15   policy if an employee was required to speak English
16   while at work?
17     MS. CALEM: Same objection.
18     THE WITNESS: No, we say that they can speak their
19   language. We don't say they can't speak their
20   language.
21 BY MS. POCHOP:
22 Q What is your responsibility to enforce Smithfield
23   policies and procedures?
24 A Once it's brought to my attention, to make sure a
25   policy or procedure has been followed.

Page 14

1 Q What is your responsibility to make sure that employees
2   understand the Speak Up policy?
3 A We provide an annual training, Train the Trainer, which
4   is then provided to our employees on speaking up or
5   harassment, and so they know what those ones are.
6 Q What do you train employees to understand about Speak
7   Up?
8 A If they're not getting treated right, if things aren't
9   fair, to speak up, you know, say something, let
10   somebody know, talk to your supervisor, talk to
11   somebody that you're comfortable with, so that way your
12   concern is brought forward.
13 Q Do you tell employees that there's an open door
14   policy --
15 A Yes.
16 Q -- for complaints?
17 A Yes.
18 Q What is the training provided to your management level
19   about reporting suspected violations of company policy?
20 A So they receive the Train the Trainer on what steps
21   need to be taken to report those, to investigate, to
22   share those with HR if need be. We've done, this year,
23   some more training on the harassment reporting plans.
24   So those are some of the ones. We've done a
25   documentation training, so that way we can make sure,

Page 15

1   you know, if somebody comes forward, what things we
2   should do and who those should go to.
3 Q What is the documentation policy at Smithfield Foods
4   when somebody makes a complaint of harassment?
5 A To investigate that. Once they bring it forward, you
6   know, you may need to involve HR or one of your ops
7   managers, somebody from above, get their statement, and
8   then, if need be, you would talk to the offending
9   party. If you need to go further, then you would talk
10   to witnesses that would have been provided from either
11   of those parties.
12 Q Under your documentation policy at HR, are you supposed
13   to get a written statement from people who report
14   policy violations?
15 A Sometimes it helps us as we start our investigation,
16   yes, I will ask them to, you know, fill something out
17   so that way we have that.
18 Q When you receive a complaint of harassment, what is
19   your responsibility as an HR manager?
20 A To review it promptly.
21 Q And what does that consist of?
22 A We would want to get that individual's statement, and
23   then we'd follow up with the one that they're making a
24   statement against. Generally, at the same time, we'd
25   also get ahold of their ops managers or superintendents

Page 16

1   to take part in that. Review those two sides. If need
2   be, then continue on with our investigation with the
3   witnesses that have been provided.
4 Q Is enforcement of the company's harassment policy
5   supposed to be a priority?
6 A Yes.
7 Q Is that the training that you provide to managers at
8   Smithfield Foods?
9 A Yes. So on the Train the Trainer ones, it's we need to
10   look into these right when we get them, yes.
11 Q And are front line managers authorized to issue
12   discipline in their departments when confronted with
13   situations involving harassment?
14 A Generally, those -- no. Those would then probably be
15   brought to HR for a final review and discussion.
16 Q So what do you mean by final review?
17 A To review it with them, make sure, you know, everything
18   was gone over.
19 Q And what do you train your managers -- if they receive
20   a report of racial discrimination, what are they
21   supposed to do under Smithfield policy?
22 A They should report that to HR. Probably talk to find
23   out what happened with that individual as well so that
24   way we know what is going on.
25 Q Are managers trained in any particular way about when

Page 17

1  to make -- when they are obligated to make a report to
2  HR about discrimination in the workplace?
3  A  They should do it right away.
4  Q  Is that part of the training?
5  A  Yes, as part of the stuff that we've been coming out --
6     yes.
7  Q  Are they told that it's supposed to be a priority?
8  A  That I do not -- I do not know.
9  Q  If you could take a look at what's been marked as
10    Exhibit 3, which is sitting in front of you there.
11 A  Okay.
12 Q  Are you familiar with this handbook?
13 A  Yes.
14 Q  Is this a guide that is supposed to be read and
15    followed by all Smithfield Foods employees?
16 A  Yes.
17 Q  I see that your company motto and your shirt today says
18    the same thing. "Good Food. Responsibly."
19        What does the company motto mean?
20 A  That we're responsible in the good food that we do
21    produce.
22 Q  Does responsibility include the maintenance of a
23    professional work environment for your employees?
24 A  Yes.
25 Q  I'm looking at page 1 of your handbook. I assume

Page 18

1     that -- like, do you actually train your managers about
2     what's in your handbook?
3  A  Yes.
4  Q  Do you actually train your employees about what's in
5     this handbook?
6  A  Yes.
7  Q  Okay. I see in here on page 1 that your CEO mentions
8     the Speak Up program and says -- represents that on
9     virtually every page of this code of conduct the "speak
10    up" words are mentioned, and that, to me, would
11    indicate that you are supposed to be encouraging
12    employees to report any concerns or policy violation.
13 A  Yes.
14 Q  Is that what managers are trained, is that they should
15    encourage their employees to make prompt reports
16    whenever they have a question or concern about
17    Smithfield policy?
18 A  Yes.
19 Q  One of the statements in Exhibit 3 on page 1 says that
20    the president and CEO of Smithfield says, "I promise
21    that you will not be retaliated against for raising a
22    question or reporting a concern."
23        Is that promise something that you understand as
24    an HR manager, first of all?
25 A  Yes.

Page 19

1  Q  You're obligated to abide by your president's promise
2     that employees won't be retaliated against for making a
3     report or asking a question about Smithfield policy?
4  A  Yes.
5  Q  And is this something that is related -- do you, as an
6     HR manager, make sure that all Smithfield Foods
7     managers are aware that it is prohibited to retaliate
8     against employees who report a question or a concern?
9  A  Yes.
10 Q  And is that also related to employees, that there is a
11    promise from the company president that they will not
12    be subject to retaliation if they report?
13 A  Yes.
14 Q  And is that because it is so important for Smithfield
15    Foods, they want to create a culture where employees do
16    not worry that they will lose their job if they report
17    policy violations?
18 A  Yes.
19 Q  Is there any other purpose for having a Speak Up policy
20    that is mentioned on virtually every page of your code
21    of conduct?
22        MS. CALEM: Objection to the form of the question.
23    If you know, you can answer.
24        THE WITNESS: Can you repeat it, please.
25

Page 20

1  BY MS. POCHOP:
2  Q  Sure. What is the purpose of telling employees --
3     making a promise and having Speak Up and examples of
4     times when you should speak up on virtually every page
5     of your employee code of conduct?
6  A  Yes. It's so that we're aware and to bring their
7     concerns forward.
8  Q  Is the code of conduct -- are the principles and
9     examples contained in the code meant to reflect the
10    laws and regulations as you understand that they apply
11    to Smithfield Foods?
12 A  Yes.
13 Q  Are employees required to sign a statement that said
14    that they've read the code of conduct and they'll act
15    in full compliance with the code?
16 A  Yes. There is one that they acknowledge that they
17    received one.
18 Q  Do you expect your managers not only to read the code
19    but actually live and example it?
20 A  Yes.
21 Q  Are employees instructed that if they have a question
22    about what it means to do the right thing in any
23    circumstances or if they think that any of their
24    co-employees are failing in their duty to live up to
25    the code, that they have a responsibility to speak up

Page 21

1  as described in this handbook?
2  A  Yes.
3  Q  Is Smithfield committed to a working environment in
4     which employees feel comfortable and encouraged to
5     speak up and ask for help or raise concerns?
6  A  Yes.
7  Q  How would you assess that your HR department is
8     fulfilling your obligation to make sure that employees
9     feel comfortable and encouraged to ask for help and
10    raise concern?
11 A  We promote an open door policy.
12 Q  On page 3, there's a description -- and I know it's
13    your written policy, but I want to know if it's the
14    actual policy.  Because there are times in HR when the
15    written policy isn't exactly how the company follows
16    it.  And I'm not talking about Smithfield Foods, just
17    in general.  Right?
18 A  Yes.
19 Q  That's a big HR red flag?
20 A  Okay.
21 Q  Is that true?
22 A  Yes.  We want to make sure we're following the policy
23    that we have written.
24 Q  And is it important to make sure that company policies
25    are applied the same to all employees?

Page 22

1  A  Yes.
2  Q  And what do you do at Smithfield in HR to assure that
3     company policies are being applied the same way to all
4     of your employees?
5  A  We have our handbook that is in place that has work
6     rule violations in there.  If it's not a work rule
7     violation, there would then be an attendance policy
8     that we review.  We want them to be looking at the
9     employee's record to see if they have anything.  We
10    do -- HR will talk, if need be, to kind of see what one
11    has done before, if they had a situation like that, for
12    recommendation on how to move forward.
13 Q  So in HR you actually compare other employee
14    disciplines to make sure that the proposed discipline
15    for an individual is consistent?
16 A  We provide suggestions on, you know, maybe just
17    feedback from another HR professional, what they've
18    done.
19 Q  So do managers have the ability to override HR's
20    suggestions?
21 A  No. So they're done in HR?  No.
22 Q  So on page 3, it defines the "speak up" term.  It says,
23    Speak Up, with an exclamation point and in all caps and
24    underlined.  And it's underlined, it's in bold, and
25    it's got an exclamation throughout the entire handbook,

Page 23

1  right?
2  A  Yes.
3  Q  Is that a way to try to encourage employees that they
4     should promptly report any violation that they see?
5  A  Yes.
6  Q  It tells employees here under the definition that it's
7     the responsibility of every employee to tell management
8     about any behavior that does not meet the standards
9     outlined in the code.  Is that accurate?
10 A  Yes.
11 Q  So employees have a responsibility to report?
12 A  Yes.
13 Q  And over here on page 3, in this little box about --
14    describing doing the right thing, again, it says
15    employees have a duty to speak up if they see anything
16    that they suspect is improper or unethical.
17       Right?
18 A  Yes.
19 Q  And there's kind of a checklist that they're supposed
20    to go through to decide whether or not they have that
21    duty to report?
22 A  Yes.
23 Q  If employees are concerned about reporting
24    discriminatory/racial comments that they hear in the
25    workplace, is Smithfield management meeting its code of

Page 24

1  conduct?
2  A  Yes, because we also have an ethics hotline and a tip
3     line too to give them another resource to reach out to.
4  Q  So, for example, if you assume that there have been
5     employees that have testified here that they haven't
6     come forward with policy violations that they've
7     witnessed or experienced because they're afraid, is
8     Smithfield management meeting its obligation to fulfill
9     their code of conduct?
10       MS. CALEM: Object to the form.
11       THE WITNESS: Yes, because we have an open door
12    policy and we're asking them to speak up and bring
13    those concerns forward.
14 BY MS. POCHOP:
15 Q  So can you describe what your open door policy for
16    employees is?
17 A  We make ourselves available that, if they have a
18    question or a concern, they can come to the HR office
19    and meet with one of the HR representatives there.
20 Q  And do you promise employees that that's what they will
21    get if they follow their obligation to speak up, is
22    they'll have an opportunity to come on the open door
23    policy and speak to an HR representative?
24 A  Yes.
25 Q  Is that the obligation of HR managers, to make sure

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Monica Derby
May 31, 2018

Page 25

1  that they have an open door policy, as advertised to
2  employees, when employees come to report discriminatory
3  treatment?
4  A  Yes.
5  Q  If you have an HR manager who does not have an open
6     door policy for employees to come and report
7     discrimination or speak up, is that employee subject to
8     discipline?
9        MS. CALEM: Object to the form.
10       THE WITNESS: That I don't know. It depends. I
11    mean, it would go through their manager to review.
12 BY MS. POCHOP:
13 Q  The central role of HR is to have an open door and
14    receive employee complaints, right?
15 A  Yes.
16 Q  And if that isn't happening, is that a policy violation
17    in and of itself by the HR manager?
18       MS. CALEM: Object to the form.
19       THE WITNESS: We have that open door policy to do
20    a prompt investigation/review of that concern.
21 BY MS. POCHOP:
22 Q  Are you aware of any -- I guess there's just two of
23    you. Have either one -- have you ever been
24    disciplined?
25 A  No.

Page 26

1  Q  Have you ever had your performance evaluated?
2  A  Yes.
3  Q  And how are your performance evaluations?
4  A  I'm always rated as doing well, good.
5  Q  Do you know how Carrie's performance evaluation is?
6  A  No.
7  Q  Is she your supervisor or are you guys at the same
8     level?
9  A  We're at the same level.
10 Q  Who does your performance evaluation?
11 A  Mr. Scott Reed.
12 Q  And is he the next step in your chain of command?
13 A  Yes.
14 Q  Where does David Hillberg fit into HR?
15 A  David Hillberg is an operation manager on our packaged
16    meat side of the plant.
17 Q  So if we go to page 6 of Exhibit 3, it's the diversity
18    and equal employment policy, first, is what I'm looking
19    at, and I've got that highlighted over there for you.
20       Is Smithfield policy that if an employee feels
21    they have been discriminated against or believes
22    somebody else has been a victim of discrimination or if
23    they even have a question about antidiscrimination
24    policies, they are instructed to speak up?
25 A  Yes.

Page 27

1  Q  They are told that they should talk to their immediate
2     supervisor, the local human resources manager, or
3     others in management?
4  A  Yes.
5  Q  And any of those three avenues is what you tell your
6     employees they're supposed to do if they experience,
7     see, or have a question about discrimination in the
8     workplace?
9  A  Yes.
10 Q  And when we look at what constitutes harassment, is it
11    true that Smithfield employees have the right to work
12    free from harassment?
13 A  Yes.
14 Q  And Smithfield tells employees that that's any behavior
15    that demeans, intimidates, or offends an individual?
16 A  Yes.
17 Q  Are employees and managers told that they are to avoid
18    unwelcome physical or visual conduct related to race,
19    color, gender, sexual preference, age, physical or
20    mental disability, veteran status, and any other
21    legally protected characteristic?
22 A  Yes.
23 Q  Are Smithfield employees expected to avoid racial,
24    ethnic, religious, sexual slurs or jokes?
25 A  Yes.

Page 28

1  Q  Is it a violation of Smithfield policy if an employee
2     makes a racial slur?
3  A  Yes.
4  Q  Is it a violation of Smithfield policy if an employee
5     makes a racial joke?
6  A  Yes.
7  Q  Is it a violation of Smithfield policy if an employee
8     says "I think you're being racist"?
9  A  That would depend on how it was used in a context.
10 Q  What would the context, where it would be a violation
11    of policy, be?
12 A  If you're being racist? Is that -- can you just repeat
13    that, please.
14 Q  Yeah. Is it a violation of the policy -- when would it
15    be a violation of policy for an employee to say "I
16    think you're being racist"? Can you think of any
17    context in which that would be a violation of
18    Smithfield policy?
19 A  No.
20 Q  Is it a violation of policy to use bullying, abusive
21    language, physical aggression, intimidating or violent
22    behaviors, or to make disparaging comments?
23 A  Yes, that is a violation.
24 Q  Is unnecessarily touching or intentionally even
25    blocking somebody from moving, is that a violation of

| Sala Naambwe and Yvette Nimenya v. Smithfield Foods, Inc. | Monica Derby May 31, 2018 |

Page 29

1  Smithfield policy?
2  A  Yes.
3  Q  Sexual advances, are those -- those are obvious
4     violations, right?
5  A  Yes.
6  Q  Other actions that unreasonably interrupt or interfere
7     with an employee's work performance, how is that
8     defined by HR at Smithfield?
9  A  So if something's -- it would be if something's coming
10    in the way of somebody performing their job duties.
11    Again, it could refer to some of the top ones, that
12    they're just making them uncomfortable but they may not
13    be able to perform their job duties as they should.
14 Q  If anybody comes to HR and makes a report about any of
15    these types of behaviors, what is HR management's
16    responsibility?
17 A  To investigate that promptly, timely.
18 Q  Are employees protected from retaliation if they speak
19    up under your policy?
20 A  Yes.
21 Q  And can you tell me what your understanding of the
22    Smithfield retaliation policy is?
23 A  We do not take any adverse action for someone taking
24    part in a protected activity, such as making a claim or
25    being part of an investigation.

Page 30

1  Q  And if a Smithfield manager retaliates against an
2     employee who is bringing a racial discrimination claim,
3     would that be a protected activity?
4  A  Yes.
5  Q  If the Smithfield employee retaliates and disciplines
6     an employee for bringing a claim, is that a violation
7     of Smithfield policy?
8  A  Can you elaborate on that just a little bit as far as
9     discipline?
10 Q  Can managers punish people for bringing -- discipline
11    people for bringing discrimination claims?
12 A  No.
13 Q  Is it a violation of the Smithfield policy by that
14    manager that should subject that manager to discipline
15    if a manager disciplines somebody for bringing a
16    discrimination claim?
17 A  Yes.
18 Q  Are you aware of any instance where any Smithfield
19    manager has been disciplined for retaliating against an
20    employee?
21 A  I do not know the answer to that.
22 Q  And on page 7 of Exhibit 3, Smithfield clarifies that
23    its policy applies to all employees and anyone else who
24    does business with Smithfield, right?
25 A  Yes.

Page 31

1  Q  And, again, it tells employees, reiterates that if they
2     are being harassed or see anybody else being harassed,
3     they need to tell a supervisor, human resources, or
4     take other action outlined in the handbook, right?
5  A  Yes.
6  Q  And they even give an example where they tell employees
7     that if you've got a supervisor who's constantly
8     yelling or even makes an offhand remark about
9     threatening somebody that nobody even thinks is true,
10    that that needs to be reported?
11 A  Yes.
12 Q  I'm just wondering, do you -- this is something that is
13    reiterated to employees in their annual training?
14 A  Yes.
15 Q  And how is that training done?  Is it, like, a video?
16    Do you do a lecture?
17 A  So it's done -- Train the Trainer, at that time, we do
18    have a PowerPoint presentation, and that would be how
19    we do that.
20 Q  If you could look at Exhibit 2 that you have there in
21    front of you.  Are you familiar with Exhibit 2?
22 A  Yes.
23 Q  Can you tell me what it is?
24 A  This is our employee handbook.
25 Q  Is HR actually responsible for writing that or --

Page 32

1  A  Yes.  We hold the original coppy and revise that as
2     needed, yes.
3  Q  So on page 5, can you describe your ethics policy?
4  A  The ethics policy is to make sure that we're treating
5     everybody fairly, responsible, living up to a high
6     ethical/legal standard.  Again, it goes back to
7     producing a high-quality product, animal care...
8  Q  On page 6, can you describe what you represent to
9     employees about Smithfield's efforts to ensure that
10    they can feel free to report policy violations?
11 A  Can you repeat that, please.
12 Q  Sure.  On page 6, is there a policy -- can you tell me
13    what your policy tells employees about retaliation?
14 A  In there -- retaliation is found in the harassment
15    verbiage, and it says that there will be no retaliation
16    for bringing forth a claim of harassment or taking part
17    in an investigation.
18 Q  I'll ask a better question when I'm looking at it.
19       At the top of page 6, it refers again to Speak Up,
20    just in case people missed it from the other
21    handbook --
22 A  Yes.
23 Q  -- I guess?
24 A  Yes.
25 Q  And it says, quote, we are doing everything we can to

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Monica Derby
May 31, 2018

Page 33

1  make speaking up easy to do, and it provided various
2  ways for anyone to raise a question or concern, right?
3  A  Yes.
4  Q  And it says, "You will not be retaliated against for
5     raising a question or reporting a concern."
6  A  Yes.
7  Q  Can you give me some examples that you know from your
8     training as an HR specialist about different ways that
9     an employer can retaliate?  Is discipline -- giving a
10    discipline for making a report, is that one of them?
11 A  That would be one, discipline.
12 Q  That's a pretty big one in HR training because of the
13    chilling effect it can have on other employees to come
14    forward, right?
15        MS. CALEM: Objection to the form.
16        THE WITNESS: Yes.
17 BY MS. POCHOP:
18 Q  How about work duties?  Can you assign -- is assigning
19    employees to more difficult or unfavorable work
20    duties -- is that a red flag for HR folks about signs
21    of retaliation?
22 A  It would -- visiting with the employee on their work
23    rule, what their work assignment is.
24 Q  Is hours, having your hours changed, is that a way that
25    is a commonly known red flag for HR to look at if

Page 34

1     employees think that they're being retaliated against?
2  A  Yes.
3  Q  Do you have an obligation as an HR manager at
4     Smithfield to investigate claims of retaliation?
5  A  Yes.
6  Q  Are you supposed to use the same procedure, which is
7     investigate, get witness statements, and follow
8     through, to determine if the employee is being subject
9     to retaliation?
10 A  Yes.
11 Q  Have you ever done an investigation yourself about
12    retaliation?
13 A  I -- yes.
14 Q  When?
15 A  I think the concern that was brought forward if having
16    to move jobs -- it was a grievance, so it wasn't -- so
17    that would be the one I've done.
18 Q  In Sala's case?
19 A  Yes.
20 Q  Is that the only time you've ever investigated a claim
21    of retaliation at Smithfield Foods?
22 A  Yes.
23 Q  How about claims of discrimination?  Have you -- how
24    many times have you investigated discrimination
25    complaints by employees at Smithfield Foods?

Page 35

1  A  I don't believe I've had any that I can think of.
2  Q  How about sexual harassment or sexual behavior in the
3     workplace complaints?  How many investigations have you
4     conducted into complaints about the company's sexual
5     harassment policy?
6  A  When a concern's brought forward, then we -- I looked
7     at it that time.  There would be the one that I can
8     think of.  Other than that, I can't really think of any
9     at this moment.
10 Q  And, again, is that in Sala's case?
11 A  It was brought up during Sala's case, but not in
12    regards to Sala, no.
13 Q  Which complaint was that?
14 A  Lisa was concerned that Tom Anderson, years prior, had
15    made some inappropriate gestures towards her.
16 Q  And so did you conduct a sexual harassment
17    investigation?
18 A  We did talk to Tom.  BJ Manning [sic] and myself talked
19    to him, and he said -- so, yes, I reviewed it.
20 Q  What was the outcome of your review?
21 A  The time frame and -- you know, we reviewed it, and
22    that was, as far as -- you know, visited with Tom as
23    well.
24 Q  Did you ever ask Lisa to make a written statement?
25 A  No.

Page 36

1  Q  Did you know that she felt that this harassment was an
2     intense experience on at least three occasions?
3  A  No.
4  Q  As the HR person who -- I mean, I just met her this
5     morning and she told me about it.  As the HR person who
6     is supposed to be investigating this, why didn't you
7     know that she felt that she had three intense sexual
8     harassment experiences with Tom Anderson?
9        MS. CALEM: Object to the form of the question.
10       It's argumentative.
11       THE WITNESS: Because they weren't brought
12       forward.
13 BY MS. POCHOP:
14 Q  But she did bring them forward to you, right?
15 A  Yes.
16 Q  And you didn't ask her to make a written statement
17    apparently?
18 A  No.
19 Q  You actually have a form for making complaints like
20    that at Smithfield Foods, right?
21 A  Yes.
22 Q  And that is your documentation policy, correct?
23 A  Yes.
24 Q  And you apparently didn't ask her for the details of
25    her sexual harassment experience?

| Sala Naambwe and Yvette Nimenya v. Smithfield Foods, Inc. | Monica Derby May 31, 2018 |
|---|---|

Page 37

1    MS. CALEM: Objection.
2  BY MS. POCHOP:
3  Q  Did you?
4  A  She verbally told us that she had an encounter with him
5     years prior and that he had made some inappropriate
6     gestures at that time.
7  Q  And so what were the gestures?
8  A  Swivelling of the hips, if that's -- that's what I
9     recall.
10 Q  Do you know what three incidents she felt were very
11    intense sexual harassment?
12 A  No.
13 Q  Is it a surprise to you today that I'm asking you what
14    three experiences she would have been testifying about
15    today?
16    MS. CALEM: Objection to the form of the question.
17    THE WITNESS: No -- can you repeat that? I'm --
18 BY MS. POCHOP:
19 Q  Is it a surprise to you that you don't know what three
20    experiences she testified about today that she felt
21    were three intense sexual harassment experiences in the
22    Smithfield workplace?
23    MS. CALEM: I'm going to object to the form of the
24    question and also the tone of the questioning. There's
25    an indignant tone that suggests that this witness did

Page 38

1     something wrong.
2     MS. POCHOP: I am indignant about it.
3  BY MS. POCHOP:
4  Q  But you can answer.
5     MS. CALEM: It's an entirely inappropriate way to
6     address this witness.
7     THE WITNESS: So, no, I visited with her.
8  BY MS. POCHOP:
9  Q  As the HR manager, is it your responsibility to find
10    out the details of her policy complaint about sexual
11    harassment?
12    MS. CALEM: Objection. Form of the question.
13    THE WITNESS: Yes. And I worked to get those
14    details from her that she did provide.
15 BY MS. POCHOP:
16 Q  When she told you that she had not reported because she
17    was afraid of getting into trouble, what did you tell
18    her?
19    MS. CALEM: Objection. That completely misstates
20    testimony, lacks foundation. There's been no such
21    testimony that Lisa Christion told Monica that. You
22    are extrapolating from Lisa's testimony and assuming
23    that Monica knows that, and that's unfair to Monica.
24 BY MS. POCHOP:
25 Q  Did you know that she didn't come forward -- she said

Page 39

1     she didn't come forward to report because she was
2     afraid of getting into trouble?
3  A  No.
4  Q  Well, maybe you can take a look at -- let's see. I
5     need those. Rather than extrapolate, let's take a look
6     at Exhibit 30.
7     On Exhibit 30 -- first of all, is that a document
8     that you recognize?
9  A  Yes.
10 Q  Is this a document that you prepared?
11 A  Yes.
12 Q  Is it accurate?
13 A  Yes.
14 Q  Is it important that your documentation be as accurate
15    and detailed as you can make it?
16 A  Yes.
17 Q  Why?
18 A  For if it would come up at a later reference and I need
19    to refer to it.
20 Q  If you look at page 2 of Exhibit 30, at the top, you're
21    describing here Lisa reporting to you an incident that
22    would be a violation of your sexual harassment policy,
23    right?
24 A  Yes.
25 Q  Do you see what you wrote in your notes about why she

Page 40

1     told you she hadn't reported it?
2  A  Yes.
3  Q  Can you tell me what you documented about why Lisa told
4     you she had not reported this sexual harassment in the
5     workplace?
6  A  Because she did not want to get him or her in trouble.
7  Q  Is that what she told you?
8  A  Yes, that's what I put down in my notes.
9  Q  And so my question is, what did you do when you found
10    out that your lead person in this department had
11    experienced sexual harassment and had worried about
12    reporting it because she didn't want to get into
13    trouble?
14 A  We did talk to Tom Anderson to see what had happened in
15    regards to their initial thing. It was an issue that
16    had happened prior.
17 Q  When?
18 A  I don't recall when she said, how far back it was. I
19    don't have that in my notes.
20 Q  That would be kind of an important detail to know,
21    right?
22    MS. CALEM: Objection to the form.
23    THE WITNESS: It would have been
24    beneficial/helpful to have, yes.
25

| Sala Naambwe and Yvette Nimenya v.<br>Smithfield Foods, Inc. | Monica Derby<br>May 31, 2018 |

**Page 41**

1 BY MS. POCHOP:
2 Q So what was the outcome of the chat that you had with
3   Tom about Lisa's report of sexual harassment?
4 A He denies harassing her.
5 Q And so what did -- what was the outcome? After she
6   said, this happened to me, he said it didn't, then what
7   happened?
8 A I did not have that -- I don't have that in front of
9   me.
10 Q Well, what did you do? Because you were the person
11   investigating, right?
12 A Uh-huh.
13 Q And it's the only one you've ever done, right?
14 A Yes.
15 Q So what did you do?
16 A I don't have that in front of me.
17 Q I want to know what you can recall doing, if anything.
18 A From my notes, it shows I didn't do anything. I did
19   not provide a follow-up.
20 Q Is that consistent with Smithfield's code of conduct?
21 A No.
22 Q Did you violate Smithfield's policy by not following up
23   when you received a report -- when somebody had the
24   concern enough about it to speak up?
25   MS. CALEM: Objection to the form.

**Page 42**

1 BY MS. POCHOP:
2 Q Ms. Derby, did you violate Smithfield policy by not
3   following up with this report?
4   MS. CALEM: Objection to the form.
5   THE WITNESS: I don't think I violated it. I may
6   not have followed the full procedure.
7 BY MS. POCHOP:
8 Q Is there some policy at Smithfield that says you don't
9   have to follow the full sexual harassment policy as an
10   HR manager?
11   MS. CALEM: Objection to the form.
12   THE WITNESS: No.
13 BY MS. POCHOP:
14 Q Are employees instructed or informed that you don't
15   have to follow the whole policy as an HR manager?
16   MS. CALEM: Objection to the form.
17   THE WITNESS: No.
18 BY MS. POCHOP:
19 Q In fact, you represent to your employees when you do
20   these trainings that you're going to follow the policy
21   because they have to follow it?
22   MS. CALEM: I'm going to object to the form and
23   again the tone. Please stop haranguing and speaking
24   snidely to this witness.
25

**Page 43**

1 BY MS. POCHOP:
2 Q I'm sorry if my tone is snide. It's just my tone.
3 A Can you repeat the question, please.
4   MS. POCHOP: Can you read it back for us, Audrey?
5   (The record was read by the reporter as follows:
6   Question: "In fact, you represent to your
7   employees when you do these trainings that you're going
8   to follow the policy because they have to follow it?")
9   THE WITNESS: Yes.
10 BY MS. POCHOP:
11 Q Are there other instances where you have not followed
12   the complete Smithfield policy that you are aware of?
13 A No.
14 Q On page 15 of Exhibit 2, I wanted to ask you about
15   postings in the workplace.
16   Is there a policy that says that anything that's
17   going to be posted in the Smithfield workplace has to
18   be approved by management?
19 A They do come to HR for approval if they're going to go
20   on the company boards.
21 Q Did you know that there was an article about Sala and
22   Yvette's lawsuit posted on the Smithfield bulletin
23   board?
24 A No.
25 Q Would that have been something that somebody should

**Page 44**

1   have gotten permission to do?
2 A Yes.
3 Q If that happened and the Argus Leader article about the
4   racial discrimination case filed by your employees was
5   posted in the Smithfield workplace, is that something
6   that should have been reported to HR if there wasn't
7   permission to post?
8   MS. CALEM: Objection to the form.
9   THE WITNESS: For somebody to speak up and say
10   that it was posted?
11 BY MS. POCHOP:
12 Q Yeah. Well, you wouldn't really even have to see it
13   and somebody'd walk by and look at it, right?
14 A Yes.
15 Q Did you know that it was posted?
16   MS. CALEM: Objection. Asked and answered.
17   THE WITNESS: No.
18 BY MS. POCHOP:
19 Q Are you aware of anybody giving permission to have that
20   newspaper article posted on the bulletin board?
21   MS. CALEM: Objection.
22   THE WITNESS: That I do not know.
23 BY MS. POCHOP:
24 Q Would there be any legitimate reason to have it -- to
25   have HR approval to post a newspaper article about the

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Monica Derby  
May 31, 2018

Page 45

1  company being sued for race discrimination and
2  retaliation?
3      MS. CALEM: Objection to the form.
4      THE WITNESS: Just to make sure there's something
5  appropriate on the board.
6  BY MS. POCHOP:
7  Q  You think that would have been an appropriate thing to
8  have there?
9      MS. CALEM: Objection to the form.
10     THE WITNESS: It would have to be reviewed and
11  determined.
12  BY MS. POCHOP:
13  Q  Who would do that? Who would make that determination?
14  A  Scott Reed.
15  Q  Is that something that he would have the sole
16  discretion to decide?
17     MS. CALEM: Objection to the form.
18     THE WITNESS: Or -- yes, or the plant manager.
19  BY MS. POCHOP:
20  Q  Does he have to come talk to you about it?
21     MS. CALEM: Objection to the form.
22     THE WITNESS: No. Mr. Reed's the director of the
23  department.
24     (Exhibit 47 is marked for identification.)
25

Page 46

1  BY MS. POCHOP:
2  Q  I'm showing you a photograph of the newspaper article
3  that was posted at work on the company bulletin board.
4  Do you recognize where this would have been
5  posted?
6  A  No.
7  Q  Is this the first time you've seen that?
8  A  I had seen the article, but this is the first I've seen
9  of this exhibit, yes.
10  Q  From an HR perspective, is there a reason why you think
11  that that would be a legitimate thing to have posted in
12  the workplace, that article?
13     MS. CALEM: Object to the form.
14     THE WITNESS: It would be if it was -- depending
15  on if the names that were in here, if they didn't want
16  their information on the company bulletin board.
17  BY MS. POCHOP:
18  Q  Have you been involved -- were you involved in any way
19  in the Scott Genzler racism incident with Sala, Yvette
20  and Lorena Morales?
21  A  No.
22  Q  Did you know about it?
23  A  After the investigation.
24  Q  How did you hear about it?
25  A  I think just in discussion and -- in discussion between

Page 47

1  the HR professionals in the office.
2  Q  I want to ask you about these specific comments.
3  Calling people of color monkeys, is that an obvious
4  violation of Smithfield policy?
5  A  Yes.
6  Q  Should that be something that any supervisor would
7  recognize as an obvious violation of policy?
8  A  Yes.
9  Q  Swearing at coworkers to hurry the fuck up?
10  A  Yes. That would be inconsiderate treatment of
11  coworkers.
12  Q  Pushing products faster than the coworkers say that
13  they can handle. If your coworkers say, "slow down, I
14  can't keep up," is it a violation of any policy or
15  safety policy at Smithfield to continue pushing the
16  products to them?
17  A  Not if it's going to hurt somebody.
18  Q  Like, for example, if you get hit by -- if you get hit
19  by a ham or a ham falls on your foot, is that an
20  obvious problem under a Smithfield policy?
21  A  Yes. For safety, make sure we review that.
22  Q  Physically intimidating coworkers so that you can see
23  that they are scared, is that a violation of Smithfield
24  policy?
25  A  Yes.

Page 48

1  Q  Is telling coworkers to go back to their country when
2  they are people of color, is that an obvious violation
3  of Smithfield policy?
4  A  Yes.
5  Q  Telling people that they need to speak English in the
6  plant, is that a violation of Smithfield policy?
7  A  Yeah, because they don't need to speak their
8  language -- or only English in the plant.
9  Q  What is rule No. 15?
10  A  Rule No. 15 is the use of profane or abusive language,
11  combative behavior, or failure to cooperate.
12  Q  When was your first involvement with Sala and Yvette
13  from an HR perspective?
14  A  My first -- working with Yvette, I believe Carrie -- I
15  sat in on an interview with her one time. She was --
16  for Juan. Sat in with Yvette on that one. That would
17  have been my first encounter with Yvette.
18     I worked with Sala when she had brought forward --
19  or we asked her to come down in regards to a grievance
20  that was brought forward, just to kind of find out her
21  concern, so I did an intake note with that.
22  Q  What was the result of your intake note? What did you
23  do after you sat in with Sala's intake?
24  A  With Sala's intake, BJ and I worked through that one.
25  We investigated the situation. When we were finished,

Page 49

1   we had agreed, decided that Sala would then pick her
2   jobs, what she would do, starting on Monday. It was a
3   recommendation from BJ to have Sala pick the jobs that
4   she would like based on her -- the work group would do.
5 Q Was that something that HR approved of?
6 A Yes.
7 Q Is that a reasonable accommodation to an employee who
8   is feeling retaliated against?
9       MS. CALEM: Objection to the form of the question.
10  Incomplete hypothetical, calls for speculation.
11      THE WITNESS: So the concern that was brought
12  forward was having to work on Arby's, so that's what
13  the grievance was for, and so that's kind of --
14  reviewed that, if they have assigned other people to
15  that job before, and so in order for that, it was
16  agreed that on Monday she would pick her job for the
17  week.
18 BY MS. POCHOP:
19 Q Did Sala make complaints to you about her supervisor
20  Gary?
21 A Yes. She laid a background on -- she had said that she
22  worked a lot with Carrie and Carrie knew her
23  background.
24 Q Did she make reports about Gary's workplace behavior
25  toward her?

Page 50

1 A Yes, that he would yell.
2 Q And under your Speak Up example, that's something that
3   she's supposed to report to HR, right?
4 A Yes.
5 Q And what else -- did she make any other complaints to
6   you about Gary?
7 A That he had swore. He had swore when they were filling
8   water buckets.
9 Q Did you conduct an investigation into Sala's complaints
10  about Gary Loger?
11 A Yes. We had talked to Tom Zuraff, which would be the
12  union steward in that area, and we talked to Lisa as
13  well.
14 Q So did you document -- did you document any of these
15  interviews?
16 A Yes.
17 Q Did you ask Sala to complete a incident intake report?
18 A Yes. Sala was able to complete the top portion, and
19  then I made the notes from there.
20 Q And why is that?
21 A Because she said she wouldn't be able to complete the
22  form. She had requested if she could take it home with
23  her, and I said I would help her and get her statement.
24 Q So then did you follow up and investigate with Gary?
25 A Yes. So we talked to Gary as well.

Page 51

1 Q And what was Gary's general response?
2 A That he didn't swear at her and that he had come out of
3   the office when they were doing the assignments.
4 Q And what was the outcome of your investigation?
5 A The outcome of the investigation is we talked to
6   everyone based on how they -- they had seven people out
7   that day. I think there was one person that had lesser
8   hours than Sala by .3 hours, and so we kind of looked
9   at the seniority. She was put on Arby's to kind of
10  fill the rest of her hours. And, again, in agreeance
11  with the union that what we would do is, on Monday, she
12  would pick her jobs for the week based on seniority and
13  working around other people's assigned jobs.
14 Q Were you involved when there was an incident when Sala
15  said that somebody had thrown meat on her?
16 A Yes.
17 Q Is throwing meat at each other permitted under
18  Smithfield policies?
19 A No.
20 Q What was the outcome of your investigation with regard
21  to the allegation that somebody threw meat at her?
22 A So working with the operations manager, they did talk
23  to everybody in the department and nobody had come
24  forward, so it was inconclusive on somebody throwing
25  meat.

Page 52

1 Q So what was the HR resolution?
2 A So a month later a training was provided on, you know,
3   treating coworkers respectfully and respectful
4   communications in the department as well, so -- which
5   had taken place.
6 Q Did you do the training?
7 A No. Mr. Reed did that.
8 Q Were managers told to leave -- to instruct employees to
9   leave Sala alone and not bother her.
10 A Yes, because nobody should be throwing meat or
11  bothering people at all.
12 Q Did you know that Russ was going to have a meeting and
13  tell everyone to leave Sala alone and not to bother
14  her? Would that have been cleared with you as an HR
15  person before the meeting?
16 A No. I believe that had happened prior to finding out.
17 Q What does it tell you that the manager then has to call
18  everybody together in the workplace and say leave her
19  alone?
20      MS. CALEM: Objection to the form.
21      Do you understand the question?
22      THE WITNESS: No. If you could please repeat
23  that.
24 BY MS. POCHOP:
25 Q Yeah. What's your understanding of why Russ had to

| Sala Naambwe and Yvette Nimenya v. | Monica Derby |
|---|---|
| Smithfield Foods, Inc. | May 31, 2018 |

**Page 53**

```
 1    tell everybody to leave Sala alone and not bother her?
 2         MS. CALEM: Objection to the form. Calls for
 3    speculation.
 4         THE WITNESS: You know, if -- that I don't know.
 5  BY MS. POCHOP:
 6  Q  Did that raise a concern for you when you were
 7    documenting that Russ did that, that Sala might be
 8    subject to retaliation in her workplace?
 9         MS. CALEM: Objection to the form.
10         THE WITNESS: It was also, my understanding, a
11    discovery to see if anybody had been -- had threw meat.
12  BY MS. POCHOP:
13  Q  Okay. I'm going to ask you to take a look at what's
14    been marked as Exhibit 29 here. It's the grievance.
15    This is the grievance about the work assignments,
16    right?
17  A  Yes.
18  Q  Did you see that grievance when you were investigating
19    Sala's complaint?
20  A  I do not recall.
21  Q  Did you know that she was complaining of being bullied
22    and harassed in the workplace?
23  A  She just -- yes, that she felt like she wasn't being
24    treated fairly. She wanted to be treated like everyone
25    else is what she was expressing.
```

**Page 54**

```
 1  Q  Did you investigate what she believed was why she felt
 2    like she was being bullied and harassed on a daily
 3    basis?
 4         MS. CALEM: Objection to the form of the question.
 5         THE WITNESS: Looked at the situation on what had
 6    taken place and what her concern was for her
 7    assignment.
 8  BY MS. POCHOP:
 9  Q  What was the harassment that she felt she was
10    experiencing on a daily basis?
11  A  Expressed not being treated the same as everyone else.
12  Q  In what way?
13  A  Felt that she was being yelled at by her supervisor --
14    or just being yelled at compared to other people.
15    Assigned to do Arby's that day by herself, was
16    concerned about that.
17  Q  What was the other -- any other harassment that she
18    expressed that she was experiencing on a daily basis?
19  A  Just that she felt she was being treated differently by
20    Lisa and Gary compared to the other coworkers.
21  Q  And in what way did she feel that she was being treated
22    differently?
23  A  Job assignments, the job assignments, have to do Arby's
24    that time by herself.
25  Q  Well, that's the one incident, but she was grieving
```

**Page 55**

```
 1    repeated harassment, wasn't she?
 2         MS. CALEM: Object to the form.
 3  BY MS. POCHOP:
 4  Q  That's what her grievance states, right?
 5  A  That she's been in jobs or situations where they know
 6    there's not reasonable placement.
 7         So they put her in jobs that she felt that weren't
 8    reasonable, asking for help --
 9  BY MS. POCHOP:
10  Q  So in the -- and I'm guessing because the resolution
11    was that she got to pick her jobs, was that a
12    successful -- her grievance was reasonable then, right?
13         MS. CALEM: Objection to the form of the question.
14  BY MS. POCHOP:
15  Q  I mean, she wouldn't have been allowed to have that
16    accommodation if it wasn't a reasonable grievance,
17    correct?
18         MS. CALEM: Objection to the form.
19         THE WITNESS: The response to allow her to pick
20    jobs on Monday allowed, you know, the placement, the
21    choice, being an open work employee.
22  BY MS. POCHOP:
23  Q  Were you involved in any of the employee warnings that
24    Sala received after she reported Scott Genzler for
25    racial discrimination in 2016?
```

**Page 56**

```
 1  A  No.
 2  Q  Did you ever review her performance record?
 3  A  No.
 4  Q  Did you ever investigate Russ for making Sala feel
 5    stressed and threatened at work?
 6         MS. CALEM: Objection to the form.
 7         THE WITNESS: No.
 8  BY MS. POCHOP:
 9  Q  I'm looking at a grievance dated in August 2017 where
10    the grievance was that grievant feels threatened and
11    stressed by manager Russ coming up behind and poking
12    grievant saying "what are you going to do now that your
13    partner is gone," referring to a steward.
14         Did you have anything to do with that
15    investigation?
16  A  No.
17  Q  Do you know whether Russ was disciplined for how he was
18    managing Sala?
19         MS. CALEM: Objection to the form.
20         THE WITNESS: Managing Sala or in regards to a
21    specific incident?
22  BY MS. POCHOP:
23  Q  Either way.
24  A  Yes.
25  Q  Okay. And what was that for?
```

| Sala Naambwe and Yvette Nimenya v. Smithfield Foods, Inc. | Monica Derby May 31, 2018 |
|---|---|

### Page 57

1  A  I know he received a suspension. For specifics, I
2     don't have those.
3  Q  Just in general, why did he receive a suspension?
4        MS. CALEM: Object to the form. It calls for
5     speculation. She said she was not involved in it.
6  BY MS. POCHOP:
7  Q  I want to know your understanding of why he received a
8     suspension.
9  A  My understanding on why Russ received a suspension was
10    for the comment that he had made to Sala.
11 Q  Was it deemed to be threatening and intimidating?
12       MS. CALEM: Objection to the form.
13       THE WITNESS: I do not know his intent.
14 BY MS. POCHOP:
15 Q  Were you involved in an investigation when Sala
16    reported that she had been physically hit by a ham
17    thrown by a coworker?
18 A  No.
19 Q  Have you had any other involvement in disciplinary
20    actions or reports of policy violations by Sala?
21 A  Yes.
22 Q  Can you tell me what they have been?
23 A  Initial intake, Sala had come in, Becky had flipped her
24    off and said an inappropriate word. Carrie and I
25    visited with Sala that day, and then we took the

### Page 58

1     intake. And then Carrie followed up with Becky and
2     everything on that one.
3  Q  And what was the outcome of that investigation?
4  A  Becky had received a written warning.
5  Q  Were you involved in investigating a complaint about
6     Amanda Avila and Sala?
7  A  Can you just give me a little bit of background,
8     please.
9  Q  Sure. Was there a complaint in January of 2018 between
10    Sala and Amanda Avila that resulted in a grievance
11    about Sala taking a picture of Amanda in the plant?
12 A  Yes. Amanda came to me initially and expressed concern
13    that Sala had taken a picture of her in the plant, so
14    she was concerned about that.
15 Q  Are employees allowed to take photos in the plant?
16 A  No. They should not be having their cell phones in the
17    plant.
18 Q  Do employees take cell phones and take pictures in the
19    plant?
20 A  They're not supposed to take their cell phones out to
21    the plant.
22 Q  But is that one of those policies, while it's in
23    writing, that employees don't really follow?
24 A  Yes.
25 Q  Were you involved in any way with any complaints -- you

### Page 59

1     said you were involved in a complaint with Yvette and
2     Juan. What was the complaint that you dealt with with
3     Yvette and Juan?
4  A  I just sat in when they took Yvette's statement that
5     day.
6  Q  Was that about Juan asking her to touch his penis at
7     work?
8  A  Yes.
9  Q  And what was the outcome of that investigation, if you
10    know?
11 A  That investigation, I believe they both expressed
12    complaints on how they were being treated, the outcome.
13 Q  I want to ask if you could look at what's been marked
14    as Exhibit 44. This is on -- 44 is on intake -- on the
15    intake form that employees are supposed to fill out if
16    they're going to report a violation of policy, right?
17 A  Yes.
18 Q  And this one says racist and -- it's misspelled, but it
19    says bullying?
20 A  Yes.
21 Q  I'm also going to show you a copy of what has been
22    marked as Exhibit 15.
23 A  Okay.
24 Q  That's just my copy of it, but -- that's another form
25    that was filled out, and that's a form provided in HR?

### Page 60

1  A  Yes.
2  Q  Do you have to go to HR to get that form?
3  A  Yes, this is -- yes, we have those in HR.
4  Q  And so when you, as an HR manager, look at this intake
5     form, does that indicate to you a serious policy
6     violation by just the general description provided
7     about the incident?
8        MS. CALEM: Objection to the form. It calls for
9     speculation, assumes the truth of what is in the form.
10       THE WITNESS: It would raise concern that this
11    would need to be reviewed.
12 BY MS. POCHOP:
13 Q  I mean, there isn't really any way to look at the
14    nature of the incident being reported and think, as an
15    HR manager, I don't need to investigate that, right?
16 A  Can you say that again?
17 Q  Yeah. I mean, as an HR manager, when somebody comes in
18    and fills out your HR form and you see that they're
19    alleging racist, bullying, and harassment, that
20    requires an investigation, right?
21 A  Yes.
22       MS. POCHOP: Thank you, Monica. I don't have any
23    further questions.
24       MS. CALEM: I have a couple of follow-ups, Monica.
25