*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*

**Russ Hultman**
May 30, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

App. Tab

G

| Sala Naambwe and Yvette Nimenya v. | Russ Hultman |
|---|---|
| Smithfield Foods, Inc. | May 30, 2018 |

Page 5

1  That's -- I don't need to know anything about that.
2  I'd like to know if you talked to anybody else.
3  A  No, I did not.
4  Q  Did you review any documents?
5  A  No.
6  Q  How old are you?
7  A  59.
8  Q  Can you give me just an overview of your educational
9  history?
10  A  High school graduate.
11  Q  From where?
12  A  Cherokee High in Cherokee, Iowa.  Washington High
13  School.
14  Q  How long have you lived in Sioux Falls?
15  A  31 years.
16  Q  And do you have any other family members who work at
17  the Smithfield plant?
18  A  No.
19  Q  How about just a general overview of your work history?
20  A  I worked at a Wilson plant back in Cherokee,
21  packinghouse for three years before I came up here, and
22  I had numerous jobs before that, I guess.
23  Q  Have you ever been fired from a job?
24  A  No.
25  Q  How did you decide to go to work at -- it would have

Page 6

1  been John Morrell when you started.
2  A  There was a strike in '87.
3  Q  A strike at your plant?
4  A  At this plant.
5  Q  And so how did you decide to get employed there if
6  there was a strike?
7  A  I just applied because they were looking for help.
8  Q  Oh, okay.  I see.  Are you a union member?
9  A  I am not.
10  Q  So in terms of your employment at John Morrell, I'd
11  like you to describe for me where you started and just
12  walk me through to what position you hold today.
13  A  I started in the beef, lugging beef off a truck, for
14  the first five years I was there.  Then I worked in the
15  beef cooler for a couple years.  In '92, I came over to
16  the processing side, worked in bacon for three months,
17  and then I went to smoked meat wash, and I was there
18  for about 25 years.  And I've been in management, I
19  believe, like 13.
20  Q  So with 13 years of management, you must understand the
21  company's harassment and discrimination policies pretty
22  well?
23  A  Uh-huh.
24  Q  Can you describe what they are?  Let's start with the
25  discrimination policy.

Page 7

1  A  There's no touching, no foul language, treat everyone
2  with respect.  That's about the sum of it.
3  Q  Is there a retaliation policy at Smithfield?
4  A  There isn't.
5  Q  There is what?
6  A  There is not.
7  Q  Can you tell me what your management training about
8  discrimination -- about the company's discrimination
9  policies consist of.  Is that annual?
10  A  Yes, it is.
11  Q  And has it been annual for -- once a year for all
12  13 years you've been in management?
13  A  Uh-huh.
14      MS. CALEM: Is that a yes?
15      THE WITNESS: Yes.
16      MS. CALEM: You have to say it verbally.
17      THE WITNESS: Yes.  I'm sorry.
18      MS. POCHOP: Sorry.  I didn't catch it either.
19  BY MS. POCHOP:
20  Q  What does Smithfield tell its employees about their
21  responsibility to report violations of company policy
22  to human resources?
23  A  We have a thing called Courage to Care, and it
24  encourages everyone in the plant, supervisors and
25  managers, to speak out on anything that they see they

Page 8

1  think is wrong.
2  Q  Is that the same thing as the Speak Up policy?
3  A  I don't know.
4  Q  Do you know what Speak Up is?
5  A  No.
6      (Discussion off the record.)
7  BY MS. POCHOP:
8  Q  If you'd take a look at what was previously marked as
9  Exhibit 3 --
10     MS. CALEM: Look through it.
11     THE WITNESS: Oh, okay.
12     MS. POCHOP: You can kind of page through it.
13     THE WITNESS: Right here?
14     MS. POCHOP: Right.
15     MS. CALEM: No, just look through the whole thing.
16  That's her highlighting, but she's asking if you've
17  seen this before.  Okay, just look through it.
18     THE WITNESS: Yeah, I'm sure I have.  Yeah.
19  BY MS. POCHOP:
20  Q  On the very first page where they're addressing
21  employees, if you would turn to what's -- the bottom of
22  the page, number is 777.  It's the letter from your
23  chief executive officer.
24     MS. CALEM: On this copy the bottom page is 439.
25     MS. POCHOP: Oh, okay.  Sorry.  I'm looking at a

| Sala Naambwe and Yvette Nimenya v. | Russ Hultman |
|---|---|
| Smithfield Foods, Inc. | May 30, 2018 |

Page 9

1  duplicate copy.
2      MS. CALEM: Yeah. Yeah.
3  BY MS. POCHOP:
4  Q  Let's just go to that page, the letter from your chief
5     executive officer on page 1 of your code of conduct.
6  A  Uh-huh.
7  Q  Are you, as a manager, responsible to be in compliance
8     with the Smithfield code of conduct?
9  A  I am.
10 Q  It says here on page 1 of the code of conduct handbook,
11    "You will see on nearly every page the words SPEAK UP!"
12 A  Uh-huh.
13 Q  You've never seen that before?
14 A  Yeah, I have.
15 Q  Tell me what it means to you.
16 A  Speak up if you see anything going wrong.
17 Q  Your chief executive officer says, "We are doing
18    everything we can to make speaking up easy to do and
19    have provided various ways for anyone to raise a
20    question or a concern."
21    Is that accurate?
22 A  Yeah.
23 Q  Is it your responsibility as a manager to make it very
24    easy for anyone to raise a question or concern when
25    they see a violation of company policy?

Page 10

1  A  It's not my responsibility to tell them to speak up.
2     They speak up if they see something wrong. It's up to
3     the person.
4  Q  Are you supposed to make it easy to do for them?
5      MS. CALEM: Object to the form.
6  BY MS. POCHOP:
7  Q  You can answer.
8  A  Make it easy?
9  Q  Yeah.
10 A  They're told to come to us with any issues that they
11    have if they think something is wrong.
12 Q  And what are you supposed to do when employees report
13    issues to you?
14 A  Investigate.
15 Q  Let's see. I wanted to go to -- if we go to pages 5
16    through 7.
17     MS. CALEM: Let's see. Starting here at 5.
18     THE WITNESS: Okay.
19 BY MS. POCHOP:
20 Q  Is it true that if an employee feels that they have
21    been discriminated against or that someone else is
22    being a victim of discrimination or they have a
23    question, they should speak up --
24 A  Uh-huh, true.
25 Q  -- under the policy? They're supposed to talk to their

Page 11

1     immediate supervisor --
2  A  Yes.
3  Q  -- or the human resources manager --
4  A  Yes.
5  Q  -- or others in management. Right?
6  A  Yes.
7  Q  They are told that if they don't feel comfortable
8     talking to their supervisor or management, they can use
9     other resources outlined in the Speak Up section of the
10    code of conduct, right?
11 A  Yes.
12 Q  Are you supposed to facilitate employees -- since they
13    have Speak Up on virtually every page of your code of
14    conduct --
15 A  Uh-huh.
16 Q  -- are you supposed to facilitate employees reporting
17    harassing or discriminatory behavior?
18     MS. CALEM: Object to the form.
19 BY MS. POCHOP:
20 Q  You can answer.
21 A  Facilitate as in how?
22 Q  I don't know. You tell me. I mean, what's your
23    obligation as a supervisor?
24 A  To listen to them if they have an issue and report it.
25 Q  Does Smithfield policy tell employees that you are

Page 12

1     going to maintain a workplace free of harassment?
2  A  Yes, it does.
3  Q  Are employees to avoid racial, ethnic, religious, and
4     sexual slurs or jokes?
5  A  Yes, they are.
6  Q  Is it a violation of policy if employees make racial,
7     ethnic, religious, or sexual slurs or jokes?
8  A  Yes, it is.
9  Q  Is it something that should subject them to discipline?
10 A  No.
11 Q  And why not if it's a violation of policy?
12 A  I guess I didn't understand your question. They're
13    subject to discipline if they say something?
14 Q  If they make a racial, ethnic, religious, or sexual
15    slur or joke in the workplace.
16 A  If I am -- if the supervisor knows about it, then he
17    addresses the issue. Then it gets reported to HR.
18 Q  Is bullying, abusive language, physical aggression,
19    intimidating or violent behavior, or disparaging
20    comments, is that prohibited in the Smithfield
21    workplace?
22 A  No, it's not.
23 Q  Do you know why --
24     MS. CALEM: Is it prohibited? Do you understand
25    the question?

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Russ Hultman  
May 30, 2018

Page 13

1  BY MS. POCHOP:
2  Q  -- on page 6 --
3       MS. CALEM: Look on page 6. You need to slow
4  down --
5       THE WITNESS: Okay.
6       MS. CALEM: -- and listen to the question.
7  BY MS. POCHOP:
8  Q  Do you see that, where it says, "To maintain a
9  workplace free of harassment, employees are to avoid
10  the following," and then there's a little bullet point
11  that says "bullying, abusive language, physical
12  aggression, intimidating or violent behavior, or
13  disparaging comments."
14       MS. CALEM: On page -- which page is this?
15       MS. POCHOP: Page 6.
16       MS. CALEM: Well, see, we don't have the -- oh,
17  page 6. Okay. Here.
18       THE WITNESS: (Examines document.)
19  BY MS. POCHOP:
20  Q  Did you know your code of conduct said that that was
21  behavior that was not going to be allowed in the
22  Smithfield workplace?
23  A  Yes.
24  Q  Unnecessary or offensive touching or intentionally
25  blocking somebody's movement is also behavior that's

Page 14

1  prohibited in the Smithfield workplace, right?
2  A  Yes, it is.
3  Q  Other actions that unreasonably disrupt or interfere
4  with an employee's work performance are prohibited in
5  the Smithfield workplace, correct?
6  A  Yes, it is.
7  Q  Does that apply to all Smithfield employees?
8  A  Yes, it does.
9  Q  Including managers?
10  A  Yes, it does.
11  Q  If you turn to page -- to the next page under Human
12  Rights, okay, there's a little section over here that
13  says, "My supervisor is constantly yelling at us and
14  today even threatened someone on our team. I don't
15  think any of us believe that our supervisor would
16  actually carry out the threat, but it makes me
17  uncomfortable. What should I do?"
18       And the answer is, according to your code of
19  conduct, that Smithfield's work environment must be
20  free from harassment, including intimidating language,
21  right?
22  A  True.
23  Q  If threatening language is used in your workplace,
24  employees are instructed to do what?
25  A  Speak up.

Page 15

1  Q  And they can do that by -- how? What are the resources
2  that you are aware of?
3  A  HR.
4  Q  Are you supposed to be one of the people who
5  addresses --
6  A  They can come to me if they have an issue, yeah.
7  Q  And what are you supposed -- what's your policy and
8  procedure?
9  A  Investigate what was said or what was done.
10  Q  Does the company tolerate harassment of any kind?
11  A  No.
12  Q  Does it tolerate sexual harassment?
13  A  No.
14  Q  Racial harassment?
15  A  No.
16  Q  Do you know what the company tells employees they are
17  to do if they witness or experience harassment in the
18  workplace?
19  A  Supposed to speak up.
20  Q  Is it actually -- are they told that it's a
21  responsibility that they have?
22  A  No. They're asked to do it, I believe. It's up to the
23  person.
24  Q  So as far as you know, it's not an employee
25  responsibility, it's an option to report harassment?

Page 16

1  A  It's all up to the person.
2  Q  In your own experience in the workplace, do employees
3  frequently use foul language?
4  A  Not around me.
5  Q  Do employees engage in sexually suggestive behavior?
6  A  Not that I've seen.
7  Q  Do managers?
8  A  Not that I've seen.
9  Q  Do you know any -- does Becky Kaufman, does she engage
10  in -- does she use foul language in the workplace?
11  A  Not around me.
12  Q  Does she use racial language in the workplace?
13  A  Not that I've seen.
14  Q  Have you ever heard anybody use racial slurs in the
15  workplace?
16  A  Not that I've seen or heard about, no.
17  Q  So prior to February of 2016, how long had you been a
18  manager in department 19 where Sala and Yvette worked?
19  A  '16? 10 years maybe.
20  Q  And, I mean, I've seen their performance -- their
21  personnel files. It doesn't appear that you had any
22  significant performance problems with Sala prior to
23  this incident with Scott Genzler. Is that a correct
24  statement by me?
25  A  Yes, it is.

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Russ Hultman  
May 30, 2018

Page 17

1  Q  How would you describe her work performance prior to
2     that time?
3  A  Good.
4  Q  And how about Yvette?
5  A  Good.
6  Q  Did you have any concerns or problems with her work
7     performance --
8  A  No, I did not.
9  Q  -- before the Scott --
10 A  I'm sorry.
11 Q  You just need to wait for me a little bit. I know you
12    know where I'm going, but --
13       Prior to the Scott Genzler incident, did you ever
14    have any issues with Yvette?
15 A  No.
16 Q  And so were you Sala's supervisor when she made a
17    report about Juan Ogaldez --
18 A  I was.
19 Q  -- making sexual gestures to her?
20 A  I was.
21 Q  Tell me what you can remember about the resolution of
22    that -- that would qualify as a sexual harassment
23    complaint, correct?
24 A  Yes, it would.
25 Q  Can you tell me what you can recall about the

Page 18

1     resolution of Sala's complaint about Juan?
2  A  I don't really recall what happened to him.
3  Q  Is it true that for several years Sala and Juan did not
4     work together?
5  A  Several years?
6  Q  Yeah.
7  A  I couldn't tell you the time frame.
8  Q  After the complaint they were separated, right?
9  A  As best we could, yeah.
10 Q  And that was by both of their requests, true?
11 A  Yeah.
12 Q  And at the time that -- up until the time that Scott --
13    that there was the Scott Genzler incident in February
14    of 2016, after they had been separated, they hadn't
15    been working together and there had not been any issues
16    between Sala and Juan?
17 A  Not to my knowledge.
18 Q  There was also an incident where another employee,
19    like, tried to run over Sala with a car. Were you
20    involved --
21 A  I don't know anything about it.
22       MS. CALEM: Object to the form.
23 BY MS. POCHOP:
24 Q  So in terms of Scott Genzler, how long had you been his
25    supervisor?

Page 19

1  A  That I couldn't tell you an exact amount of time.
2  Q  How long do you think he worked there? An estimate.
3  A  I think he was there two, three years. I don't
4     remember.
5  Q  And had he been working in your department the whole
6     time?
7  A  I believe so.
8  Q  Department 19?
9  A  Yes.
10 Q  And had there been any other complaints about Scott?
11 A  I don't think so.
12 Q  Had you disciplined him at any time?
13 A  He might have had an attendance issue or something, but
14    that's about it, I think.
15 Q  So tell me what you can remember about the day that you
16    found out that Scott Genzler had made racist comments
17    to Sala and Yvette?
18 A  I got everybody in the office, union stewards,
19    everybody that was involved with it, asked them what
20    happened. They told me, and I told them that we would
21    go to HR on Monday.
22 Q  So, first of all, how did you find out that this had
23    happened?
24 A  I was told in the morning when I came to work.
25 Q  By whom?

Page 20

1  A  I don't remember who it was.
2  Q  Were you the supervisor who was on duty when the
3     incident happened?
4  A  I had gone home or I was working elsewhere at the time.
5     I don't remember. I think I was out of the department.
6  Q  Do you know who was -- if there was a supervisor in the
7     department at the time?
8  A  There must not have been.
9  Q  Is it a violation of company policy for an employee to
10    be, like, pushing hams faster than the employees on the
11    line can physically handle?
12 A  Everything has a standard. You just go at a certain
13    pace.
14 Q  Right. So --
15 A  That's the way it's supposed to be.
16 Q  So if the employees are pushing hams too fast for the
17    people that they're working for, what's supposed to
18    happen?
19 A  Well, if the supervisor knows about it, then they would
20    address the issue, make the line run the way it's
21    supposed to.
22 Q  And so what if you find out afterwards that somebody
23    had been intentionally, out of frustration, pushing
24    product faster than the people that they were working
25    with could physically handle?

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Russ Hultman
May 30, 2018

Page 21

1  A  They would talk to the person.
2  Q  Is it a disciplinary matter?
3  A  No.
4  Q  So the next morning you came in and somebody told you
5     that there had been an incident with Scott?
6  A  Yes.
7  Q  And what was the -- what's your recollection about what
8     the incident was?
9  A  That he had called them monkeys. That's all I was
10    told.
11 Q  Did you think that was a racist remark?
12 A  Yes, I did.
13 Q  And what did you say to him?
14 A  I didn't say anything to him specifically. I got the
15    whole group in the office.
16 Q  So tell me what happened when you got the whole group
17    in the office.
18 A  Well --
19 Q  That would be Sala and Yvette...
20 A  They told their side of what they said happened and --
21    well, he basically agreed, too, I guess, what had
22    happened and why he was so upset, and that was it.
23 Q  So what did you do as a supervisor?
24 A  Well, I said to go to HR. It was a Saturday, and HR's
25    not open, so I said we'd take care of it on Monday.

Page 22

1  Q  Did he apologize or anything during this meeting?
2  A  I believe he did.
3  Q  Tell me what you can remember him saying.
4  A  I couldn't tell you exactly.
5  Q  And so you knew that on Monday -- in fact, did you
6     direct your employees that they should report this to
7     HR on Monday?
8  A  I told them that I would report it on Monday.
9  Q  Did you?
10 A  I didn't get a chance to. They went over there before
11    I could get a chance to.
12 Q  Were they pretty upset about this incident with Scott?
13 A  Yes, they were.
14 Q  Were they physically upset about the incident with
15    Scott?
16    MS. CALEM: Objection to the form.
17    THE WITNESS: I would say emotionally, not
18    physically.
19 BY MS. POCHOP:
20 Q  And how could you tell that?
21 A  Just their body language.
22 Q  And so, on Monday, tell me how this whole incident with
23    HR transpires.
24 A  Well, I don't remember the time. It must have been
25    after the last break, so 9:00 o'clock, 9:15. We got

Page 23

1     the department running. I never got a chance to get
2     ahold of HR before that point. And they didn't come
3     back from break, so I asked the employees on the line
4     where they were, and they said they were over in HR, so
5     I went over to HR to get them.
6  Q  So they did go to HR on a break?
7  A  After their break, I'm guessing. I don't know if they
8     went at break time or if they went after.
9  Q  And would this have been the first break of the day?
10 A  Yep.
11 Q  And that's at what time?
12 A  9:15.
13 Q  And so they didn't -- you didn't know that they were
14    going to HR?
15 A  I did not.
16 Q  Is there any policy out of any of the Speak Up policies
17    or the union contract or the Smithfield handbook that
18    says that they have to get your permission to go to HR?
19 A  I'm sure it's in the contract. I can't say that
20    specifically.
21 Q  Where do you think it is in the contract?
22 A  Well, you have to inform your supervisor if you're not
23    going to be back after break or if you have an issue to
24    go somewhere or --
25 Q  So what did you do when you went to HR?

Page 24

1  A  I just asked them what they were doing over there, and
2     they told me --
3  Q  And what did they tell you?
4  A  -- that they came to talk to Scott or Carrie, whoever
5     was over there at the time.
6  Q  About?
7  A  Scott Genzler.
8  Q  About him making a racist remark?
9  A  They didn't say specifically. They were filling out
10    papers.
11 Q  But you knew what it was?
12 A  Yes, I did.
13 Q  You knew that they were there to report racial
14    discrimination?
15 A  Yes.
16 Q  And harassment?
17 A  Yes.
18 Q  And bullying?
19 A  Yes.
20 Q  And so you -- it looks like they were right in the
21    middle of filling out their paperwork and they were
22    instructed to return to work?
23 A  Uh-huh.
24    MS. CALEM: Object to the form.
25

Page 25

1  BY MS. POCHOP:
2  Q  Right?
3  A  Yes.
4  Q  And then did you have conversation with Carrie about
5     what should happen with Sala, Yvette --
6  A  Yes.
7  Q  -- and Lorena?
8  A  Yes, I did.
9  Q  Tell me about your conversation with her.
10 A  All I told her was that they didn't come back from
11    break. That's all I knew at that point.
12 Q  Well, you did know that they were there to report
13    racial discrimination.
14 A  I knew this once I got over there, yeah.
15 Q  And so what did you say to Carrie about that?
16 A  I just asked her what should be done.
17 Q  So you told her that they were there because they were
18    going to report this incident --
19 A  I did not tell her that they were there for that
20    because they, I'm sure, had informed somebody in HR
21    already since they were filling out the paperwork
22    already.
23 Q  So -- it will be easier for me if you tell me what you
24    can remember telling Carrie.
25 A  The only thing I was over there for was because they

Page 26

1     didn't come back from break.
2  Q  Were you angry?
3  A  No. Surprised that they didn't come back from break.
4  Q  And so what did you do?
5  A  They went back to work.
6  Q  What did you say to them?
7  A  Not much. I don't remember if I said anything to them.
8     They knew they had to go back to work, so they went
9     back to work.
10 Q  What did Carrie say to them?
11 A  I couldn't tell you.
12 Q  How did they end up getting a disciplinary action?
13 A  That was Carrie's decision.
14 Q  Did you have any input into it?
15 A  No.
16 Q  And what was the disciplinary action that she gave
17    them?
18 A  I believe they got verbal warnings.
19 Q  And why did they get verbal warnings?
20 A  For not coming back from break on time.
21 Q  At that point Scott Genzler hadn't had any disciplinary
22    action, right?
23    MS. CALEM: Object to the form.
24    THE WITNESS: No, he had not.
25

Page 27

1  BY MS. POCHOP:
2  Q  And did you provide disciplinary warnings to Yvette,
3     Sala, and Lorena back in the department?
4  A  I did.
5  Q  Did you do that in private?
6  A  I think so. I don't remember.
7  Q  How did Scott find out that they received a
8     disciplinary warning for going to report his racist
9     behavior?
10    MS. CALEM: Object to the form.
11    THE WITNESS: I do not know.
12 BY MS. POCHOP:
13 Q  You do know that he found out about it, right?
14 A  I would imagine.
15 Q  One of the reasons that you know that is because that
16    was a complaint that Sala and Yvette and Lorena all
17    had, correct?
18    MS. CALEM: Objection to the form. What
19    complaint?
20    THE WITNESS: What complaint?
21 BY MS. POCHOP:
22 Q  Is that Scott was laughing at them because they had
23    been disciplined for going to HR to report him.
24 A  I know nothing about laughing.
25 Q  You don't know anything about Sala complaining about

Page 28

1     Scott knowing that she was disciplined for going to HR?
2  A  No.
3  Q  So tell me what happens next then. When do you get
4     around to disciplining Scott?
5  A  I don't recall the time frame, but once Carrie knew all
6     the information, I think he was brought over to the
7     office after that.
8  Q  And who decided what level of discipline he got?
9  A  HR.
10 Q  And he was disciplined for using profane language?
11 A  I don't know what he was disciplined for exactly.
12 Q  Do you know if he was subject to any suspension or
13    anything?
14 A  I think he was -- I don't recall. Just a write-up I
15    think he got.
16 Q  Is that consistent with how employees who engage in
17    discriminatory behavior are usually disciplined?
18    MS. CALEM: Object to the form. There's no
19    evidence that there's other discriminatory behavior.
20    THE WITNESS: I've never dealt with anyone who's
21    ever did what Scott did.
22 BY MS. POCHOP:
23 Q  Okay. So then what's the next thing that you can
24    remember happening with Sala and Yvette and Scott?
25 A  Happening, like what?

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Russ Hultman  
May 30, 2018

Page 29

1  Q  Happening like anything. Maybe this will make it a
2     little bit easier.
3        (Exhibit 42 is marked for identification.)
4        MS. POCHOP: I believe this has been marked as
5     Exhibit 16 already.
6  BY MS. POCHOP:
7  Q  Does that have your signature on it?
8  A  It sure does.
9  Q  It's a John Morrell employee warning. Was the company
10    John Morrell at this time or --
11 A  Maybe just the write-ups still had John Morrell on
12    them.
13 Q  So do you recall Exhibit 16?
14 A  Yes.
15 Q  When did you sign it?
16 A  22nd.
17 Q  Was it filled out or did you fill it out?
18 A  I filled it out.
19 Q  And so you decided that it was profane language?
20 A  No, this is what HR decided.
21 Q  So somebody told you how to fill this out?
22 A  They told me what to write him up for.
23 Q  Did they tell you that he would get a written warning,
24    or is that something that was up to you?
25 A  That was up to them.

Page 30

1  Q  And then Tom Zuraff was also involved?
2  A  He was the union steward.
3  Q  And was he present when you delivered this to Scott?
4  A  We usually ask the people if they want union or they
5     don't. He did not.
6  Q  So he did not?
7  A  Scott didn't.
8  Q  So after the disciplinary action was issued for Scott,
9     how did Sala and Yvette work with him in the workplace?
10    MS. CALEM: Object to the form of the question.
11    THE WITNESS: We never had any issues with him
12    after that.
13 BY MS. POCHOP:
14 Q  It looks to me like there were a number of meetings
15    following the disciplinary actions that were issued in
16    February of 2016. Does that square with your
17    recollection?
18 A  Meetings with who?
19 Q  Well, meetings with the union, for one. Did you meet
20    with any union members about Sala and Yvette's
21    complaint, about the way that they were disciplined?
22 A  Not to my knowledge.
23 Q  How -- I understood that the discipline that was issued
24    to Sala, Yvette, and Lorena initially, was withdrawn.
25    Is that your understanding?

Page 31

1  A  Yes, it is.
2  Q  How did that come about?
3  A  That was HR's decision.
4  Q  For what reason?
5  A  I don't recall.
6  Q  How did you find out about it?
7  A  I'm sure they contacted me.
8  Q  So were you the person who would have -- who was
9     supposed to inform them that their disciplinary actions
10    were withdrawn?
11 A  I don't recall if I did or HR did, to tell you the
12    truth.
13 Q  And whose decision was it to have Sala -- to bring Juan
14    back into department 19 to work on the shift where Sala
15    was after the Genzler --
16    MS. CALEM: Object to the form.
17 BY MS. POCHOP:
18 Q  -- complaint?
19 A  I don't know who made the decision.
20 Q  Both Sala and Juan were unhappy about that decision,
21    true?
22    MS. CALEM: Object to the form. I don't even know
23    that there's a foundation for whatever decision we're
24    talking about.
25    THE WITNESS: I don't know if they were unhappy,

Page 32

1     the both of them, or not.
2  BY MS. POCHOP:
3  Q  Well, you do know that Sala, like, took out a
4     restraining order because she was upset about having to
5     work with him, right?
6  A  Yes.
7  Q  And -- but you don't have any memory of any union
8     involvement with the decision to have the two of them
9     work together?
10 A  I do not.
11 Q  Did anybody -- did Sala or anyone from the union talk
12    to you about whether there had been a union agreement
13    that they would not work together?
14 A  I don't believe there was.
15 Q  And what's the basis for your opinion about that?
16 A  They were told that they would have to work together if
17    necessary according to how our day went, how the
18    manning was, how short of people we were.
19 Q  And do you know the ultimate resolution of the
20    complaint that Sala had about having to work with Juan?
21 A  I do not.
22 Q  How did you find out that there was a protection --
23    that she was upset enough about it that she took out a
24    protection order?
25 A  Someone in the plant told me.

| Sala Naambwe and Yvette Nimenya v. | Russ Hultman |
|---|---|
| Smithfield Foods, Inc. | May 30, 2018 |

Page 33

1  Q  And when, as a manager, you found out that an employee
2     was so upset and fearful about working with another
3     employee that she took out a protection order, what did
4     you do?
5  A  I don't think that's my decision to make.
6  Q  Well, do you have --
7  A  That was on HR.
8  Q  Did you report it to HR?
9  A  I think HR knew about it before I did.
10 Q  How do you know that?
11 A  I don't know.
12 Q  Did somebody from HR tell you that Sala had taken out a
13    protection order?
14 A  No.  I believe it was just word of mouth.
15 Q  Tell me who you can remember talking to about the
16    protection order.
17 A  I don't remember any specific person.
18 Q  Was there any investigation into why she would take out
19    a protection order against a coworker?
20 A  Not by me.
21 Q  Do you know if anybody investigated it?
22 A  I do not know.
23 Q  And then Tom Anderson was a union representative at the
24    time?
25 A  Yes.

Page 34

1  Q  Did you have any conflicts with Tom before the Scott
2     Genzler incident?
3  A  No.
4  Q  After Sala made the Scott Genzler complaint and
5     complained about having to work with Juan, did you
6     start having conflicts with Tom Anderson?
7  A  I did not.
8  Q  Did you tell people that Sala was having a relationship
9     with Tom Anderson?
10 A  I did not.
11 Q  Did you ever hear that from anybody?
12 A  I did not.
13 Q  Would it make any difference?
14 A  No, it wouldn't.
15 Q  Is there any policy in Smithfield about employees
16    dating?
17 A  No.
18 Q  Was there at some point when Tom Anderson was
19    transferred to another department?
20 A  He was never transferred.
21 Q  What was -- did he leave the department area of 19?
22 A  He was never in 19.
23 Q  How would you describe -- did he go to work in a
24    different area?  Was he reassigned?
25 A  No.

Page 35

1  Q  Well, why would you come up and touch Sala and ask her
2     what she was going to do with her partner being gone?
3  A  He had signed out of the department but he never took
4     the job.
5  Q  So he signed out of the department --
6     And it was Tom Anderson --
7  A  Yes.
8  Q  -- that triggered your contact with her?
9     MS. CALEM:  Object to the form.
10    THE WITNESS:  It was a bad move on my part.
11 BY MS. POCHOP:
12 Q  You physically touched her?
13 A  I tapped her on the shoulder.
14 Q  And there was no need to have physical contact with
15    her, right?
16    MS. CALEM:  Object to the form.
17    THE WITNESS:  No.
18 BY MS. POCHOP:
19 Q  And you -- what did you say to her?
20 A  I don't recall the exact words.
21 Q  Come as close as you can remember.
22 A  I believe it was, how are you going to get along when
23    your partner's gone?  Are you going to miss him -- no,
24    I didn't say miss him.  How are you going to get along
25    when your partner's gone?  Something like that.

Page 36

1  Q  And why would you say that to her?
2  A  Because they were just good friends.  They were
3     together all the time.
4  Q  So this was a friendly gesture on your part?  You were
5     worried about her or what?
6     MS. CALEM:  Object to the form.
7     THE WITNESS:  It was just a passing question.  No
8     malicious intent whatsoever.  Just a question.
9  BY MS. POCHOP:
10 Q  And you referred to him as her partner?
11 A  Maybe wrong phrasing.  Friend.
12 Q  Did you say friend or did you say partner?
13 A  No, I think I said partner.
14 Q  And what happened as a result of that incident in terms
15    of your employment?
16 A  I got suspended for two days.
17 Q  For what reason?
18 A  For tapping her on the shoulder.
19 Q  Why -- what violation of policy would that be?
20 A  Touching, I suppose.
21 Q  Were you involved in the discipline that Sala received
22    for calling an employee -- a supervisor a racist?
23 A  No.
24 Q  That's Gary?
25 A  Must be.  It wasn't me.

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Russ Hultman  
May 30, 2018

Page 37

1  Q  Did you and Gary -- did you work with Gary?
2  A  Yes, I did.
3  Q  And were you two at the same level?
4  A  Yes.
5  Q  Did you two communicate about employees?
6  A  Of course.
7  Q  And what had you told Gary about your experience with
8     Sala?
9  A  Which experience?
10 Q  Supervising her.
11 A  He never asked me anything about her that I remember.
12 Q  Did any supervisor ever ask you anything about Sala or
13    Yvette after the Genzler --
14 A  No.
15 Q  -- incident?
16    Okay. And then there was an incident where you
17    were reported for spraying water on Sala and touching
18    her?
19    MS. CALEM: Object to the form.
20    THE WITNESS: I was cleaning off the honey line
21    since it broke down for two or three hours, and they
22    got a little splashed on them and I didn't apologize,
23    which I probably should have. And I never did touch
24    her.
25

Page 38

1  BY MS. POCHOP:
2  Q  Just didn't have any physical contact with her at all
3     even though it's this small, confined space?
4  A  Nope. I walked right past her.
5  Q  So you disputed that you had had any contact with her?
6  A  Yes, I did.
7  Q  And do you know why she thinks that you did?
8  A  No, I do not.
9  Q  So what happened as a result of that report?
10 A  To me?
11 Q  Yes.
12 A  I had a talk with HR, and I went to a management class.
13 Q  What was the management class?
14 A  I forget the name of it. It was in Kansas City.
15    Management improvement or something like that.
16 Q  And what did you learn at your management improvement
17    class?
18 A  More -- the class was more on different personalities
19    and workforce -- how everybody's different.
20 Q  Was it about diversity?
21 A  No. It was more just personalities.
22 Q  What did you find out about your personality at your
23    class?
24    MS. CALEM: Object to the form.
25    THE WITNESS: That I was a C.

Page 39

1  BY MS. POCHOP:
2  Q  What does that mean?
3  A  More laid back type of personality.
4  Q  Would it surprise you to know that employees who worked
5     in department 19 when you were supervising them
6     frequently heard racist remarks?
7  A  Would it --
8     MS. CALEM: Object to the form.
9     THE WITNESS: -- surprise me?
10    MS. CALEM: Go ahead.
11    THE WITNESS: I have not heard any.
12 BY MS. POCHOP:
13 Q  Would it surprise you to know that the employees who
14    work in your department under your supervision heard
15    and saw employees violating the sexual harassment
16    policy about sexual gestures and comments?
17    MS. CALEM: Object to the form.
18    THE WITNESS: I never saw such a thing or heard
19    anything.
20 BY MS. POCHOP:
21 Q  Would it be your responsibility to make sure that your
22    employees are in compliance with company policies?
23    MS. CALEM: Object to the form.
24    THE WITNESS: It's up to the employee to follow
25    the policy. It's not for me to tell them to follow the

Page 40

1     policy.
2  BY MS. POCHOP:
3  Q  Is that what they taught you in the management class?
4  A  No, they did not teach me in my management class that.
5  Q  What did they teach you in your management class after
6     you were sent to Kansas City for more training?
7  A  That's about the emphasis of the whole class was just
8     diversity of people, how to read people, different
9     personalities.
10 Q  Did they suggest that you might want to apologize to
11    the employees who were -- because it wasn't just -- I
12    mean, Sala wasn't making that up. You did spray more
13    than one employee, right?
14 A  There was a lady standing beside her.
15 Q  Right. And both of them complained?
16 A  I couldn't tell you.
17 Q  You don't even know?
18    MS. CALEM: Object to the form.
19    THE WITNESS: All I heard about was her.
20 BY MS. POCHOP:
21 Q  And what was the resolution when you know that she
22    complained that you rubbed up against her --
23 A  I didn't touch her.
24 Q  -- and offended --
25    And so there's just never been any resolution of

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Russ Hultman  
May 30, 2018

Page 45

1   THE WITNESS: I don't remember if she said
2   intentionally. It just happened that she got hit in
3   the chest.
4   BY MS. POCHOP:
5   Q   And she actually had -- somebody actually had thrown a
6       ham, right? I mean, this was a legitimate report?
7       MS. CALEM: Object to the form.
8       THE WITNESS: I can't make out the writing. I
9       don't recall it being intentional. All I knew is that
10      she got hit by a ham.
11  BY MS. POCHOP:
12  Q   Who was the employee involved?
13  A   I can't read the writing.
14  Q   Is this your writing on page 3 of Exhibit 43?
15  A   Where it says, "Will talk to employee about being more
16      careful"?
17  Q   Uh-huh.
18  A   That's my writing, yeah.
19  Q   Did you mark the box the root cause was deficient or
20      improper material storage?
21  A   Yeah, because it says the clipper wasn't working.
22  Q   And on page 2, is this your handwriting here at the top
23      about employee's incident detail?
24  A   This here?
25  Q   Yes.

Page 46

1   A   No, that's not my handwriting.
2   Q   Okay. It says that -- it relates that the person who
3       threw the ham at Sala's chest was upset about
4       something?
5   A   All I recall is that the clipper was broke. I'm
6       guessing they were moving the hams down the line, one
7       hit her in the chest. I don't know anything about
8       anybody being upset.
9   Q   Did anything happen to the employee who engaged in
10      deficient or improper material storage?
11      MS. CALEM: Object to the form.
12      THE WITNESS: I don't believe so, no.
13  BY MS. POCHOP:
14  Q   Did the company change its policy about how hams were
15      moved along because of this incident?
16      MS. CALEM: Object to the form of the question.
17      THE WITNESS: No.
18  BY MS. POCHOP:
19  Q   Do you know how many grievances were filed after the
20      Scott -- by Sala after --
21  A   I --
22  Q   -- the Scott Genzler --
23  A   I do not.
24  Q   -- report?
25      MS. CALEM: Let her finish.

Page 47

1   THE WITNESS: No, I do not.
2   BY MS. POCHOP:
3   Q   Do you know how many were filed before that?
4   A   I do not.
5   Q   Do you know the outcome of any of the grievances that
6       were filed on Sala's behalf after the Scott Genzler
7       report?
8   A   No.
9   Q   Do you know Ozie Townsend?
10  A   Ozie? Used to work in the wash, I think.
11  Q   Is there an incident about Sala taking photos while you
12      were her supervisor? Or were you out of the department
13      at that point?
14      MS. CALEM: Object to the form.
15      THE WITNESS: I was out of the department.
16  BY MS. POCHOP:
17  Q   Did you hear about it?
18  A   Yes, I did.
19  Q   From whom?
20  A   The lady I was talking to.
21  Q   Who is that?
22  A   Amanda Avila.
23  Q   Is Amanda Avila a close friend of yours?
24  A   She sure is.
25  Q   She's somebody you date?

Page 48

1   A   No. I've known her for 20 years.
2   Q   She's a person that you come down to visit in the
3       department?
4   A   Once in a while.
5   Q   What were you and Amanda talking about with regard to
6       Sala taking the photo?
7   A   Talking about?
8   Q   Yeah. You said you had heard about it from Amanda.
9   A   That she had taken a photo. That's all.
10  Q   And did that upset you or --
11  A   Didn't bother me at all.
12      MS. POCHOP: I think I'm about done here, but let
13      me just look at my notes for a minute.
14      (Pause in the proceedings.)
15  BY MS. POCHOP:
16  Q   This has previously been marked as Exhibit 8. I don't
17      have the exhibit sticker on it.
18      So on Monday, February 29, there's an email from
19      Gary to Scott. And I understand that's not you. But
20      it's referring to suspensions.
21      Do you know why Gary was providing Lorena, Yvette,
22      and Sala's names on an email marked suspensions?
23  A   I do not.
24  Q   And then on March 3rd there's an email forwarded to you
25      that says removal of reprimands, and that's from Scott

Page 49

1  to you, right?
2  A  Yes.
3  Q  And he wanted your notes from the meeting to close out
4     the file, and he wanted to know who was in the meeting,
5     key messages, and that it was important to have good
6     notes on this, right?
7  A  Yes.
8  Q  Why was it important to have good notes on this
9     incident?
10    MS. CALEM: Objection to the form of the question.
11    Calls for speculation.
12 BY MS. POCHOP:
13 Q  Go ahead.
14 A  We should take good notes on every meeting that we
15    have.
16 Q  Okay. The handwriting on Exhibit 8, whose handwriting
17    is that?
18 A  This here?
19 Q  Yeah.
20 A  It's me.
21 Q  And is this accurate?
22 A  Yes.
23 Q  Did you provide him any other notes in response to this
24    email?
25 A  I had written an email about what had happened to him.

Page 50

1  Q  And what did you tell him in the email?
2  A  Just that we had gotten all the people involved in the
3     issue in the office and we had discussed what had
4     happened and that we would take care of it on Monday.
5  Q  Are the dates accurate in this email that's marked
6     Exhibit 8 that you provided after Scott asked you to
7     have good notes?
8  A  I'm not sure. I believe so.
9  Q  And it said: Notified ladies that verbal reprimand
10    WR No. 4, issued on 2, blank, would be removed from
11    their files.
12 A  Yes.
13 Q  What date was it issued?
14 A  I believe the day that they went over to the office, so
15    it would have been that Monday.
16 Q  So when did you tell them that it would be removed?
17    Were you the person who was supposed to tell them?
18 A  I don't recall if I was or not.
19 Q  Well, your note here says, "Notified ladies that verbal
20    reprimand would be removed from their files," right?
21 A  Then I must have been.
22 Q  Do you remember doing that?
23 A  No, I do not, but I must have if that's what it says.
24 Q  Did they get a suspension?
25 A  They who?

Page 51

1  Q  Sala, Yvette, and Lorena.
2  A  I don't believe so.
3  Q  Why did Gary think it was a suspension, do you know?
4     MS. CALEM: Objection. Calls for speculation.
5     THE WITNESS: I don't know.
6  BY MS. POCHOP:
7  Q  Did you and Gary discuss it?
8  A  No.
9  Q  Did Gary think they should be suspended?
10    MS. CALEM: Objection. Calls for speculation.
11    THE WITNESS: I don't know.
12    MS. POCHOP: I think I'm just going to take a few
13    minutes -- oh, I did have one other question I'd like
14    to ask you.
15 BY MS. POCHOP:
16 Q  This has already been marked as Exhibit 19, and I don't
17    have my copy of it, but I'd like you to take a look at
18    the statement there. I've got it highlighted.
19    MS. CALEM: So Exhibit 19 is Acknowledgment of
20    Sexual Harassment Training form signed by Sala Naambwe
21    on 6-14-13.
22 BY MS. POCHOP:
23 Q  Do you see that I have highlighted there that it
24    tells -- that the employee is acknowledging there that
25    they have both the right and the responsibility to

Page 52

1     report harassment, right?
2  A  Yes.
3  Q  Is that accurate?
4     MS. CALEM: Objection to the form.
5  BY MS. POCHOP:
6  Q  They have the responsibility to report it?
7  A  Like I said before, it's up to the person.
8  Q  Why does the form that they're required to sign to
9     acknowledge receipt of the policy say that they have
10    the responsibility to report then?
11    MS. CALEM: Object to the form of the question.
12    How would he know that?
13    THE WITNESS: It's company policy.
14 BY MS. POCHOP:
15 Q  Right. That is supposed to be the company policy,
16    right?
17 A  I understand that, but I don't write the company
18    policy.
19 Q  You're supposed to enforce it, though, right?
20    MS. CALEM: Objection to the form of the question.
21    THE WITNESS: We do enforce it.
22 BY MS. POCHOP:
23 Q  That is your obligation and your duty as a manager,
24    right?
25    MS. CALEM: Object to the form.