*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*

Gary Loger
May 31, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

App. Tab

H

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

**Page 5**

1  catch myself too.
2      The other thing is that we need to make sure that
3  we make verbal answers.  I caught myself yesterday with
4  some people nodding, I knew that that was a yes, but it
5  won't reflect on our record if we don't do it.  So if
6  I'm prompting you or Andrea is prompting you, it's
7  probably for that reason.
8      If there is an objection, unless you are
9  specifically instructed not to answer, you do need to
10  continue with your answer.  The judge will rule on
11  those objections later, not today, unless we call him.
12      And, finally, I want to know if there's any reason
13  that you can't medically or physically accurately
14  remember today.
15  A  No.
16  Q  Because you are under oath.  And one of my first
17  questions for you is what it means to you when you are
18  under oath.
19  A  You tell the truth, the whole truth, and nothing but
20  the truth.
21  Q  Very good.
22      In terms of preparation for your deposition today,
23  can you tell me what you did?
24  A  I came here, me and Andrea spoke for a little bit.
25  Q  I don't need to know anything you talked to your lawyer

**Page 6**

1  about.
2      Did you review any documents?
3  A  No.
4  Q  Did you prepare any documents about Sala and Yvette's
5  case?
6  A  I did not.
7  Q  How did you learn about Sala and Yvette's case?
8  A  Probably through HR.
9  Q  Did you see it posted on the bulletin board at work?
10  A  No.
11  Q  Did you know -- what is the rule about posting on the
12  Smithfield Foods bulletin boards?
13  A  What is the rule?
14  Q  Yeah.  Does it have to be management approved?
15  A  I would imagine it does.
16  Q  Just so I have some background information -- these are
17  the easy things -- how old are you?
18  A  I'm 59.
19  Q  Could you just overview your educational background for
20  me.
21  A  12th grade, high school.
22  Q  And same thing with your work history after you entered
23  the workforce, if you could just give me a general
24  overview of where you've worked.
25  A  After high school, let's see, I worked a couple years

**Page 7**

1  in my hometown.  After that, I joined the Navy.  I was
2  in the Navy for four years active.
3  Q  Thank you for your service.
4  A  After I got out of the Navy, I worked in a sheet metal
5  shop for about a year, and then I got a job with Iowa
6  Beef Processors.  I was with them for 15 years, and the
7  plant I was working at closed down and Morrell's
8  offered me a job.  I took it.
9  Q  So what year did you start at Morrell's?
10  A  1998.
11  Q  I was trying to figure out what year Morrell's became
12  Smithfield.  Do you know that?
13  A  Maybe two years ago.
14  Q  So it's just kind of merged from John Morrell's into
15  Smithfield Foods?
16  A  Right, Smithfield bought the brand, I believe.
17  Q  What is the difference between John Morrell's policy
18  and Smithfield Foods' policy in your experience?
19  A  Well, I believe Smithfield has a Smithfield One policy,
20  which they would like all plants to get on the same
21  page, and I don't think there's really much difference.
22  Q  So all of the policies and procedures at all of the
23  Smithfield Foods plants are supposed to be the same?
24  A  I believe that's what they're striving for.
25  Q  And they call that Smithfield One?

**Page 8**

1  A  Yeah.
2  Q  In terms of your own progression through the ranks --
3  because you're a manager at Smithfield, right?
4  A  Correct.
5  Q  Can you just kind of march me through your progression
6  at John Morrell and now Smithfield in terms of job
7  positions?
8  A  I've always been a production manager, started as one.
9  Q  Did you have training to be a John Morrell's manager?
10  A  I have had training as a manager, yes.
11  Q  Can you tell me what that consists of?
12  A  It wasn't with this company.  It was with the company I
13  was with before.
14  Q  At IBP?
15  A  Right.
16  Q  So to be a manager at John Morrell, they didn't sit
17  down and have you go through policies and procedures?
18  A  Throughout my career, yes.  Yes.  It's a break-in
19  period, you know.  They just didn't -- you know.
20  Q  They hired you with some managerial experience --
21  A  Correct.
22  Q  -- and just expected you to hit the ground running, so
23  to speak?
24  A  They would put me in positions and train me on that
25  position, correct, as far as the job goes.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

Page 9

1 Q How about as -- when Smithfield took over, did you have
2   any training about Smithfield policies and procedures?
3 A Specifically Smithfield?
4 Q Yeah.
5 A I believe the policies were very similar.  I can't say
6   that there was a Smithfield policy, you know.  The
7   policy at the plant has always been pretty much the
8   same, all the policies.
9 Q All right.  Well, one of the things I wanted to ask
10   you -- and this has been previously marked as
11   Exhibit 3 --
12 A Correct.
13 Q -- the code of conduct and ethics at Smithfield.
14   Have you had any specific training on your code of
15   conduct and ethics as a Smithfield manager?
16 A Yes.  We have to sign off on it.  What's in here is our
17   policy.
18 Q And so when Smithfield took over -- how important is
19   this code of conduct and ethics in terms of Smithfield
20   policy for you as a manager?
21 A It's very important.  I mean, it is our job.
22 Q Right.  And I see in here that it is -- your CEO, is
23   that still Ken Sullivan?
24 A Yes, as far as I know.
25 Q They say, "The principles and examples contained in

Page 10

1   this code reflect laws and regulations that apply to
2   our business."
3   Is that true?  Is that your training?
4 A If that's what it says, yes.
5 Q All employees are asked to sign a statement that
6   they've read the Smithfield code of conduct and ethics
7   and will act in full compliance with the code.
8   Is that what Smithfield employees are trained?
9 A Yes, it is, as far as I know.
10 Q Your obligation to do the right thing, however, does
11   not end with reading the code.
12   Is that your training at Smithfield?
13 A Do the right thing is what we have to do.
14 Q And so what does -- do the right thing, when I see that
15   in the code of conduct, what does that mean?
16 A I would say exactly what it says, do the right thing.
17 Q Is there any training --
18 A Yes, we do have training.
19 Q So what is your training about how to do the right
20   thing as a manager?
21 A Well, we have annual training on harassment,
22   discrimination, respect -- be respectful to other
23   employees and other -- everybody.
24 Q So what is the Smithfield training about being
25   respectful to others in the Smithfield workplace.

Page 11

1 A Always treat people with respect.
2 Q As a manager, are you expected to be an example of
3   that?
4 A Absolutely.
5 Q Is that a key part of your job duty?
6 A Yes, it's a key part of everybody's -- it's everybody's
7   responsibility.
8 Q And is exampling doing the right thing a responsibility
9   that you have as a Smithfield manager?
10 A Yes.
11 Q Is enforcing the Speak Up program of the code of
12   conduct, is that one of your primary responsibilities
13   as a manager?
14 A The Speak Up part is -- yes, we want people to speak
15   up, okay, but we can't -- we can't force them.  If they
16   have any kind of problem, speak up and we'll deal with
17   it.
18 Q And does the company have an open door policy for
19   employees to come and report any concerns about ethical
20   or rules violation?
21 A Yes.
22 Q And is that what your training is?
23 A I believe that's part of it.
24 Q Could you just describe for me what you understand
25   employees are told about Speak Up as a program?

Page 12

1   Because -- let me ask this question:  Speak Up -- and
2   it's all in all caps with an exclamation point -- is an
3   actual company policy, right?
4   MS. CALEM:  Object to the form.  You can answer.
5   THE WITNESS:  Yeah, I believe that is a -- yeah, I
6   believe that.  It's in the handbook.
7 BY MS. POCHOP:
8 Q And so when employees are told that they have a
9   responsibility to speak up, what are you telling them
10   their responsibility is?
11 A If they have a problem or a complaint or if they see
12   something unsafe, speak up because it's for everybody's
13   good, especially in a safety situation, you know.
14 Q And what are employees told about speaking up about
15   seeing a violation of the company's discrimination
16   policy?
17   MS. CALEM:  Object to the form.
18   I'm just going to say objections occasionally.
19   You just keep going.
20   THE WITNESS:  Oh, okay.  All right.
21   What -- can you repeat that, please.
22 BY MS. POCHOP:
23 Q And we'll give a little break for her to make her
24   objection, and then you can answer.  Okay?
25 A Okay.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

|  | Page 13 |
|---|---|
| 1 | Q  What are employees told their responsibility to speak |
| 2 |    up is when they observe violations of the company's |
| 3 |    discrimination policy? |
| 4 | A  Well, I believe in their training it is recommended |
| 5 |    that they speak up, you know. |
| 6 | Q  What about in your training? |
| 7 | A  It's the same. |
| 8 | Q  Is it required? |
| 9 | A  In my case, I would say, yes, I have to act on it.  If |
| 10 |    anybody comes with any kind of complaint in that |
| 11 |    direction, yes, we take action immediately. |
| 12 | Q  Is, quote/unquote, speak up the term used to describe |
| 13 |    the right and responsibility of every employee to tell |
| 14 |    management about any behavior that doesn't meet the |
| 15 |    standards outlined in the code of conduct? |
| 16 | A  I don't believe you can force somebody to come forward, |
| 17 |    but it is sure encouraged. |
| 18 | Q  Yeah. |
| 19 | A  Yeah. |
| 20 | Q  And are employees told that they're encouraged to |
| 21 |    report any violation of the code of conduct? |
| 22 |    MS. CALEM: Object to the form of the question. |
| 23 |    THE WITNESS: Yes, I believe they're -- yes, they |
| 24 |    are told that. |
| 25 | |

|  | Page 14 |
|---|---|
| 1 | BY MS. POCHOP: |
| 2 | Q  Can you tell me what the company's diversity and equal |
| 3 |    employment policy is according to your Smithfield |
| 4 |    training? |
| 5 | A  I believe it is you cannot be not hired because of your |
| 6 |    race, your place of origin, disabilities, anything |
| 7 |    involved in that -- you can't discriminate against |
| 8 |    somebody for employment. |
| 9 | Q  And what is your understanding of what employees are |
| 10 |    instructed to do if they feel that they have been |
| 11 |    discriminated against or if they witness |
| 12 |    discrimination?  Is it different? |
| 13 | A  Come forward, report it. |
| 14 | Q  Is that an employee responsibility? |
| 15 |    MS. CALEM: Object to the form of the question. |
| 16 |    THE WITNESS: I believe it is their |
| 17 |    responsibility, yes. |
| 18 | BY MS. POCHOP: |
| 19 | Q  Do employees at Smithfield have the right to work free |
| 20 |    from harassment? |
| 21 | A  Yes, they do. |
| 22 | Q  Under Smithfield's policies, is derogatory or offensive |
| 23 |    language a violation of policy? |
| 24 | A  Yes. |
| 25 | Q  Bullying, is that a violation of Smithfield's code of |

|  | Page 15 |
|---|---|
| 1 |    conduct? |
| 2 | A  Yes. |
| 3 | Q  Abusive language, is that -- |
| 4 | A  Yes, it is. |
| 5 | Q  -- a violation? |
| 6 |    Intimidating behavior? |
| 7 | A  Yes, it is. |
| 8 | Q  Disparaging comments about a coworker, are those a |
| 9 |    violation of -- |
| 10 | A  Yes, it could be. |
| 11 | Q  Racial, ethnic, religious or sexual slurs or jokes, are |
| 12 |    those violations? |
| 13 | A  Yes. |
| 14 | Q  And if an employee hears something -- hears somebody |
| 15 |    making a sexual remark to another coworker or making a |
| 16 |    sexual -- or making a racial slur to somebody or about |
| 17 |    a group of people in your workplace, what is -- the |
| 18 |    employee who hears that, what is their responsibility |
| 19 |    under the policy? |
| 20 | A  Their responsibility would be to report it. |
| 21 | Q  And how are they supposed to report it? |
| 22 | A  They could report to their immediate supervisor.  They |
| 23 |    could report to their supervisor.  They could go to HR. |
| 24 | Q  Is there any procedure that they're instructed that |
| 25 |    they must follow to report harassment? |

|  | Page 16 |
|---|---|
| 1 |    MS. CALEM: Object to the form. |
| 2 |    THE WITNESS: They should report to their |
| 3 |    supervisor and start the chain of command, correct. |
| 4 | BY MS. POCHOP: |
| 5 | Q  What if their supervisor is not available or they're |
| 6 |    uncomfortable?  What are Smithfield managers trained to |
| 7 |    tell employees to do? |
| 8 | A  They could go to the lead person.  They could go to |
| 9 |    their -- any supervisor.  You could report it to any |
| 10 |    supervisor or to human resources. |
| 11 | Q  If you look at page 7 of Exhibit 3 -- |
| 12 | A  Page 7? |
| 13 | Q  Uh-huh.  Are we on the -- |
| 14 |    MS. CALEM: That's 9. |
| 15 |    THE WITNESS: Oh, okay. |
| 16 |    MS. POCHOP: It looks like this. |
| 17 | BY MS. POCHOP: |
| 18 | Q  There are some examples that are offered in the |
| 19 |    handbook just so employees get a sense of what the |
| 20 |    Smithfield workplace is supposed to be like, right? |
| 21 | A  Okay. |
| 22 | Q  Have you ever read the handbook?  Have you read this |
| 23 |    yourself? |
| 24 | A  I have gone over it.  I don't remember anything |
| 25 |    word-for-word, but... |

Sala Naambwe and Yvette Nimenya v.                                          Gary Loger
Smithfield Foods, Inc.                                                    May 31, 2018

---

Page 17

1  Q  So this is familiar to you at least, right?
2  A  Yep.
3  Q  One of the top examples says, "My supervisor is
4     constantly yelling at us and today even threatened
5     someone on our team.  I don't think any of us believe
6     that our supervisor would actually carry out the
7     threat, but it makes me uncomfortable.  What should
8     I do?"
9        And what advice -- actually, it wouldn't really be
10    advice, I guess.  What does the handbook instruct
11    employees that should happen if an employee -- if a
12    manager is behaving that way?
13 A  The answer is, "Smithfield's work environment must be
14    free from harassment, including intimidating language.
15    If threatening language is used in your workplace,
16    speak up using one of the resources listed in this
17    code."
18 Q  It says -- it not only says it must be free from
19    harassment, it says, "including intimidating language,"
20    right?
21 A  Correct.
22 Q  And are you bound by -- and this is talking about a
23    manager who is yelling at people and saying rude and
24    intimidating things, right?
25 A  That's what it says.

Page 18

1  Q  Would you agree that a manager who yells at employees
2     and says rude and intimidating things is in violation
3     of Smithfield's fundamental code of ethics?
4  A  I would.
5  Q  And that should not be tolerated in the Smithfield
6     workplace, right?
7  A  Correct.
8  Q  In addition, there's some other rules that you're
9     required to comply with at Smithfield, right, as a
10    manager?
11 A  There are rules, correct.
12 Q  And, in fact, it's your obligation not just to comply
13    with these, but you're supposed to enforce the code of
14    conduct?
15 A  Correct.
16 Q  You're supposed to make sure that the people that you
17    supervise are following it?
18       MS. CALEM:  Object to the form.
19       THE WITNESS:  Yes.
20 BY MS. POCHOP:
21 Q  I'd also like to ask you to take a look at -- this is a
22    copy of the Smithfield handbook.  It's been marked as
23    Exhibit 2.  Are you familiar with it?
24 A  Yes.
25 Q  Are you required to comply with the policies and

Page 19

1     procedures that are in this handbook?
2  A  Yes, I am.
3  Q  Are you required to enforce the policies in this
4     handbook?
5  A  Yes, I am.
6  Q  And it's your responsibility as a manager to make sure
7     that the department that you supervise runs in accord
8     with the principles of Exhibits 3 and 2, right?
9  A  Correct.
10 Q  Can you tell me what the core values of the company are
11    in terms of ethics at work?
12 A  Treat everybody with respect, don't harass anybody,
13    don't discriminate against people.
14 Q  Are you supposed to have high ethical and legal
15    standards in terms of the work environment that you are
16    supervising at Smithfield Foods?
17 A  Yes.
18 Q  Is that your responsibility?
19 A  Yes.
20 Q  Are you expected to example high ethical and legal
21    standards in the performance of your job duties?
22 A  Yes.
23 Q  When I look at Exhibit 2, on page 6 of Exhibit 2, the
24    company handbook, the very top -- I have it highlighted
25    there for you.  It says in the code, on nearly every

Page 20

1     page, you'll see the words speak up.  We are doing
2     everything we can to have speaking up easy to do and
3     have provided various ways for anyone to raise a
4     question or a concern.  You can even make an anonymous
5     report using the ethics hotline.  You will not be
6     retaliated against for raising a question or a concern.
7        Is this accurate about what Smithfield Foods'
8     actual policy is for employees who want to report any
9     question or concern they have about workplace behavior?
10 A  Yes, it is.
11 Q  With regard to -- as a manager at Smithfield, what are
12    you doing to do everything you can to make speaking up
13    easy to do?
14 A  Well, we encourage it.  We ask them to do that.
15 Q  Give me an example of how you -- like in the
16    performance of your job duties this month, how have you
17    encouraged and done everything you can to have
18    employees feel free to speak up about questions or
19    concerns they have about Smithfield policies?
20 A  I'd say we have at safety meetings, sometimes we have
21    during our -- we have the annual training, and we bring
22    this to their attention.
23 Q  And is reporting ethical issues and concerns an
24    integral part of every Smithfield employee's job
25    duties?

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

**Page 21**

1    MS. CALEM: Object to the form.
2    THE WITNESS: I would think it is, yes.
3 BY MS. POCHOP:
4 Q Okay. And if you look at page 6, it actually says that
5    down in the section F there, the last sentence of the
6    first paragraph.
7    Did you know that was -- that employees were told
8    it's an integral part of their responsibilities to
9    report problems or violations?
10 A Correct.
11 Q They're supposed to first report to their manager?
12 A Yes.
13 Q What if they have a problem with their manager?
14 A They could report to his manager.
15 Q And what is the follow-ups, do you know?
16 A Depends on the situation, I would imagine.
17 Q Do you know what reprisal means or retaliation means?
18 A Yeah, if somebody would make a complaint about
19    something or somebody, that they would be punished, in
20    a way.
21 Q And what is the company policy about protecting
22    employees from retaliation?
23 A Well, it's forbidden.
24 Q And is that part of your training as a Smithfield
25    manager?

---

**Page 22**

1 A Yes.
2 Q Has every manager received training that says you're
3    not supposed to retaliate if an employee makes a
4    complaint about a policy?
5    MS. CALEM: Object to the form. Go ahead.
6    THE WITNESS: Yes.
7 BY MS. POCHOP:
8 Q In fact, I wanted to have you -- if you turn the page
9    to page 7 of Exhibit 2 , there's actually a restatement
10    of the nonreprisal policy for the company on page 7,
11    correct?
12 A Yes, there is.
13 Q And that policy, as written, says, quote, there will be
14    no reprisal or retaliation against any person who
15    reports health, safety, security, environmental,
16    ethical problems or violations, right?
17 A Correct.
18 Q Is that the training that you receive as a Smithfield
19    manager?
20 A Yes.
21 Q The policy further states, quote, the company will not
22    tolerate acts of reprisal or retaliation by any of its
23    employees and will take appropriate disciplinary action
24    if it occurs, correct?
25 A Correct.

---

**Page 23**

1 Q And is that the training that every Smithfield manager
2    receives as far as you know?
3 A Yes.
4 Q And how are you instructed that you would identify
5    reprisal?
6 A It could be a number of different things, I guess.
7 Q And what are you, as a Smithfield manager, told you
8    should do about -- you should tell your employees about
9    when or if they should report an incident to human
10    resources?
11 A Excuse me?
12 Q What do you, as a Smithfield manager, tell employees
13    about what their right or obligation is to report
14    incidents to human resources?
15 A They have the right to do so.
16 Q If you tell an employee that they should go to human
17    resources and make a report to human resources, are
18    they expected to do so?
19 A Absolutely.
20 Q I see that on page 8 of the policy handbook it says
21    that your manager advises you about your start and end
22    times and lunch times.
23    Is there any specific policy that you're a --
24    written policy that you're aware of that tells
25    employees what their attendance and promptness is --

---

**Page 24**

1    their expectations are at work?
2 A Yes. Everybody goes through orientation, and then once
3    they're in the department, we do our own orientation,
4    the department orientation. It's all spelled out to
5    them then.
6 Q During the department orientation, do you cover
7    discrimination, bullying, and harassment again?
8 A I don't know if we -- if that's specific in the
9    department orientation or not, so I'm not -- I'm not
10    positive. We talk about -- well, your attendance is
11    brought up. Safety is the number one concern when we
12    go through department orientation, the break times,
13    what job they might be doing. I'm not sure if it's in
14    the department orientation that we go through or not,
15    but I'm sure it's covered in the third initial
16    orientation.
17 Q What is the Courage to Care policy at Smithfield Foods?
18 A It deals a lot with safety. If you see anything
19    unsafe, report it, because it's not only for the person
20    that is doing something unsafe, it could get other
21    people injured or worse. So...
22 Q And in terms of behavior that could injure somebody, I
23    mean, what are employees instructed that their
24    responsibility is?
25 A They are trained on their job, and if -- they're --

---

Sala Naambwe and Yvette Nimenya v.                                                          Gary Loger
Smithfield Foods, Inc.                                                                     May 31, 2018

Page 25

1   they should not take shortcuts with safety.
2   Q  Are you allowed to do things that put your other
3      coworkers at risk of injury?
4   A  No.
5   Q  That seems pretty obvious.  I just needed to know what
6      you as a manager tell your employees about -- for
7      example, like, if you -- over in department 19, it
8      sounds like there's, on the ham line, throwing or
9      having hams come down to the next employee.
10      Is it a violation of policy if somebody is
11     intentionally pushing more hams than the people in the
12     line below them can handle?
13  A  For the most part, the lines -- what line are you
14     talking about specifically?  I mean --
15  Q  Like the honey line.
16  A  The honey line?
17  Q  Yeah.
18  A  Where Yvette and Sala work?
19  Q  Right.  Yeah, yeah.
20  A  It comes on a conveyor.
21  Q  Right.  And if you're pushing -- if you're punching
22     more of those hams on the conveyor than you can see the
23     people below you that are standing there with the socks
24     can catch, is that a violation of the safety policy?
25  A  It is something that we'd have to regulate --

Page 26

1   Q  Right.
2   A  -- as far as how fast they're letting the hams come
3      down.
4   Q  Right.
5   A  They're not actually getting pushed down.  They're
6      coming down a conveyor.  There should be a certain
7      space in between them.
8   Q  I mean, it is possible, if an employee is mad at
9      another employee, that they can kind of punch those
10     hams, especially if there's two of them working, that
11     they can send them down quicker than the people
12     catching them in the nets or socks can do, right?
13  A  It's possible, yes.
14  Q  And is that a job for a supervisor to make sure that
15     that's not happening?
16  A  If it's brought to their attention.  And, you know, if
17     it's coming down too fast, there's a shutoff button.
18     Shut the line off, get ahold of your manager, tell
19     them, you know -- tell the person at the end of the
20     line, hey, you know, they're coming too fast.
21  Q  In terms of just another workplace policy, I want to
22     make sure I understand what the training is at
23     Smithfield Foods.
24     Are you allowed to push or shove or poke or tap
25     your employees to get them to do what you want them to

Page 27

1   do at work?
2   A  No.  We're instructed not to touch people.
3   Q  Right.  And what is the reason that you're instructed
4      not to touch your employees?
5   A  I guess it's just not a good practice, you know.
6   Q  I mean, does Smithfield do any sort of explanation or
7      training for managers about -- that assume that your
8      employees might be sensitive or might not like being
9      physically touched?
10  A  Correct.  That's probably -- that's why, yeah.
11  Q  You're supposed to treat everybody --
12  A  Yeah.
13  Q  -- like they might be kind of fragile or --
14     MS. CALEM:  Object to the form.
15     THE WITNESS:  Well, I mean, it's just not a good
16     idea.
17  BY MS. POCHOP:
18  Q  You, yourself, are you a person who hollers at
19     employees?
20  A  I raise my voice when I need to.
21  Q  Do you know that your employees think that you are
22     constantly yelling at them?
23     MS. CALEM:  Object to the form.
24     THE WITNESS:  I've heard that.
25

Page 28

1   BY MS. POCHOP:
2   Q  That's a violation of the code of business conduct and
3      ethics, right?
4   A  Not if you're raising your voice so they can hear you.
5   Q  Do you swear when you raise your voice so employees can
6      hear you?
7   A  I have before, yes.
8   Q  Do you tell people to get the fuck out of the way?
9   A  I have used the F-word.
10  Q  How often in an average week do you raise your voice
11     and use the F-word to get your employees to do what you
12     want?
13  A  I do not use the F-word anymore.  I've been warned not
14     to do that.
15  Q  And tell me about that.
16  A  There was a complaint about it, I'm sure, and my
17     manager told me don't do that anymore.
18  Q  Who brought the complaint against you?
19  A  I don't recall.
20  Q  When was that?
21  A  I don't recall, but I was just told, hey, watch your
22     language, you know.
23  Q  I mean, was it last year?  This year?
24  A  Oh, it's been, oh, a couple years.
25  Q  So your testimony is you haven't used an F-word or

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

**Page 29**

1  hollered at employees with profanity for a couple of
2  years?
3  A  Correct.
4  Q  And that's because you had a disciplinary action?
5  A  It wasn't a disciplinary action.  It was a warning.
6  Q  And was it a written warning or did you just get pulled
7  aside --
8  A  Right, I just got pulled aside.
9  Q  And who pulled you aside and said, don't talk like that
10  anymore?
11  A  Well, I believe it was my supervisor, Dave Hillberg.
12  Q  But you were actually violating the Smithfield code of
13  conduct by hollering and using disrespectful language
14  at the same time, right?
15  A  I was.
16  Q  In fact, you were violating, basically, the example
17  that employees are told that they should report?
18      MS. CALEM: Object to form.
19      THE WITNESS: Yes.  Yes, I was.
20  BY MS. POCHOP:
21  Q  And yet you did not get any sort of formal disciplinary
22  action?
23  A  I was told to not do it anymore.
24  Q  Right.  But I'm asking, did you get a disciplinary
25  action for violating a written rule?

---

**Page 30**

1  A  I don't believe anything was put in my file about it.
2  Q  Have you ever disciplined another employee for using
3  foul language or hollering at a coworker?
4  A  I have probably interjected into in a situation and
5  told them not to --
6  Q  And did you discipline an employee for that?
7  A  I can't recall if I have or not.
8  Q  I mean, I'm curious, because I want to know if you've
9  disciplined employees for behavior that you, yourself,
10  engaged in without discipline?
11      MS. CALEM: Object to the form.
12      THE WITNESS: I don't recall if I have or not.
13  BY MS. POCHOP:
14  Q  How would you rate your performance as a manager in
15  terms of encouraging employees to speak up?
16      MS. CALEM: Object to the form.
17      THE WITNESS: Well, I think, you know, we
18  encourage it.  I can't force anybody to.  I would sure
19  appreciate it if they did, you know, in any instance.
20  BY MS. POCHOP:
21  Q  Do you know why employees in your -- in the department
22  that you manage would feel afraid to report sexual
23  harassment, for example?
24      MS. CALEM: Object to the form of the question.
25      THE WITNESS: No, I do not.

---

**Page 31**

1  BY MS. POCHOP:
2  Q  Do you know why employees working in your department
3  would feel afraid for their job if they reported racial
4  discrimination?
5      MS. CALEM: Object to the form.
6      THE WITNESS: No, I do not.
7  BY MS. POCHOP:
8  Q  Have you, yourself, heard employees that you supervise
9  speaking to each other in sexual terms that are
10  inappropriate under the code of conduct?
11  A  No, I have not.
12  Q  Have you heard employees use racial jokes or slurs with
13  each other?
14  A  No, I have not.
15  Q  How do you, as a manager, go about disciplining
16  employees?
17  A  It would depend on the situation.  If somebody's having
18  a spat on a line or arguing back and forth --
19  Q  Yep.
20  A  -- I would go over and ask them what's going on, find
21  out what the situation is, and tell them we don't need
22  this here, we're here to work.
23  Q  Does that type of -- when people are having a spat on
24  the line, are you authorized to issue a disciplinary
25  warning?

---

**Page 32**

1  A  Yes, I am, but it depends on the severity of it.
2  Q  So if it's -- like, would be really severe
3  where -- give me an example that you can think of where
4  it's a severe spat between coworkers.
5  A  Well, if anything physical happens, of course --
6  Q  Right.
7  A  -- that would be severe.
8  Q  Right.  Because there's supposed to be, like, a zero
9  tolerance for physical threats and violence at work,
10  right?
11  A  Right.
12  Q  And so what would your procedures tell you, as a
13  manager, you should do if you witness a severe policy
14  violation or an obvious one?
15  A  Well, the parties involved would be brought to the
16  office first and we would find out what exactly then
17  it and how we're going to resolve it, and if I can't
18  resolve it, we would take it to human resources.
19  Q  If, like, you see somebody physically touch another
20  person in a threatening or intimidating way, can you
21  issue a discipline right there in your office?
22  A  Yes, I can.
23  Q  And every supervisor has the authority to do that if
24  they see an obvious policy violation?
25      MS. CALEM: Object to the form.

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

**Page 33**

1       THE WITNESS: Yes, they do.
2    BY MS. POCHOP:
3    Q   And what would be the reason why you would need to
4        refer it up to HR?
5    A   If it's just a verbal confrontation or something, a lot
6        of times -- most of the time we're going to resolve
7        that at the department level. Anything more than that,
8        we're required to take it to HR and report it to HR.
9    Q   So can we agree that an employee who calls a person of
10       color who's a coworker a monkey -- kind of ripped from
11       the headlines, I guess -- and that's an obvious racist
12       remark, right?
13   A   Correct.
14   Q   It's an obvious violation of the code of conduct?
15   A   Yes.
16   Q   How about telling an employee to speak English? Is
17       that a violation of the code of conduct?
18   A   I believe it would be, yes.
19   Q   Okay. And that's because one of the things at
20       Smithfield Foods is that managers are instructed that
21       they're to encourage the diversity of the workplace,
22       correct?
23   A   Correct.
24   Q   And, in fact, Smithfield has a very diverse
25       workplace --

---

**Page 34**

1    A   Yes.
2    Q   -- in terms of its working staff, at least, right?
3    A   Yes, they do.
4    Q   How would you describe the diversity among Smithfield
5        management?
6    A   It's quite diverse.
7    Q   So even at the management level you have people who
8        might be English second language?
9    A   Yes, we do.
10   Q   And there's no English-only requirement at Smithfield?
11   A   For managers, there could be. I'm not -- I'm not
12       positive about that.
13   Q   Okay. Well, as long as you've been there and as many
14       trainings as you've sat through, have you ever heard
15       any -- have you ever had any training about
16       English-only?
17   A   No, not that I recall.
18   Q   Would telling somebody to go back to your country be a
19       violation of Smithfield's code of conduct and ethics?
20   A   Yes, it would be.
21   Q   Would telling somebody, get this fucking thing done, or
22       do some fucking thing, in an intimidating voice, is
23       that a violation of Smithfield's code of conduct?
24   A   Yes, it is.
25   Q   Is acting out sexually in the workplace in front of

---

**Page 35**

1        other employees, is that a violation of Smithfield's
2        code of conduct?
3    A   Yes, it is.
4    Q   Are all of those things obvious violations that you
5        would have authority, as a Smithfield manager, to issue
6        a discipline if you witnessed them?
7    A   Yes, it would.
8    Q   And what if you didn't witness them but the employee
9        admitted that they had engaged in that behavior? Would
10       you have the authority to issue a discipline to that
11       employee?
12   A   Yes, I would.
13   Q   Are you allowed, as a Smithfield manager, to tell other
14       Smithfield employees about disciplines issued to their
15       coworkers?
16   A   No.
17   Q   And why not?
18   A   It's none of their business. It's their -- you know.
19       I see references in the code of conduct and the
20       policies and procedures about maintaining
21       confidentiality and a kind of need-to-know basis.
22   Q   Is there anything that you are instructed as a
23       Smithfield manager about when it is appropriate to tell
24       a coworker about another coworker's disciplinary
25       experience?

---

**Page 36**

1    A   No, you shouldn't -- you shouldn't talk about somebody
2        else's file or their behavior.
3    Q   So how long have you supervised Sala and Yvette?
4    A   I would say they came to the department in 2015 maybe.
5        I don't recall the year exactly.
6    Q   Sometime around there?
7    A   Yeah, two, two and a half years.
8    Q   And I want to -- and maybe you've covered it and I just
9        kind of lost track here.
10       But in terms of your departments that you've
11       managed, can you kind of tell me your time frame about
12       the departments that you have managed at John Morrell's
13       or Smithfield? And just in general.
14   A   I started out in department 19. I've been in
15       department 19 most of my career there but in different
16       capacities. Basically, smoked meat wash is where --
17       it's a stuffing room, basically, is what you call it.
18       You're hanging -- you're putting up hams for the
19       smokehouses to cook, to go to cook.
20   Q   Is there something you have to do in department 19
21       where you have to spray some black stuff on a ham?
22   A   Yes, there is.
23   Q   What is that called?
24   A   It's a product for Arby's. It's a caramel color you
25       put on it, on the ham -- on the muscle.

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

**Page 37**

1  Q   What is that product?  I mean, what's the name of that
2      job duty?
3  A   Spraying the Arby's.
4  Q   Okay.  Spraying the Arby's.
5          Is there somebody who routinely does that job?
6  A   Various people do it.
7  Q   How do you get assigned to spray the Arby's?
8  A   How do you get assigned to it?
9  Q   Yeah.
10 A   It would depend on what time of day it is and who's
11     available to do it.
12 Q   Do you have to have any training to do it?
13 A   No, you really don't.
14 Q   Did you assign Sala to go spray the Arby's?
15 A   One time I did, yes.
16 Q   So one time in the entire time that she's worked at
17     Smithfield she got assigned to go spray the Arby's?
18 A   Yes, she did.
19 Q   And how did you select her as the person that would be
20     assigned to this job?
21 A   Well, she had an option of doing one job -- there was
22     two -- she was on open work, and there was two open
23     work jobs available, and she refused to do the other
24     job.
25 Q   Why did she refuse to do the other job?

---

**Page 38**

1  A   She did not want to do it.
2  Q   Why?
3          MS. CALEM:  Object to the form.
4          THE WITNESS:  I'm not sure, but I asked her over
5      and over, I said, this job's available and this job,
6      the two open work jobs today.
7  BY MS. POCHOP:
8  Q   Did you say something like, I'm sending you to do this
9      shit or get covered with this shit?
10 A   I told her, you're not going to -- I said, if you're --
11     if you're refusing to do this job, this is the job
12     you're going to do and you're not going to like that
13     shit.
14         That's what I told her.  But she still refused, so
15     that's the job she got.
16 Q   So during the time that you have supervised Sala, were
17     you her supervisor at the time -- let's call it the
18     Scott Genzler incident.  You know what I'm talking
19     about, right?
20 A   Yes, I do.
21 Q   That's when Scott made racist remarks to Sala and
22     Yvette --
23 A   Yes.
24 Q   -- in the presence of other coworkers?
25 A   As far as I know, yes.

---

**Page 39**

1  Q   Were you the supervisor for them in department 19 that
2      day?
3  A   No, I wasn't.
4  Q   I wanted to ask, like, in terms of department 19, how
5      many subdepartments are there?  I mean, there's the
6      spraying the Arby's thing, there's the honey line,
7      the --
8  A   There are five different lines.
9  Q   And so I can understand how it works, can you explain
10     how department 19 is set up physically with those five
11     lines?
12 A   At one end of the department you have -- it's called
13     the honey line.  It's a bone-in line.  You hang bone-in
14     hams.  Okay?  There are actually two bone-in lines.  If
15     one breaks down, you can use the other one or use it
16     for different products.
17         And then there is -- it's called the 4204 line.
18     That's an auto stuffer.  You're stuffing muscles into a
19     casing, and they get put on various types of trees and
20     sent to the smokehouses.
21         And then you have what's called the hand line, and
22     you're physically hand stuffing or -- you can
23     physically hand stuff them or there are machines
24     that -- but you're physically putting the meat in the
25     machine, okay, and stuffing it into a net and then

---

**Page 40**

1      hanging that on a tree and off to the smokehouse it
2      goes after it gets scaled up.
3          And then there is the Great Bend line, which --
4      the name comes from Great Bend, Kansas.  That's where
5      they used to do this product and that plant closed down
6      and they brought that here, so they call it the Great
7      Bend line.  And that is hand stuffing, and you're
8      literally hand stuffing muscles into a net.
9          And we have a deli line also.  We're doing deli
10     meat for a different department.  We're stuffing it,
11     putting it on racks, hauling it to an elevator, going
12     to another floor for cook and further process.
13 Q   Is there, like, an -- is there a special Arby's line or
14     all of these are that kind of Arby's related?
15 A   You would do the Arby's when a table was available to
16     do it or a line was available to do it.
17 Q   So, like, to be in department 19D, is there a
18     department 19A, B, C --
19 A   No.  D is for days.
20 Q   Days, okay.  So how many 19D shifts are there?
21 A   There's one day shift and one night shift.  19N would
22     be nights.
23 Q   And how many employees are you supervising on 19D?
24 A   Full staff would be 52.
25 Q   And how about the evening staff?

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

Page 41

1  A  That would be less. They might have 30 employees.
2  Q  And it's all physically located in one area?
3  A  Correct.
4  Q  And you have -- as a supervisor, do you have some
5     authority to assign who gets to work on what line?
6  A  Yes. Most jobs are bid on -- or owned. You own the
7     job.
8  Q  And there's also a seniority policy?
9  A  Correct.
10 Q  And if you're a union person, how does that work in
11    terms of what your job assignments are supposed to be?
12 A  Well, if you own a job, that is the job you will do.
13 Q  Okay.
14 A  Okay? If somebody is -- if you do not own a job,
15    you're on what's called open work. So if there's a
16    vacancy, somebody's sick, somebody's on vacation, those
17    are the jobs you'll fill in on.
18 Q  And you get to use your seniority to decide what your
19    job duty is if you are on open work?
20 A  You sure could.
21 Q  As a manager, do you have a right to override people's
22    seniority in choosing open work?
23 A  Yes, you do as in a qualification matter. If you're
24    not qualified to do the job, you're not going to do it,
25    you know. We could train you to do the job, but for

Page 42

1     that particular day, if somebody else is -- you know.
2  Q  Yeah. If you are angry at an employee, you can assign
3     them to go do shit work?
4     MS. CALEM: Object to the form.
5     THE WITNESS: You could.
6  BY MS. POCHOP:
7  Q  I mean, you're not supposed to under Smithfield policy,
8     right?
9  A  Correct.
10 Q  Do managers sometimes do that just out of human nature?
11    MS. CALEM: Object to the form.
12    THE WITNESS: No, they don't.
13 BY MS. POCHOP:
14 Q  Did you have any problems with Sala as an employee
15    before this Scott Genzler incident?
16 A  I don't recall what -- anything specific. We -- no, I
17    don't recall anything specific. I guess we'd have to
18    look at her record or whatever.
19 Q  And how would you describe Sala's work performance?
20 A  She did an adequate job.
21 Q  And how about Yvette? Did you have any problems with
22    Yvette's performance before this incident with Scott
23    Genzler about racist behavior?
24 A  No, not for the most part.
25 Q  And how would you describe her work performance?

Page 43

1  A  Adequate for whatever job she was doing.
2  Q  Were you involved with any sort of the discipline or
3     review of the Scott Genzler incident at work with Sala
4     and Yvette in a managerial role?
5  A  No, I wasn't involved with that.
6  Q  Did you hear about it?
7  A  I sure did.
8  Q  How did you find out about it?
9  A  Through Russ Hultman.
10 Q  And what did Russ tell you?
11 A  He told me what Scott had said and what was going to
12    happen. You know, he just informed me of the situation
13    so I'd know, you know.
14 Q  Why did he want to tell you so that you would know?
15    Why would it be important for you to know this had
16    happened?
17    MS. CALEM: Object to the form of the question.
18    THE WITNESS: Because we're both managers in that
19    department, you know. You need to know what the
20    situation is in your department.
21 BY MS. POCHOP:
22 Q  So you could keep those employees apart? Or what was
23    the -- what was your managerial strategy about how to
24    deal with this overt racism?
25    MS. CALEM: Object to the form of the question.

Page 44

1     THE WITNESS: Well, we had to get our supervisors
2     involved, get HR involved, and take it from there.
3  BY MS. POCHOP:
4  Q  So you heard about this incident even before any
5     disciplinary action was taken?
6     MS. CALEM: Object to the form.
7     THE WITNESS: I found out about it, I believe, the
8     next Monday when I came back to work. I believe that I
9     was back on Monday.
10 BY MS. POCHOP:
11 Q  Did you know that Sala, Yvette, and Lorena Morales were
12    disciplined because they went to HR to report what
13    Scott Genzler had said and done in the workplace?
14    MS. CALEM: Object to the form.
15    THE WITNESS: I believe they were disciplined for
16    not returning to work after their break and without
17    informing anybody.
18 BY MS. POCHOP:
19 Q  Did Russ tell you that they were going to get
20    disciplined?
21 A  I don't believe -- well, after the fact, that we found
22    out.
23 Q  What did he tell you about it?
24 A  That they had been disciplined for it, got a verbal
25    warning, I believe it was.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

Page 45

1  Q  They actually got disciplined before Scott got
2     disciplined, right?
3        MS. CALEM: Object to the form.
4        THE WITNESS: I'm not sure.
5  BY MS. POCHOP:
6  Q  Did you know if Scott got any discipline?
7  A  I'm sure he did.
8  Q  I want to know if you know if he did or not.
9  A  Yes, he did. I can't recall exactly what. We'd have
10    to look it up.
11 Q  Did Russ talk to you about what kind of discipline
12    Scott should get for this behavior?
13 A  I believe Russ was looking to HR to take care of the
14    disciplinary action.
15 Q  Do you know why he didn't issue a disciplinary action
16    immediately? I mean, there wasn't any question that
17    this was a violation of a number of Smithfield
18    policies, right?
19       MS. CALEM: Object to the form.
20       THE WITNESS: Yes, it was a violation of
21    Smithfield policies. I believe he called HR on it and
22    he was going to let them handle the disciplinary
23    action.
24 BY MS. POCHOP:
25 Q  But my question is to you, your training is, that

---

Page 46

1     you could issue -- you just told me you can issue
2     discipline yourself immediately if you witness --
3  A  Uh-huh.
4  Q  -- or somebody admits a policy violation, right?
5  A  Could.
6  Q  So do you know -- Russ would have had the ability to
7     issue a disciplinary action the minute that Scott
8     Genzler said, yeah, I did that, right?
9  A  He could have, I believe.
10 Q  But he didn't?
11 A  I don't know if did he or not.
12 Q  What would your training be? Should he have initiated
13    a disciplinary action at that point?
14       MS. CALEM: Object to the form.
15       THE WITNESS: He certainly could have. I don't
16    know what Russ's thinking was at the time. You'd have
17    to ask Russ.
18 BY MS. POCHOP:
19 Q  Did you have any participation in the issues that
20    developed between Sala and Yvette and Juan Ogaldez?
21 A  Yes. Ogaldez. Yes.
22 Q  Were you involved in the initial complaint that Sala
23    had about Juan's sexual behavior at work?
24 A  Yes.
25 Q  Were there other employees who reported to you that

---

Page 47

1     Juan engaged in sexual behavior at work?
2  A  No, there wasn't.
3  Q  Have you ever seen him behaving that way in the
4     workplace?
5  A  No, I haven't.
6  Q  Have you seen any employees engaged in sexual joking or
7     horseplay?
8  A  No, I haven't.
9  Q  Like Becky Kaufman, for example?
10 A  I have not personally seen it, no.
11 Q  Have you heard that Becky is a person who engages in
12    sexual joking around in the workplace?
13 A  Nobody's reported it to me, no.
14 Q  Have you heard it just in passing?
15 A  No, I have not.
16 Q  That's kind of news to you?
17 A  Yeah. As far as that goes, yes.
18 Q  Has anybody reported to you that she uses foul and
19    intimidating language or profanity?
20 A  I don't know if they reported it, but I've heard her do
21    it and I have cautioned her before.
22 Q  Has she been disciplined by you for using profanity at
23    work?
24 A  She has been warned, verbally warned.
25 Q  And so when you give a verbal warning, then that goes

---

Page 48

1     in her personnel file?
2  A  Not a written verbal warning. I've talked to her about
3     it.
4  Q  Okay.
5  A  Okay.
6  Q  So how did you decide to -- because I see that
7     employees are disciplined for using profanity in the
8     workplace.
9  A  They could be, yes.
10 Q  And so tell me -- give me an example of a time when you
11    warned Becky Kaufman not to use language that she had
12    chosen to use.
13 A  I can't give you a specific incident.
14 Q  How many times has this happened?
15 A  I can't tell you that. Once for sure. Okay?
16 Q  Okay. So tell me about the one time that you know you
17    talked to her about it.
18 A  She was just cussing, and I told her, you know, enough
19    of that --
20 Q  Was she cussing --
21 A  -- and she said okay.
22 Q  Was she cussing at another employee?
23 A  No. She was just talking -- talking -- probably
24    talking to another employee and I overheard it. That's
25    about it. We don't have to give written warnings for

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

Page 49

1   everything, you know, but...
2   Q   So that's discretionary?
3   A   I've heard coarse language there before.
4   Q   Well, sure. It's a meat-packing plant, right?
5   A   Well, that's not an excuse, but I -- you know.
6   Q   And it's true that that's what your training is, is
7       just because the work is rough --
8   A   Right.
9   Q   -- that the environment is supposed to be professional,
10      isn't it?
11  A   It should be, yes.
12  Q   Well, I mean, that's what your code of conduct is
13      designed to tell employees their obligation is?
14  A   Correct.
15  Q   But as a supervisor you have the discretion about who
16      you're going to discipline for profanity or rough
17      language, right?
18  A   It depends on the severity of the issue -- of the
19      situation.
20  Q   It sounds to me like a number of -- are you aware if
21      Becky has a reputation for using a lot of profanity in
22      the course of her job?
23      MS. CALEM: Object to the form.
24      THE WITNESS: You would have to give me something
25      specific. I've heard her cuss before, yes, and I

---

Page 50

1       warned her about it, and -- you know, that's about it.
2   BY MS. POCHOP:
3   Q   So the Juan Ogaldez situation, were you involved when
4       the sexual harassment complaint first got addressed in
5       2014, I think?
6   A   Yeah, I believe Sala came to me with it.
7   Q   And is it true that basically for two years after the
8       incident about Juan's sexual gesturing in the workplace
9       came up that -- the union was involved in that
10      complaint --
11  A   Oh, I'm sure they were.
12  Q   -- right?
13      And Scott -- or at least Juan and Sala were not
14      assigned to work together?
15  A   Correct. We told -- we told Sala we would not -- we
16      did not want her to work there -- or she would not work
17      there unless it was absolutely necessary, and during a
18      meeting we said it might -- it could possibly happen
19      that you'd have to work on that line again, if you
20      know, we're that shorthanded or something.
21  Q   After the Scott Genzler complaint, was Sala required to
22      start working with Juan again?
23  A   After the Scott Genzler --
24  Q   Right.
25  A   -- was she required?

---

Page 51

1   Q   Yeah.
2   A   Never required, no.
3   Q   So she --
4   A   I don't know what -- what came first, Scott or Juan.
5       How does --
6   Q   Well --
7   A   I don't understand.
8   Q   The incident with Juan, when they were separated
9       because of a sexual harassment complaint, came first,
10      right, back in 2014?
11  A   Okay.
12  Q   And is it your recollection that Sala was told that she
13      wasn't going to have to work with Juan?
14      MS. CALEM: Objection. Form of the question.
15      It's been asked and answered.
16      THE WITNESS: I'm not sure I understand the
17      question, really.
18  BY MS. POCHOP:
19  Q   Well, you just told me that you had a meeting --
20  A   Yeah.
21  Q   -- and she wasn't going to have to work with Juan?
22      MS. CALEM: Object to form.
23      THE WITNESS: Unless it was absolutely necessary,
24      correct.
25

---

Page 52

1   BY MS. POCHOP:
2   Q   And somehow it wasn't necessary for at least a year and
3       a half?
4   A   Well, I guess I can't recall when she worked over
5       there, unless -- she did work there after that, yes.
6   Q   And would you have been the person who was responsible
7       to assign her to work with Juan? Or is that Russ?
8   A   Both of us were there, probably. The only time she
9       worked with Juan after that was she was on open work.
10      So she had seniority to pick her job, and that's the
11      job she picked.
12  Q   And so your position is, is that she selected to work
13      with Juan?
14  A   She did. Well, not work with Juan. Work on the same
15      line.
16  Q   I mean, you know that she actually went -- she was so
17      upset about having to work with him that she went and
18      tried to get a protective order so she didn't have to
19      work with him, right?
20      MS. CALEM: Object to the form.
21      THE WITNESS: Yeah, it came to our knowledge, yes,
22      that she did that.
23  BY MS. POCHOP:
24  Q   Yeah. And, in fact, you got a copy of the protection
25      order that she tried to file against Juan, right?

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

Page 53

1       MS. CALEM: Object to the form of the question.
2       THE WITNESS: I believe I did, yeah.
3   BY MS. POCHOP:
4   Q   How did you get it?
5   A   I don't recall, to tell you the truth.  Did I get it
6       from HR or --
7   Q   So when I take a look at Exhibit -- what's been marked
8       as Exhibit 20, which is a notice of protection order,
9       and it says "copy for Gary" at the top -- you can look
10      at my copy there -- are you the Gary that would have
11      gotten a copy of this protection order?
12  A   Yeah.
13  Q   So what did you do, Gary, when you got a copy of a
14      protection order for two employees that work on the
15      same line in your department?
16      MS. CALEM: Object to the form of the question.
17      THE WITNESS: What did I do with it?
18  BY MS. POCHOP:
19  Q   Yeah.
20  A   What did I do about what?
21  Q   About -- you've got an employee that's filing a
22      protection order to keep another employee that you are
23      assigning her to work with away from her, right?
24      MS. CALEM: Objection to form.
25      THE WITNESS: I don't know when she was working

---

Page 54

1       with Juan again.  What day was that?
2   BY MS. POCHOP:
3   Q   Well, I mean, that would be within your control to
4       determine, right, in your department?
5       MS. CALEM: Object to the form.
6       THE WITNESS: I guess I'm not sure when she --
7       what the date was that she had to work with Juan again.
8   BY MS. POCHOP:
9   Q   You do know that she complained about that to the
10      union, right?
11  A   All I knew of the situation was Juan -- she was on that
12      line for whatever amount of time and we had an incident
13      on the line and I had to remove her from the line.
14  Q   And the incident was about working with Juan, right?
15  A   Correct.
16  Q   And this is an employee that you know she has made a
17      sexual harassment report about in the past?
18  A   Correct.
19  Q   Would it surprise you to know that, like, yesterday
20      Lorena Morales described that Juan is a person who
21      makes sexual gestures all the time at work?
22  A   That would surprise me, yes.
23  Q   What does that tell you about how effective your Speak
24      Up enforcement under your management in department 19
25      is?

---

Page 55

1       MS. CALEM: Object to the form of the question.
2       THE WITNESS: I can't force people to speak up.
3       Sala spoke up, and we dealt with it.
4   BY MS. POCHOP:
5   Q   And as a result of -- like, she was following the
6       policy, wasn't she?
7       MS. CALEM: Objection --
8       THE WITNESS: Yes, she was.  Yes.
9   BY MS. POCHOP:
10  Q   And as a result of speaking up, Sala received a
11      disciplinary action?
12      MS. CALEM: Object to the form of the question.
13      THE WITNESS: For what?
14  BY MS. POCHOP:
15  Q   Let's talk about Scott Genzler.  She followed the
16      policy and -- she followed the Speak Up policy, didn't
17      she?
18  A   For with Scott Genzler?
19  Q   Yes.
20  A   Absolutely, yes.
21  Q   And she received a disciplinary action, and so did
22      Yvette and so did Lorena.
23      MS. CALEM: Object to the form.
24      THE WITNESS: Not for speaking up.
25

---

Page 56

1   BY MS. POCHOP:
2   Q   For going to HR and not coming back on time.
3   A   For not being back on time from break without letting
4       somebody know that they were going to be gone.
5   Q   Because they were in the HR department reporting
6       harassment, racism, and bullying, right?
7       MS. CALEM: Object to the form.
8       THE WITNESS: For not being back on time from
9       their -- to their jobs and not letting anybody know.
10      The line was stopped because nobody knew where they
11      were.
12  BY MS. POCHOP:
13  Q   So after they got that disciplinary action, then Sala
14      came to you and she spoke up again when you apparently
15      reassigned her to work with the person that she had
16      reported for sexual harassment before?
17      MS. CALEM: Object to the form.
18  BY MS. POCHOP:
19  Q   Right?
20  A   The fact that she worked over there is because she
21      complained she was not getting to use her seniority.
22      Okay?  So we let her choose her job.  That's how she
23      ended up over there.  She chose to do that job.
24  Q   And she complained --
25  A   And she wanted to do that job.

---

Sala Naambwe and Yvette Nimenya v.                                    Gary Loger
Smithfield Foods, Inc.                                              May 31, 2018

Page 57

1  Q  And she complained again about Juan touching her?
2       MS. CALEM: Object to the form of the question.
3       THE WITNESS: Not that I recall.
4  BY MS. POCHOP:
5  Q  Well, how did she end up getting removed from the line?
6       MS. CALEM: Object to the form.
7       THE WITNESS: There was an incident. Juan came to
8  me and said, she will not do the job right, it's
9  slowing me down, it's making my job harder. So we went
10  and talked to Sala. I explained to her, this is how I
11  want you to do the job. She didn't -- she did not say
12  she wanted off of that job. So I explained to her, you
13  know, exactly how I wanted this job done. Okay. This
14  is how you have to do the job in order to make the line
15  more efficient. And I asked her if she understood.
16  Okay? And she just shrugged her shoulders. I said,
17  now, this is how I want you to do the job. Do you
18  understand? And she just shrugged her shoulders. I
19  said, you don't know what I mean? And it escalated
20  from there a little bit. Tom Anderson got involved
21  and --
22  BY MS. POCHOP:
23  Q  The union steward?
24  A  Right, from another department. Right. And at some
25  point I just said, well, I'm going to have to take you

Page 58

1  off the line. And we assigned her to another job.
2  Q  Did she get a disciplinary action --
3  A  No, she didn't.
4  Q  -- as a result of that incident?
5  A  Well, eventually, I believe she did.
6  Q  And what was that for?
7  A  I don't -- I don't recall. I made some notes on it.
8       So -- I don't have the notes with me.
9  Q  Who has the notes?
10  A  I think we emailed them to Scott, I believe.
11  Q  Is that a --
12  A  Just the situation involved, I'm not sure she got
13  disciplined over that. I don't believe she got
14  disciplined over that. I'm not sure.
15  Q  So when you got a copy of -- you did get a copy of
16  Exhibit 20? Do you recall that? The protection order,
17  is that No. 20?
18  A  Oh, this? Okay.
19  Q  Are you the Gary who needed a copy?
20  A  I'm sure.
21  Q  So when you get a copy of this protection order, did
22  you go talk to Sala to try to figure out why she would
23  take out a protection order against a coworker?
24  A  No, I did not.
25  Q  Did anybody?

Page 59

1       MS. CALEM: Object to the form.
2       THE WITNESS: I don't believe they did.
3  BY MS. POCHOP:
4  Q  Can you explain why, when I look at the Speak Up policy
5  and the open door policy and the come report policy and
6  we don't tolerate bullying, abusive language, or
7  threats, aggression, and intimidation in the
8  workplace -- can you explain to me why, as a manager,
9  you would not have wanted to know from Sala why she was
10  seeking a protection order against her coworker?
11       MS. CALEM: Object to the form.
12       THE WITNESS: I guess I don't know why she did it.
13  I don't believe Juan returned to work after that.
14  So...
15  BY MS. POCHOP:
16  Q  Well, I want to know why you didn't investigate it,
17  because you clearly got a copy of it.
18  A  Okay. I -- I -- I don't know why I didn't investigate
19  it.
20  Q  That is not consistent with your obligation under the
21  Smithfield code of conduct as a manager, is it?
22       MS. CALEM: Object to the form of the question.
23       THE WITNESS: Well, I don't know if it is or not
24  because I did not -- nobody came to me and served --
25  you know, this was served to Juan, and Juan never

Page 60

1  returned to work after that. I guess I'm not really
2  sure why I didn't investigate why she served him with a
3  protection order.
4  BY MS. POCHOP:
5  Q  How did you get a copy of it?
6       MS. CALEM: Objection to the form. Asked and
7  answered.
8       THE WITNESS: Did I get this from HR?
9       MS. CALEM: You can't talk to him.
10       THE WITNESS: Oh, I'm sorry.
11  I don't recall. I got it from HR, I believe.
12  BY MS. POCHOP:
13  Q  The incident about working with Juan actually resulted
14  in a union grievance, right?
15       MS. CALEM: Object to the form.
16  BY MS. POCHOP:
17  Q  Do you recall that?
18  A  Incident with Juan?
19  Q  Yeah, about Sala complaining that she was being
20  retaliated against by being assigned to work with Juan.
21  A  I don't know if there was or not.
22  Q  You were involved in several meetings about whether
23  there had actually been any written agreement from the
24  prior sexual harassment complaint about whether they
25  were going to be specifically separated.

Sala Naambwe and Yvette Nimenya v.                                           Gary Loger
Smithfield Foods, Inc.                                                       May 31, 2018

---

Page 61

1       MS. CALEM: Object to the form. Was that a
2    question? That was a statement.
3    BY MS. POCHOP:
4    Q   Go ahead.
5    A   I believe that what we told her, that she would not be
6    assigned to work with Juan unless absolutely necessary.
7    Q   Have you --
8       MS. CALEM: Can we take a break whenever you're at
9    a good stopping point?
10      MS. POCHOP: Yeah.
11   BY MS. POCHOP:
12   Q   Have you physically touched Sala to push her to get
13   moving at work?
14   A   No.
15   Q   Have you said, "Get the fuck out of my way"?
16   A   No.
17   Q   "Get the fuck moving"?
18   A   No.
19   Q   Anything that might be interpreted as "get the fuck
20   going"?
21   A   No.
22   Q   Because you don't talk like that since you got advised
23   by a supervisor not to do that?
24      MS. CALEM: Object to the form.
25      THE WITNESS: Yes, that's true. Yeah.

---

Page 62

1    BY MS. POCHOP:
2    Q   Are you the supervisor that suggested that Sala should
3    be disciplined for calling you a racist?
4    A   I reported that she called me a racist. The discipline
5    wouldn't fall on my shoulders. It could, but -- I
6    reported that she did, yes.
7    Q   Is it a violation of Smithfield policy for an employee
8    to say somebody's racist?
9    A   I don't know if it is or not.
10   Q   So why did you report it?
11   A   Why did I report it?
12   Q   Yeah.
13   A   I didn't like it. I don't like being called a racist.
14   There was --
15   Q   Do you know why you were called a racist?
16      MS. CALEM: Object to the form.
17      THE WITNESS: No, I don't, actually.
18   BY MS. POCHOP:
19   Q   As a manager, you think that saying somebody is a
20   racist is a violation of a policy?
21      MS. CALEM: Object to the form.
22      THE WITNESS: It offended me.
23   BY MS. POCHOP:
24   Q   And it was offensive enough that -- did you request
25   discipline?

---

Page 63

1    A   No, I did not. I reported it as to what it was.
2       MS. CALEM: Can I have a break?
3       MS. POCHOP: Yeah, yeah. Sorry. I didn't mean
4    to --
5       (Recess taken from 9:57 a.m. to 10:12 a.m.)
6    BY MS. POCHOP:
7    Q   I'm almost completed here. Famous last words by a
8    lawyer, I know, but --
9       So I wanted just to clarify. It looks like, by my
10   timeline, that in March -- February and March of 2016
11   there was the incident with Scott Genzler and the
12   follow-up disciplinary actions that, at least as a
13   manager, you were being consulted and informed about,
14   right?
15   A   I believe that's right.
16   Q   Were Scott and Sala to be separated because of that --
17   and Yvette, because of that incident?
18   A   I don't recall what the disciplinary had called for.
19   Q   Were you ever informed that Sala, Yvette, and Lorena
20   were not going to be disciplined after they received an
21   incident for going to HR and not coming back?
22   A   I was informed that they were going to take the
23   discipline back.
24   Q   And what was the reason that you were informed that the
25   discipline was being revoked?

---

Page 64

1    A   I'm not really sure if it was the union request or what
2    it was.
3    Q   Who told you that?
4    A   Told me what?
5    Q   That the discipline was being removed.
6    A   I don't recall who told me personally, no.
7    Q   Was it HR, or did you just hear it through the
8    grapevine?
9    A   Well, it came from HR.
10   Q   And then were you ever investigated by HR in 2016 about
11   your language and intimidating treatment of Sala and
12   Yvette or Sala or Yvette?
13      MS. CALEM: Object to the form.
14      THE WITNESS: No.
15   BY MS. POCHOP:
16   Q   And then in December you reported Sala to -- well, in
17   the meantime, there was a -- strike that.
18   In December you initiated a disciplinary action
19   against Sala, two on the same day; is that accurate?
20      MS. CALEM: Object to the form.
21      THE WITNESS: I don't know what -- I'd have to see
22   what --
23   BY MS. POCHOP:
24   Q   I'm going to show you what's been marked as Exhibit 31.
25   We've got two disciplinary actions on the same day for

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

Page 65

1  Sala, right, for a total of 10 days of suspension?  Is
2  that ringing a bell now?
3  A  The first one is a seven-day suspension.  The other one
4  looks like three days.
5  Q  And the seven-day -- were you the supervisor who was
6  keeping track of her attendance?
7  A  I was her supervisor at the time, I believe.
8  Q  And do you have some discretion about how you address
9  attendance issues as a supervisor?
10  A  It's a progressive system.  You miss so many days, you
11  get a warning.  It starts with a verbal, written,
12  three-day suspension, seven-day suspension, and it
13  could be up to and including discharge after that.
14  Q  So she was --
15  A  So --
16  Q  The next step after this would have been discharge?
17  A  It's possible.  Probably not likely.
18  Q  Do you know of any other employees who've gotten a
19  10-day suspension like Sala did in December of 2016?
20  A  No, I don't -- in December of '16, on that day, any
21  other employees?
22  Q  Any other employees ever had this type of disciplinary
23  action where they get two separate disciplinary actions
24  on the same day for a suspension like the one that was
25  issued to Sala in December of 2016?

Page 66

1      MS. CALEM: Object to the form of the question.
2      THE WITNESS: Well, I'm not -- no.  Not
3  personally, no.
4  BY MS. POCHOP:
5  Q  And this three-day suspension for "called supervisor a
6  racist," that's the complaint that you made, right?
7  A  I reported it.
8  Q  Were you offended by Sala's comment to you?
9  A  Yes, I was.
10  Q  Were you angry at her for saying that about you?
11  A  I wasn't happy with her, no.
12  Q  Right.  And were you ever told that this disciplinary
13  action was reduced or revoked?
14  A  I don't recall.
15  Q  So if I show you Exhibit 41, it says that it was
16  reduced.  Have you ever seen that before, Exhibit 41?
17  A  I don't believe I have.
18  Q  Did anybody in HR talk to you about the fact that the
19  disciplinary action that you had triggered about
20  yourself was going to be reduced?
21  A  I don't recall.
22  Q  As her supervisor, that would be something that you
23  would need to know to be able to enact the step
24  discipline policy, right?
25      MS. CALEM: Object to the form.

Page 67

1      THE WITNESS: It would be, but I just don't
2  recall.  I don't recall it.
3  BY MS. POCHOP:
4  Q  So in December of 2016, we have this disciplinary
5  action.  Were you aware that Sala and Yvette had filed
6  an EEO charge about their work environment, claiming it
7  was discriminatory and retaliatory?
8      MS. CALEM: Object to the form.  In December 2016?
9      MS. POCHOP: At any point.
10      MS. CALEM: Okay.
11      THE WITNESS: I'm not sure when I found out.
12  BY MS. POCHOP:
13  Q  Did somebody from HR tell you that there was an EEO
14  investigation into discrimination and retaliation in
15  your department by Sala and Yvette?
16  A  I would guess that's where it came from, but I don't
17  recall, you know.
18  Q  Do you recall when Sala was -- and Yvette, missed work
19  to attend a mediation with several members of HR, with
20  the EEOC in 2017?
21  A  No, I do not.
22  Q  Do you know -- if I understand correctly, Juan's job --
23  Juan was a member of the union?
24  A  I don't know if he was or not.
25  Q  Okay.  His job that he bid was on the Great Bend line?

Page 68

1  A  That is correct, yeah.
2  Q  And that was his assigned job?
3  A  That was his bid job.
4  Q  Right.  And yet the day after the EEO mediation, he was
5  assigned to come over and work on Sala's line, right?
6      MS. CALEM: Object to the form.  He said he
7  doesn't know when the mediation was.  Lacks foundation.
8      THE WITNESS: I don't recall what -- who did what
9  what date three years ago.
10  BY MS. POCHOP:
11  Q  Right.  Because if Juan has a bid job on Great Bend,
12  that's where he's supposed to stay, right?
13  A  Correct.
14  Q  Sala's the person with the open position?
15  A  All right.
16  Q  Right?
17  A  Okay.
18  Q  Well, is that accurate or not?
19  A  That Juan moved over to her line to work?
20  Q  Just in general.  If she's the person in your
21  department with the open position, she's the person who
22  is supposed to go fill open jobs, right?
23  A  Correct.  Yeah.  She would be assigned a job or she
24  could pick a job.
25  Q  Right.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

Page 69

1  A  And that's where she would go.
2  Q  And yet Juan, who had a bid job, was moved over to
3     Sala's line. That isn't really how it's supposed to
4     work, is it?
5        MS. CALEM: Object to the form.
6        THE WITNESS: It's possible that he could have
7        been.
8  BY MS. POCHOP:
9  Q  And how would that work under your policies where he
10    has a bid and assigned job?
11 A  It would work if he was qualified to do a job on that
12    line and we were shorthanded there and he would have to
13    do it, you know.
14 Q  So it's a coincidence that the day after the EEO
15    mediation that he was assigned to work over -- he was
16    assigned over to the ham line?
17       MS. CALEM: Object to the form. Lacks foundation.
18    He said he didn't know the date of the mediation.
19       THE WITNESS: I don't know what job you're talking
20    about. What job was he assigned to?
21 BY MS. POCHOP:
22 Q  The one that resulted in a union grievance and a
23    protection order.
24       MS. CALEM: Object to the form.
25       THE WITNESS: What job specifically was he

Page 70

1     assigned to, do you know? Because I don't recall who
2     did what, I mean, on any given days years ago.
3  BY MS. POCHOP:
4  Q  And then Russ was disciplined for making inappropriate
5     comments and spraying Sala with water in 2017. You're
6     familiar with that?
7        MS. CALEM: Object to the form.
8        THE WITNESS: Yes.
9  BY MS. POCHOP:
10 Q  And were you upset about your coworker -- your
11    co-supervisor being disciplined?
12 A  I wouldn't say I was upset about it.
13 Q  Did you think he should be disciplined?
14       MS. CALEM: Object to the form.
15       THE WITNESS: Did I think he should be
16    disciplined? No, I did not.
17 BY MS. POCHOP:
18 Q  Did you think his comments to Sala were inappropriate
19    about -- touching her and making a comment about her
20    partner being gone, what was she going to do?
21       MS. CALEM: Object to the form.
22       THE WITNESS: Yes, I guess I'd call that
23    inappropriate.
24 Q  And then there was an incident where Sala was hit in

Page 71

1     the chest with a ham, and it looks like that was in
2     2017, in August. Are you familiar with that?
3  A  I don't recall it, no.
4  Q  Should Sala have spoken up about Russ's inappropriate
5     comment under the Smithfield policy?
6        MS. CALEM: Object to the form.
7        THE WITNESS: Did she?
8  BY MS. POCHOP:
9  Q  Should she? Was it her responsibility as an employee?
10 A  Absolutely. She should have.
11 Q  Should she have spoken up about being hit in the chest
12    with a ham?
13 A  Oh, yes.
14 Q  Was there -- that was a legitimate report, right?
15       MS. CALEM: Object to the form.
16       THE WITNESS: I do not recall the specific --
17 BY MS. POCHOP:
18 Q  Did the department change its procedure and prohibit
19    employees from throwing hams that way after Sala's
20    report?
21 A  No, there was no --
22 Q  Then there was an incident in September of 2017 where
23    Sala reported that she had been sprayed with water and
24    that Russ had touched her when he was squeezing by her.
25    You're familiar with that incident, right?

Page 72

1  A  Yes.
2  Q  Did you think that he should be disciplined for that?
3        MS. CALEM: Object to the form.
4        THE WITNESS: I did not think he should have been
5     disciplined. No, I did not.
6  BY MS. POCHOP:
7  Q  Did you think Sala, as a Smithfield employee with the
8     Speak Up policy, should have reported her concerns
9     about what she perceived to be a policy violation when
10    Russ sprayed her with water and squeezed past her in a
11    way that made her physically uncomfortable?
12       MS. CALEM: Object to the form.
13       THE WITNESS: If that made her uncomfortable, I
14    think she should have reported it, yes.
15 BY MS. POCHOP:
16 Q  Would that be her responsibility under the policies?
17 A  Yes.
18 Q  So there wasn't anything wrong with Sala making these
19    reports?
20 A  No.
21 Q  And, in fact, you're supposed to encourage them, aren't
22    you?
23 A  Correct.
24 Q  Was Sala disciplined by you for chewing gum?
25 A  Yes, she was.

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

**Page 73**

1  Q  Have you disciplined any other employees in your
2     department for chewing gum?
3  A  Yes.
4  Q  Who?
5  A  I don't recall anybody specific.
6  Q  When would you have issued discipline for somebody
7     chewing gum in your department?
8  A  I don't believe I issued a write-up for her for chewing
9     gum. I told her to spit it out.
10 Q  And anybody else who --
11 A  Anybody else I see chewing gum, I tell them to spit it
12    out.
13 Q  Are you a person who, like, gets, like, really close up
14    and talks close in people's faces?
15 A  No.
16 Q  Were you involved in disciplining Sala for taking a
17    photo at work in 2018?
18 A  I don't believe I disciplined her for taking a photo.
19 Q  Do you have employees who bring their electronic media
20    into the workplace?
21 A  I have seen people with their cell phones, yes.
22    Everybody's got to have their cell phone. So...
23 Q  Right. Have you disciplined anybody for having their
24    cell phones?
25 A  I believe there was an employee that was disciplined

**Page 74**

1     for that.
2  Q  Who is that?
3  A  I believe it was Ozie Townsend.
4  Q  Because he had an iPad or iPod or something at work and
5     was taking pictures?
6  A  I believe Sala complained that he took a picture of her
7     with his cell phone is what I understood.
8  Q  Were you involved in a conflict that developed between
9     Abegail and Sala in April of 2018 when they were
10    calling each other old or something like that?
11 A  No. I wasn't in that department then.
12 Q  You weren't in the department then?
13 A  No.
14 Q  When did you move out of the department?
15 A  Last part of March of '18.
16 Q  And where did you go?
17 A  Different department.
18 Q  Which department?
19 A  26.
20 Q  What is that? Is that canning?
21 A  Bacon.
22 Q  And how did you come to move over to the bacon
23    department in 2018?
24 A  My supervisor moved -- switched us around.
25 Q  Was it a disciplinary --

**Page 75**

1  A  I believe he just wanted to move people around, get
2     cross-training done, get some people some -- get some
3     new blood into departments.
4  Q  So anything that happened after you left you haven't
5     been involved in?
6  A  No.
7  Q  If somebody calls somebody a gossip at work, is that
8     something that should be reported under the code of
9     conduct?
10    MS. CALEM: Object to the form.
11    THE WITNESS: I don't believe gossip should be
12    spread around, no. I guess if you want to report it,
13    you're more than welcome to and we'll look into it, you
14    know.
15 BY MS. POCHOP:
16 Q  Well, I'm just wondering, because if somebody is
17    disciplined for calling somebody a racist, is it on the
18    same -- is that the same standard, like, if you were
19    called a gossip or you're referred to in a slang term
20    that you think is a slur, under the Speak Up policy, is
21    it an employee responsibility to report that?
22 A  You sure could.
23 Q  Was Russ upset about being disciplined about Sala's
24    complaint?
25    MS. CALEM: Object to the form. Calls for

**Page 76**

1     speculation.
2     THE WITNESS: I guess you'd have to ask Russ, but
3     I imagine he probably was.
4  BY MS. POCHOP:
5  Q  You and Russ didn't discuss this at all?
6  A  We had some words about it probably.
7  Q  Tell me what you and Russ discussed about Sala's
8     complaint about him.
9  A  What he told me was he had no intention of touching her
10    or spraying her with water. His main concern was
11    getting the line going again because the line had been
12    down for most of the day and it needed to be washed up
13    before we started again.
14 Q  Did he tell --
15 A  That was his priority as to -- he wasn't trying to
16    spray anybody with water. It's just something that
17    happened. But he would -- you know. And, you know, he
18    didn't mean to touch her. It was a small, confined
19    space, and he was trying to get through to get --
20 Q  So he told you --
21 A  And that's what he told me happened. He just told me
22    what happened is all.
23 Q  He told you he was just -- he just brushed her because
24    he was trying to get through a small space?
25 A  It just happened is what he told me. He said he didn't

Sala Naambwe and Yvette Nimenya v.                                                Gary Loger
Smithfield Foods, Inc.                                                            May 31, 2018

---

**Page 77**

1    try to touch anybody or wasn't trying to, you know,
2    molest anybody in any way, shape, or form.
3    Q   So the physical contact -- he did tell you that he had
4        physical contact with her?
5    A   He said if it happened, he -- you know, it happened,
6        but it wasn't his intent to touch her intentionally.
7            MS. POCHOP: Well, I appreciate your time today,
8        and I don't think I have any further questions.
9            MS. CALEM: So I have a few follow-up questions
10       for you, and I will try not to take a long time.
11               EXAMINATION
12   BY MS. CALEM:
13   Q   So you're talking about your use of the F-word and
14       being told by Dave Hillberg not to do it.
15           Have you intentionally directed that word at an
16       employee to talk to them?
17   A   No, it -- there's situations where if -- it was at a
18       situation probably where a machine would break down
19       constantly and constantly and it would be, what the F
20       is going on, you know, something like that, you know,
21       and --
22   Q   And you would do that in front of other employees,
23       correct?
24   A   Yeah, I'm sure it happened.
25   Q   Did you ever curse at Sala and say "fuck you" or

---

**Page 78**

1        anything to that effect?
2    A   No, I did not.
3    Q   You might have used the F-word in front of her in
4        reference to a machine?
5    A   Yeah, it's pretty possible.
6    Q   In fact, were you aware that Sala told HR that you
7        cursed when a machine broke down?
8    A   I wasn't aware of that.
9    Q   Have you ever heard Sala use the F-word?
10   A   Yes, I have.
11   Q   In what context?
12   A   She had a lot of confrontations with employees on the
13       line. Lamar, for one, and there was another employee,
14       Ozie, she would be confrontational with them, and --
15       and while it was going on, I'd get up and I'd say,
16       that's enough of this, no more. And the F-word was
17       flying around. I said, enough, you two stop it right
18       now. If you can't get along, don't talk to each other.
19           Basically, that's about it.
20   Q   Did you ever discipline Sala for using that word?
21   A   No. I just told them quit it, don't even talk to each
22       other, just get to work, you're not here to -- not here
23       to fight, you're here to work, get the job done, and
24       this is creating problems. So...
25           And they would settle down, and they'd get back to

---

**Page 79**

1        work and --
2    Q   Are you aware that Becky Kaufman got a written warning
3        for saying "fuck you" to Sala?
4    A   I guess I don't recall that.
5    Q   You said that Sala came to you with a complaint about
6        Juan Ogaldez in 2014?
7    A   Correct.
8    Q   Can you tell me what you remember about that and what
9        you did?
10   A   Well, I think she didn't want to work on that line that
11       day. Can't remember the job she was doing. And so I
12       believe we put her on another line, and then she was --
13       just kept saying, I'm not a ho, I'm not a ho, and I'm
14       like -- you know, I didn't know how to respond because
15       she's, you know, making a statement like that. And,
16       you know, what are you talking about? What's going on?
17       And then she told me what Juan had said, or supposedly
18       said or did. And I said, well, I'm going to get to the
19       bottom of this right now. So...
20   Q   I'm sorry. You said what?
21   A   We'll get to the bottom of this right now. So...
22   Q   Did you speak to people to investigate what had
23       happened?
24   A   Yes, we did.
25   Q   Did you have assistance from human resources in doing

---

**Page 80**

1        that?
2    A   I believe the initial one was in the office. We got
3        everybody in there and asked them what they seen,
4        heard, what they know, you know, because she was
5        claiming there was witnesses, and so we got them in
6        there.
7            And it eventually went down to HR, yes.
8    Q   Did anybody corroborate that they had seen Juan do this
9        to her?
10   A   I don't believe that they did --
11   Q   Did anyone else --
12   A   -- during our initial meetings. I believe Dave was in
13       there, and he was taking notes.
14   Q   Dave Hillberg?
15   A   Right. Dave or -- yeah, I believe Dave was. Dave or
16       Steve. I don't recall. I believe I took notes on it
17       also.
18   Q   All right. The incident on the line where you said
19       Juan came to you and had a complaint about Sala and you
20       wrote something up about it, I'm going to show you --
21       and we can mark this, an email from you to Dave
22       Hillberg --
23   A   Okay.
24   Q   -- which he then forwarded to Scott Reed -- and ask if
25       you recognize this.

---

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Gary Loger
May 31, 2018

---

**Page 85**

1  Q  Do you recall if the deli line was down that day and
2     Lorena Morales came and bumped Sala on the -- on her
3     socks job on the honey line?
4  A  I don't recall what the deal was, to tell you the
5     truth.
6  Q  On that day, in this incident, did Sala refer to Juan
7     Ogaldez as the reason why she didn't want any
8     particular job?
9  A  No, I don't recall, because the job I think she was --
10    we were offering her wasn't on the line.
11 Q  With regard to Juan Ogaldez, Stephanie asked you a
12    number of questions about this protective order and
13    your response to it.
14       Had Sala -- between 2014 and the time you learned
15    about this protective order, had Sala complained to you
16    that Juan was sexually harassing her in any way?
17 A  I would say after --
18 Q  After 2014.
19 A  After her original first complaint about it, no.
20 Q  Did anybody tell you that Juan was behaving
21    inappropriately towards Sala after her original
22    complaint?
23 A  No.
24 Q  Did you observe Juan do anything inappropriate towards
25    Sala after her original complaint?

---

**Page 86**

1  A  No, I did not.
2  Q  Did you have any reason to believe that Juan was
3     sexually harassing Sala after that day in 2014 when you
4     conducted your investigation?
5  A  No, I did not have any -- I didn't see anything of that
6     order at all.
7  Q  Did human resources ask you to conduct an investigation
8     into Sala's protective order?
9  A  No.
10 Q  Is it true that Juan lost his job because he was not
11    coming to work because of the protective order?
12 A  I did call Juan at home and asked him what the deal
13    was, how come you're not coming to work, and he told me
14    because he had a protection order against him and the
15    sheriff had come to his door and told him that he could
16    be arrested and thrown in jail if he came within a
17    certain distance of her.
18 Q  Do you know how long it took Juan to find another job?
19 A  No, I don't.
20    MS. CALEM:  All right.  Nothing further.
21       FURTHER EXAMINATION
22 BY MS. POCHOP:
23 Q  So you actually called Juan about the protection order?
24 A  Yeah, I knew Juan.
25 Q  And you still didn't ask Sala about why she was seeking

---

**Page 87**

1     a protection order against him?
2     MS. CALEM:  Object to the form.  He called Juan to
3     ask why he wasn't at work, not about the protective
4     order.
5     MS. POCHOP:  That's not what I asked, and that's
6     not a proper objection in South Dakota.
7     THE WITNESS:  No, I didn't feel it was -- it was a
8     personal thing between him and her and the sheriff is
9     what I thought.  Why would I investigate it?
10 BY MS. POCHOP:
11 Q  Why would you call him at home?
12 A  Because I knew Juan and I was wondering why he wasn't
13    coming to work.  I had given Juan rides to work in the
14    past, and I had his phone number, and he lived on the
15    way there.  Because, before he got a vehicle, he walked
16    to work, and it was a good 3, 4 miles in the
17    wintertime, and he asked me for -- if I could pick him
18    up sometimes, and I did.
19 Q  So it's true that after Sala made the sexual harassment
20    complaint, there weren't any complaints between Sala
21    and Juan until they were assigned to start working
22    together again in 2016 and '17, right?
23    MS. CALEM:  Object to the form.
24    THE WITNESS:  They weren't assigned together.  She
25    chose to work there, and I let her work there.  It

---

**Page 88**

1     wasn't an assignment.
2  BY MS. POCHOP:
3  Q  And one of her complaints, which was addressed to you
4     through the union and Tom Anderson, was that it's close
5     proximity in that department and they had to work very
6     physically close to each other and that made her
7     uncomfortable, right?
8     MS. CALEM:  Object to the form.
9     THE WITNESS:  I don't know what was said
10    specifically in --
11 BY MS. POCHOP:
12 Q  They were required to work very physically close to
13    each other.
14    MS. CALEM:  Object to the form.
15    THE WITNESS:  Yes, they would be -- the job that
16    she was doing, she was working behind Juan.  Juan's
17    back would have been to her.
18 BY MS. POCHOP:
19 Q  And you knew because she had said, I'm not a ho, I'm
20    not a ho, that she was uncomfortable about being around
21    Juan, right?
22    MS. CALEM:  Object to the form.
23    THE WITNESS:  I would imagine so, but I -- you
24    know, I didn't question her when she was complaining
25    that she wasn't getting to use her seniority to pick

---