*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*



Lisa Christion
May 31, 2018

*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

**App. Tab**

**I**

### Page 1

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH DAKOTA
                    SOUTHERN DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

SALA NAAMBWE and YVETTE NIMENYA,

         Plaintiffs,

vs.                                    4:17-cv-04123-LLP

SMITHFIELD FOODS, INC.,

         Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

           Deposition of:  LISA CHRISTION
                    Date:  May 31, 2018
                    Time:  11:07 a.m.

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

                     APPEARANCES

Ms. Stephanie Pochop
Johnson Pochop & Bartling
Gregory, South Dakota

     Attorney for the Plaintiffs

Ms. Andrea R. Calem
Hunton Andrews Kurth, LLP
Washington, DC

     Attorney for the Defendant

ALSO PRESENT:     Sala Naambwe
                  Yvette Nimenya
                  Scott Reed, Smithfield Foods, Inc.

REPORTED BY:      Audrey M. Barbush, RPR
```

### Page 2

```
 1                    I N D E X
 2  Examination:                              Page
 3  By Ms. Pochop                           4/40/52
 4  By Ms. Calem                             33/52
 5                      -oOo-
 6  (There were no exhibits marked for identification)
 7                      -oOo-
```

### Page 3

1            S T I P U L A T I O N  
2     It is hereby stipulated and agreed by and between the  
3  above-named parties through their attorneys of record, whose  
4  appearances have been hereinabove noted, that the videotaped  
5  deposition of LISA CHRISTION may be taken at this time and  
6  place, that is, at the offices of Boyce Law Firm, LLP,  
7  300 South Main Avenue, Sioux Falls, South Dakota, on the  
8  31st day of May, 2018, commencing at the hour of 11:07 a.m.;  
9  said deposition taken before Audrey M. Barbush, a Registered  
10 Professional Reporter and Notary Public within and for the  
11 State of South Dakota.  Objections, except as to the form of  
12 the question, are reserved until the time of trial.  Insofar  
13 as counsel are concerned, the reading and signing of the  
14 transcript by the witness is not waived.  
15           -oOo-  
23           LISA CHRISTION,  
24 called as a witness, having been first duly sworn,  
25 testified as follows:

### Page 4

1            EXAMINATION  
2  BY MS. POCHOP:  
3  Q  Is it all right if I call you Lisa?  
4  A  Yes, ma'am.  
5  Q  You can call me Stephanie too.  
6  A  Okay.  
7  Q  Have you ever given testimony before?  
8  A  Yeah.  
9  Q  In what kind of case?  
10 A  Divorce.  
11 Q  So you kind of have the ground rules about how it works  
12    to answer questions under oath?  
13 A  Yeah.  
14 Q  Can you tell me what it means to answer questions under  
15    oath to you?  
16 A  Questions under oath?  
17 Q  Uh-huh.  
18 A  Truth and only but the truth.  
19 Q  Do you have any physical impairment or issues that  
20    prevent you from accurately remembering?  
21 A  No.  
22 Q  Lisa, how long have you worked at John Morrell or  
23    Smithfield Foods?  
24 A  26 years September 9th.  
25 Q  And can you walk me through how you've progressed in

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Lisa Christion
May 31, 2018

Page 5

1   terms of job duties at -- we'll call it Smithfield, but
2   I'm also referring to your history at John Morrell.
3   Okay?
4  A  All right. So from day one? Okay.
5  Q  Just generally.
6  A  First, I was a dependent in the military. Sioux Falls
7   is home of record. I was drawing unemployment.
8   John Morrell called. And you can't deny unemployment
9   when a job comes around, so I was hired at John Morrell
10  on September 9th of 1992.
11     I worked one and a half years on night shift, and
12  then I moved over to smoked meat wash in, like, '93,
13  end of '93 into '94. And I worked on one job and --
14  that was on the line. Then I worked off the line for
15  17 years, and then I've been on the job I'm on now,
16  which is the lead person, since 2010, and that was on
17  January 2nd, 2010. And I've been on that position ever
18  since.
19 Q  So you're in department 19 --
20 A  Yes.
21 Q  -- D?
22 A  Yes.
23 Q  And your -- what is your job title?
24 A  Just lead person, lead woman.
25 Q  Is lead woman the actual title?

Page 6

1  A  I just said that now. Lead. Pretty much lead.
2  Q  Can you describe the responsibilities of your lead
3   position?
4  A  My responsibilities? Make sure everybody gets on their
5   line, make sure the lines are running. If they're not
6   running, find out why they're not, operational,
7   mechanical, and that's about it.
8  Q  Do you have responsibilities to fill in for supervisors
9   if supervisors aren't available?
10 A  On occasions. On occasions.
11 Q  Do you have training about how you should perform your
12  role as the lead in your department?
13 A  Training as from John Morrell/Smithfield or any
14  experience?
15 Q  Well, let's try Smithfield first. Did Smithfield
16  provide you with any training on how you should conduct
17  your job duties as a lead person in your department?
18 A  No.
19 Q  How about John Morrell?
20 A  No.
21 Q  Basically, the training that you've had about how to be
22  the lead in your department is on-the-job training?
23 A  I would say any job could be on-the-job training, but
24  when I had my interview for the job -- there was, like,
25  six different people, and I had my interview, and I was

Page 7

1   the one that they decided to go with.
2  Q  So you don't have to have any sort of training about
3   what the policies at Smithfield Foods are in particular
4   to be a lead?
5  A  I would say yes.
6  Q  And what is that?
7  A  I would say, because being John Morrell before, which
8   was John Morrell when I got the position, to where they
9   changed now, and Smithfield, they have a different
10  procedure.
11     I know of other departments that are going through
12  the actual placement of a lead person, and they had
13  posted it and signed and they're in the process of
14  having interviews, and they actually have an actual
15  paper that they have to, how do you want to say, go by
16  or a document that they can, you know, use for the
17  interview, to where when I had my interview, I just had
18  one-on-one.
19 Q  Sure. So in terms of your responsibility as a lead at
20  Smithfield Foods, what is your obligation to follow the
21  Smithfield code of conduct?
22 A  Probably fulfill, the best of my ability, but I, as a
23  lead person, is almost the same as any hourly employee.
24 Q  Do you know what the Smithfield discrimination policy
25  is?

Page 8

1  A  No tolerance.
2  Q  Do you know what the Smithfield Speak Up policy is?
3  A  Well, as in any workplace, I would say speak up or
4   forever hold your peace.
5  Q  Did you know that there's a specific program at
6   Smithfield Foods called, quote, Speak Up?
7  A  Oh, yeah. Oh, yeah.
8  Q  Okay.
9  A  You hear it all the time. Yeah.
10 Q  So employees hear all the time that if they see a
11  violation of policy at Smithfield Foods, they're
12  supposed to speak up, right?
13 A  I'm not understanding.
14 Q  Well, maybe we should do it this way: Tell me what you
15  hear about the Speak Up program.
16 A  Anything that you have -- any issues within your
17  department, you know, bring it to your attention --
18  bring it to somebody's attention.
19 Q  Whose attention are you supposed to bring it to under
20  the Speak Up program?
21 A  I would say particularly the managers.
22 Q  Do you know?
23 A  I would say the managers.
24 Q  Are you guessing or do you know this?
25 A  No --

| Sala Naambwe and Yvette Nimenya v. | Lisa Christion |
|---|---|
| Smithfield Foods, Inc. | May 31, 2018 |

Page 13

1  A   No, I do not.
2  Q   Anybody else ever tell you that Juan acts out sexually
3      at work?
4  A   No.
5  Q   Is making sexual gestures and making sexual comments a
6      violation of Smithfield policy?
7  A   Yeah.
8  Q   Is it something that employees are responsible to
9      report to management if it occurs?
10         MS. CALEM: Object to the form.
11         THE WITNESS: Yeah.
12 BY MS. POCHOP:
13 Q   Is it your responsibility as an employee, if you see
14     another coworker engaged in sexual harassment, are you
15     responsible to make a report to management?
16 A   If I see it --
17 Q   Yeah.
18 A   -- I need to report it?
19 Q   Is that the policy?
20 A   No, is that the question?
21 Q   Yeah. I'm wondering, what is your responsibility if
22     you see a coworker engaged in sexually harassing
23     behavior?
24 A   Yes.
25 Q   You have a responsibility to report?

Page 14

1  A   Yeah.
2  Q   And, Lisa, like, I'm not trying to be confusing in my
3      questions. I want to know, what is your training as
4      the lead person about your responsibility to report
5      sexually harassing behavior in your workplace. If you
6      could just describe it for me.
7          MS. CALEM: Object to the form.
8          THE WITNESS: I would say -- ask the question
9      again, please.
10 BY MS. POCHOP:
11 Q   You're the lead person who is responsible to fill in
12     for supervisors, right?
13 A   More less than -- not very often. Pretty much
14     everybody comes every day, and then they're entitled
15     their time off. Then I probably do.
16 Q   And you have the responsibility to know and enforce and
17     follow all Smithfield Foods policies?
18         MS. CALEM: Object to the form.
19         THE WITNESS: Yes.
20 BY MS. POCHOP:
21 Q   And you have some training about what Smithfield's
22     sexual harassment policy is?
23 A   Yes.
24 Q   Can you tell me what your responsibility is if you see
25     or experience sexual harassment in your workplace under

Page 15

1      Smithfield policy?
2  A   First of all, if I see it, I usually have to go get a
3      manager, and they would come out and they would get
4      involved, and the manager would take care of it.
5          So, in other words, for me, as far as being able
6      to take care of any of that, no, pretty much the
7      manager. There's always two or three other managers
8      other than the one that's in my department. We all
9      work out of the same office.
10 Q   Is it a violation of Smithfield policy to make racial
11     comments about coworkers?
12 A   Yes.
13 Q   In your work environment, do you hear coworkers make
14     racial comments about your coworkers?
15 A   No.
16 Q   Does Becky Kaufman make racial comments in your
17     workplace about coworkers?
18 A   No.
19 Q   Does Becky Kaufman use profanity and sexual remarks in
20     your workplace?
21 A   No.
22 Q   If she did, what would your responsibility as a
23     Smithfield employee be?
24 A   If I ever heard her -- everybody works on a line. I'm
25     not on the line. So whatever goes on in one area is

Page 16

1      there. I don't hear it.
2  Q   I'm going to ask you to take a look at what's been
3      marked as Exhibit 30, and it looks like to me -- was
4      the congregation that you had when you were a witness,
5      was that in, like, 2014 when Sala and Yvette were
6      talking about Juan and sexual harassment? Or is that
7      at some other later time?
8          You can go ahead and look through that.
9  A   (Examines document.)
10         MS. CALEM: Did you want the witness to read this?
11     Obviously she's never seen it before.
12         MS. POCHOP: I think she is reading it. Aren't
13     you?
14         THE WITNESS: Yeah, I'm reading it.
15         MS. CALEM: Okay.
16         THE WITNESS: (Examines document.)
17 BY MS. POCHOP:
18 Q   You've completed reading the two pages that comprise
19     Exhibit 30, right?
20 A   Yep.
21 Q   And I know that this is not a document that you
22     authored. This is the first time you've seen
23     Exhibit 30, I'm taking it?
24 A   Yes.
25 Q   And Exhibit 30 refers to a grievance that Sala filed

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Lisa Christion
May 31, 2018

Page 17

1 regarding retaliation, bullying, and harassment. Do
2 you recall that?
3 A Yep.
4 Q Did you know that she had complained about being
5 bullied, harassed, and retaliated against by you and
6 Gary in terms of her job placements?
7 A No.
8 Q Nobody told you that she had said that she was being
9 bullied, harassed on a daily basis and retaliated
10 against by Gary and Lisa by moving her jobs or
11 situation?
12 A Not by them. Only by Tom A. He had flat-out told me
13 that, we're going to be filing a grievance and you
14 mother fuckers are going down. He did say that. I
15 heard that.
16 Q And then it looks like you had a meeting with Monica
17 Derby to discuss the grievance, which did apparently
18 get filed, right?
19 A Yep.
20 Q Did you ever see a copy of the grievance that was
21 filed?
22 A No.
23 Q It's Exhibit 29. We've had it marked here. You never
24 did see it in the process of this?
25 A Huh-uh.

Page 18

1 Q The reason that I really wanted to talk to you about
2 Exhibit 30, Lisa, is apparently during your meeting
3 with Monica, you told her that you and Tom Anderson
4 have a history together. Is that accurate?
5 A What's your meaning of history?
6 Q I'm just reading what Monica said you told her.
7 A All right.
8 Q Did you tell her that you and Tom had --
9 A Oh, yeah. I told them what -- I told them what had
10 happened.
11 Q Who did you tell?
12 A Did I ever tell it before? No.
13 Q Who did you tell what happened with you and
14 Tom Anderson?
15 A Only over there. That was the first time I said
16 anything to anybody.
17 Q "Lisa documents" -- if we look at page 1, down here is
18 where I'm looking. Okay? Just so you can follow along
19 with me.
20 It says that you began expressing that you and
21 Tom Anderson have a history as he used to bother you.
22 A Yep. But then there was way -- months, months, months
23 after that that it had stopped, and then it was just --
24 Q Was it sexual harassment?
25 A I would say it probably was.

Page 19

1 Q Well, as a lead, do you know, did his behavior of
2 making inappropriate gestures toward you, moving his
3 body around in a circular motion and rubbing his body
4 against you, trying to work close to you --
5 A Yeah. Yep.
6 Q -- is that a violation of the Smithfield sexual
7 harassment policy?
8 A I'd say yes.
9 Q But even though -- were you a lead when this was
10 happening to you?
11 A No.
12 Q What was the time frame?
13 A Oh, man. A long time. I started in '92, and he
14 started '95. So even when he was not even in the
15 department what he is in now, so -- I would see him in
16 the morning because that was part of my job, I had to
17 go downstairs and pick up my papers and whatnot and
18 come back. But it didn't get worse until later, and
19 then --
20 Q How long --
21 A Go ahead.
22 Q How long did this go on, Lisa?
23 A It's, what, 2018? It's been 6 -- so 12, 7 -- maybe 12,
24 I'd say 12 months maybe. Maybe even less. But, I
25 mean, it -- it wasn't every day, every day.

Page 20

1 Q It sounds awful.
2 A I suppose, any individual it would be, but I never did
3 nothing. I just held my hands down and my words were,
4 you know, you ain't supposed to be doing this, and the
5 words back out of the other individual, which was
6 Thomas A., is, it's going to be my word against your
7 word, ain't nothing going to -- ain't nothing going
8 down, nothing.
9 Q So this was bad enough that you confronted the person
10 that you felt was harassing you to stop?
11 A Oh, yeah. I said, we're not even -- you're not even
12 supposed to be doing this, you're not even supposed to
13 be over here. I mean, I couldn't even go out there and
14 take my numbers down or nothing without turning around
15 and wondering if he was going to be behind me.
16 Q And at that time it would have been John Morrell?
17 A That time it probably -- yeah.
18 Q Are we talking about -- I heard you say six years.
19 A Yep, estimating now.
20 Q Okay. Sure.
21 A But, I mean, the three occasions that I distinctly
22 remember, because they were, you know, intense, you
23 know, just --
24 Q What happened?
25 A Well, it's just the approach, you know, and it's

| Sala Naambwe and Yvette Nimenya v.<br>Smithfield Foods, Inc. | Lisa Christion<br>May 31, 2018 |
|---|---|

Page 21

1  not like, you know, this distance talking.  I mean, you
2  ain't got to be right up in my face, you know, and you
3  ain't got to be going -- whatever, you know.  You got
4  something to say?  Say it.  Hey, how you doing?  Well,
5  where's the love at?  How can I give you -- what are
6  you talking about, you know?  You're not even supposed
7  to be doing this.  Well, it's going to be my word
8  against yours if you say anything to anybody.
9  Q  So you had at least three experiences where you
10     experienced what you felt was intense sexual
11     harassment?
12  A  Yeah.
13  Q  And you did not report it?
14  A  No.
15  Q  And in Monica's notes, at least, it says you mentioned
16     it to your supervisor.  Is that accurate?  Are her
17     notes accurate?
18  A  Yep.  I did.  I did.  But it was months, months, months
19     later.
20  Q  Who did you tell?
21  A  I'd say Gary and Russ, and there might have been
22     another manager from the belly pumps in the room, but I
23     wasn't directly speaking to that individual.  I was
24     only directing it to the other.  And other than going
25     over to HR, that was the first time that I told, BJ and

Page 22

1     Monica.  Other than that, I never said nothing.
2     Then --
3  Q  But you did tell Gary and Russ?
4  A  After -- after I told it the first time over in HR,
5     yeah.
6  Q  You went to HR and reported him?
7  A  No.  They called me over.  They called me over to talk,
8     and then they were just -- one thing went to another,
9     and I just -- you know.
10  Q  When was this that you were called over to HR about --
11  A  Well, it says right here.
12  Q  When did you tell Russ and Gary that you had been
13     sexually harassed by Tom Anderson?
14  A  I would say after the day that we were over in the
15     98 building, and that's when, you mother fuckers are
16     going down and we're filing a grievance and -- yeah.
17     And he was saying this as he was walking by.  Because I
18     was over there trying to do my supply order and, I
19     don't know, he had his phone out, maybe he was calling
20     somebody, I don't know, but he just -- really loud and
21     pointed at me, and I just went on and did my business
22     and let him say what he was saying.  I heard what he
23     was saying.
24  Q  Aren't you supposed to speak up under their policy if
25     you hear something like that?

Page 23

1       MS. CALEM:  Object to the form.
2       THE WITNESS:  I'd say no.
3  BY MS. POCHOP:
4  Q  On page 2 of Exhibit 30 it says -- at least Monica
5     reported it this way, quote, Lisa did not want to
6     report because she didn't want to get him or her in
7     trouble.  Did you tell --
8  A  I don't want to get anybody in trouble, ever, anywhere.
9  Q  Why would you get in trouble for making a report if
10     somebody's sexually harassing you?
11  A  Because -- probably because, I would actually say that,
12     you know, like anything, anywhere, anyplace, it's going
13     to be my word against your word.
14     Did I get scared?  Probably so.  Enough to where
15     you're just going to be quiet.  Look at all the stuff
16     that's going on in the world now.  10 and 15 years
17     later.  Why didn't they speak up before?  Why didn't I
18     speak up before?  You know, I really can't answer that.
19  Q  Just scared?
20  A  Was I scared?  Probably so.
21  Q  Did you think you might lose your job?
22  A  I could think that.  If I think about it now, I really
23     could.  But at the time, yeah, I was probably scared
24     stiff, you know.  I've never had this happen before.
25     I've never dealt with anything before --

Page 24

1  Q  Sure.
2  A  -- and all of a sudden this happens.  I thought it
3     would just dissipate into the air.  And eventually it
4     did, and I was so relieved.
5  Q  You just had to kind of live through it?
6  A  Yeah.
7  Q  Even though you sit through sexual harassment training
8     every year at Smithfield?
9       MS. CALEM:  Object to the form.  She said --
10     object to the form.
11     THE WITNESS:  No.
12  BY MS. POCHOP:
13  Q  Despite all the Speak Up policies, you were still too
14     scared to do it until this day?
15     MS. CALEM:  Object to the form.
16     THE WITNESS:  Yes, I was scared.  I was scared.
17  BY MS. POCHOP:
18  Q  What happened after you made this report about
19     Tom Anderson?
20  A  What, still conversations or --
21  Q  No.  Was there an investigation into your complaint?
22  A  No.
23     MS. CALEM:  Object to the form.
24     THE WITNESS:  No.  No.
25

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Lisa Christion  
May 31, 2018

Page 25

1   BY MS. POCHOP:  
2   Q   Nobody asked you to make a detailed report or say --  
3   A   No.  
4   Q   Is today, when we're talking about these three  
5       incidents of what you experienced as intense sexual  
6       harassment, is, like, this the first time that you've  
7       really talked about it?  
8           MS. CALEM: Object to the form of the question.  
9           THE WITNESS: To who?  
10  BY MS. POCHOP:  
11  Q   To Smithfield, because Scott Reed is sitting here.  
12          MS. CALEM: Objection to the form.  
13          THE WITNESS: No.  
14  BY MS. POCHOP:  
15  Q   Other than this day with Monica, after you mentioned  
16      this to her, was there any follow-up about your report  
17      about Tom Anderson?  
18          MS. CALEM: Objection to the form.  
19          THE WITNESS: Nope.  
20  BY MS. POCHOP:  
21  Q   Okay.  Her notes also indicate that you have heard  
22      secondhand that Sala has stated that you are racist  
23      toward black people.  Why did you tell Monica that?  
24  A   Read your question again.  
25  Q   Why did you tell Monica that you had heard secondhand  

Page 26

1       that Sala stated you are racist toward black people?  
2   A   Why have I heard?  
3   Q   Why did you tell Monica that?  
4   A   Because I've heard it.  I've had people come to me and  
5       tell me that employees think that I am, but I'm not.  
6   Q   Because I was going to ask you if you are because  
7       that's kind of a thing now, I guess, but you answered  
8       that for me.  
9           So what employees think that you are racist?  
10  A   I'm not.  
11  Q   I understand that.  I'm asking, who said that you are?  
12      Who have you heard thinks you are racist in your  
13      workplace?  Sala is one of them, because we have it  
14      right here in Exhibit 30, right?  
15  A   Okay.  
16  Q   Anybody else?  
17  A   Yes.  
18  Q   Who?  
19  A   He doesn't work there anymore.  
20  Q   Who is it?  
21  A   I'd say Adis Gello.  
22  Q   Oh, boy.  We'll have to get that one later.  
23          Anybody else?  
24  A   That I have said -- no.  
25  Q   That you have heard from others say you are racist  

Page 27

1       toward black people.  
2   A   No.  
3   Q   Why did you tell Lisa [sic] that you heard secondhand  
4       that Sala said that you were racist toward black  
5       people?  
6   A   You better read that again.  
7   Q   Why did you tell Monica --  
8   A   Yeah, you said, why did Lisa tell Lisa.  
9   Q   Oh, sorry.  
10  A   That's why I was like, wait a minute here.  
11  Q   Thank you for that correction.  
12  A   Uh-huh.  
13  Q   Why did you tell Monica that you had heard that Sala  
14      had said that you were racist?  
15  A   So you want other people?  Like, three or four other  
16      employees.  You want names?  
17  Q   Yeah.  
18  A   All right.  I would say Lorena Morales.  I would say  
19      Amanda Avila.  I would say both managers.  To me, that  
20      was enough to where, why would they tell me that, you  
21      know, people are talking about you being racist.  Well,  
22      I'm not.  
23  Q   Gary and Russ told you that Sala said you were racist  
24      toward black people?  
25  A   Yep.  

Page 28

1   Q   Why would they tell you that?  
2           MS. CALEM: Objection to the form.  
3   BY MS. POCHOP:  
4   Q   I mean, what context were you having a discussion with  
5       Gary in which he said, Sala says you're a racist?  
6   A   It just got into the picture.  
7   Q   Like, what were you talking about that this came up?  
8   A   In particular or not in particular?  It was just  
9       everything.  Everything right here.  
10  Q   So in --  
11  A   Everything that could have happened before.  
12  Q   In terms of -- like, did he just say because there was  
13      this grievance about you being harassing and bullying  
14      and retaliatory toward her, or was it before that?  
15  A   Speculating, probably so.  
16  Q   Before the --  
17  A   This was after, after the fact.  After everything  
18      was -- after the grievance and everything was filed,  
19      yeah.  
20  Q   Were you angry that Sala had said this about you?  
21  A   Probably no.  
22  Q   So why did you tell Monica that Sala had allegedly said  
23      this about you?  
24  A   Probably because my husband -- I'm married to a black  
25      man, and I've been with him for almost 25 years.  And I