*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*

Becky Kaufman
June 1, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

App. Tab

J

**Page 1**

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH DAKOTA
                   SOUTHERN DIVISION
= = = = = = = = = = = = = = = = = = = = = = = = = =

SALA NAAMBWE and YVETTE NIMENYA,

          Plaintiffs,

vs.                                  4:17-cv-04123-LLP

SMITHFIELD FOODS, INC.,

          Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = =

          Deposition of:  BECKY KAUFMAN
                   Date:  June 1, 2018
                   Time:  2:25 p.m.

= = = = = = = = = = = = = = = = = = = = = = = = = =

                    APPEARANCES

Ms. Stephanie Pochop
Johnson Pochop & Bartling
Gregory, South Dakota

     Attorney for the Plaintiffs

Ms. Andrea R. Calem
Hunton Andrews Kurth, LLP
Washington, DC

     Attorney for the Defendant

ALSO PRESENT:    Sala Naambwe
                 Yvette Nimenya
                 Scott Reed, Smithfield Foods, Inc.

REPORTED BY:     Audrey M. Barbush, RPR
```

**Page 2**

```
 1                    I N D E X
 2  Examination:                              Page
 3  By Ms. Pochop                                4
 4                      -oOo-
 5     (There were no exhibits marked for identification.)
 6                      -oOo-
```

**Page 3**

```
 1                  S T I P U L A T I O N
 2       It is hereby stipulated and agreed by and between the
 3  above-named parties through their attorneys of record, whose
 4  appearances have been hereinabove noted, that the videotaped
 5  deposition of BECKY KAUFMAN may be taken at this time and
 6  place, that is, at the offices of Boyce Law Firm, LLP,
 7  300 South Main Avenue, Sioux Falls, South Dakota, on the
 8  1st day of June, 2018, commencing at the hour of 2:25 p.m.;
 9  said deposition taken before Audrey M. Barbush, a Registered
10  Professional Reporter and Notary Public within and for the
11  State of South Dakota.  Objections, except as to the form of
12  the question, are reserved until the time of trial.  Insofar
13  as counsel are concerned, the reading and signing of the
14  transcript by the witness is not waived.
15                       -oOo-
16
17
18
19
20
21
22
23            BECKY KAUFMAN,
24  called as a witness, having been first duly sworn,
25  testified as follows:
```

**Page 4**

```
 1                    EXAMINATION
 2  BY MS. POCHOP:
 3  Q  Becky, what does it mean to you when you swear to tell
 4     the truth?
 5  A  Meaning you don't lie.  You tell the truth and
 6     everything that happened truthfully and not make shit
 7     up -- stuff up.  Sorry.
 8  Q  That's okay.  How long have you worked at John Morrell
 9     or Smithfield?
10  A  March 2nd was nine years.
11  Q  And what is your current job title?
12  A  Production?  Yeah.  Or tree puller, actually.
13     Production.  Slash production.  I forgot I started
14     Tuesday on a new job as a tree pusher.
15  Q  In what department?
16  A  Smoked meat pack.
17  Q  Is that department 19?
18  A  20.
19  Q  So you are moving to a new department as of --
20  A  I signed a new job, so I started this last Tuesday, a
21     few days ago.
22  Q  And while you were in department 19 -- how long were
23     you in department 19?
24  A  It would be nine years.
25  Q  During that time you worked with Sala as a coworker?
```

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Becky Kaufman
June 1, 2018

Page 5

1  A  Yes.
2  Q  How would you describe Sala's performance in her job
3     duties?
4  A  Her job duties were really good. She actually, you
5     know, did really good and did what she was asked and
6     performed good, and if she had to do something she
7     didn't really want, she still did it.
8  Q  And how about Yvette?
9  A  Yvette, the same way. I mean, there's some
10    limitations, like, it depends on the product, you know,
11    of what she can -- you know, how high something was or
12    what she could do, because, I mean, that's for
13    everyone -- anybody, you know, limitations of the
14    length of what the job is.
15 Q  Do you identify as being a member of any protected
16    class other than being a woman?
17       MS. CALEM: Object to the form of the question.
18    Do you know what "protected class" means, Becky? If
19    you don't, you can ask her to explain.
20       THE WITNESS: What do you mean by that? I mean --
21 BY MS. POCHOP:
22 Q  How do you identify racially?
23 A  We're all equal. I mean, I -- I know -- I have friends
24    that are black. I, you know, have nephews and nieces
25    that are of a different color, and I would never trade

Page 6

1     them for the world because they're the sweetest things
2     ever. So...
3  Q  I was just wondering about you. Do you identify as a
4     Caucasian person or native American or --
5  A  Oh, Caucasian.
6  Q  Do you have any disabilities or anything like that?
7  A  Not that I'm aware of.
8  Q  Can you tell me what you can remember about being at
9     work with Scott Genzler on the day that he made racial
10    remarks to Sala and Yvette?
11 A  All I remember is when he told them to speak English or
12    go back to your country. I do remember that. Anything
13    else I don't because I just -- I mean, a lot of times I
14    tune things out just because it's, you know, not my --
15    I didn't want to get involved, really, if coworkers
16    were fighting and on what their stupidity was. And I
17    told him later on to apologize.
18 Q  You told who to apologize?
19 A  Scott.
20 Q  Why did you tell him to apologize?
21 A  Because I told him that was kind of rude.
22 Q  Did he not want to apologize?
23 A  He said no, but after that, I don't know if he did or
24    not. I don't know.
25 Q  Why were you and Scott talking about what had happened

Page 7

1     after the fact?
2  A  Well, because I was right there and I heard him saying
3     it, and, afterwards, on the way to break, I told him
4     you need to apologize because, you know, this is
5     America where it is freedom and they are free to speak
6     how they want, and, I mean, yeah, just like us, we're
7     annoying, you know, to them probably or, you know,
8     anybody, but you know what, I don't care because it's
9     who they are, and if they want to -- I told him if
10    that's what they want to speak, just let them.
11 Q  When you say just like us --
12 A  Well, meaning like -- people that speak English, maybe
13    we're annoying -- our language is annoying to, you
14    know, somebody else where -- you know, everybody is
15    different, and maybe we are annoying to them or -- you
16    know, people are annoying, people do get annoying. But
17    I told him to apologize because that was kind of mean
18    to say.
19 Q  And he said?
20 A  At first he said no. After that, I don't know.
21 Q  Were you ever interviewed by anybody in Smithfield
22    Foods management about your -- whether you had
23    witnessed or heard anything between Scott and Sala and
24    Yvette?
25 A  No.

Page 8

1  Q  Did you think it was your job -- after the training
2     that you've had about the code of conduct and the
3     harassment and discrimination policy, did you think
4     that you were responsible to report behavior that you
5     thought was bad enough that you told your coworker that
6     he needed to apologize?
7  A  I don't know, because I just -- I mean, to report
8     everything -- I mean, I told him to apologize. I
9     wanted him to step up and, you know, be an adult on
10    that. So after that, I just -- I thought it was done
11    and over with, because I didn't hear anything after
12    that. So...
13 Q  Have you heard other coworkers make racial remarks to
14    people of color in the workplace?
15 A  No, not that I'm aware of. I have not --
16 Q  Have you ever made remarks about your coworkers' race?
17 A  No.
18 Q  Have you ever made sexual jokes in the workplace?
19 A  Used to.
20 Q  What do you mean you used to?
21 A  I kind of got told not to do it anymore by a
22    supervisor. So...
23 Q  So the answer is, yes, you used to?
24 A  Yes, I used to.
25 Q  So what supervisor told you that you needed to --

| Sala Naambwe and Yvette Nimenya v.<br>Smithfield Foods, Inc. | Becky Kaufman<br>June 1, 2018 |
|---|---|

**Page 9**

1  A  Russ.
2  Q  And when did this occur?
3  A  I'm not sure. It's been a while. I'm not sure exactly
4     when.
5  Q  Why did Russ tell you you had to --
6  A  Just because -- oh, I'm sorry.
7  Q  If you'd just let me finish.
8  A  Sorry.
9  Q  Why did Russ tell you that you needed to stop making
10    sexual jokes in the workplace?
11       MS. CALEM: Object to the form.
12       You can answer, Becky.
13       THE WITNESS: Because of it offends people and he
14    didn't want to see people offended or get in trouble.
15 BY MS. POCHOP:
16 Q  Had he heard you make a sexual joke?
17 A  I'm not sure if he heard me, so I don't know. He
18    just -- it was later on he -- when I was on break and
19    he caught me coming back and he's like, you need to
20    just, you know, stop doing that because there are
21    people that are getting offended -- that will get
22    offended, or however you want to put it, but people do
23    get offended, and he just didn't want to see me getting
24    in trouble for something stupid.
25 Q  Because the training that you receive is that you're

**Page 10**

1     not supposed to make sexual comments and jokes at work,
2     right?
3  A  Right.
4  Q  Do you remember what the sexual joke that got Russ's
5     attention was?
6  A  I don't. I do not.
7  Q  Before Russ talked to you about, don't talk like that
8     anymore in the workplace, about sexual comments, are
9     you a person that -- to lighten the mood or joke
10    around, that would, like, act out sex acts with other
11    employees?
12 A  Lighten the mood, but I don't do a lot of the sexual
13    stuff, no. I just -- you know, there was a couple
14    times that I used to do it, and that's when Russ talked
15    to me, and, I mean, I stopped doing that, and I just
16    find other ways, I guess, to lighten the mood and --
17 Q  Have you brought your phone onto the production floor?
18 A  I always carry it on me, like everybody else, yes.
19 Q  Have you gotten your phone out on the production floor
20    and showed coworkers videos?
21 A  No.
22 Q  You've never shown a porno at work to Yvette?
23 A  No, not that I remember ever doing.
24 Q  There was an incident in 2016 when you were accused of
25    throwing meat at Sala. Have you had conflicts with

**Page 11**

1     Sala as a result of -- after this incident with Scott
2     Genzler and the race discrimination complaint?
3        MS. CALEM: Object to the form.
4        You can answer if you understand it.
5        THE WITNESS: Can you -- like, can you, like, kind
6     of repeat it or explain it more, what you mean?
7  BY MS. POCHOP:
8  Q  Prior to the incident with Scott Genzler, had you had
9     any conflicts with Sala in the workplace?
10 A  No.
11 Q  After the incident with Scott Genzler -- are you and
12    Scott friends?
13 A  No. No.
14 Q  After the incident with you and Scott, did you and Sala
15    start to have conflicts at work?
16 A  Not that I know of.
17 Q  Have you told Sala to fuck off?
18 A  Yes.
19 Q  More than once?
20 A  I just know the once and that was -- can I explain?
21 Q  Sure.
22 A  It was just that she kept blaming me when we were on
23    the same line, and she kept blaming me for something
24    that was not my fault, and finally I just snapped at
25    her and I said FU, and that was it. So, yes, once.

**Page 12**

1  Q  Are you the person who threw meat at Sala --
2  A  No.
3  Q  -- on the day that she complained?
4  A  No.
5  Q  Do you know who did?
6  A  No. I was busy cutting the meat and putting them on
7     the thing, the rack thing.
8  Q  Did you and your coworkers talk about who would have
9     thrown the meat on Sala?
10 A  I haven't talked to anybody about it, no.
11 Q  Have you ever been subject to discipline at --
12 A  What do you mean? Can you --
13 Q  Have you gotten any written disciplinary warnings?
14 A  Yes.
15 Q  Tell me about your disciplinary history.
16 A  I've gotten suspended from my attendance. I got
17    written up for swearing at the employee.
18 Q  Why did you get written up for swearing at the
19    employee?
20 A  Because I swore at an employee and that was wrong.
21 Q  Who was that?
22 A  Sala. That was after I swore at Sala and told her FU,
23    I got written up.
24 Q  What was your discipline for that?
25 A  A write-up, and the next time it was suspension if I

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

Becky Kaufman
June 1, 2018

Page 13

1  did it again. And after that I never did it again.
2  Q  Did you get a verbal warning or a written?
3  A  A written.
4  Q  Any other disciplinary actions besides attendance
5     things?
6  A  Not that I can remember.
7  Q  Have you observed coworkers -- other coworkers engaged
8     in sexual jokes and banter in the workplace?
9  A  There might have been, but I seriously wasn't really
10    paying attention, because there's times I've switched
11    to other jobs too, so I don't know, you know -- I know
12    there's some that would joke and stuff, but -- yes,
13    there's one that would joke sexually.
14 Q  Who is that?
15 A  Yvette. And she would touch other women's asses or the
16    crotch area, or one day I was stretching my back,
17    laying on the one stand on the line we were on, and she
18    came and started humping me. I mean, there was times I
19    have told her to stop.
20 Q  Well, did you report her pursuant to Smithfield policy?
21 A  No.
22 Q  Why not?
23 A  Because I -- we're adults, and I just -- I don't want
24    to be one of these people that right away, oh, I got to
25    tell. Because, you know, I wanted to kind of say, hey,

Page 14

1     can you please stop. And if she would have kept going
2     and going, then, yes, I would have had to take the next
3     step. But I just think we're adults and, say, I'm
4     asking, hey, can you please -- just enough, I do kind
5     of feel uncomfortable, can you stop, please.
6  Q  When did -- never mind.
7         Do you believe you've ever been subject to sexual
8     harassment in the workplace?
9  A  Have I ever?
10 Q  Yeah.
11 A  Like somebody harassing me?
12 Q  Yes.
13 A  Just, I mean, the times that Yvette -- I know she was
14    joking, but there was times where I felt uncomfortable,
15    and that's when I told her, please stop. Otherwise,
16    not that -- not that I can remember or think of. I
17    mean, not that I can think of at this time. I don't
18    know.
19     MS. POCHOP: I don't have any further questions,
20    Becky.
21     MS. CALEM: Let me just check.
22     I don't have anything else. You're done.
23     Do you want to read this and sign it, or do you
24    want to just -- you don't have to. It's up to you.
25    You can read it and make sure everything's accurate and

Page 15

1  sign it, or you can just let it go the way it is. So,
2  totally up to you.
3      THE WITNESS: I'll read it and sign it.
4      (Whereupon, at 2:40 p.m. the deposition was
5  concluded.)

Page 16

1  STATE OF SOUTH DAKOTA
2                                    CERTIFICATE
3  COUNTY OF LINCOLN
4      I, Audrey M. Barbush, a Registered Professional
5  Reporter and Notary Public, do hereby certify that the
6  witness was first duly sworn by me to testify to the truth,
7  the whole truth, and nothing but the truth relative to the
8  matter under consideration; that the foregoing pages 4-15,
9  inclusive, are a true and correct transcript of my stenotype
10 notes; that the witness did not waive the reading and
11 signing of the deposition transcript.
12     I further certify that I am not a relative or employee
13 or attorney or counsel of any of the parties or a relative
14 or employee of such attorney or counsel, and that I am not
15 financially interested in this action.
16     In testimony whereof, I have hereto affixed my
17 signature this 15th day of June, 2018.
18
19
20
21                              /s/Audrey M. Barbush