*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*

Thomas Anderson
June 1, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

App. Tab

K

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Thomas Anderson  
June 1, 2018

---

**Page 1**

```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF SOUTH DAKOTA
                     SOUTHERN DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = = = =

SALA NAAMBWE and YVETTE NIMENYA,

         Plaintiffs,

vs.                                    4:17-cv-04123-LLP

SMITHFIELD FOODS, INC.,

         Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = = =

          Deposition of:   TOM ANDERSON
                    Date:  June 1, 2018
                    Time:  2:47 p.m.

= = = = = = = = = = = = = = = = = = = = = = = = = = =

                    APPEARANCES

Ms. Stephanie Pochop
Johnson Pochop & Bartling
Gregory, South Dakota

      Attorney for the Plaintiffs

Ms. Andrea R. Calem
Hunton Andrews Kurth, LLP
Washington, DC

      Attorney for the Defendant

ALSO PRESENT:   Sala Naambwe
                Yvette Nimenya
                Scott Reed, Smithfield Foods, Inc.

REPORTED BY:    Audrey M. Barbush, RPR
```

**Page 2**

```
1                     I N D E X
2    Examination:                            Page
3    By Ms. Pochop                           4/21
4    By Ms. Calem                             15
5                       -oOo-
6    (There were no exhibits marked for identification.)
7                       -oOo-
```

**Page 3**

1  STIPULATION
2  It is hereby stipulated and agreed by and between the
3  above-named parties through their attorneys of record, whose
4  appearances have been hereinabove noted, that the videotaped
5  deposition of TOM ANDERSON may be taken at this time and
6  place, that is, at the offices of Boyce Law Firm, LLP,
7  300 South Main Avenue, Sioux Falls, South Dakota, on the
8  1st day of June, 2018, commencing at the hour of 2:47 p.m.;
9  said deposition taken before Audrey M. Barbush, a Registered
10 Professional Reporter and Notary Public within and for the
11 State of South Dakota.  Objections, except as to the form of
12 the question, are reserved until the time of trial.  Insofar
13 as counsel are concerned, the reading and signing of the
14 transcript by the witness is not waived.
15                      -oOo-
23            TOM ANDERSON,
24 called as a witness, having been first duly sworn,
25 testified as follows:

**Page 4**

1            EXAMINATION
2  BY MS. POCHOP:
3  Q  Tom, you and I just introduced each other right before
4     your deposition, and I am the lawyer for Sala and
5     Yvette, and I'm going to be asking you questions today.
6     I'd like to know first how long you have been
7     employed at Smithfield Foods or John Morrell.
8  A  24 years.
9  Q  Can you tell me what your job description is in
10    Smithfield Foods right now?
11 A  I'm a pickle maker.
12 Q  What --
13 A  Pickle.  Pickle maker.  I make pickle for the bacon.
14    And I'm a steward, a union steward.
15 Q  And have you been a member of department 19?
16 A  (No response.)
17 Q  What department are you in right now?
18 A  Department 11.
19 Q  How long have you been in department 11?
20 A  24 years.
21 Q  Regarding your role as a union steward, can you
22    describe for me, is that a job within the company, or
23    is that a job within the union?
24 A  In the union.
25 Q  Do the union and the company -- other than their

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Thomas Anderson  
June 1, 2018

Page 5

1  contract -- like, for example, is the union -- as a
2  union steward, are you able to say what policies and
3  procedures Smithfield Foods managers should follow?
4  A  Yeah.  Yeah, I'm supposed to tell them, no, that it's
5  in the policy, they can't -- yes, that's what I'm
6  supposed to do.
7  Q  And are you supposed to advise them about the -- when
8  you see managers or employees who aren't following the
9  union contract, is it your job as a union steward to --
10 A  No, my job is I go tell the union member that they
11 can't do it or whatever, and if the supervisor doesn't
12 agree with that, then I have to call somebody else
13 bigger.  That's the business agent.
14 Q  One of the things I want -- how long have you been a
15 union steward?
16 A  I'm going to say about nine years.
17 Q  Have you been involved in any race discrimination
18 complaints against the company in your role as a union
19 steward?
20 A  Yes.
21 Q  How many?
22 A  One now.  One.
23 Q  Is that --
24 A  Sala.
25 Q  -- Sala's?  Do you think -- have you ever experienced

Page 6

1  race discrimination in the workplace?
2  A  No.
3  Q  Have you ever witnessed other employees besides Sala
4  and Yvette be subject to discriminatory treatment in
5  the workplace?
6  A  No.
7  Q  Tell me about your involvement, what your role is in
8  Sala and Yvette's race discrimination complaint.
9  A  Okay.  Well, my role in it is because, okay, Saturday
10 they came in work and said, hey, Scott called them,
11 like, a name -- called them out their name, cussed at
12 them, and all that.  So I went to the supervisor,
13 Rusty, and we went into the smoked meats wash office,
14 and it was, like, Sala, Yvette, Scott, Eudoxio, and
15 Lisa.  And then he said he said it, and -- he said he
16 said it.  He told me he said it, and I said -- he's
17 like, Tom, I don't want to get fired.  And I said, hey,
18 you know, you're union steward just like -- you're a
19 union person just like the rest of them, okay, so if
20 anything, we'll see, they might give you three days or
21 something.  Right?
22      And he came over and worked with me that day, and
23 then I went -- then I went home.  And then they said
24 they was going to send these girls over to human
25 resources to fill the complaint out that Monday.  Okay?

Page 7

1  And then when Monday came along, they said -- they came
2  back to me and said, hey, we got wrote up, Tom, for
3  going over to report something.  And I said, nah, you
4  shouldn't -- no, you shouldn't get wrote up for that,
5  you know, and then --
6  Q  Did you actually see the write-ups that they got?
7  A  No.  No, I didn't see it.  Then I asked Rusty -- or he
8  said, Scott got wrote up too, but I didn't see it.
9  And, again, these girls got wrote up.  I said, no, man,
10 it ain't supposed to go down like that.
11      And then I went to Scott Reed and told him.  For
12 discrimination, a piece of paper, he gave me a blank
13 sheet of paper.  Scott did.  Yeah, he gave me a blank
14 sheet of paper.  Yeah.  And I was like, what's this?
15     So then I went to the union office, and I talked
16 to BJ, and he said, no, let he get a form.  Then he
17 gave me a form, but it wasn't the same form for
18 discrimination or whatever, because they send me
19 something else saying that was a different form, told
20 me I had to go to a different building.  Then we said
21 okay -- I said okay.
22     Then I gave it to -- told Sala that, you know,
23 they discriminated against y'all, they can't do that,
24 and then that was it.
25 Q  So why did you go to talk to Scott Reed?

Page 8

1  A  Because I don't think that they should be wrote up and
2  everything, somebody call somebody out their name and
3  all -- and do all that, and though it in your -- in our
4  handbook it says zero tolerance, and I'm like -- I'm
5  stuck on that zero tolerance, like, what does that
6  mean?  You know, you call somebody out their name and
7  it's okay.  So...
8     Okay.  So I went back over to the honey line the
9  next day and told the steward to do your damn job, and
10 then I went to human resources.  Scott gave me three
11 days for saying "damn," so I was like --
12 Q  Did you think that that was --
13 A  Discrimination?  Yeah.
14 Q  And why do you think that you were -- what basis --
15 A  Because why does --
16     (Reporter interrupts.)
17 Q  You have to wait for each other.
18 A  Oh, okay.  I'm sorry.
19 Q  Yeah, she can only take one of us at one time.
20     Why did you -- what basis did you think you were
21 being discriminated on?
22 A  Just because why did I get three days and the other --
23 to me, the white guy, he didn't get three days, but he
24 can cuss these ladies out and say whatever and then
25 admit that you did say this and they say they just

Sala Naambwe and Yvette Nimenya v. Smithfield Foods, Inc.

Thomas Anderson
June 1, 2018

Page 9

1  wrote you up, that's not fair.
2  Q  You've been described as being very emotional and upset
3     about Sala's and -- well, Sala's discrimination
4     complaint.
5  A  Just because when -- when she came over it seemed like
6     they was being bullied -- bullying to her, you know
7     what I mean, just doing whatever they want or saying
8     whatever they want, and I'm here like, no, you can't --
9     you know, you can't harass -- you can't harass the
10    woman, you know, you can't harass her or whatever.  And
11    they just keep on doing it.  So I said, nah, y'all
12    can't do that.
13 Q  There's been a suggestion that you are emotional about
14    this race discrimination and retaliation complaint
15    because you have a personal or romantic relationship
16    with Sala.
17 A  No.  No.  She's just a union member just like I am, and
18    I talked to them -- I treat everybody the same.  I
19    don't care who they are.  If somebody got a problem,
20    I'm going to go over there and help them, each and
21    every one of them and ask them, hey, what you doing,
22    you know, it's not right, it's not right.
23 Q  Have you ever told Scott Reed that you were having a
24    romantic relationship with Sala?
25 A  No.

Page 10

1  Q  Have you ever told anybody at work that you were --
2  A  No.
3  Q  -- having a romantic --
4  A  No.
5  Q  -- relationship with Sala?
6  A  No.
7  Q  Has any manager ever asked you about it?
8  A  No.
9  Q  Have you ever been asked about your -- the nature of
10    your relationship with Sala by anybody in the union?
11 A  No.
12 Q  Did you tell people that if this case is resolved, you
13    and Sala are going to take the money and go to Florida?
14 A  No, because I can't swim and I don't like water.
15 Q  Have you been prohibited from going into department 19?
16 A  Yes.
17 Q  Why?
18 A  Why is because of the supervisor that's over there.
19    Okay?  He used to be in the smoke alley.  His name is
20    Ernest Terry, and he used to be the smoke alley
21    supervisor.  And he came over there trying to be macho
22    man, or whatever, and come over there to the honey line
23    trying to tell them 15-minute break and this and that,
24    or I'll stop this line and -- I'll stop the line and
25    you go to break when I go to break.  No.  They used to

Page 11

1  get an extra three minutes, four minutes travel time to
2  get to the cafeteria.
3     So I got in conflict with him.  Okay?  But then he
4  cussed me out and all that.  Right?  It was just me and
5  him and this and that, and then he said a remark that I
6  said something, I'm going to F your kids and your wife
7  and all this.  Then this is when he went to Scott Reed
8  and told him that I said it.  Then Scott Reed's like --
9  to me, he's like -- he's like, guilty, so I'm going to
10 give you indefinite suspension.  I'm like, for what?  I
11 have to do my investigation.  I said that's cool.
12    So I went on home and all that.  Then he called me
13 back and said, Tom, you not allowed to go into
14 department 19.  What?  You know, he says, no, you can't
15 handle union business unless you on -- off work or on
16 your break.  I said, no, you know.
17    My reaction that I got from our union president in
18 the union is, a union steward, whenever there's a
19 problem, that whoever that person want, that they can
20 go solve that.  Why we got to wait until after work or
21 on my break?  Because when they want to discipline me,
22 they do it on the company's time.
23 Q  Did you grieve the discipline that you received in
24    relation to --
25 A  I signed because, to me, it seem like I had to sign

Page 12

1  this thing to go back to work.  I was like, hmm, you
2  know, so I did sign it, and he said I couldn't go to
3  department 19, have any kind of communication with
4  department 19.
5  Q  Do you know of anybody else who has received the sort
6     of disciplinary action that you've received for
7     participation in a race discrimination or retaliation
8     complaint?
9        MS. CALEM:  Object to the form.
10       THE WITNESS:  No.
11 BY MS. POCHOP:
12 Q  Did you think that the disciplinary action that was
13    taken against you for your participation in the -- in
14    Sala's discrimination and retaliation complaints was
15    related to her objection to discrimination and --
16 A  Yes.
17       MS. CALEM:  Object to the form.
18 BY MS. POCHOP:
19 Q  Did you report that to Smithfield management?
20 A  No.
21 Q  Why not?
22 A  It's because who was I supposed to report it to?
23    Scott?
24 BY MS. POCHOP:
25 Q  Yeah.  Why not?

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

Thomas Anderson  
June 1, 2018

Page 13

1  A  At that time, like, you know -- at that time, okay, I
2     told the president of the union, I said, man, it's not
3     right, you know, they was doing this and they give me
4     the time because I take [sic] up for the lady and her
5     right.  I said, no, that's -- that's -- that's not
6     right, because -- I said, man, that's -- you can't do
7     that.  And so -- so they're going after me for whenever
8     I do something, boom, three days, because I take up for
9     the union people saying this and that and they don't
10    want me to do that.
11 Q  What does your own disciplinary history look like at
12    the company?
13 A  Oh, it's all right.  I got three days for calling him
14    out his name.  I got that indefinite --
15        (Interruption by reporter.)
16        THE WITNESS:  No, because I told him to do his
17    damn job.  Scott.  I told the steward, I go up to his
18    ear --
19 BY MS. POCHOP:
20 Q  Are you saying calling out --
21 A  No, I called him -- I called him in his ear, I cussed
22    him out, told him to do his damn job and take care of
23    the people, the union people.
24 Q  Your voice is so quiet that we're having a hard time
25    hearing.

Page 14

1  A  Okay.  No.  Okay.  When I went over there and told that
2     union steward to do your damn job and all that, since
3     then, it seem like whenever something went wrong or
4     done something and I go up, and if they got a complaint
5     and their steward ain't over there -- he's been sick
6     and all that -- they come over there and ask me, hey,
7     Tom, and I will call a business agent, maybe BJ Manning
8     [sic] and them to come take care of this.  But then I
9     got the problem, if I do anything, they got me straight
10    over to that HR.
11 Q  For disciplinary action?
12 A  Yep.
13 Q  Is that different --
14 A  Yep.
15 Q  -- than how you were treated before --
16 A  Yep.
17 Q  -- you were involved with --
18 A  Yep.
19 Q  -- Sala and Yvette's discrimination complaint?
20 A  Yep.  It was okay.  Okay?  I had 17 years perfect
21    attendance, and I lost all that because I took up for
22    them for discrimination, telling them they can't do
23    this to them, they can't discriminate y'all because of
24    that, and he can't say what he said and don't nothing
25    happen.  He can't do that.

Page 15

1        MS. POCHOP:  I don't have any further questions,
2     Tom.
3        MS. CALEM:  I have a few questions.
4              EXAMINATION
5  BY MS. CALEM:
6  Q  So when this thing happened with Scott Genzler --
7  A  Uh-huh.
8  Q  -- you went to see Scott Reed about it, right?
9  A  Yeah.
10 Q  And he listened to you, right?
11 A  Yep, I went -- yeah, okay.  I went and talked to Scott
12    Reed first, like -- but first I talked to him on the
13    telephone.  Okay?  First I talked to him on the
14    telephone, and he said, we're going to make this right.
15    That's what Scott Reed told me.  Okay?  I said okay.
16    He said, let me -- let me do my investigation and let
17    me check in, and all this, and check in -- check in on
18    it.  Right?
19       All right.  Then he came back and he called me
20    down to the personnel office and said -- and then Scott
21    told Scott Reed he did say this.  Right?  And then
22    Scott Reed told -- said to me that, I can't punish him
23    twice because Carrie already punish him.  I was like,
24    but you give these girls a write-up?  And he said
25    Sala -- he told me Sala got wrote up and Scott got

Page 16

1     wrote up.  I said, they shouldn't even got wrote up for
2     this.
3  Q  So let me ask you this:  Did you know that their
4     write-ups -- Sala, Yvette, and Lorena -- were
5     withdrawn?
6  A  No.  After -- after I came --
7  Q  Right.
8  A  -- yeah.
9  Q  Right.  You knew they were withdrawn afterwards, right?
10 A  After that, yes.
11 Q  So do you think in that way Scott Reed was trying to
12    make it right?
13 A  Make it right?
14 Q  By withdrawing their write-ups?
15 A  No.  Because why did he -- did he take Scott's too?
16 Q  He didn't withdraw Scott's.
17 A  Okay.  I don't -- but I don't -- but I don't know if he
18    got wrote up or not.  But why do you get a written for
19    somebody saying something like that, with their policy,
20    zero policy?  Why did I get three days three days later
21    for cussing somebody out?
22 Q  Okay.  All right.
23 A  I didn't understand.  I'm just saying I didn't
24    understand the whole thing.
25 Q  I understand what you're saying there.

Sala Naambwe and Yvette Nimenya v. Smithfield Foods, Inc.
Thomas Anderson
June 1, 2018

Page 21

1  though --
2  Q  I don't know.
3  A  -- to Lisa, when there's -- to me, there's -- no, I'm
4     not -- no, I never did nothing like that.  No.  Lisa?
5     Nah.  No.  Nah.
6     MS. CALEM:  Let's take two minutes to go over
7     notes, please.
8     We don't have anything else.
9     FURTHER EXAMINATION
10 BY MS. POCHOP:
11 Q  Were you ever interviewed by anybody at HR about Lisa
12    Christion's allegation that you sexually harassed her
13    some years ago?
14 A  No.
15 Q  Is that kind of news to you today?
16 A  Yeah, that's news.  Like, what?  Oh, no.  Wow, Lisa?
17    Whoa, no.  No.  That was my first, like, whoa, no.
18 Q  When did you file an EEO complaint?
19 A  When I got -- when I got my three days for cussing at
20    Tom, where I told him to do his damn job.  And I says,
21    you gave me three days?  He goes yeah.  And that's when
22    I filed it.
23 Q  Is the basis of your EEO complaint that you thought it
24    was discriminatory or you thought it was retaliation?
25 A  Retaliation.

Page 22

1  Q  Because of your participation --
2  A  Right.  With them, yeah.
3  Q  Did you have a lawyer?
4  A  Nope.
5  Q  Exhibit 52 and 53 are sitting out, I think, there.
6     First of all, is that Exhibit 53 that you're looking
7     at?
8  A  Yes.
9  Q  Can you tell me, is that a document that you prepared?
10 A  Yeah, yeah, I wrote this.  I wrote this out because,
11    after that happened to Sala and them and I got my three
12    days, I told the president of the union, and he said,
13    Tom, you need to document whatever's going on so you
14    can remember what's going on.  So I said okay.
15    So I wrote this up for Sala or whatever, and let
16    them know, because she was on open work in
17    department 19 and that she couldn't ever use her
18    seniority or none of that.
19 Q  Were you involved, as the union steward, in any of the
20    issues that Sala raised about having to work with Juan
21    after she made this complaint about Scott Genzler?
22 A  No, I wasn't in on them.
23 Q  Is Exhibit 52, sitting next to you, is that the
24    three-day suspension that triggered your own --
25 A  Yeah.

Page 23

1  Q  -- EEO complaint?
2  A  Yes, because -- can I talk now?
3  Q  Yeah, if you have something that you want to add.
4  A  I'm just stuck on that zero tolerance.  I don't even
5     understand what it means.  You asked me to, just tell
6     me what it means, man, you know, just tell me what it
7     means.  It mean you tolerate nothing.  Okay.  So -- but
8     they did.  And I got three days.  Why?
9  Q  As a union steward, do you have experience in what the
10    range of discipline that employees normally get for
11    policy violations --
12 A  No.
13 Q  -- at Smithfield?
14 A  No.
15 Q  Does anybody in the union have that information?
16 A  No.
17 Q  So why did you think it was a big deal if you got three
18    days for --
19 A  It's because they got -- he got a write-up for telling
20    them to go back to their country and cussing at them
21    and calling them whatever this and that, and you give a
22    write-up.  Where's my write-up?  I got three days.  Why
23    did I get three days?
24 Q  What did Scott tell you the reason that he couldn't
25    give Scott Genzler more discipline was?

Page 24

1  A  He said that he already was disciplined one time by
2     Carrie and he can't override Carrie.
3  Q  Is that accurate under the union contract?
4  A  No --
5     MS. CALEM:  Objection to the form.
6  BY MS. POCHOP:
7  Q  You can answer.
8  A  No, I don't think -- yeah, because he's in human
9     resource.  Because anything else goes on, Scott, he
10    disciplines or he over -- he over -- he overrides that.
11    Because the incident that happened here with them is
12    that Sala had an incident down there and she got three
13    days because some girl over there threatened to kill
14    her and -- threatened to kill her and do this and was
15    calling her old or something like that, and then Sala
16    called her ugly.  Right?  And then she got three days.
17    And she wanted to report it to HR.  Like, how you going
18    to get three days and you report it to somebody?  But
19    the other girl got three days too.  Don't get me wrong,
20    though.  But you threaten to kill somebody, you still
21    got a job, but you got three days because y'all two are
22    arguing, so they both have three days.
23    MS. POCHOP:  I don't have any more questions, Tom.
24    THE WITNESS:  Okay.
25    MS. CALEM:  Neither do I.