*Sala Naambwe and Yvette Nimenya v.*
*Smithfield Foods, Inc.*

BJ Motley
May 30, 2018



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*


paramount reporting

Min-U-Script® with Word Index

**App. Tab**

**L**

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

BJ Motley  
May 30, 2018

Page 5

1  harder.
2  A  Okay.
3  Q  So if I'm giving you the hand -- or you can give me the
4     hand too -- so, to just wait for each other to finish.
5        The second one is to make sure that we give verbal
6     answers.  A lot of times we do an uh-huh and we know
7     while we're sitting here exactly what it means, but
8     when it gets transcribed, it's really hard to tell the
9     difference whether that was a positive or a negative.
10       And then, finally, it's important to remember that
11    your testimony here today is under oath just as if we
12    were in a courtroom, and my main thing is if I -- I'm
13    not the type of lawyer that does try to ask questions
14    that are intentionally confusing, but a lot of my
15    questions are.  My mouth gets going faster than my
16    brain and vice versa.  So if I ask you a question that
17    you don't understand, please let me know.  I'll try to
18    rephrase it or reask it, and I want to make sure to
19    give you the time so that you can have as accurate of
20    an answer as possible today.
21       Can you tell me what you did to prepare for your
22    deposition today?
23  A  Nothing, really.
24  Q  Did you look at any documents that you have there --
25  A  No.

Page 6

1  Q  -- at your office or anything like that?
2  A  No.
3  Q  Did you talk to anybody at Smithfield Foods or
4     John Morrell or within the union about this case?
5  A  Today or --
6  Q  Just to get ready for the deposition.
7  A  No.  I was just informed by the HR director that I was
8     having one.
9  Q  Okay.  Well, I'd like to find out just a little bit
10    about your background.
11 A  Okay.
12 Q  I'm not trying to pry.  It's just, basically, so I can
13    get some context about what -- where you're from and
14    how you became involved in the union out at Smithfield
15    Foods.
16       But let's start with some really basic stuff.  If
17    you could say -- what is your full name?  Is it BJ?
18 A  BJ Motley.
19 Q  Is that short for something or --
20 A  No.  My legal name.
21 Q  And how old are you?
22 A  54.
23 Q  Your education background?
24 A  Graduated from University of Sioux Falls in 1988.
25 Q  With a degree in what?

Page 7

1  A  Bachelor's, health and physical education.
2  Q  How about a thumbnail history of your work history?
3  A  Well, after leaving that, I was maintenance manager at
4     Younkers out in the Empire Mall.  Then after that I
5     came down to John Morrell & Company, actually in 1989,
6     but I had to get eye surgery, so I left there for about
7     a year and came back in 1990.
8  Q  Can you describe for me, basically, how you progressed
9     through the John Morrell positions that you have held
10    over the -- since 1990?
11 A  Well, after a couple years of starting there, I became
12    a union steward.  Was a union steward for about
13    22 years.  Then I ran and was elected to the
14    secretary-treasurer position.  Did that for three
15    years.  Then after that I ran and was elected and now
16    president of the UFCW Local 304 union.
17 Q  That's what I was going to ask you to make sure I knew
18    exactly what union.
19       And so in terms of what your -- are you still
20    actively working at Smithfield Foods, or is your union
21    position --
22 A  My union position is my --
23 Q  Full-time --
24 A  -- full-time -- right.
25 Q  Okay.  And in terms of what your current job duties are

Page 8

1     with the union, could you give me an idea of --
2  A  Well, I'm basically a representative of the members
3     down -- well, the workers down at Smithfield Foods.  So
4     I hear their case and then, you know, offer solutions
5     or -- you know, or concerns they might have, then, you
6     know, I help them out and stuff like that.
7  Q  And because we've really just taken Sala and Yvette's
8     deposition, I'm going to ask you to do a little bit of
9     heavy lifting in terms of just plant hierarchy and even
10    the physical layout.
11       So your union office is not on the main campus
12    where, like, department 19 works; is that accurate?
13 A  No, we're in a separate building.
14 Q  Is it near the facility, or do people have to drive to
15    get over to visit with you?
16 A  Yeah.  I'd say within a mile, 2 miles maybe.
17 Q  Is there a way that people can contact union
18    representatives --
19 A  Oh, yeah, we have phone numbers that they can, you
20    know, contact us at any time.  You know, usually we're
21    down there, you know, inside the plant also.  So we're
22    always available, you know, for the workers if they
23    need us.
24 Q  How many representatives of the union are there at
25    Smithfield Foods?

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

BJ Motley
May 30, 2018

Page 9

1  A  Well, there's myself and our secretary-treasurer, and
2     we have two business agents, a day shift and a night
3     shift, business agents.
4  Q  In 2016, who would have been filling those positions
5     along with you?
6  A  Well, 2016, would be -- 2016, I think the day shift
7     business agent at that time was Rick Stokke, and the
8     night shift business agent at that time I think was
9     Ian Strum. But, in the day shift, usually Rick Stokke
10    would have been filling that position in 2016.
11 Q  Was there a Tom Anderson?
12 A  He's an employee down there, and he's a union steward.
13    So we do have union stewards inside the plant itself.
14    Basically, in every department there's a union steward
15    and that union steward represent the workers in that
16    department and in that area, but they're not subject to
17    just one department, because if an employee asks for a
18    certain person to represent them, they're allowed to do
19    that.
20       So, yeah, we have union stewards in every
21    department.
22 Q  How many departments are there at Smithfield Foods?
23 A  Offhand, I couldn't tell you, but we have a few
24    departments there.
25 Q  Is the union steward person, is that an elected

Page 10

1     position, or do you --
2  A  Yes. Pretty much, yeah. They get elected by the
3     members in their department.
4  Q  Within the union, how does that chain of reporting go
5     between the stewards and the union officers?
6  A  Well, usually a worker will go to their steward if they
7     got a issue or concern, and usually the steward will
8     try to resolve that in the department, but if they
9     can't resolve that in the department, then they will go
10    to a business agent.
11       And then the business agent will either try to
12    resolve that in the department or, if they can't, they
13    file what they call a grievance, and then, with that
14    grievance, they come and we just, say, have a
15    conference with me, and I have a consult with my
16    business agent, and then, you know, we turn the
17    grievance in, and then we go from -- that's step one
18    where, you know, we initiate with the company itself.
19 Q  This might be a good time to mark --
20    (Exhibit 27 is marked for identification.)
21 BY MS. POCHOP:
22 Q  BJ, I'm having you take a look at what has been marked
23    Exhibit 27. Is this a document that you recognize?
24 A  It's a copy of our contract.
25 Q  And this is the union's contract with Smithfield Foods?

Page 11

1  A  This is what's been negotiated between the union and
2     the company.
3  Q  How often is the contract negotiated?
4  A  Every four years.
5  Q  So would this contract have been in effect during 2016?
6     It looks like it was --
7  A  Probably not exactly this one, because we just ratified
8     a contract in 2017. So...
9  Q  Okay. Have you had any material changes in terms of
10    your discrimination --
11 A  No, none of that really hasn't changed with those
12    articles at all.
13 Q  How about discipline and grievance policies?
14 A  No. All that's the same.
15 Q  Well, let's take a look at page 4 of Exhibit 27. This
16    is the discrimination and harassment policy that was
17    negotiated with the company.
18       Is this a policy that you are familiar with as a
19    union officer?
20 A  Yes.
21 Q  Do you have to use this policy very often? Is it
22    something that you refer to in the regular course of
23    your --
24 A  Yeah, I'm sure it gets used a lot.
25 Q  How long have you been a union officer?

Page 12

1  A  A union officer consider usually six years -- well,
2     it'd be four years, actually.
3  Q  During that four-year term have you had any race
4     discrimination claims besides Sala's and Yvette's claim
5     that you've been involved with?
6  A  Oh, yeah. I've dealt with a few discrimination and
7     harassment.
8  Q  How about retaliation?
9  A  Yeah. Workplace violence.
10 Q  Do you know -- I mean, can you give me an estimated
11    number of how many claims you've had to evaluate under
12    your discrimination and harassment policy?
13 A  Filed or just people coming in?
14 Q  Let's start with filed.
15 A  Right offhand, I couldn't tell you how many we filed,
16    but it's been, you know, quite a few.
17 Q  When we say quite a few, are we talking 50?
18 A  Oh, just say --
19 Q  And it's not a quiz on numbers.
20 A  Oh, okay.
21 Q  An estimate is fine.
22 A  I was going to say, we deal with it probably about
23    every week, but just say 10 or so a month.
24 Q  Okay. And those are harassment or discrimination
25    complaints that are filed by the union?

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

BJ Motley  
May 30, 2018

Page 13

1  A  Pretty much combined, you know, because with the
2     discrimination you also get harassment along with that,
3     so it's all, you know, considered one.
4  Q  The contract states that the company will not tolerate
5     harassment of any kind, including sexual, racial,
6     religious, or union status within the workplace.
7        Do you think that Smithfield Foods tolerates
8     harassment in its workplace despite its contract
9     language?
10 A  Yes.
11       MS. CALEM: Objection. I'm just making my
12    objection for the record.
13 BY MS. POCHOP:
14 Q  Go ahead. Let's wait for the plane too.
15 A  Now, personally, I don't think they go by what the
16    contract states.
17 Q  And can you tell me why you feel that way?
18 A  Because it seem like when we file a complaint just,
19    say, workers compared to management, the company seem
20    to take management's side over employee/worker. They
21    seem to be at a different, I don't know, level than,
22    you know, workers. When, in fact, Smithfield say they
23    consider Smithfield as one, everybody, you know,
24    subject to the same rules, but I don't feel that
25    everybody's subject to the same rules.

Page 14

1  Q  Do you think that they do tolerate race discrimination
2     in the Smithfield workplace?
3        MS. CALEM: Objection.
4        THE WITNESS: Yeah.
5  BY MS. POCHOP:
6  Q  Have you personally observed that?
7  A  Yeah.
8  Q  Can you give me an example outside of the case that
9     we're here about today?
10 A  Well, let me see if I can find a good one.
11 Q  How many are we talking about? I mean, are you talking
12    about hundreds of them that you're thinking through
13    or --
14 A  Well, there's been a few over the years I've worked
15    there where a worker would have a complaint about, you
16    know, discrimination or harassment or something like
17    that towards a manager and nothing, you know, is ever,
18    you know, subject -- any discipline towards that
19    manager, whereas a manager can just come down and say
20    this employee, you know, did something simple, and they
21    will get terminated or a suspension for something, you
22    know, related to the same case. So...
23 Q  Are we talking about racial or --
24 A  Oh, yeah.
25 Q  So if I'm -- and correct me. I just want to make sure

Page 15

1     I'm understanding your testimony.
2        You have personally observed that managers
3     discriminate or harass employees based on race and,
4     when the employee complains, nothing happens to the
5     manager?
6  A  Right.
7  Q  But if a manager complains about an employee, the
8     employee can even be terminated?
9        MS. CALEM: Objection.
10       THE WITNESS: Right.
11 BY MS. POCHOP:
12 Q  I mean, is it arbitrary? Does it depend on who the
13    manager is? Or is that just kind of across the board?
14       MS. CALEM: Objection.
15       THE WITNESS: Probably across the board, because
16    you got to understand that Smithfield is like -- in our
17    plant just, say, basically 95 percent diversified,
18    whereas the managers are about 95 percent Caucasian.
19    So -- and that's a dilemma right there itself. There's
20    a lot of -- you know, it just -- you know, a lot of
21    times the manager, in my personal view, you know, just
22    treat their workers differently because of where
23    they're from.
24 BY MS. POCHOP:
25 Q  Have you been involved with any sort of successful

Page 16

1     resolution of any discrimination claims during your
2     union service?
3  A  Not that I can recall.
4  Q  Never?
5  A  It's always in favor of the company.
6  Q  Okay. If you'd look on page 4 of Exhibit 27, in
7     subsection 16, in addition to saying that the company
8     will not tolerate harassment of any kind, it says that
9     an employee who thinks that they are a victim of
10    harassment should notify the plant affirmative action
11    officer.
12       Do you work regularly with the plant affirmative
13    action officer?
14 A  Actually, I really don't know who they have designated
15    as a, you know -- from what I was understanding, her
16    name's Monica, but I don't know if she's HR or
17    affirmative action, so -- because she does both. So I
18    can't really say that I have.
19 Q  You don't even really know today who the affirmative
20    action officer is?
21 A  No.
22 Q  The policy also states that all inquiries will be held
23    in the utmost confidence and the matter will be
24    investigated and dealt with expeditiously, except in
25    cases involving grievances where the company agrees to

Page 17

1  share appropriate information with the union.
2      Does the company follow that part of its contract
3  with its union members?
4  A  Yeah, with grievances. Yeah, we do the grievances
5      according to what's outlined.
6  Q  Do they hold their inquiries -- well, first of all, do
7      they investigate claims of race discrimination when the
8      union brings them to the company's attention?
9      MS. CALEM: Objection.
10     THE WITNESS: They say to us they do, but we can't
11     be for sure that they do the investigation, you know,
12     because we don't be with them when they do their own
13     investigation. So we just have to go by what
14     information that they give us.
15 BY MS. POCHOP:
16 Q  Do you believe they actually do an investigation?
17     MS. CALEM: Objection.
18     THE WITNESS: Not as thoroughly, but it is subject
19     to their discretion. So...
20 BY MS. POCHOP:
21 Q  Do you think that they hold their inquiries into
22     harassment claims in the utmost confidence --
23     MS. CALEM: Objection.
24 BY MS. POCHOP:
25 Q  -- as required by the contract?

Page 18

1      MS. CALEM: Objection.
2      THE WITNESS: Can you --
3  BY MS. POCHOP:
4  Q  Do you know what it means when the contract says that
5      they're going to hold all inquiries in the utmost
6      confidence?
7  A  I can say they don't.
8      MS. CALEM: Objection.
9  BY MS. POCHOP:
10 Q  Do you know what the company does to make sure that the
11     matter is investigated and dealt with expeditiously?
12 A  No, I don't think they get disciplined like they
13     should.
14     MS. CALEM: Objection. That is not responsive to
15     the question at all.
16 BY MS. POCHOP:
17 Q  The next policy I wanted to have you look at -- or
18     contractual term I wanted to have you look at is over
19     here on page 26, talking about discipline.
20     Do you participate in any of the company training
21     on its ethics policies or its discrimination policies?
22 A  No.
23 Q  Do you know what -- if they do training on their
24     policies and procedures when it comes to
25     discrimination?

Page 19

1  A  The HR director say that they do classes or training
2      for the managers on discrimination and harassment.
3  Q  Have you ever been invited to participate in any of
4      their trainings for managers?
5  A  No, I haven't.
6  Q  When it comes to -- if you could, just describe for me,
7      BJ, how the disciplinary policy is supposed to work for
8      union members. If a union member is going to be
9      disciplined --
10 A  Uh-huh.
11 Q  -- let's say for using profanity -- let's just use that
12     as a hypothetical -- can you describe for me how the
13     company policy is supposed to work for union members?
14     MS. CALEM: Objection.
15     THE WITNESS: Well, the policy supposed -- if a
16     person get accused of something, you know, like just,
17     say, for swearing or whatever, insubordination, you
18     know, the discipline is that the manager brings the
19     employee forward and then the employee will probably
20     call a union representative, and then they talk it over
21     and try to decide if it's, you know, a warning, a
22     different -- like a suspension or something like -- you
23     know, like I said, a suspension or written warning or a
24     write-up or something like that.
25     You know, but most likely, like I say, you know,

Page 20

1      with the discipline part, we've had people -- workers
2      use, just, say, profanity, and it's not like everybody
3      gets subject to the same discipline. We've had some
4      that get written warnings or -- well, warnings. We
5      have some get suspended. We've had some get, you know,
6      maybe even termination. So...
7  BY MS. POCHOP:
8  Q  What's the difference, to your knowledge?
9  A  Well, I think a profanity word is a profanity word no
10     matter what, you know, you say, you know.
11 Q  Is there a different standard if you are a person of
12     color and you use profanity?
13 A  I think so.
14 Q  And what is the difference?
15     MS. CALEM: Objection.
16     THE WITNESS: Well, there should be no difference,
17     but you can see it, you know, where, like I say, a
18     worker can use a profanity word and they get harshly
19     disciplined, whereas a manager can use the same word
20     and nothing, you know.
21 BY MS. POCHOP:
22 Q  Do you think that people of color get disciplined
23     differently than workers who are Caucasian?
24 A  Yes --
25     MS. CALEM: Objection.

Page 21

1      THE WITNESS: -- I do.
2          MS. CALEM: You have to wait and pause so I can
3      object. Okay, BJ?
4          MS. POCHOP: You get to answer. She gets to --
5          THE WITNESS: Well, when I'm answering, they jump
6      in, so how do I know to separate the two?
7          MS. POCHOP: We'll try to do a little bit better.
8  BY MS. POCHOP:
9  Q   So tell me why you believe that workers of color get
10     disciplined more harshly than workers who are
11     Caucasian? I'm not talking about managers, I'm just
12     talking about similarly situated employees.
13         You can go.
14 A   Okay. Because I think that -- like I said, being that
15     the company is 95 percent diversified, a lot of people
16     that come over here don't understand the ways of, you
17     know, just, say, the United States, and I feel that
18     they get mistreated because they think if somebody say,
19     you do this, you do that, you have to do it, because,
20     like I said, their jobs are their livelihood. So
21     they're going to do whatever, just, say, a authority
22     figure, say to them, and the authority figure say,
23     okay, I got a person, say, maybe that probably don't
24     understand what I say, but if I tell you to do this,
25     you do it.

Page 22

1          So I think they use that as an intimidation tactic
2      towards employees for different, you know,
3      nationalities or whatever that can't understand, you
4      know, the true, I don't know, values or -- you know,
5      they just, I think, get violated because their
6      understanding is not quite the same as just, say, an
7      American, or whatever, or a Caucasian.
8  Q   And is this based on your personal observation?
9  A   No, I think it's fact.
10 Q   Did you, yourself -- when you were working in the
11     plant, did you experience racial discrimination?
12 A   Yes, I have.
13 Q   Can you tell me about it?
14 A   Well, when I first started, you know, just, you know --
15     you know, you hear the language, you know. You know,
16     I've been called the "N" word, you know, a few times
17     down there during my early years at Smithfield.
18 Q   Did you report it?
19 A   No, because, you know, I don't feel like nothing would
20     have been done about it, so -- that's how I feel a lot
21     of them do. They feel like, you know, nothing's going
22     to come out of it, so they just put their head down and
23     don't say anything.
24 Q   Are there times when union members tell you about being
25     subject to racial slurs --

Page 23

1  A   Yeah.
2  Q   -- and you encourage them to report and they don't?
3  A   I always encourage them to report it. That way we can
4      get documentation on, you know, this when it happens.
5  Q   In your experience, is Smithfield fostering a culture
6      that permits racial discrimination among its workers
7      and its managers?
8          MS. CALEM: Objection. You're asking him his
9      personal opinion?
10         MS. POCHOP: Yes.
11         THE WITNESS: Can you --
12 BY MS. POCHOP:
13 Q   Sure. That wasn't a very easy question.
14         In your experience, do you think Smithfield Foods
15     has a culture of tolerating racial discrimination?
16         MS. CALEM: Objection.
17         THE WITNESS: I just think they don't, you know,
18     put forth, or whatever, what they, you know, put out in
19     the, you know, policies or whatever. I don't think the
20     guidelines that they put out, that they follow.
21 BY MS. POCHOP:
22 Q   Their policies are more on paper than in action?
23         MS. CALEM: Objection.
24         THE WITNESS: Right, than they actually implement
25     or whatever.

Page 24

1  BY MS. POCHOP:
2  Q   In terms of how the grievance procedure in general is
3      supposed to run, on Exhibit 27, page 27, there's a
4      grievance procedure, but I was wondering if you could
5      explain to me in reality how it really works when
6      somebody wants to make a -- when a union member wants
7      to make a grievance about racial discrimination.
8  A   Well, like I say, they bring the complaint -- I guess
9      they can start from the union steward. You know, when
10     they come to the union steward, they file a complaint.
11     Then the steward file a complaint with the business
12     agent. Then we file a grievance. Then we present it
13     first, you know, to the manager. They can either give
14     an answer on it where they, you know, settle it or
15     don't. But after that, you know, then they go to -- we
16     have a grievance meeting with the second step, and then
17     we follow that with -- if we can't get it solved in the
18     second step, we move on to the third step.
19 Q   What's -- who's available or participates in the second
20     step from Smithfield?
21 A   The second step, it's the assistant HR director.
22 Q   And who is that?
23 A   Her name's Carrie Moate.
24 Q   And what does a second step grievance consist of?
25 A   Well, we try to explain to them, you know, whether the

Page 25

1  write-up or discipline is warranted, you know, and we
2  try to find ways to either reduce what the discipline
3  is or try to remove it completely.
4  Q  And how do you go about trying to reduce or remove a
5     disciplinary action?
6  A  Well, we go through our investigation, and then the
7     company go through their investigation, but sometimes
8     our investigation show that it shouldn't -- that the
9     discipline that they, I guess, give the employee is not
10    warranted, like, from what their investigation might
11    present.  Sometimes the investigations are different.
12 Q  What does a union investigation -- how is that
13    conducted?
14 A  Well, talking to the employees, trying to get witnesses
15    to the incident that happened, you know.
16 Q  At Smithfield Foods, do people participate in the union
17    investigations into racial discrimination?
18 A  Yeah, we bring witnesses down, you know, to tell what
19    they saw, what they heard.
20 Q  Are employees generally willing to do that, in your
21    experience?
22 A  On the most part, yes, but some feel intimidated for --
23    you know, thinking if they come down and they speak,
24    they might have a chance of being retaliated against
25    or -- you know.  Some of them feel threatened to come

Page 26

1  down.
2  Q  In your experience, do you think that that's a
3     reasonable concern for employees about retaliation?
4        MS. CALEM:  Objection.
5        THE WITNESS:  Yeah, because, you know, I don't
6     think a person should feel, you know, intimidated or
7     threatened that if they say something, they might
8     jeopardize losing their job.
9  BY MS. POCHOP:
10 Q  Are you aware of people who you believe have been
11    subject to retaliation for their participation in
12    racial discrimination --
13 A  Yeah.
14 Q  -- investigations?
15       MS. CALEM:  Objection.
16       THE WITNESS:  Yeah, I witness it.
17 BY MS. POCHOP:
18 Q  Can you tell me how frequently you think that occurs?
19       MS. CALEM:  Objection.
20       THE WITNESS:  I'm sure a lot, you know.  Like I
21    say, you know, that's why a lot of them -- workers
22    don't come down, because they know once they go back to
23    their department, you know, they probably going to be
24    subject to maybe a retaliation from their manager.
25

Page 27

1  BY MS. POCHOP:
2  Q  What types of retaliation have you been aware of from
3     managers after an employee participates in an
4     investigation or making a complaint of racial
5     discrimination?
6  A  Well, I've heard some that say that after they just go
7     back on the line, the manager might stand behind them
8     and stare at them, you know, and stuff like -- little
9     stuff like that, or always watching and that, you know.
10 Q  Do people complain of disciplinary action as a
11    retaliation?
12       MS. CALEM:  Objection.
13       THE WITNESS:  You have a few, you know, that it
14    seem like they get targeted after, you know, they just
15    initiate a complaint, you know, and, I don't know,
16    weeks later they might get subject to another
17    discipline.  It's just, you know, like a cycle, and
18    a lot of them get targeted and -- you know.
19 BY MS. POCHOP:
20 Q  When you say targeted, can you describe for me what you
21    mean by employees who are targeted after they make a
22    race discrimination complaint?
23 A  Well, a lot of times once a worker just, say, complain
24    about a manager or whatever, that manager -- what I
25    mean by targeting, they try to find something on the

Page 28

1  employee or try to watch them and try to catch them at
2  any little thing they would do to try and maybe
3  progress the discipline so they can be either suspended
4  or terminated to get them out.  So -- they call it a
5  problem, so they get rid of a problem.
6  Q  Have you, yourself, ever felt that you were subject to
7     retaliation for your participation in objecting to race
8     discrimination in the workplace?
9        MS. CALEM:  Objection.
10       THE WITNESS:  Myself?
11 BY MS. POCHOP:
12 Q  Yes.
13 A  As to the beginning of my --
14 Q  Yeah.  For any participation in objecting to race
15    discrimination in any role.
16       MS. CALEM:  Objection.
17       THE WITNESS:  You mean, did I feel like I been
18    retaliated against me?
19 BY MS. POCHOP:
20 Q  Yes, you.
21 A  Not that I can think of right now.
22 Q  Okay.  Are there any particular managers at Smithfield
23    Foods that you think are prone to retaliating against
24    employees who complain of race discrimination?
25       MS. CALEM:  Objection.

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

BJ Motley  
May 30, 2018

Page 29

1       THE WITNESS: Yes.
2   BY MS. POCHOP:
3   Q   Can you tell me who those are?
4       MS. CALEM: Objection.
5       THE WITNESS: Names?
6   BY MS. POCHOP:
7   Q   Yes.
8   A   Dennis Hamm, Dave DeBoer --
9       MS. CALEM: I'm sorry. Dave who?
10      THE WITNESS: DeBoer.
11      A guy, Charles Tomlin I think is his name, and he
12      has a brother Brian Tomlin. Got a guy, Matt Frieberg.
13      I think her name's Kristen Cress.
14      MS. CALEM: Kristen what?
15      THE WITNESS: Cress.
16  BY MS. POCHOP:
17  Q   K-r-e-s-s?
18  A   C-r-e-s-s, I think.
19  Q   Okay.
20  A   I think Russ Altman [sic], Gary Loger. There's a few.
21      I just can't think of them all, but...
22  Q   And for each one of those managers, you can think of at
23      least one time when they have retaliated against an
24      employee who complained of race discrimination?
25      MS. CALEM: Objection.

Page 30

1       THE WITNESS: To be honest, I think all.
2   BY MS. POCHOP:
3   Q   Okay. For example, Dennis Hamm, can you tell me what
4       kind of retaliation you think Dennis Hamm has carried
5       out for an employee who was objecting to race
6       discrimination in the workplace?
7       MS. CALEM: And so we're talking specifically
8       about an objection to race discrimination?
9       MS. POCHOP: Yes.
10      THE WITNESS: I guess right offhand I can't, but I
11      know on one occasion he came after me at one point
12      because of a job that I was doing, and I don't know
13      that -- I didn't really want to do it anymore, and I
14      think he came after me in that way and tried to find
15      something on me to, you know, discipline me in a way,
16      and he called me in the office, you know, and he -- you
17      know.
18  BY MS. POCHOP:
19  Q   How about Dave DeBoer? Why is he on your list of
20      people who retaliate?
21  A   Because of some of the workers that's complained about,
22      you know, how he represent hisself towards them or how
23      he comes at them.
24  Q   Like what kind of complaints do they have, targeting
25      or --

Page 31

1       MS. CALEM: Objection.
2       THE WITNESS: You know, the yelling and screaming
3       and, you know, having tantrums and -- you know.
4   BY MS. POCHOP:
5   Q   Charles Tomlin?
6   A   Like I said, I just get these complaints from the
7       people where they say that stuff happens, but I can't
8       be specific on, you know, exactly what, you know.
9   Q   And Brian Tomlin?
10  A   The same, you know.
11  Q   Matt Frieberg, why is he on your list of managers who
12      retaliate?
13  A   Because some, you know, people come ask, you know,
14      maybe -- try to ask a question or whatever, and they
15      just like, to me, belittle the people, you know, by --
16      I guess it's hard to explain how, you know, people get
17      treated because, like I say, of their nationalities or
18      whatever. They talk to them like they're, you know --
19      I guess I can't really explain it, but...
20  Q   I'm sorry to press you on it, but I do need to
21      understand why you think that these managers treat
22      people who object to race discrimination differently
23      than other employees.
24  A   Well, I just think they just go towards people that --
25      you know, you can see it. You know, just, say, a

Page 32

1       person of color, they will go to them more harshly than
2       they do to a person that's, you know, not of color or
3       whatever.
4   Q   In the course of your investigation, how do you
5       determine whether they're getting the same type of
6       discipline as a similarly situated employee?
7       MS. CALEM: Objection.
8       Go ahead.
9       THE WITNESS: Well, sometimes because of the
10      write-up disciplines they get. You know, just, say, if
11      a person get discipline, you know, they write down what
12      they're being disciplined for. Some get disciplined
13      differently, I think, compared to, you know, other ones
14      getting disciplined not in the same way. I don't think
15      a lot of time it's consistent.
16  BY MS. POCHOP:
17  Q   I want to come back to that, the way that you address
18      inconsistency, but I want to find out -- like Kristen
19      Cress, why is she a manager that's on your list of
20      managers --
21  A   Because of the people in her department, she get
22      complaints, you know, a lot. You know, just like one
23      occasion, you know, where an employee might have just,
24      say, let a certain amount of just, say, pigs get by
25      that shouldn't have got by that's gotten disciplined

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

BJ Motley  
May 30, 2018

### Page 33

1  or, you know, maybe terminated, whereas she's did the  
2  same thing and nothing was done to her.  
3  Q  Russ Hultman?  
4  A  Oh, like I say, from complaints about, you know, his  
5     actions in his department.  
6  Q  Have there been more than Sala and Yvette who had  
7     complaints about Russ being retaliatory?  
8  A  Not that I can think of right offhand. So...  
9  Q  How about Gary Loger?  
10 A  Yeah, same with him, complaints about him.  
11 Q  Anybody besides Sala or Yvette that you can think of?  
12 A  Not that I can think of offhand, by names anyway.  
13 Q  For any of these managers that you identify as  
14    retaliating against employees who raise discrimination  
15    complaints, have you made the company aware of the  
16    union's belief that this manager is retaliating?  
17        MS. CALEM: Objection. There's a lack of  
18    foundation. He could not identify any manager who  
19    discriminated based on retaliation complaints.  
20        THE WITNESS: Yes, I feel that the company -- you  
21    know, I've made it aware of the complaints about these  
22    managers and others, and I don't think the company, you  
23    know, really takes it seriously. So...  
24 BY MS. POCHOP:  
25 Q  Have any of your complaints about managers who you feel  

### Page 34

1  are, first of all, discriminating based on race ever  
2  been addressed in the employee's favor when you raise  
3  those issues with Smithfield Foods?  
4        MS. CALEM: Objection.  
5        THE WITNESS: Nothing ever goes in the employee's  
6     favor.  
7  BY MS. POCHOP:  
8  Q  Never?  
9  A  Not that I've witnessed.  
10 Q  And the same question, these managers that you  
11    identified by name that engage in what you perceive as  
12    retaliatory behavior towards employees who object to  
13    discrimination, when you have raised those issues with  
14    Smithfield management, has there ever been any  
15    disciplinary action against any of these managers?  
16       MS. CALEM: Same objection.  
17       THE WITNESS: No.  
18       MS. CALEM: There's absolutely no foundation for  
19    this question.  
20 BY MS. POCHOP:  
21 Q  As a union representative, would you know, would you be  
22    informed if these managers were being disciplined for a  
23    complaint that you had raised on behalf of a union  
24    member?  
25 A  Can you repeat that?  

### Page 35

1  Q  Sure. I mean, you would be contacting Smithfield Foods  
2     for a union member, to represent them if there is a  
3     complaint of discrimination or retaliation that is  
4     brought to you, correct?  
5  A  From the employee?  
6  Q  Yes.  
7  A  Yes, they let me know.  
8  Q  Okay. And once they do that and you become involved,  
9     do you remain involved with Smithfield Foods  
10    management --  
11 A  Yes.  
12 Q  -- for the resolution?  
13 A  I investigate to find out the facts, and then when I  
14    find out, I approach the HR, you know, and we go from  
15    there.  
16 Q  When you go from there, does HR tell you what the  
17    resolution of your report and complaint is?  
18 A  Well, they say they will investigate it and then they  
19    will let me know, I guess, their answer on the  
20    investigation that they come to.  
21 Q  As we sit here today, BJ, can you think of any race  
22    discrimination claim that you have ever brought to  
23    Smithfield management that they have found in the  
24    employee's favor?  
25       MS. CALEM: Objection.  

### Page 36

1        THE WITNESS: That the employee was --  
2  BY MS. POCHOP:  
3  Q  The employee.  
4  A  -- discriminated against or --  
5  Q  Yeah, that the employee was discriminated against.  
6  A  And that they brought forward to me and nothing was  
7     really done?  
8  Q  Yeah.  
9  A  Yeah.  
10 Q  Okay. And as we sit here today, can you think of any  
11    specific instance where you thought, well, that was the  
12    resolution that we were asking for on behalf of the  
13    union member?  
14       MS. CALEM: Objection.  
15       THE WITNESS: In favor of the employee?  
16 BY MS. POCHOP:  
17 Q  Yes.  
18 A  No.  
19 Q  You also deal with sexual harassment complaints for  
20    union members?  
21 A  Yeah, we've had some of those.  
22 Q  Does the company have a similar approach to having a  
23    policy that prohibits sexual harassment but a practice  
24    that allows it, in your opinion?  
25       MS. CALEM: Objection.

Sala Naambwe and Yvette Nimenya v.  
Smithfield Foods, Inc.

BJ Motley  
May 30, 2018

### Page 61

1   have -- grievance or grievances would have been.  
2 A  I think -- from what I can think is that when he went  
3   over to the department to represent Sala and he felt  
4   that the other steward wasn't doing his job, that he  
5   said a profane word and he was disciplined for that. I  
6   think he got a three-day suspension for that, and I  
7   don't think it was -- he should have gotten a three-day  
8   suspension just for a one word, you know, a profanity,  
9   what he said.  
10 Q  Are you aware of other employees or managers who have  
11   said the same word and not been subject to discipline?  
12 A  Yeah.  
13 Q  Do you know what the outcome of Tom Anderson's  
14   grievance was?  
15 A  It wasn't -- he didn't -- it was negative. They  
16   didn't -- it wasn't in his favor.  
17   MS. POCHOP: I'm going to mark this here as 31.  
18   (Exhibit 31 is marked for identification.)  
19   MS. POCHOP: I'll mark this at the same time.  
20   (Exhibit 32 is marked for identification.)  
21   MS. CALEM: Is this 32?  
22   MS. POCHOP: Yeah. 31 and 32.  
23 BY MS. POCHOP:  
24 Q  I've presented you with what I've had marked as  
25   Exhibit 31, which are copies of two warning notices  

### Page 62

1   issued to Sala --  
2   MS. CALEM: Oh, they're both Exhibit 31?  
3   MS. POCHOP: No.  
4   MS. CALEM: Oh, okay. Got it.  
5 BY MS. POCHOP:  
6 Q  There's two --  
7   MS. CALEM: All right. Sorry.  
8 BY MS. POCHOP:  
9 Q  -- two warnings on the same date issued to Sala on  
10   December 8, 2016.  
11 A  Right.  
12 Q  The first is a seven-day suspension for excessive  
13   absenteeism. Is that consistent with company policy,  
14   to issue a seven-day suspension for absenteeism?  
15 A  Well, for absenteeism, but I don't think it was  
16   progressive because she got two in the same day, and  
17   she was brought down for the issue of abusive language.  
18 Q  Okay.  
19 A  And then if you're going to discipline for that issue,  
20   you shouldn't go down a person's record and also  
21   discipline for another, you know, issue in the same  
22   time. I don't think it was -- should have been given.  
23 Q  Abusive language, combative behavior, failure to  
24   cooperate.  
25 A  And all this prospired [sic] by she -- of her opinion  

### Page 63

1   of a manager. By me saying that I feel that my manager  
2   was racist, why would I be suspended for my, you know,  
3   right to -- or my opinion?  
4 Q  Then if we look at Exhibit 32, you filed a grievance on  
5   her behalf?  
6 A  Because I -- to me, that's a violation of your first  
7   amendment, you know, what you can say. You know, you  
8   subject to speak, you know, your -- whatever you feel,  
9   and I don't think, you know, it was right to be  
10   disciplined for speaking, you know, what you feel  
11   that -- you know, by saying the word racist, you know,  
12   that you feel that, that's your opinion.  
13 Q  In comparison to other disciplinary actions that you  
14   have seen as a union representative, was that a  
15   proportionate discipline that she received?  
16   MS. CALEM: Objection. There's no foundation.  
17   You're not talking about any other disciplinary  
18   actions.  
19   THE WITNESS: No. She should have never received  
20   that by just saying -- giving her opinion.  
21 BY MS. POCHOP:  
22 Q  And your request was to remove the write-ups and  
23   reevaluate the discipline process?  
24 A  Yeah.  
25 Q  What do you mean about reeval -- what were you  

### Page 64

1   requesting there in terms of reevaluating the  
2   discipline process?  
3 A  Well, how a person's opinion can lead to two  
4   disciplines, you know, which resulted of being on your  
5   record a three-day suspension and a seven-day  
6   suspension and, after that, termination. A person's  
7   job is in jeopardy, you know, because of their opinion.  
8 Q  How many employee disciplinary actions do you think  
9   that you have reviewed over your course of tenure as a  
10   union representative?  
11 A  How many grievances?  
12 Q  Disciplinary actions.  
13 A  Numerous, you know. I deal with that every day.  
14 Q  I mean, are we talking 50 or a hundred or a thousand  
15   or --  
16 A  Yeah, every day, you know, so -- couldn't put a number  
17   on it because you can get 10 in a day, 5 in a day or --  
18   you know.  
19 Q  Have you ever seen anybody disciplined in the same way  
20   that Sala was disciplined as we see here in Exhibit 31?  
21 A  No.  
22 Q  Did you express that to Smithfield HR when you filed  
23   this grievance?  
24 A  Yeah, I feel that she was being targeted.  
25 Q  And do you know why she was being targeted?

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

BJ Motley
May 30, 2018

Page 65

1  A  I don't know. I couldn't answer that, you know.
2  Q  The supervisor's first step answer was, it looks like,
3     "Denied," according to Exhibit 32?
4  A  That's always a common practice.
5  Q  And it was submitted to second step on the same day it
6     was denied, but the rest of the form is blank in terms
7     of what happened to her grievance after that.
8     Do you have any recollection?
9  A  I can't recall.
10 Q  Would it normally be completed here if --
11 A  No. You go -- like I said, next step would be second
12    step grievance meeting, and then we would push it to
13    third step if we don't get it settled in the second
14    step. So...
15 Q  The next thing that -- at least according to Smithfield
16    records that it looks like happened with Sala at work
17    was that she was investigated and disciplined for
18    taking a photo of another employee.
19    Do you know of any other employees who have been
20    disciplined at Smithfield for taking pictures of other
21    employees at work?
22 A  I can't recall.
23 Q  Is there a policy that prohibits employees from having
24    their iPads or cell phones at work?
25 A  Yes, you can't have it in a working area.

Page 66

1  Q  So if an employee had his iPad in a working area, would
2     that employee also be violating the company policy?
3  A  Yes.
4  Q  Would that be the same sort of discipline as having
5     your phone out and taking a picture?
6  A  I would say so, electronics.
7     MS. CALEM: Objection.
8  BY MS. POCHOP:
9  Q  Do employees -- despite the policy, do employees carry
10    their cell phones and electronics into work areas at
11    Smithfield, as far as you know?
12    MS. CALEM: Objection.
13    THE WITNESS: I can't -- you know.
14 BY MS. POCHOP:
15 Q  You don't know?
16 A  I can't say one way or the other, but -- you know.
17    (Exhibit 33 is marked for identification.)
18    THE WITNESS: (Examines document.)
19 BY MS. POCHOP:
20 Q  So it looks like on July 18 of 2017, Sala was
21    continuing to come to the union office with complaints
22    about how she was being treated --
23 A  Right.
24 Q  -- in her department, and you filed another grievance
25    on her behalf?

Page 67

1  A  Right.
2  Q  And this one was because she felt threatened and
3     stressed that Russ Hultman came up to her and poked her
4     and said, "What are you going to do now that your
5     partner is gone?" And you were requesting a reprimand,
6     issue same discipline as other Smithfield employees.
7     Can you tell me what your request for --
8  A  Well, I can kind of remember this issue, that he came
9     up and poked her, and I presented it to the HR, and the
10    manager admitted that he did this, and then HR, from
11    what I'm -- my understanding, HR investigated and that
12    he disciplined this manager. But I know personally
13    that if it was an hourly, that hourly would have been
14    terminated.
15 Q  Okay. And how do you know that?
16 A  Because I've seen it.
17 Q  So after the investigation in the first step, do you
18    recall what happened to this manager for a violation
19    of --
20 A  I don't know what discipline the company issued to
21    their management, but it was replied that he was
22    disciplined. But, you know, like I said, it's their
23    word.
24 Q  And in terms of the violation, was the violation poking
25    her or the comment or both? What was the basis for --

Page 68

1  A  Well, like the policy say, zero tolerance, you know,
2     and, to me, that can be considered as violence, you
3     know.
4  Q  And has something like an employee coming up and poking
5     another employee been treated by management as a threat
6     of violence?
7  A  And been fired, terminated.
8  Q  And so with regard to Exhibit 33, you don't really know
9     what the outcome --
10 A  No, I don't know what his discipline would have been.
11 Q  Do you recall -- here, I'll ask you to take a look at
12    this.
13    (Exhibit 34 is marked for identification.)
14    THE WITNESS: (Examines document.)
15 BY MS. POCHOP:
16 Q  Exhibit 34 is an email from you to Scott Reed regarding
17    inappropriate behavior, and it's about Russ spraying
18    some employees in September of 2017.
19    Do you remember this incident?
20 A  Yes, I remember this. He said that he lifted a hose
21    and sprayed -- I don't know how many it was, but with a
22    hose, and all of them witnessed and said that happened.
23 Q  And then this Exhibit 34 references a sexual assault by
24    walking behind her and rubbing against her.
25 A  Yes, that's what's reported, that she said he walked

Page 69

1  behind her and rubbed up against her with his genitals.
2  Q  And you said Abegail witnessed this. How did you know
3  that Abegail witnessed that?
4  A  Because that's what was, you know, said to me, that she
5  witnessed it.
6  Q  Did Abegail say that or did Sala say that?
7  A  I can't recall which one said it, but...
8  Q  You say, "Enough is enough." What -- what --
9  A  Well, because you get these complaints about just, say,
10  the same person over and over, you know, when is it
11  enough to know that that person may be not a right fit
12  in the company, you know? When they have these
13  policies and rules and not following them, you know,
14  it's -- you know, when is enough going to be enough?
15  Q  Were there other people besides Sala who had complaints
16  about Russ Hultman?
17  A  I can't recall.
18  Q  So tell me what you can recall about the resolution of
19  your -- is this -- basically, is this Exhibit 34, would
20  that be enough to constitute a grievance?
21  A  Yeah, I would think so.
22  Q  Can you tell me what you can recall about the
23  resolution of that grievance?
24  A  From this incident?
25  Q  Yes.

Page 70

1  A  I don't think nothing was ever done about it.
2  Q  And as the person who was bringing it to management's
3  attention, would policy and procedure be for them to
4  notify you about the resolution of the problem that
5  you -- the complaint that you were making in
6  Exhibit 34?
7      MS. CALEM: Objection.
8      THE WITNESS: Of this -- of the employees bringing
9  this to me?
10  BY MS. POCHOP:
11  Q  Yeah.
12  A  Yeah, they should.
13  Q  In 2008 -- well, I wanted to ask you, is it permitted
14  under company policy for employees to bring food or eat
15  food in the work areas?
16  A  No, you can't have that stuff in the work area.
17  Q  Do employees have food in the work areas in practice?
18  A  No, you're not allowed to have food in the production
19  area.
20  Q  Did you have anything to -- were you involved in any
21  way with Amanda Avila, A-v-i-l-a, complaining about
22  Sala taking her photo at work?
23  A  No, I can't recall that.
24      (Exhibits 35-36 are marked for identification.)
25      THE WITNESS: (Examines documents.)

Page 71

1  BY MS. POCHOP:
2  Q  Now that you've had an opportunity to review
3  Exhibit 35 -- we're here in 2018, so it's a little more
4  recent.
5      Do you recall what led you to write an email to
6  Scott Reed on January 12, 2018, about yet another
7  grievance for Sala where there's a similar case with
8  her coworker and no reprimand?
9      MS. CALEM: Did you say January?
10     MS. POCHOP: January 12, 2018.
11     THE WITNESS: Like I say, I just feel like she was
12  being targeted. So...
13  BY MS. POCHOP:
14  Q  Do you remember which --
15  A  I don't --
16  Q  Do you remember which --
17  A  -- know what this was referring to.
18  Q  It says, "The union feels Sala is being targeted
19  because of a pending suit she has against the company."
20  A  Right.
21  Q  What was the basis of your opinion that she was being
22  targeted because of her lawsuit? Is that this present
23  lawsuit?
24  A  Yes. I just feel -- in that incident, I just think
25  that instead of just actually maybe just, say,

Page 72

1  terminate her, they was targeting her in ways to try to
2  get her and get her stressed out or frustrated that
3  she'd just quit.
4  Q  Is that -- have you seen the company do that to other
5  employees before?
6      MS. CALEM: Objection.
7      THE WITNESS: I can't recall.
8  BY MS. POCHOP:
9  Q  Did anybody from the company ever talk to you about
10  Sala's lawsuit for discrimination and retaliation?
11  A  Has it been discussed at the company?
12  Q  Yeah.
13  A  Yeah.
14  Q  In what context?
15  A  Just that it was, you know, a lawsuit pending to the
16  company.
17  Q  Did anybody in management express frustration about
18  Sala having brought that lawsuit?
19  A  Not that I'm aware of.
20  Q  Or how about Yvette?
21  A  No.
22  Q  So you indicate, "Furthermore, the manager in which she
23  had troubles with keeps coming into the work area, in
24  my opinion, to intimidate Sala."
25      Which manager are we talking about?

Page 73

1  A  I think that would be Russ Alt -- Russ Hultman, or
2     whatever.
3  Q  And why did you think he was coming back in the area to
4     intimidate her?
5  A  Because, to me, I felt like -- just like, I don't know
6     if you can say bully, but a person that can come in and
7     say, hey, I'm still here, you know, no matter what you
8     say or what you do, I'm still going to be here, you
9     know, like throwing it in your face.
10 Q  Did you think that that was different treatment than
11    Sala would have received if she would have been showing
12    up where Russ was working?
13        MS. CALEM: Objection.
14 BY MS. POCHOP:
15 Q  You can answer.
16 A  No. I just -- I think it was just -- it's different.
17 Q  It says, "I understand your point about management can
18    go in other areas, but why escalate the already tension
19    that dwells in the department."
20    What --
21 A  To me, that's an intimidation tactic.
22 Q  Did you and Scott have a discussion that you thought it
23    was intimidation?
24 A  Yeah.
25 Q  Did you talk about the fact that you thought -- with

Page 74

1     Scott, that you thought it was about her lawsuit?
2  A  No, I didn't mention no lawsuit.
3  Q  What was Scott's response to you when you said, I think
4     she's being targeted because of her pending suit?
5  A  I can't recall.
6  Q  Do you know what the resolution of this -- did this
7     email that you sent here in Exhibit 35 constitute a
8     grievance?
9  A  I'm sure it's part of the same grievance or one of the
10    other grievances. So...
11 Q  If I could ask you to look at what has been marked as
12    Exhibit 36. Here Sala is just receiving a --
13 A  Verbal warning.
14 Q  -- verbal warning. In terms of how disciplinary action
15    affects an employee, when you get a file that has a lot
16    of disciplinary warnings in it, what does that mean for
17    the employee in terms of their future with the company?
18        MS. CALEM: Objection.
19        THE WITNESS: Warnings?
20 BY MS. POCHOP:
21 Q  Yeah. How do they affect an employee's --
22 A  It just goes on their work record and stays for, you
23    know, two years.
24 Q  And does it affect an employee's ability to advance to
25    a different pay grade?

Page 75

1        MS. CALEM: Objection.
2        THE WITNESS: No.
3  BY MS. POCHOP:
4  Q  Does it -- I mean, what's the purpose of having
5     warnings then?
6  A  Well, like I say --
7        MS. CALEM: Objection.
8        THE WITNESS: -- it goes toward your record, and
9     it stays on your record for two years. So...
10 BY MS. POCHOP:
11 Q  If you get too many of them, what happens?
12 A  Well, it's a progression. If you get -- you know, you
13    go from verbal to written to suspension to termination.
14 Q  In terms of getting a verbal warning for having a
15    camera on a phone in the plant, was this a reasonable
16    disciplinary action or warning?
17        MS. CALEM: Objection.
18        THE WITNESS: Yeah, because the policy say you
19    don't suppose to have that in, you know, working areas.
20    So, yeah.
21    (Exhibits 37-38 are marked for identification.)
22        THE WITNESS: (Examines documents.)
23        MS. POCHOP: You know, I think I'll also mark this
24    at the same time.
25    (Exhibits 39-40 are marked for identification.)

Page 76

1        THE WITNESS: (Examines documents.)
2  BY MS. POCHOP:
3  Q  With regard to Exhibit 37, do you know if this is
4     another -- 37 and 38 are both employee warning notices
5     that were issued to Sala in March of 2018.
6        Do you know if there was a grievance filed by the
7     union on Sala's behalf with regard to these
8     disciplinary actions?
9  A  Yes. As far as I know, there was a grievance filed for
10    this.
11 Q  Is it common for an employee to be sent home until an
12    investigation is complete?
13 A  Yes.
14 Q  And in terms of -- so if both -- do you know if both
15    employees were sent home?
16 A  Yes, I think so.
17 Q  And so that would be consistent with what would
18    normally happen with a complaint?
19 A  During an investigation, yeah, people have been sent
20    home.
21 Q  And Exhibit 38, Sala is issued a three-day suspension
22    for profane and abusive language.
23 A  I don't think that should have been a warning or
24    three-day suspension. That was just two employees
25    speaking to each other, and it was one word against

Sala Naambwe and Yvette Nimenya v.
Smithfield Foods, Inc.

BJ Motley
May 30, 2018

### Page 77

```
 1    another word, and I think -- my solution would have
 2    been just to speak with those two employees to say
 3    knock it off, if this happens again, you know, you will
 4    be disciplined, you know, maybe written or verbal
 5    warning, but not warrant a three-day suspension.
 6  Q  Did this warning that we see here in Exhibit 38, is
 7    this disproportionate compared to other employee
 8    disciplines that you've seen for similar behavior?
 9  A  Right.  Yes.
10       MS. CALEM: Objection.
11       THE WITNESS: For a three-day, yeah, that was --
12    that was excessive.
13  BY MS. POCHOP:
14  Q  What was the management response to your grievance for
15    Sala regarding the March 2018 disciplinary actions?
16  A  Of this one?
17  Q  Yeah.
18  A  What was their response?
19  Q  Yeah.
20  A  It wasn't in favor of the employee.
21  Q  Okay.  And then the last one I'd like to have you take
22    a look at is Exhibit 40, which is a grievance filed by
23    Yvette Nimenya.
24       Were you involved in this complaint at all?
25  A  Not that I recall.
```

### Page 78

```
 1  Q  So some other union representative --
 2  A  Right.
 3  Q  -- was involved in that?
 4       Have you been involved in any grievances or
 5    complaints for Yvette?
 6  A  Not that I recall.
 7  Q  Is there a way that Smithfield has to evaluate an
 8    employee's performance?
 9  A  Is it a --
10  Q  Like, do they do a performance evaluation so employees
11    know if they're meeting expectations or --
12  A  Well, early on in probationary periods they do
13    evaluations.
14  Q  And that's the only time?
15  A  As far as I know.
16  Q  Do you believe Sala is being treated differently at
17    Smithfield because of her race?
18       MS. CALEM: Objection.
19       THE WITNESS: Yes, I do.
20  BY MS. POCHOP:
21  Q  Do you believe that Sala is being subject to
22    retaliatory treatment because she's complained about
23    racial discrimination and sexual harassment?
24       MS. CALEM: Objection.
25       THE WITNESS: Yes, I do.
```

### Page 79

```
 1  BY MS. POCHOP:
 2  Q  And what is the basis for your belief that she's being
 3    subject to retaliation?
 4  A  Well, because all the progression is of these
 5    write-ups, you know, and I feel that she's being
 6    targeted.
 7       MS. POCHOP: I think I'm done.
 8       MS. CALEM: Well, we have at least another two
 9    hours because I have questions about every single bit
10    of his testimony.  Do you want to take a short break?
11       MS. POCHOP: Sure.
12       MS. CALEM: And you probably have to push back the
13    other people.
14       (Recess taken from 11:57 a.m. to 12:14 p.m.)
15            EXAMINATION
16  BY MS. CALEM:
17  Q  So, BJ, I have a number of questions to ask you about
18    pretty much every single thing that you've said.
19       So how many years did you work for Smithfield
20    before taking up a full-time position with the union?
21  A  How many what?
22  Q  How many years did you work for Smithfield before you
23    took a full-time position with the union?
24  A  Like I say, I've been there -- on record, this will be
25    my 28th year.
```

### Page 80

```
 1  Q  28 years.  Well, you paint a pretty horrible picture of
 2    the place.  Why were you there 28 years if it was so
 3    horrible?
 4  A  Because I needed employment.
 5  Q  That's the only employment you could find?
 6  A  That pays well, yeah.
 7  Q  Did you look for other employment while you were
 8    employed for Smithfield?
 9  A  No.
10  Q  You said you were called the "N" word.  Did you report
11    that to human resources?
12  A  No.
13  Q  Did you file a grievance about it?
14  A  No.  Like I said, it was during my early years when I
15    was down there.
16  Q  So you did not do --
17  A  No.
18  Q  -- anything about that?
19  A  Because why?  That was my choice, wasn't it?
20  Q  It certainly is your choice, but would you agree that
21    the company can't do anything about incidents like that
22    if people don't report them?
23  A  Right.
24  Q  Isn't that what you tell people?
25  A  Yeah, I tell people to report it.  That's their choice
```