UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SALA NAAMBWE and YVETTE NIMENYA, | CIV 17-4123 |
| Plaintiffs, | |
| vs. | MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT |
| SMITHFIELD FOODS, INC. | |
| Defendant. | |

Plaintiffs Sala Naambwe ("Sala") and Yvette Nimenya ("Yvette") sued their employer, Smithfield Foods, Inc. ("Smithfield") alleging claims of race discrimination and retaliation in violation of Title VII. Smithfield moves for summary judgment on both claims, Doc. 30, and Plaintiffs oppose the motion, Doc. 46. For the reasons explained below, this Court denies Smithfield's motion for summary judgment in part and grants it in part.

## FACTS

Smithfield filed a Statement of Undisputed Facts, Doc. 32, and Plaintiffs responded, Doc. 44. This Court takes the facts in the light most favorable to Plaintiffs, as the non-moving parties, and draws the facts primarily from the undisputed portion of Defendant's Statement of Undisputed Facts and Plaintiffs' Supplemental Statement of Material Facts, Doc. 45, where supported by the record.

### A. Background

Smithfield owns a pork processing plant in Sioux Falls, where Nimenya and Naambwe have worked since 2011 and 2013, respectively. Nimenya originally is from Rwanda, and Naambwe originally is from the Democratic Republic of Congo.

Since 2014, both Plaintiffs have worked on the day shift in Department 19, Smoked Meats. The 52 day shift workers in Department 19 perform tasks on five different production lines, on which hams are packaged into casings, hung on "trees" (stands), and sent to the smokehouse or deli department.

Separately, not on a moving production line, Department 19 also processes ribs and other meats designated for Arby's and other customers. The ribs and meat pieces come to the department in large vats. Employees use hooks to remove the meat pieces from the vats, place them on a table, and hang them on trees. Once hung, the meat is taken for further processing or distribution.

In 2016 and 2017, Gary Loger and Russ Hultman were the two supervisors in Department 19. The supervisors reported to David Hillberg, Operations Manager.

Hourly employees at the plant are members of United Food and Commercial Workers Local 304A. Employees may bid for open positions, which are posted in the plant; if they are awarded the position, they "own" that job. Employees who do not have "bid" jobs are considered to be on "open work" – they are assigned to temporarily vacant positions in their departments as needed.

Nimenya has always had a bid job on the "Honey Line". Naambwe was on open work until late 2017. On the Honey Line, workers prepare hams to be placed into nets (called "socks"). The socks are placed on a "horn" and opened wide enough for the ham to slide in. The sock is then clipped.

Since 2010, the Human Resources Department ("HR") at the plant has been headed by Scott Reed, Human Resources Director. Among Reed's direct reports are two Human Resources Managers, Carrie Moate and Monica Derby. Reed has overall responsibility at the plant for promoting compliance with, and providing guidance and education on, Smithfield's anti-discrimination and anti-retaliation policies. There is no dispute that at the start of Plaintiffs' employment, both signed forms acknowledging their receipt of the employee handbook, the Code of Conduct, and training relating to sexual harassment.

**B. Genzler Incident**

On February 19 or 20, 2016, a co-worker of Plaintiffs' named Scott Genzler made reprehensible, racist comments to them and to another co-worker named Lorena Morales while they all worked on the Honey Line. No supervisor was present at the time. Genzler was angry at Nimenya

and Naambwe and said, "Bitch, open the fucking socks like this" as he tried to tell them to do something. Genzler said, "If you don't want to work a job, you have to go back to your fucking country Africa." Naambwe and Nimenya were visibly frightened and started to talk and pray with each other in Swahili. Genzler then told them, "Stop speaking fucking – your language, speak fucking English." Naambwe responded that it was a free country and she could speak whatever language she wanted. In response, Genzler started pushing the hams to Naambwe and Morales too fast. One of the hams glanced Morales on the hip and another fell on Naambwe's toes. As their shift finally ended, Naambwe heard Genzler telling co-workers that he had done it because of "these two monkeys," referring to Naambwe and Nimenya. Naambwe was upset about the comment and promptly told the union steward about the incident that day. The union steward said he would pass the incident on to the supervisor.

The next day, Russ Hultman, the supervisor, called Naambwe, Nimenya, Morales, Genzler, and union stewards Tom Zuraff and Tom Anderson into his office to discuss the incident. Naambwe and Morales explained what they had experienced the day before. Hultman asked Genzler if their description was true, and Genzler said it was. Hultman said then that the matter needed to go to HR on Monday.

When their shift started on Monday morning, Hultman did not say anything about the incident. During their first scheduled morning break, Naambwe, Nimenya and Morales went to the Human Resources Department ("HR"). They did not tell Hultman they were going to HR. In the HR office, the three women asked an HR staff member for a complaint form. Morales began filling it out because she was the most fluent in writing in English. Morales clearly wrote that the women were reporting "racist/bulling[sic]/ harassment [sic]" and had started to describe Genzler's behavior. The three women were still in HR when break ended and production started up again, and because of their absence the line was idle for a period of time. Hultman learned the women were in Human Resources, and went there to instruct them to return to the line.

Hultman saw HR manager Carrie Moate who was on her way out the door. Hultman told Moate that the women were there because Genzler had called them "bitches." Hultman did not tell

Moate about the meeting on Saturday when Genzler had admitted to swearing and using racial slurs toward the women. Before Morales could complete the form, Carrie Moate and Hultman appeared and Moate hollered at the women. According to Plaintiffs, they were angry and said, "You guys came down here because to – because of reporting, somebody reporting this – you know, this incident. Is that the reason you came here? You left the line without anybody." Moate did not ask them why they were at HR or look at the form they were completing. Hultman told Moate that he thought the issue had been resolved on Saturday. The three women each received a written disciplinary warning. This disciplinary action was recommended by HR. The warnings were for not being back at their work stations after break. Morales, Naambwe and Nimenya were in compliance with the Smithfield policy when they had gone to report discrimination at HR during their break. Genzler had not been disciplined when Hultman issued the disciplinary actions against the three women. When they got back to work, Genzler was laughing at Naambwe and Nimenya for getting disciplined for trying to report him. Later that day, after Hultman emailed Moate an explanation of the entire incident, Moate instructed Hultman that Genzler needed to be disciplined too. Hultman issued a disciplinary action to Genzler. Genzler later apologized for his behavior.

**C. Investigation by Human Resources**

The following Thursday, Scott Reed, the Director of Human Resources, learned of these events from a union representative, Tom Anderson. After learning about it, Reed did the following:

- Met with Hultman and Moate, and had Moate prepare a written summary of events.

- Met with Naambwe and Genzler to independently investigate the incident, and reviewed all notes and emails relating to the incident.

- Called a meeting with the Union's president, secretary-treasurer and business agent, along with Hultman's managers, and proposed that Genzler be suspended. The Union pushed back on this, arguing that Genzler could not be disciplined twice for the same offense.

- Reviewed Genzler's file and approved the recommendation of the plant manager and safety leadership to remove Genzler from a plant safety committee (the PIT Committee) comprised of managers and hourly employees.

- Instructed Hultman to cancel the verbal warnings issued to the three women and report back to him once he had notified the women that the warnings had been canceled. Hultman did so.

- Reviewed with Hultman his (Reed's) and the company's expectations regarding the importance of reporting incidents fully, completely and on a timely basis, and reinforced the importance of respectful workplace communications among employees.

- Reviewed with Moate the importance of obtaining all relevant information prior to making recommendations for disciplinary action.

**D. Hostile Work Environment**

According to both Plaintiffs and Morales, they never again experienced any other racial slurs like Genzler's from Genzler or anyone else, but they allege additional discriminatory conduct by superiors at Smithfield beginning with the handling of their initial complaint. In addition, Plaintiff Naambwe points to two specific incidents of hostility from supervisor Hultman after the Genzler incident in February 2016.

First, Naambwe cites an incident where Hultman tapped her on the shoulder and asked her, "What are you going to do now that your partner is gone?" Hultman was referring to Tom Anderson, a union representative and person of color whom Hultman mistakenly believed to have bid out of the department. (Tom Anderson was an advocate for Plaintiffs during the Genzler incident.) Naambwe filed a union grievance on July 21, 2017, based on this occurrence. Reed took immediate action on this complaint. Hultman admitted to the conduct, saying he knew it was a mistake the minute he said it, and expressing regret. Hultman received a three-day suspension and a letter of warning. Naambwe's grievance was resolved in her favor at the first step. Naambwe was out on leave during the second half of July 2017, but when she returned, Reed and Operations Manager Garney Henle met with her to explain the disciplinary action that had been taken against Hultman, and to assure her they agreed that Hultman's conduct was inappropriate. Hultman extended an apology to Naambwe through Reed and Henle.

Second, in September 2017, Naambwe accused Hultman of intentionally spraying her with water and then pressing his body against hers. On the day in question, Hultman reportedly was in a rush to fix the Honey Line, which had broken down. Naambwe and other employees were working on another line in close proximity to the broken Honey Line. Hultman testified that he accidentally indirectly sprayed Naambwe and one other employee (Abegail David) when he was hosing off the

5

Honey Line. He did not apologize for this, which annoyed both women. Later the same day, as Hultman continued to work to get the Honey Line back in action, he squeezed through a narrow space where Naambwe was standing without saying "excuse me." Naambwe complained that Hultman intentionally "ground himself" into her "booty" when he passed by. Naambwe's complaint was investigated. It was determined that Hultman sprayed the women with water accidentally and indirectly, and impolitely did not apologize. Naambwe's allegation that Hultman ground himself against her could not be corroborated; he firmly denied it, and Ms. David said that she had not seen Hultman do so. Hultman was sent for additional management training after this incident.

**E. Retaliation**

Plaintiffs allege that, following their complaint of harassment, they suffered the following kinds of retaliation: (1) the disciplinary actions when they were off the line to report Genzler's harassment; (2) work assignments with more physically demanding duties; (3) Naambwe's assignment to work with a co-worker she previously reported for sexual harassment (4) Naambwe's suspension in December 2016. The disciplinary actions for being off line to report the Genzler incident were discussed above. The other three incidents of alleged retaliation are discussed below.

1. Plaintiffs' Assignments to Harsher Physical Duties

Plaintiffs allege that, following their report of the Genzler incident, lead employee Lisa Christion (a non-supervisor) retaliated against them by assigning them to work alone on the production process for Arby's/ribs when normally two or more people perform that task together. Prior to this time they had never been assigned to these less desirable job duties, nor had they ever seen anyone do them alone.[1]

---

[1] Naambwe filed a union grievance in which she protested her assignment to this job on August 22, 2016. An investigation was completed and a meeting was held with Naambwe where she was assured she was not being singled out and urged to bring any further concerns to human resources or the union.

Nimenya testified that this has happened to her on three occasions, the most recent in May 2018, but she never made a formal complaint to HR or filed a Union grievance about the issue. (Doc 31 at 9). This is appears to be Nimenya's only example of alleged retaliatory conduct.

## 2. Naambwe's Assignment to Work with an Alleged Sexual Harasser

In December 2014, Naambwe complained about a coworker, Juan Ogaldez, making a sexual gesture (pointing at his penis). Naambwe alleges that, as a result of her complaint, she was told she and Ogaldez would not have to work together and that they would be assigned to different lines in the department. Smithfield denies this and says Naambwe and Ogaldez were told they might have to work together but that supervisors would try to keep them separate. In any event, Naambwe says she did not work near Ogaldez ever again until after her EEOC mediation session in March of 2017, when the supervisors began giving Naambwe work assignments in close proximity to Ogaldez.

## 3. Naambwe's December 2016 Suspension

On a Wednesday in December 2016, Morales' bid job was temporarily unavailable and the union contract allowed her to pick an "open" job. Morales picked Naambwe's job. When Naambwe's supervisor, Loger, tried to reassign her to a different job an argument ensued. There was yelling and a work delay. Reed investigated the incident. Naambwe testified that Loger was swearing and yelling at her. She denies calling him a racist during this incident, but admits she said he was harassing her. The next day, Naambwe was suspended for three days for calling Loger a racist. When reviewing her file attendance violations were discovered, so she also received a 7-day suspension for attendance. Plaintiffs contend Naambwe was suspended in retaliation for reporting to Loger and Reed during the investigation that she was being harassed by Loger.

The facts of these incidents will be discussed in more detail, if warranted, below in the legal analysis of Plaintiffs' retaliation claim.

## LEGAL DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of

its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273-74 (8th Cir. 1988). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). All facts presented to the district court by the non-moving party are accepted as true if properly supported by the record. *See Beck v. Skon*, 253 F.3d 330, 332–33 (8th Cir. 2001). Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### A. Hostile Work Environment

Defendants argue that they are entitled to summary judgment on the hostile work environment claim because there was only a "one-time incident of co-worker harassment that undisputedly did not recur." *See* Doc. 49 at 2. Plaintiffs counter that theirs is more than a single incident claim, and that a reasonable jury could conclude that the words and actions of others in the workplace, in addition to Genzler, were because of Plaintiffs' race, and were sufficiently severe or pervasive to present a fact question.

To succeed on a hostile work environment claim, a plaintiff must show that (1) she belongs to a protected group, (2) she was subject to unwelcome harassment, (3) a causal nexus exists between the harassment and the protected group status, (4) the harassment affected a term, condition, or privilege of her employment and (5) the employer knew or should have known of the harassment and failed to properly respond. *Tademe v. St. Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003).

The parties do not dispute that Plaintiffs are members of a protected class and the parties agree that the Genzler incident subjected Plaintiffs to reprehensible comments based on their race. The element that is principally in dispute here is the fourth one, whether the harassment affected a term, condition, or privilege of employment, *i.e.*, whether the harassment is "actionable." The Eighth

Circuit has explained that this element requires a twofold inquiry including both objective and subjective components: it requires a finding that the environment was both one that "a reasonable person would find hostile and one that the victim actually perceived as abusive." *Duncan v. Gen Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002). Determination of whether or not an environment was "objectively hostile" is "a fact-intensive inquiry." *See Moring v. Arkansas Dep't of Correction*, 243 F.3d at 452, 456 (8th Cir. 2001) (citing *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir. 1998)). Although a single offensive utterance or exposure to distasteful conduct ordinarily does not rise to the level of a Title VII violation, *see Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997), there is no "rule of law holding that a single incident can never be sufficiently severe" to constitute a hostile work environment. *Moring*, 243 F.3d at 456. Thus, "[w]hether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076 (8th Cir. 2005). "[N]o single factor is required," and it "is not, and by its nature cannot be, a mathematically precise test." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22–23 (1993).

Here, Plaintiffs admit they never again experienced any other racial slurs like the one in February of 2016 from Genzler. Smithfield focuses on the one isolated incident with Genzler and on Reed's remedial action that ended Genzler's racial slurs, and Smithfield cites cases holding that an employer is not liable for harassment if it takes prompt remedial action that stops the offending conduct. *See, e.g., Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010) ("If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment.").

But Plaintiffs' hostile work environment allegations cast a wider net than the isolated incident involving Genzler. Plaintiffs' allegations include the subsequent conduct by their supervisor, Russ Hultman, and the human resources manager, Carrie Moate, stifling rather than encouraging Plaintiffs' efforts to seek help, shouting at Plaintiffs, and disciplining them instead of the offender (at first), thereby adding to the abusiveness of the environment. It is not clear whether Genzler's

9

conduct ever would have been redressed if Tom Anderson had not stepped in and reported the incident to Reed.

Though Smithfield rejects Plaintiffs' characterization of the facts, at this stage of the proceeding the Court must construe all evidence in the light most favorable to the nonmoving party. Viewed through this lens, Plaintiffs received no help whatsoever from their superiors in their initial attempts to seek redress for or protection from Genzler's racial slurs and threatening behavior. To the contrary, Plaintiffs were further demeaned by the Smithfield managers other than Reed. Instead, a co-worker came to their aid. Looking at the totality of the circumstances, there is sufficient evidence to support a reasonable fact-finder's conclusion that all of the events spurned by the Genzler incident in February 2016 were severe enough to alter the terms and conditions of Plaintiffs' employment. Moreover, there were subsequent episodes of conduct by Plaintiffs' supervisors, including Hultman, that could be viewed to have contributed to a hostile environment at Smithfield. "[A] series of individual episodes of inappropriate behavior eventually can amount to a hostile environment." *Alvarez*, 626 F.3d at 421.

In summary, Plaintiffs produced sufficient evidence to defeat summary judgment on the issue whether conduct at Smithfield was sufficiently severe or pervasive to create a hostile work environment. *See, e.g., Dowd v. United Steelworkers of America*, Local No. 286, 253 F.3d 1093 (8th Cir. 2001) (upholding district court's denial of union's motion for summary judgment on black plaintiffs' hostile work environment claim where there was evidence that white employees who also crossed the union's picket line were not subject to the same intensity of harassment as black employees).

**B. Retaliation**

Smithfield contends that Plaintiffs' protected activities did not result in any adverse employment actions. Plaintiffs believe the evidence is sufficient to demonstrate that, as a result of their complaints about harassment in the workplace, they suffered retaliation in the form of harsher discipline and more difficult work assignments.

A prima facie case of retaliation under § 2000e-3(a) requires a showing that: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered a materially adverse employment action; and (3) the adverse employment action was causally linked to the protected activity. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011).

### 1. Disciplinary Actions for Being Off the Line While Reporting Genzler Incident

Defendants argue the disciplinary actions Plaintiffs and Morales received for not returning to work on time were not retaliatory because Plaintiffs, in fact, violated company policy. Smithfield compares it to the workplace misconduct of the plaintiff in *Alvarez*. In *Alvarez*, after the employer's investigation into the plaintiff's sexual harassment complaint was complete, the plaintiff herself was found to have engaged in sexual harassment, and she was appropriately disciplined for the misconduct. *See Alvarez*, 626 F.3d at 417. Here, Plaintiffs were following Smithfield policy by reporting harassment when they were disciplined. They have presented sufficient evidence to survive summary judgment on the issue whether the disciplinary actions were issued for being off the line, or whether that reason was pretext for retaliation.

### 2. Plaintiffs' Assignments to Harsher Physical Duties

Reassignment of duties may be an adverse employment action even if the new roles are within the same job category. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) The *Burlington Northern* Court observed that

> [a]lmost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee ... from bringing discrimination charges would be to insist that [he or] she spend[s] more time performing the more arduous duties and less time performing those that are easier or more agreeable.

*Id.* at 70–71. Smithfield does not deny that Plaintiffs were assigned to the Arby's job alone; rather, Smithfield says other employees have also been assigned to do the job alone. But the main controversy here is whether the assignments for Plaintiffs were materially adverse to them and linked to their protected activity. Plaintiffs have raised a genuine issue of fact on these issues and thus this retaliation claim survives summary judgment.

### 3. Naambwe's Assignment to Work with an Alleged Sexual Harasser

Smithfield does not deny starting to assign Naambwe to work with the man she accused of sexually harassing her in 2014. Smithfield kept them separated in the workplace until after Plaintiffs' EEOC mediation session in March of 2017, when the supervisors began giving Naambwe work assignments in close proximity to Ogaldez. Although Smithfield denies Naambwe's claims that it promised Naambwe she would never have to work near Ogaldez, Naambwe has raised genuine issues of fact whether this work assignment resulted from her protected activity.

### 4. Naambwe's December 2016 Suspension

Smithfield contends that Naambwe has failed to rebut the legitimate, non-retaliatory reasons that it has put forward for the actions surrounding the December 2016 suspension. The Court agrees that no reasonable fact finder could find, on the record presented, that Naambwe has established that Smithfield's explanations for the suspension are a pretext for retaliation. *Eliserio*, 398 F.3d at 1079–80 (applying the standard for determining whether the plaintiff refuted the defendant's proffered reason with sufficient evidence of pretext).

Specifically, Plaintiffs cannot refute that under the union contract Morales could have displaced any employee on open work whose job she wanted that Wednesday, including Naambwe. Smithfield's evidence shows that, after the incident, Reed interviewed Naambwe, Loger, union steward Tom Zuroff, union steward Tom Anderson, David Hillberg and Yvette Nimenya (who said she did not hear Loger use bad language to Naambwe). Reed concluded from his investigation that Naambwe argued with Loger about giving up her job to Morales and caused a production delay. Reed received corroboration from Zuroff that Naambwe call Loger a "racist." Naambwe must do more than disagree with Smithfield's proffered legitimate reason for her suspension, or show that the reason is arguably a poor one; instead, she must point to some basis for finding that the reason is a pretext for retaliation, which she has not done. Naambwe's contention that she reported harassment to Reed when he interviewed her in connection with the incident is insufficient to generate a material question of fact whether her suspension was in retaliation for protected activity. Therefore, Smithfield is entitled to summary judgment on Plaintiffs' retaliation claim to the extent that it relies on Naambwe's December 2016 suspension.

## CONCLUSION

Plaintiffs have presented genuine issues of material fact to survive summary judgment on their hostile work environment claim. In addition, genuine issues of material fact exist in regard to all retaliation claims with the exception of the claim based on Naambwe's suspension in December 2016. Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment, Doc. 30, is granted in part and denied in part, as follows:

1. The motion is denied as to the hostile work environment claims; and

2. The motion is granted as to the retaliation claim stemming from Naambwe's suspension in December 2016, but denied as to the remainder of the retaliation claims.

Dated this 5th day of October, 2018.

BY THE COURT:

_____
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

By:_____, Deputy
   (SEAL)