UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| SALA NAAMBWE and YVETTE NIMENYA, * | CIV 17-4123 |
| Plaintiffs, * | |
| vs. * | MEMORANDUM OPINION |
| * | AND ORDER WITH |
| JOHN MORRELL & CO. * | FINDINGS OF FACT AND |
| (a subsidiary of SMITHFIELD FOODS, INC.), * | CONCLUSIONS OF LAW |
| Defendant. * | |

* * * * * * * * * * * * * * * * * * * * * * * * ** * * * * * * * * * * * * * * * * *

Plaintiffs Sala Naambwe ("Naambwe") and Yvette Nimenya ("Nimenya") sued their employer, Smithfield Foods, Inc. ("Smithfield") alleging claims of race discrimination and retaliation in violation of Title VII. The Court denied Smithfield's motion for summary judgment on both claims, with the exception of one retaliation allegation stemming from Naambwe's suspension in December of 2016, on which the Court granted summary judgment in favor of Smithfield. (Doc. 80.)

A bench trial began on October 22, 2018. After opening statements were made, counsel for Plaintiffs moved to withdraw because she was dismissed by Plaintiffs after opening statements. The Court granted the motion to withdraw and gave Plaintiffs until January 1, 2019 to hire a new lawyer.

After some continuances Plaintiffs elected to proceed pro se. The Court heard this matter in a bench trial that began on September 24, 2019, and concluded on September 27, 2019. The trial included the testimony of six witnesses on behalf of Plaintiffs and fifteen witnesses on behalf of Smithfield. Six exhibits were admitted into evidence for Plaintiffs, and forty-five exhibits were admitted for Defendant. (Docs. 151, 152.) In addition to live testimony at trial, the parties stipulated to admit the deposition of Dr. William Fuller. (Doc. 85.)

After Plaintiffs presented their evidence, Smithfield moved for judgment on partial findings under Rule 52(c), arguing Plaintiffs failed to present enough evidence to establish they suffered from a hostile work environment, that they suffered adverse action, or that any alleged adverse action was causally related to their engagement in protected activity under Title VII. (Doc. 148; Trial Transcript ("TT") at 249.) The Court took the motion under advisement. (Doc. 157, TT at 297). *See* Fed. R. Civ. P. 52(c) ("The court may, however, decline to render any judgment until the close of the

evidence."). The Court denies Smithfield's motion for judgment on partial findings, and will base its findings and conclusions on all the evidence presented at trial.

A transcript of the trial was ordered.  Smithfield submitted proposed findings of fact and conclusions of law. (Doc. 158.) Plaintiffs filed their objections to the findings and conclusions proposed by Smithfield.[1] (Doc. 160.)

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court enters the following findings of fact and conclusions of law.[2]

## FINDINGS OF FACT

1. Plaintiff Naambwe originally is from the Democratic Republic of the Congo. Plaintiff Nimenya is from Rwanda. Both plaintiffs are residents of Minnehaha County, South Dakota.

2.  Defendant Smithfield Foods, Inc. owns a pork processing plant in Sioux Falls, South Dakota. Nimenya was hired to work at Smithfield  in 2011 and Naambwe was hired in 2013. At all times relevant to this case, both plaintiffs worked in Department 19, Smoked Meat Wash, on which hams are packaged into casings, hung on stands (called "trees") and sent to the smokehouse or deli department. At the time of trial, Plaintiffs were still employed at Smithfield.[3]  Naambwe was a union steward.

---

[1] Plaintiffs were advised they could also file their own Findings of Fact and Conclusions of Law. (Doc. 155.) Some of Plaintiffs' objections amount to proposed findings and conclusions, and they will be considered as such. The Court will not, however, accept or address any of Plaintiffs' findings or conclusions regarding pregnancy discrimination against Nimenya. This claim was not exhausted as it was not included in Nimenya's administrative charge filed with the EEOC, nor was it pled in the Complaint in this case. Federal Rule of Civil Procedure 8(a) requires a complaint to give the defendants "fair notice of the nature and basis of [the plaintiff's] claim." *Wishnatsky v. Rovner*, 433 F.3d 608, 611 (8th Cir. 2006). The first time a pregnancy discrimination claim was alluded to was at trial. After receiving all of the evidence at trial, the Court informed the parties that this is not a pregnancy discrimination case. (TT at 740.) The Court cannot make a finding of pregnancy discrimination based wholly on the fact that Nimenya was pregnant when she worked at the Arby's table. Nor can a finding of pregnancy discrimination be based on Plaintiffs' conclusory allegations in their findings and conclusions.

[2] To the extent that any conclusion of law is more appropriately a finding of fact, it is incorporated by reference as if it was a finding of fact.

[3] On Sunday, April 12, 2020, Smithfield announced that its Sioux Falls, SD facility will remain closed until further notice due to the large number of employees infected with COVID-19.

3.  There are at least five different production lines in Department 19. During the relevant time period, Plaintiffs both worked the day shift on what was known as the "honey line."

4.  Of the 3,600 employees at the Smithfield plant, 3,200 are hourly employees, including Plaintiffs.

5.  United Food and Commercial Workers Local 304A represents the hourly workers at the plant. The collective bargaining agreement, which each employee receives upon hire, contains an anti-discrimination provision.

6.  Employees can bid for permanent positions in the plant, or be placed on "open work." "Open work" employees are assigned to temporarily vacant positions in their departments, as needed, to fill in for employees who are absent or on vacation.

7. At all relevant times, plaintiff Nimenya had a bid job on the "honey line," and plaintiff Naambwe had an open work position in Department 19 until 2017, when she took a bid job on the honey line.

8.  In 2016 and 2017, Gary Loger and Russ Hultman were the two production supervisors on the day shift in Department 19.

9.  In 2016, Mr. Loger and Mr. Hultman reported to David Hillberg, Operations Manager.

10.  At all relevant times, Scott Reed was the Human Resources Director at the Sioux Falls plant. In that capacity, he has overall responsibility for human resources functions, the plant's safety functions, the Health Services department, plant security, and plant environmental issues.

11.  At all relevant times, Carrie Moate was a Human Resources Manager at the Sioux Falls plant. She reported to Mr. Reed.

12.  At all relevant times, Monica Derby was a Human Resources Manager at the Sioux Falls plant. She also reported to Mr. Reed.

13.   The majority of the workforce at the plant come from countries outside the United States. Roughly 20% of the workforce is Caucasian.

14.   Approximately 40 different languages, and around 70 different dialects, are spoken at the Sioux Falls plant.

15.   The company uses telephonic interpreters to communicate with employees who are not fluent in English, and also has a network of interpreters in the plant to assist with work instructions and on the job training.

16.   Both Plaintiffs are paid on an hourly basis.  Each year since the start of their employment, their hourly rate of pay has increased.  It has never decreased.  They have retained their employment benefits such as health insurance throughout their employment.

17.   Smithfield offers the following benefits to its hourly employees:  medical and dental insurance, paid vacation, a 401k plan which the company matches, life insurance, a health coach, a pastor from New Roots Ministry who spends 16-18 hours a week at the facility, breast cancer screenings, PSA screenings, wellness checks on blood sugar and blood pressure, free tax-filing assistance, and tuition reimbursement up to $6,000 per year.

18.   Smithfield has an Employee Handbook, which both plaintiffs received when they started work at the plant (as do all new employees).

19.   The Handbook contains a policy prohibiting discrimination, harassment, and retaliation.

20.   Smithfield also publishes a document called the Smithfield Code of Business Conduct and Ethics ("Code of Conduct"), which it distributes to all employees when they start work.

21.   The Code of Conduct includes policies that prohibit discrimination, harassment, and retaliation.

4

22.  Both plaintiffs signed a form when they started work in which they acknowledged receipt of the Code of Conduct and the Employee Handbook.

23.  The Employee Handbook and the Code of Conduct both explain the procedure for making a complaint about any matter of concern to employees.

24.  One method employees can make a complaint is to go to the Human Resources Department ("HR"), where a complaint form can be filled out.

25.  Another is to call one of the company's hotlines.  Smithfield has a corporate hotline, and the Sioux Falls plant has a local hotline.

26.  The hotline numbers are set forth in the Code of Conduct and the Employee Handbook.

27.  The hotline numbers also are posted on bulletin boards throughout the plant.

28.  The Employee Handbook also has a section that lists the company's work rules, including rules about time and attendance.  The attendance policy is reviewed with employees during orientation.

29.  Smithfield provides training to all new employees on its anti-discrimination and anti-harassment policy. Starting in 2018, the company has provided interpreters for employees during orientation.

30.  Plaintiffs received this training when they started work.

31.  The company provides all its employees annual training on its anti-harassment and anti-discrimination policies, and trains managers on how to respond to complaints about these issues. Witnesses testified to their understanding that the company has a zero-tolerance policy for harassment of any kind.

32.  The subject of respectful conduct in the workplace is discussed at Department 19's safety meetings on a periodic basis.

33.  Since 2018, Mr. Reed has conducted training on respectful workplace conduct for all plant employees, on all shifts.

**GENZLER INCIDENT ON FEBRUARY 19, 2016**

34. On Friday, February 19, 2016, Scott Genzler ("Genzler"), Plaintiffs' co-worker, made race-related comments to them and to another co-worker named Lorena Morales while they all worked on the honey line.  The comments he made to Plaintiffs were:  a statement that the plaintiffs should "speak fucking English" (or similar words); the statement, "Bitch, open the fucking socks like this;" and a statement that the women should "go back to their countries" if they didn't want to work.  In addition, when speaking to other employees, Genzler referred to Plaintiffs as monkeys.

35.  Morales attributed this to Genzler's frustration at the pace the women were working, because he began to get angry and yell "hurry up!"

36.  No supervisor or lead person was present when these comments were made.

37.  Naambwe reported this incident to the union, and a union steward in turn notified one of Plaintiffs' supervisors, Russ Hultman ("Hultman"), about the incident the following day.

38.  Hultman learned about the Genzler incident the day after it took place:  Saturday, February 20, 2016.

39.  Shortly after learning about the incident from union steward Anderson, Hultman called Plaintiffs, Morales, Genzler, and union stewards Thomas Zuraff and Thomas Anderson, into his office, and asked the women to explain fully what had happened.  He asked Genzler if what they reported was true, and Genzler admitted that it was.

40.  The meeting in Hultman's office lasted between 10 and 25 minutes.

41.  Hultman told the group that the matter would have to be taken up with human resources on Monday.  The Human Resources Department was closed on Saturday and Sunday.  They did not schedule a specific time on Monday to go to HR, but Naambwe understood that it would be on Monday morning.

42.  Around the time of the meeting, union steward Anderson told Genzler that the union would not let him get fired for this incident. Anderson thought Genzler should receive a suspension, at most, for the incident.

43. On Monday, February 22, 2016, Plaintiffs and Morales decided to go to HR themselves during their first break in the morning.

44.  They did not speak to Hultman, or any other supervisor, to tell him their plans, nor did they ask if he had already spoken to anyone in human resources. Plaintiffs did not need to get permission to go places in the plant during their breaks, but they needed to be back at the honey line when their break ended.

45.  The three women left without notifying a supervisor that they might be back from break late because they were reporting the incident to HR.

46.  Naambwe told Morales that they had permission to go to HR.

47.  The three women were still in HR when their break ended and the production line was supposed to start.  Because of their absence, the production line was idle for a period of time.

48.  Hultman learned from other employees that Plaintiffs and Morales were in the Human Resources Department, and went to look for them there.

49.  Upon entering the Human Resources Department, Hultman encountered Moate, who was about to leave the office to perform payroll tasks in another building.

50.  Hultman told Moate that he was missing three of his employees, who had not returned from break, and his line had stopped. Moate told Hultman that absent employees could be given a warning for being off the line. Moate testified that, at the time, she did not know who the employees in question were, or that they were in HR.  Nimenya testified that Moate is the person in HR who gave the women a form to fill out after they said they had a complaint about the line.

51.  Hultman and Moate looked into the HR waiting room, and saw the three women there filling out forms.

52.  Moate testified that she did not know any of the women, and did not know why they were in HR filling out forms.

53.  Hultman approached the women and told them they were off the production line without permission, and had to get back to work. The women handed in their forms and returned to work.

54.  Plaintiffs testified that Moate told Hultman to give the women a warning and told them they could not leave the line to report someone. Moate and Hultman deny this. Morales testified that neither Moate nor Hultman yelled at the women in HR. Hultman said he and Moate used a normal tone. Moate testified that Hultman was "a little agitated" that Plaintiffs didn't tell him where they were, but she "wouldn't consider it yelling."  Plaintiffs did not testify at trial that Moate or Hultman yelled at them.

55.  Moate asked Hultman why the three women were in HR, and he responded that it was over an incident the previous day in which another employee had used profanity towards them. Moate told Hultman to be sure that the offending employee is disciplined.

56.  When Naambwe, Nimenya and Morales returned to Department 19, Hultman issued them verbal warnings for not returning to the line on time after their break.

57.  After returning to the department, Hultman wrote Moate an email describing what he had learned about the Genzler incident, including that Genzler had called the Plaintiffs a race-related name and used profanity. He copied his supervisor, Hillberg, whom he had spoken to by phone earlier to let him know of the incident.

58.  Failure to return from break on time is a violation of Work Rules 4 and 13, and the company's time and attendance policy.

59.  The range of discipline for a violation of Work Rule 4 or 13 is a verbal warning through discharge, depending on the employee's prior disciplinary history.

60.  Many other Smithfield employees, of all races and nationalities, have received disciplinary action for not being present at their work stations when production starts.

61.  Nimenya is aware that the company's work rules require her to be at her station on time after her break.

62.  That same day, Hultman also issued Genzler a written warning for his abusive conduct. The warning was for violation of Work Rule 15, which prohibits profane and abusive conduct.

63.  Both Plaintiffs were told that Genzler was disciplined for his conduct.

64.  That afternoon, Moate followed up twice with Hultman and his manager, Hillberg, to ensure that Genzler had been disciplined for this incident.  By 2:30 that afternoon, she was told that Hultman had given Genzler a written warning.

65.  The range of discipline for a violation of Work Rule 15 runs from a verbal warning to termination of employment, depending on the employee's progressive disciplinary history.

66.  Genzler did not have any prior disciplinary history for this type of offense.

67.  Neither HR managers, nor Department 19 managers, had ever seen or heard of Genzler making racist comments before this incident on February 19, 2016.

68.  A written warning is the highest level of discipline that a manager can issue on his own.

69.  Mr. Reed heard about the Genzler incident from union steward Anderson, who thought Genzler should have received a suspension, rather than a written warning.

70.  After he learned about the Genzler incident, Reed held a series of meetings with Naambwe, Genzler, Hultman, Moate and Hillberg.  He told Genzler that his employment could be terminated if there was another incident of this sort.

71.  At Reed's suggestion, Hultman rescinded the verbal warnings he gave to Plaintiffs and Ms. Morales for being off the line when production started on February 22, 2016. The warnings were rescinded by February 29, 2016.

72.  Hultman says he told both Plaintiffs that the verbal warnings had been removed from their records, and documented that meeting in an email to Reed. Anderson, the union steward, was aware the warnings were rescinded.

73.  Reed also met with union representatives James Larson (then-President), B.J. Motley (then-Secretary-Treasurer), and Ian Strum (Business Agent) to discuss the Genzler incident.  Reed proposed giving Genzler additional discipline for this incident.  Mr. Larson testified that the union resisted Reed's proposal, saying it would amount to "double jeopardy."  The union did, however, commit to monitoring the area going forward.

74.  Genzler was removed from his position on a safety committee (the "PIT Committee") as a result of this incident.

75.  On March 4, 2016, Moate met separately with Naambwe, Nimenya and Morales to ask if they were having any other problems with Genzler.  All three women reported that no other objectionable

behavior had occurred.

76.  In March 2016, when Moate followed up with Plaintiffs to ensure that Genzler's conduct had stopped, Plaintiffs told her that supervisor, Gary Loger ("Loger") used bad language and cursed when machines were broken. Prior to that, they had not reported such concerns.

77.  Plaintiffs both testified that Loger cursed at them when they reported that machines on the line were not working, such as, "Get the fuck out of here."  Loger denied this.

78.  Naambwe admitted that, in her deposition, she testified that Loger treats other employees the same way.

79.  Loger's manager did not receive complaints from employees about Loger, and the hourly workers who testified at trial described Loger as a good supervisor who tried to help them.

80.  Loger and Hultman's manager, Steve Fergen, described Loger and Hultman's supervisory styles:

> I would describe them as old school, growing up, you know, in the packinghouse. They all came up through the ranks as hourlies.  They were there for a long time. And they are in that "firm but fair," but maybe a little bit rough around the edges sometimes.

TT at 366.

81.  On March 8, 2016, Department 19 managers (including Hillberg, Operations Manager) spoke to Department 19 at the monthly safety meeting about the importance of respectful conduct in the workplace. Plaintiffs attended this meeting.

82.  On October 4, 2016, Reed gave a presentation at a Department 19 safety meeting about respectful treatment of others in the workplace, which included information about the company's anti-harassment and anti-discrimination policies.  Plaintiffs attended this meeting.

83.  According to Morales, Genzler later apologized for his behavior in front of the department, which included Naambwe and Nimenya.

11

84.  Genzler did not make any racist comments to the Plaintiffs or to Morales ever again.

85.  Other than the Genzler incident, Plaintiffs never reported hearing any racist comments or statements during their employment with Smithfield.

**ARBY'S WORK IN AUGUST OF 2016 (NAAMBWE) AND MARCH OF 2017 (NIMENYA)**

86.  The work in Department 19 includes processing of meat for Arby's.  This work does not take place on a moving production line.  It involves "hooking" ham muscles out of vats (using large or small hooks, depending upon the level of meat in the vat), placing the muscles onto a table, and then hanging the muscles on "trees," or moving stands.  The trees then are moved to the smoke room, where the smoke seasoning is applied.

87.  The production standard for the Arby's work is based on the number of people assigned to the Arby's table.  Sometimes one person does this work alone; usually, several people do the work. A person working alone does not have to work any harder or faster than if he or she was working with a team.

88.  If three people are assigned to the Arby's table, they rotate the different tasks in order to manage the work flow.

89.  Each of the muscles moved from vat to table, and table to tree, weighs about 6 pounds.

90.  The Arby's work is not considered to be strenuous.  Employees on light duty have been assigned to the Arby's table.

91.  Department 19 started to perform the Arby's work in early 2016.

92.  A similar process, involving ribs, started in 2014.  Ribs weigh about 2 to 3 pounds apiece.

93.  In August 2016, Naambwe filed a union grievance complaining that lead employee Lisa Christion assigned her to work alone on the Arby's table on August 22, 2016, when normally two or more

12

people perform that task together. Naambwe did not allege that this occurred because of her race, national origin, or in retaliation for the Genzler incident.

94.  Nimenya alleges that she, too, was assigned to work alone on the Arby's table, the first time in March of 2017.  But, she never complained to HR about these assignments, nor did she file a union grievance.

95.  Naambwe claims she never saw another person working alone on the Arby's table prior to the time she filed an EEOC charge.[4]

96.  According to Department 19's managers, Arby's tasks sometimes are assigned to one person at a time.

97.  More recently, another employee complained to union steward Anderson about having to work alone on the Arby's table.

98.  Other employees in Department 19, of all different races and nationalities, testified at trial that they have worked on the Arby's table alone.

99.  Human Resources Manager Derby led the investigation into Naambwe's August 2016 grievance about the Arby's work assignment.  She conducted interviews together with union representative Motley.  Derby's investigation revealed that employees other than Naambwe have also worked on the Arby's line by themselves.

100.  Derby's investigation also revealed that, on August 22, 2016, the date of the Arby's assignment about which Naambwe complained, Department 19 was short-staffed, and other employees were not sent home substantially earlier than Naambwe was, as Naambwe has claimed.

---

[4]  The Plaintiffs' EEOC complaints were filed on May 23, 2016.

101.  Neither Naambwe nor Nimenya testified at trial as to any particular date on which they were assigned to work alone on the Arby's table, but Naambwe's union grievance indicated that she was assigned to work alone at the Arby's table on August 22, 2016, over seven months after the Genzler incident.

102.  Lisa Christion is a lead employee in Department 19.

103.  Plaintiffs allege that Christion assigned them to work on the Arby's table. Ms. Christion was not involved in the Genzler incident.

104.  Nimenya never heard Christion make a racist statement.  Naambwe did not testify that Christion made any racist statements or behaved improperly to her in any way.

105.  Nimenya does not know of any reason why Christion would treat her differently from other employees.

106.  When Naambwe spoke to Derby about her complaints, she did not attribute the assignment to the Arby's table to race, national origin or retaliation.

107.  Nimenya did not testify that her assignment to work alone on the Arby's table was due to her race, national origin, or to her having engaged in any protected activity.

**NAAMBWE'S WORK WITH ALLEGED SEXUAL HARASSER IN APRIL 2016**

108.  Naambwe had a history with a co-worker named Juan Ogaldez.  In December 2014, Naambwe accused Ogaldez of making a single gesture towards his genitals, which she interpreted as a request that she touch his penis.  She did not claim that Ogaldez made any verbal remark to her, or that he touched her.

109.  Loger conducted an initial investigation of Naambwe's 2014 complaint.  He interviewed witnesses, none of whom corroborated Naambwe's accusation, which Ogaldez denied.

110.   Afterwards, HR conducted a further investigation into Naambwe's allegations. That investigation likewise did not result in corroboration of Naambwe's allegations, which Ogaldez denied.  Ogaldez accused Naambwe of making up the incident to attempt to get him in trouble, and indicated he did not want to work with her anymore.

111.  After December 2014, managers made an effort to accommodate Naambwe's and Ogaldez's mutual preference not to work together, but sometimes staffing levels and available assignments did not allow for that, and they worked on the same line.

112.  In April 2016, the union raised a concern on Naambwe's behalf that Loger had forced Naambwe to work with Juan Ogaldez, a co-worker whom Naambwe had accused of harassing her in 2014. According to Naambwe, in 2014, she was promised that she would never have to work on the same line as Ogaldez.

113.  Reed investigated Naambwe's 2016 complaint that the company had broken a promise to keep her separate from Ogaldez, and reviewed his notes of the December 2014 incident.  He found no evidence of such a promise.

114.  Contemporaneous notes written by Reed in connection with the 2014 investigation make no mention of a promise to keep the two employees apart, but rather state that both employees "need to work together to get the job done."

115.  The union's notes of the meetings relating to the 2014 investigation likewise do not reflect such a promise.

116.  During the 2016 investigation, Naambwe acknowledged that, since the single incident about which she had complained in 2014, Ogaldez had not behaved inappropriately towards her.

117.  As part of the April 2016 investigation, Reed met with Naambwe and Motley to discuss this issue.  Separately, Hillberg met with Naambwe, Motley, Loger, Anderson, Christion, Zuraff and

Hultman to talk about Naambwe's concerns and to stress the need for respectful communications going forward.

118.  Naambwe chose to work on the same line as Ogaldez on at least one occasion in January 2017.

119.  Ogaldez abandoned his job at Smithfield in March 2017 after Naambwe obtained a protection order against him from a state court, in which she asked that he be ordered to stay 100 miles away from her, and in which the court ordered Ogaldez not to come within 1,000 feet of Naambwe.  In her petition for that order, Naambwe referred to the one incident in 2014 as causing distress when she was near Ogaldez at work in 2017.

120.  Neither the managers in Department 19, nor the plant's HR managers, have received any complaints about Ogaldez sexually harassing any employee, other than Naambwe's complaint in 2014.

121.  When Naambwe raised concerns about Ogaldez in 2016, she did not attribute her assignment to work near him to race, national origin, or to retaliation for complaining about the Genzler incident in February 2016.

**NAAMBWE'S COMPLAINTS ABOUT HULTMAN**

Poke on Shoulder Incident in July of 2017

122.  On July 21, 2017, Naambwe filed a union grievance because of an incident in which Hultman poked her on the shoulder and asked her, "What are you going to do now that your partner (or "friend") is gone?"  Naambwe claimed to be very upset about this comment.

123.  Hultman was referring to Anderson, whom he understood had taken a position in another part of the plant.  Though he was the union steward for Department 11, not Department 19, Anderson often advocated on Naambwe's behalf.

124.  Reed investigated this incident, and decided to discipline Hultman for making this comment.

125.  According to Reed, Hultman said he knew the statement was a mistake, that he regretted it the moment he said it, and offered to apologize to Naambwe.

126.  Hultman received a two-day suspension for this incident.

127.  Reed told Naambwe about that disciplinary action in a meeting with her and Garney Henle, Operations Manager.  Henle at that time had supervisory responsibility over Loger and Hultman.  At that meeting, Reed introduced Naambwe to Henle in an effort to encourage her to approach Henle with any complaints or concerns.

128.  When she complained in July of 2017, Naambwe did not indicate that Hultman's poke on the shoulder or comment about Anderson were due to her race, her national origin, or to her filing complaints about the 2016 Genzler incident.

#### Hose Spraying and "Grinding" Incidents in September of 2017

129.  In September 2017, the union complained about Hultman on Naambwe's behalf. Naambwe accused Hultman of intentionally spraying her in the face with water, and then sexually assaulting her by pressing his body against her "booty" when he walked through a tight spot on the line behind her.

130.  Reed investigated this incident by speaking to Naambwe, Hultman, and to a witness to the alleged events, hourly employee Abegail David.  He asked Fergen to assist with this investigation, and to take photographs of the area in which the events took place.

131.  The investigation concluded that Hultman's spraying of Naambwe and David was accidental.

132.  At the time, Naambwe was wearing a helmet, glasses, a plastic coat, rubber boots and earphones.

133.  Both Naambwe and David were annoyed that Hultman did not apologize for this, and both went to HR to talk about it.

134.  After Hultman finished spraying the production table, he walked past Naambwe and David, who were standing in a narrow area alongside a production table.

135.  According to Naambwe, Hultman intentionally pressed against her from behind as he walked by, and ground his genitals against her.

136.  David was standing directly next to Naambwe when Hultman walked by them, and told both Fergen and Reed that she did not see Hultman touch Naambwe, much less press himself against her. David testified at trial that she was standing so close to Naambwe that if Hultman would have touched Naambwe he would have touched her, too, but Hultman did not touch her when he walked by.

137.  David also testified that she and Naambwe went to HR that day to complain that Hultman did not apologize after spraying them with water. It was not until the next day that Naambwe asked David if she saw Hultman touch her, and David responded that she did not.

138.  Hultman was sent home pending the results of the investigation.  Because it was determined that he had not sexually assaulted Naambwe, as she alleged, he did not receive any additional discipline related to this incident.

139.  Shortly afterwards, Hultman transferred to another department on a different floor.

140.  During the investigation of the September 2017 incident, Naambwe did not attribute the water spray, or the alleged sexual assault by Hultman, to animus based on race, national origin, or her complaining about the Genzler incident in February 2016.

<u>Alleged Staring by Hultman After September of 2017</u>

141.  Naambwe alleges that, after Hultman transferred to another department, he returned to Department 19 on occasion and stared at her for as long as 20 minutes at a time. Naambwe did not testify that she complained to HR about Hultman allegedly staring at her.

142.  No other employee corroborated this allegation.

143. Hultman occasionally walked through Department 19 after his transfer for work-related reasons. While he was there, he said hello to some of his friends, including hourly worker Amanda Avila.

144. Naambwe took photographs of Hultman and Avila visiting together, in contravention of company rules. Avila filed a complaint about this with HR.

145. Naambwe made statements to her physician, Kalee Olson, to the effect that she believed someone at work (possibly Hultman) was trying to kill her.

146. Olson did not actually believe that anyone at Smithfield was trying to kill Naambwe.

147. Other hourly employees from Department 19 who testified at trial described Hultman as a fair, friendly and supportive supervisor.

148. Hultman's managers have not received complaints about Hultman from any employee other than Naambwe.

**HAM-THROWING INCIDENT IN AUGUST OF 2017**

149. In August 2017, Naambwe was hit in the chest by a ham that an hourly employee tossed back up the honey line.

150. The employee who threw the ham, Desbelle Gebremichael, is from Eritrea. He threw the ham back up the line because it was not properly clipped (*i.e.*, the casing was not properly fastened).

151. After this incident, a safety investigation was conducted, led by Dakota Mills, Safety Manager. The investigation revealed that employees sometimes tossed hams back up the line if they were not properly clipped. It was determined that this practice would cease.

152. There was no evidence that Gebremichael had intended to hit Naambwe with the ham, and he testified credibly at trial that he did not intend to hit her.

153.  After the incident, Naambwe vacillated between telling supervisor Henle that she thought it was an accident and that she thought Gebremichael hit her with the ham on purpose, and finally she said she saw in Gebremichael's eyes that he wanted to hurt her.

154.  At the time of the incident and investigation, Naambwe did not attribute the ham-throwing to her race, national origin, or to her complaint about the Genzler incident in February 2016.

**PROTECTED ACTIVITY**

155.  Plaintiffs filed administrative charges with the Equal Employment Opportunity Commission on May 23, 2016, in which they alleged they had been discriminated against in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") on the basis of race and national origin, and that they had been retaliated against for engaging in protected activity.  (Def. Ex. 247, 248.)

156.  Plaintiffs filed this lawsuit on September 7, 2017.  (Doc. 1)  Smithfield was served with the lawsuit on September 21, 2017.  (Doc. 5)

157.  Hultman was the only Department 19 supervisor involved in investigating Plaintiffs' complaint about the Genzler incident.

158.  There is no evidence that Hultman or Loger were aware of the date that Plaintiffs filed their EEOC charges, the date that Plaintiffs filed their complaint, or the date that Plaintiffs served their complaint on Smithfield, nor is there evidence that Hultman or Loger were aware of the dates of any significant events relating to this litigation (other than their depositions and court appearances).

159.  Hultman knew that Plaintiffs reported the Genzler incident in February of 2016, and he participated in the ensuing investigation, but Plaintiffs presented no evidence that Hultman knew of any other protected activity by Plaintiffs before the incidents Naambwe described that involved Hultman in July and September of 2017.

## CONCLUSIONS OF LAW

**A. HOSTILE WORK ENVIRONMENT BASED ON RACE**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees and applicants for employment on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1).

Plaintiffs' first claim is that they were subjected to a hostile work environment at Smithfield based on their race. To establish a claim for hostile work environment, Plaintiff must show: "(1) he or she belongs to a protected group; (2) he or she was the subject of unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper action." *Tademe v. Saint Could State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (citation omitted).

**1. Genzler Incident**

There is no dispute that Plaintiffs belong to a protected group, that the racist comments by Genzler were unwelcome, and that the comments were connected to Plaintiffs' race or national origin. The next questions, then, are: 1) whether Plaintiffs proved that the environment at Smithfield was subjectively and objectively hostile to them based on their race, thus affecting a term, condition, or privilege of employment; and 2) whether Smithfield took prompt remedial action.

a. No Evidence that Harassment Affected a Term, Condition, or Privilege of Employment

The Court concludes that Plaintiffs failed to present proof that the harassment affected a term, condition, or privilege of employment. The Eighth Circuit has explained this element requires "a twofold inquiry." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005). "First, the harassment must be sufficiently severe or pervasive to create an 'objectively hostile' work environment . . . . Second, if the victim does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment." *Id.* (internal citations omitted). In other words, the conduct must be severe as viewed objectively by a reasonable person and subjectively by the alleged victim. *Singletary v. Missouri Dep't of Corrs.*, 423 F.3d 886, 892 (8th Cir. 2005) (citation omitted).

The Eighth Circuit has elaborated on the inquiry into whether or not the environment was "objectively hostile:"

> [the environment] must be more than merely offensive, immature or unprofessional; it must be extreme. Conduct that does not exceed the threshold of severity is insufficient to create a prima facie case of sexual harassment. Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.

*Kratzer*, 398 F.3d at 1047 (internal citations and quotations omitted). In other words,

> [H]arassment standards are demanding — to be actionable, conduct must be extreme and not merely rude or unpleasant. More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment. [The plaintiff] must prove [her] workplace was permeated with discriminatory intimidation, ridicule, and insult.

*LeGrand v. Area Res. for Cmty. and Human Servs.*, 394 F.3d 1098, 1101–02 (8th Cir. 2005) (internal citations and quotations omitted). The determination of whether or not an environment was "objectively hostile" is "a fact-intensive inquiry." *Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001) (citing *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir. 1998)). To determine whether a work environment would be objectively offensive to a reasonable person, courts "examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Singletary*, 423 F.3d at 892. This is a demanding standard—"conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). A single offensive utterance or exposure to distasteful conduct ordinarily does not rise to the level of a Title VII violation. *See Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997).

As to the second prong of the inquiry, whether or not the environment was "subjectively hostile," " ' if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "[A]n employee's admission that [the environment] was not abusive is fatal to the employee's Title VII sexual harassment claim." *Kratzer*, 398 F.3d at 1047 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)).

### i) Objectively Hostile

Objectively, Genzler's behavior does not reach the high threshold for a hostile work environment. Whether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to an offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. Nimenya and Naambwe worked at Smithfield for 5 years and 3 years, respectively, without encountering racist statements until Genzler's. Genzler's conduct occurred on only one occasion and nothing like it ever happened again, either from Genzler or anyone else. In light of these factors and the high standard that a workplace must be permeated with discriminatory intimidation, ridicule and insult so hostile that it poisoned the work environment, the Genzler incident does not objectively support a claim of harassment so severe or pervasive as to alter a term, condition, or privilege of Plaintiffs' employment.

### ii) Subjectively Hostile

Subjectively, the evidence showed that Plaintiffs were justifiably upset by Genzler's conduct; however, Plaintiffs did not show that the terms and conditions of their employment were affected as a result of the Genzler incident. Neither Plaintiff offered any evidence that they experienced difficulty in doing their work. Both continued to receive the annual increases to their hourly rates negotiated by their union, continued to receive the protection and support offered by their union, and continued to receive the employment benefits offered by Smithfield. Neither Plaintiff was transferred to a different position that might be viewed as a demotion. In the years following the Genzler incident, Smithfield offered Naambwe several opportunities to transfer to another department in light of her complaints, but she declined those offers and was permitted to continue in the same position. Further, Naambwe became a union steward, a leadership position in the department, which she took after the Genzler incident.

There is no question that Genzler's statements were offensive and inappropriate for any workplace, and must be condemned in the strongest manner possible. However, there is insufficient evidence that his conduct on one occasion affected a term, condition, or privilege of employment. For these reasons, Smithfield is entitled to judgment in its favor on Plaintiffs' hostile environment claim. And because Nimenya did not present any evidence of harassment beyond the Genzler incident, discussion of her hostile work environment claim could end here. However, the Court will

23

go on to address why Plaintiffs also failed to meet the final necessary element of a hostile work environment claim based on the prompt remedial action Smithfield took in response to the Genzler incident.

          b.  <u>Smithfield Took Prompt and Effective Remedial Action</u>

The Court finds Plaintiffs did not prove a hostile work environment for the additional reason that they did not present sufficient evidence to establish Smithfield failed to take prompt remedial action following the Genzler incident, the fifth element of a hostile work environment claim.

When it learns of harassment, an employer must respond in a way that puts an end to the offending conduct.  "If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment."  *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010); *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 693 (8th Cir. 2012); *Engel v. Rapid City School Dist.*, 506 F.3d 1118, 1123 (8th Cir. 2007).  The evidence establishes that Smithfield met this obligation.

The day Hultman was informed about the Genzler incident, he called a meeting at which Genzler admitted to his conduct.  The HR department was closed for the weekend, so Hultman told the employees that the matter would be addressed there on Monday.  The Court finds that there was a misunderstanding or miscommunication about the timing of the reporting to HR, but this alone does not establish that Smithfield failed to address the issue.  On Monday morning, Hultman wrote an email to Moate in which he reported the Genzler incident, and disciplined Genzler on the first day the department reopened following the Plaintiffs' report.  The Court finds such remedial conduct to be prompt under the circumstances.  The Plaintiffs' verbal warnings, which were rescinded within days, do not detract in any significant way from Smithfield's evidence that it quickly put a stop to the harassment, particularly in light of the circumstances, which included a stopped production line and the evidence that Plaintiffs and Morales violated well-established work rules, of which they were aware. *See Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137, 1142 (8th Cir. 2008) (employee who receives discipline, even if it was a mistake, does not suffer adverse employment action when it's promptly rescinded ).

The Court also takes note of Reed's robust efforts to remediate the effects of Genzler's actions once he learned of the incident, including directing Hultman to rescind the verbal warnings, confronting Genzler with the seriousness of his actions, involving the union in the effort to prevent further occurrences of this sort, directing Moate to follow up with Plaintiffs to ensure that Genzler's

behavior had not recurred, and training the department on the company's anti-harassment and anti-discrimination rules.

While there may be a dispute regarding whether the discipline Genzler received was sufficient given the nature of his misconduct, or whether the investigation conducted by Hultman was sufficient given Plaintiffs' allegations, Eighth Circuit law provides that "where the employer responds to a . . . harassment complaint in such a way as to promptly stop the . . . harassment, there is no basis for finding the employer's postcomplaint actions not sufficiently corrective." *Weger v. City of Ladue*, 500 F.3d 710, 723 (8th Cir. 2007), citing *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997) ("Although [an employee] remains unsatisfied with [her employer's] resolution of her complaint, we have never stated . . . that a complainant in a discrimination action has a right to the remedy of her choice."). A flawed investigation that corrects the problem may satisfy an employer's Title VII obligations. *Weger*, 500 F.3d at 723 (flaws in investigation do not create issue of fact under correction prong when harassment ceased the day after employer received notice of it). Even a decision not to issue any discipline can meet the standard for an effective response as long as no further harassment occurred. *Tatum v. Arkansas Dep't of Health*, 411 F.3d 955, 958–959 (8th Cir. 2005) (even though investigation took eight weeks, employer satisfied remedial action requirement without disciplining alleged harasser because it investigated and no further harassment occurred).

The Court also factors into this analysis Smithfield's written policies prohibiting discrimination, harassment and retaliation, and its efforts to publicize these policies. Morales and Reed testified about Smithfield's "Speak Up" policy, about which employees are trained annually. Plaintiffs admit to receiving the Employee Handbook and anti-harassment training during their orientation process. They signed acknowledgement forms indicating that they also received the Code of Business Conduct and Ethics, which explains the "Speak Up" policy and contains contact information for the ethics hotline. They testified that Smithfield provided training on respectful conduct in the workplace, and Smithfield presented evidence that it increased the scope and frequency of that training after the Genzler incident.

Substantial evidence also was offered at trial showing that conduct such as Genzler's is clearly prohibited by Smithfield. Witnesses, including Plaintiffs, testified that Smithfield does not tolerate any form of harassment. Witnesses, including Plaintiffs, testified that they regularly were trained about Smithfield's anti-harassment and anti-discrimination policies, during their orientation and annually, and on an ad hoc basis in safety meetings. Plaintiffs understood the procedures for making

complaints about harassment, and in fact followed them.  Naambwe, Reed, and Spanish-speaking witness, Fernando DeLeon, testified that the employees at Smithfield come from many different countries and speak many different languages in the workplace.  The company uses interpreters to communicate with employees whose English is not proficient, for both job training and instruction, and employee relations matters.

Because Plaintiffs acknowledged that they never again experienced any other race-based conduct like Genzler's (from Genzler or anyone else), the evidence establishes that Smithfield's actions following the Genzler incident were, in fact, prompt and remedial to prevent any further harassment.  Plaintiffs' hostile work environment claim fails for this reason, as well.

### 2. **Hultman Incidents**

The Court finds that Hultman did brush against Naambwe in the close quarters, but the evidence as a whole does not support that he ground his genitals into Naambwe. The Court finds that Hultman did come back to Department 19 after he transferred to another department.  The evidence does not support that Hultman came back to Department 19 in order to stare at Naambwe for long periods of time.  The Court also finds that while Hultman sprayed Naambwe and David with water when he was cleaning off the line, it was not established that the incident was intentional.  The Court believes that Naambwe's testimony about Hultman was sincerely her belief, but her perception of the events differed from other credible witnesses' testimony from disinterested onlookers as well as the investigators who appeared to be objective.  Intentional spraying, grinding and staring by Hultman was not supported by the preponderance of evidence at trial.

a. No evidence of causal nexus between harassment and protected group status

Even assuming all of the alleged Hultman incidents happened as Naambwe alleges, Naambwe did not present evidence that Hultman was motivated by her race or national origin, and the Court has no basis to find that Hultman did anything because of Naambwe's race or national origin.

First, the statements and actions Naambwe attributes to Hultman are facially race-neutral. Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker. *See Putman v. Unity Health System*, 348 F.3d 731, 735 (8th Cir. 2003) (noting that statements that plaintiff was not "humble enough" and was "too prideful" were facially race-neutral and were not direct evidence of discrimination). This Court cannot extrapolate racial animus from Hultman's question on July 21, 2017:  "What are you going to do now that your partner (or "friend") is gone?" Nor can the Court infer that Hultman's apparently accidental spraying of Naambwe with

water, alleged grinding against her while walking by in September of 2017, or allegedly staring at her after he moved to a different department, were the result of racial animus.

Second, while Naambwe exhibited dissatisfaction with Hultman, she did not come forward with facts establishing a causal nexus between the alleged harassment by Hultman and Naambwe's race. The Sixth Circuit has observed, "[P]ersonal conflict does not equate with discriminatory animus." *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 342–43 (6th Cir. 1998) (upholding district court's determination that witness's statements describing how supervisor made it known that "he disliked [the plaintiff] and used her as the butt of office jokes, are consistent with personal dislike rather than discriminatory animus"). Here, the Court cannot speculate that Hultman's motive was racial animus rather than a personality conflict with Naambwe. Hultman worked with and managed numerous employees of all different races, and those witnesses who testified at trial said they had no problems with Hultman. Without some showing that Hultman's conduct toward Naambwe was discrimination "because of race," a hostile environment theory of race discrimination is not supported.[5] *See Tademe*, 328 F.3d at 991 (finding no hostile work environment where evidence showed that harassment stemmed from inter-departmental politics and personality conflicts and not from actions taken for discriminatory reasons).

    b. Insufficient Evidence that Harassment Affected a Term, Condition, or Privilege of Employment

Again, assuming all of them happened as described by Naambwe, Naambwe's alleged incidents with Hultman do not rise to the level of a hostile work environment. "Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment." *See Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003) (citing *Faragher*, 524 U.S. at 788). The three non-race-based incidents asserted by Naambwe occurred a year and a half after the Genzler incident, and the first two incidents occurred two months apart from each other. Given the breaks in time between the incidents, Naambwe did not show that the alleged harassment was pervasive. The Hultman incidents do not rise to a level that meets the standard of objectively severe or pervasive harassment as defined by the Eighth Circuit and the Supreme Court.

---

[5] This same analysis applies to Plaintiffs' complaints at trial about Gary Loger swearing at people in the workplace when machines broke down. There was no showing that racial animus motivated the swearing. Naambwe's concession that Loger cursed in front of other employees also belies the notion that his conduct was causally connected to Plaintiffs' race.

c.  Smithfield Took Prompt and Effective Remedial Action

Furthermore, Smithfield took prompt remedial action after each reported incident.[6]  Reed investigated the shoulder-poking incident in July of 2017, and decided to discipline Hultman for making the comment to Naambwe about Anderson. According to Reed, Hultman said he knew the statement was a mistake, that he regretted it the moment he said it, and offered to apologize to Naambwe.  Hultman received a two-day suspension for this incident. Reed told Naambwe about that disciplinary action and introduced her to Henle, Hultman's manager, in an effort to encourage her to approach Henle with any complaints or concerns.  Regarding the hose-spraying and grinding incidents in September of 2017, Reed and Fergen investigated thoroughly and found no basis for adverse action against Hultman. Naambwe's allegation that Hultman ground himself against her could not be corroborated. The fact that it could not be corroborated does not mean that it did not happen. Hultman firmly denied it, and Ms. David, working beside Naambwe, said that she had not seen Hultman do so.  It is the Court's conclusion that Hultman did brush against Naambwe, but the brush was the result of close quarters and was not a contact of a sexual nature.  There were no measurements of the site in question. The site was described as close quarters where Hultman would have to turn sideways to move past Naambwe.

The Court concludes Smithfield took prompt, effective remedial action after Naambwe's complaints.

None of these conclusions are meant to discredit Naambwe. The Court believes that, for her own reasons unrelated to racism in the workplace, Naambwe believed she was treated unfairly by Hultman at times. His management style was described by one of his managers as "old school" and "firm but fair, but maybe a little bit rough around the edges sometimes." The Court credits Naambwe for not being afraid to speak up when she felt mistreated.  The Court also credits the managers in the HR department, and other supervisors, for listening to Naambwe and taking action even though it was not always to Naambwe's satisfaction.  The evidence at trial illustrated the physically demanding nature of the work done at Smithfield, and how employees and managers from all over the world work together in very close proximity, often shoulder-to-shoulder.  Difficult situations are bound to arise. The Court commends Mr. Reed whose testimony and exhibits reflected that he took Naambwe's

---

[6]  Naambwe did not report the staring. It is the Court's finding that, in light of all the incidents Naambwe did report, including things involving people other than Hultman, it is more likely she would have reported it if it occurred.

complaints seriously, thoroughly investigated them, attempted to resolve disputes as favorably as possible to everyone involved, and acted in such a way to avoid reoccurrence of the problems, if possible.

## B. RETALIATION

Plaintiffs' second claim is for retaliation in violation of Title VII. To succeed on their retaliation claim, Plaintiffs must establish (1) they engaged in protected conduct, (2) they suffered a materially adverse employment action, and (3) there was a causal connection between their protected activity and the adverse action. *Bunch v. Univ. of Ark. Bd. of Trs*., 863 F.3d 1062, 1069 (8th Cir. 2017); *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012).

The causal-connection requirement is exacting: plaintiffs must show more than that retaliation was a motivating factor for an adverse employment action. "The plaintiff's ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the 'but-for cause' of the adverse employment action." *Donathan v. Oakley Grain, Inc*., 861 F.3d 735, 739 (8th Cir. 2017) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). In other words, the plaintiff must show the protected conduct was a determinative, not just motivating, factor in the employer's adverse decision. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008); *see also Wright v. St. Vincent Health Sys*., 730 F.3d 732, 737 (8th Cir. 2013) ("To establish causation, [the plaintiff] must prove the desire to retaliate was the but for causation of her termination.") (citation and internal quotation omitted).

The timing of events, alone, may be sufficient to create an inference of retaliation, but the Eighth Circuit has typically required more than a close temporal connection to establish a retaliation claim. *Wright*, 730 F.3d at 738–39. In addition, an unsupported, self-serving allegation that an employer's decision was based on retaliation is not enough. *Jackson v. United Parcel Serv., Inc*., 643 F.3d 1081, 1088 (8th Cir. 2011).

1. Events on Monday, February 22, 2016

In support of their retaliation claim, Plaintiffs rely heavily on the events that occurred when they went to the HR department on Monday, February 22, 2016 to report the Genzler incident. Plaintiffs assert that they had authorization to go HR to report the Genzler incident during their break on Monday morning, and they said that they were reprimanded by Moate and Hultman, demeaned, and unfairly punished for doing so. It is probable that Hultman was upset that the line had stopped and production was stopped due to Plaintiffs' absence. Though Plaintiffs may have subjectively felt

demeaned, the greater weight of the evidence convinces the Court that their complaint about Genzler did not result in retaliation in the HR Department on Monday morning.

Though Plaintiffs thought they had permission to go to the HR department and that the honey line was not delayed due to their absence, they admit that they were late to return to the line after their break. Plaintiffs do not disagree that they violated Smithfield's policy requiring employees to be back on time from break. And though Smithfield had proper grounds to issue a verbal warning to Plaintiffs for returning late from break, the warning was rescinded after the HR investigation of the incident was completed. The verbal warnings Plaintiffs were given following the Genzler incident for their failure to timely return to the production line do not constitute adverse employment actions because they did not lead to a change in compensation, responsibilities, or other benefits. *See Powell v. Yellow Book USA Inc.*, 445 F.3d 1074, 1079 (8th Cir. 2006) (three written warnings without cut in pay, reduction of hours or any other changes to conditions of employment not adverse employment action). And, even employees who engage in protected activity can be disciplined for violation of legitimate company rules. *See Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 417 (8th Cir. 2010) (sexual harassment complaint which led to complainant's suspension for violating company policy does not in itself show unlawful retaliation); *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) (employee who made internal complaint of sexual harassment may properly be disciplined for violating workplace rules).

Plaintiffs criticize Hultman for not going to HR first thing on Monday morning to report the Genzler incident. But Plaintiffs testified that Hultman did hold a meeting the next day when he found out about the Genzler incident. During that meeting, Genzler admitted to his conduct. The HR department was closed for the weekend, but Hultman told the three women that they would report to HR on Monday. The evidence showed that there was some confusion when Plaintiffs and Morales visited the HR Department on their own on Monday morning without talking to Hultman first, and they were late reporting back to the honey line, but there was no showing Hultman's failure to report to HR first thing Monday morning was in retaliation for Plaintiffs' complaint about Genzler.

From the evidence presented at trial, this Court cannot find that the events that occurred on Monday morning, or the verbal warnings issued to Plaintiffs by Hultman that day, were based on unlawful retaliation. Thus, Plaintiffs did not prove the causation element of their retaliation claim for any of the events that occurred on Monday, February 22, 2016.

2.  Subsequent Incidents with Hultman

Naambwe presented no evidence that her filing of the EEOC complaint or this lawsuit was a reason for Hultman's conduct in July or September of 2017, or the alleged subsequent staring. There is no evidence that Hultman learned of Plaintiffs' EEOC filings (or their lawsuit) prior to his conduct on those dates.[7] Thus, Naambwe failed to prove this protected activity caused Hultman's subsequent conduct. *Culton v. Missouri Dep't of Corr.*, 515 F.3d 828, 831 (8th Cir. 2008) (finding "failure to present any evidence that [supervisor] was aware of [plaintiff's] protected activities is fatal" to a retaliation claim); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir. 1998) (no causal link between protected activity and adverse action if decision-maker is unaware of plaintiff's protected activity).  In addition, over a year passed between the filing of the EEOC charges in May of 2016 and the first Hultman incident in July 2017. (Poking Naambwe on the shoulder and asking about Anderson). In addition, though Hultman knew Plaintiffs reported the Genzler incident to HR, a year and a half passed between the Genzler incident in February of 2016 and Naambwe's first reported Hultman incident in July of 2017.  Periods of months or years between protected activity and adverse employment actions do not create an inference of causation.  *Robinson v. Am. Red Cross*, 753 F.3d 749, 756 (8th Cir. 2014) (six months between alleged protected activity and adverse action cannot create inference of causation); *Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008) (a six-month gap too long to give rise to inference of causal connection); *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim and that a two-week interval was 'sufficient, but barely so.'"); *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir. 2003) (time interval of "more than two months" too long to support inference of causation); *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (two month interval between complaint and adverse action too long to create an inference of discrimination).

In short, Naambwe did not provide any evidence at trial to support a finding of a retaliatory motive by Hultman without requiring speculation. The Court cannot speculate that Hultman's motive was retaliation for Naambwe's protected activity.  *See, e.g., O'Brien v. Dep't of Agric.*, 532 F.3d 805, 811 n. 3  (8th Cir. 2008) ("Though Peterson said that Trice denied O'Brien a monetary award due to

---

[7]  Reed testified about his contemporaneous notes taken during his investigation of the September incident, and the notes are dated September 13, 2017. (Defendant's Ex. 256.) Smithfield was not served with the lawsuit until September 21, 2017.

her EEO activity in September 2004, this bare assertion and speculation as to Trice's motive does not create a genuine issue of material fact"); *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 917 (8th Cir. 2006) (rejecting plaintiff's retaliation claim based on unsupported and contradicted speculation about an ulterior motive by employer).

Instead of raising an inference of retaliation, the evidence at trial raises an inference that personality conflicts developed in the relationship between Naambwe and Hultman.  This Court cannot—based on the evidence presented at trial—conclude that the conflicts or any contentiousness were in retaliation for Naambwe's report of the Genzler incident, to either Smithfield, the EEOC, or to this Court through filing their lawsuit, or any other possible protected conduct.

For all of these reasons, judgment in Smithfield's favor with respect to Naambwe's retaliation claims based on Hultman's conduct is appropriate.

### 3. Arby's Work

This is the only alleged retaliatory action that applies to both Naambwe and Nimenya because it is the sole incident Nimenya relies on for her retaliation claim. Plaintiffs allege that, following their report of the Genzler incident, lead employee Lisa Christion (a non-supervisor) retaliated against them by assigning them to work alone on the production process for Arby's meat when normally two or more people perform that task together.  However, Plaintiffs presented no evidence of a retaliatory motive by Christion. There is no evidence Christion knew of the Genzler incident or any other protected conduct by Plaintiffs. Furthermore, the Arby's table work assignments took place months after Plaintiffs reported the Genzler incident to HR. As explained earlier, periods of months between protected activity and adverse employment actions do not create an inference of causation

In addition, the trial testimony of Plaintiffs' co-workers from Department 19 convinces the Court that assignment to the Arby's table is not a materially adverse employment action.  Many employees were given this assignment, and none considered it to be strenuous or punitive. Further, the testimony of Fergen established that each worker on the Arby's table is held to the same production standard regardless of how many people are assigned to those tasks.  In other words, an employee does not need to work harder or faster if they are doing Arby's work on their own.  Duties or working conditions that cause no materially significant disadvantage -- even if an employee finds them undesirable -- do not rise to the level of an adverse employment action. *See Jackman v. Fifth Judicial Dist. Dep't of Corr. Services*, 728 F.3d 800, 804 (8th Cir. 2013) ("minor changes in duties

or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action").

Derby's detailed description of her investigation of Naambwe's August 2016 complaint about the Arby's assignment shows that the company made a good-faith effort to determine whether that assignment was unfair or unduly difficult, and the Court concludes based on all the trial testimony that Arby's work does not constitute an adverse employment action.

4.  Work with Alleged Harasser

In December 2014, Naambwe complained about a coworker, Juan Ogaldez, making a sexual gesture (pointing to the area of his penis). Naambwe alleges that, as a result of her complaint, she was told she and Ogaldez would not have to work together and that they would be assigned to different lines in the department. Smithfield denies this and testimony at trial convinces the Court that Naambwe and Ogaldez were told they might have to work together but that supervisors would try to keep them separate. Moreover, Gary Loger's testimony and contemporaneous notes established that Naambwe subsequently chose to work on the same line with Ogaldez at times.

No evidence was presented at trial that Naambwe's assignment to work on the same line as Ogaldez was retaliatory. Naambwe appears to have had an aversion to Ogaldez based on her alleged experience with him in 2014.  However, the evidence showed that Smithfield promptly investigated her 2014 harassment complaint against Ogaldez, that Ogaldez afterwards did not do anything objectionable to Naambwe, and that the two worked together occasionally in the period between 2014 and 2016 without incident.

Naambwe did not establish the particular dates she was assigned to work with Ogaldez, so the Court cannot fully assess the temporal connection here.  It is possible that these assignments took place prior to February 2016; Naambwe testified that "sometimes Russ, he used to send me over there," in response to a question about whether she worked near Ogaldez between 2014 and 2016. (TT at 179.) Her complaint about working with Ogaldez occurred in April 2016, two months after the Genzler incident, but there is no evidence that an assignment took place between February and April 2016.  Further, the Court credits Loger's evidence that Naambwe herself chose to work with Ogaldez in January 2017, nearly one year after the Genzler incident.

The Court concludes that Naambwe's sensitivity to interacting with Ogaldez was a subjective reaction. Retaliatory adverse actions must be analyzed under an objective standard, to avoid the "uncertainties and unfair discrepancies" that are attributable to a plaintiff's "unusual subjective

feelings," *Clegg v. Arkansas Dep't of Corr.*, 496 F.3d 922, 929, quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006), which appears to have been the case here.

    5. Ham Incident

There was no evidence presented at trial that Gebremichael intended to hit Naambwe with the ham, and the Court finds credible Bebremichael's testimony that he did not intend to hit her. Smithfield's investigation of the incident showed that employees sometimes tossed hams back up the line if they were not properly clipped, and Smithfield put an end to that practice. It was unfortunate that Naambwe was hurt by being hit with a ham. But Smithfield took the incident seriously, and there is no evidence from which to glean a retaliatory motive of any kind.

## CONCLUSION

Looking at the events as a whole, over the course of the months and years following the Genzler incident, the Court is unable to find any materially adverse employment actions taken against Plaintiffs, or that retaliation played a part in the events that occurred with Plaintiffs at Smithfield. The Genzler incident itself was truly despicable, but it was a one time event by a co-employee and it was not repeated. The incident was promptly dealt with by Smithfield in an appropriate manner even though the discipline could have been more severe. As previously explained, under the law, that incident does not give rise to liability on the part of Genzler's employer, the Defendant, nor was it a part of the retaliation claim. Therefore, Plaintiffs' retaliation claim fails.

For the reasons stated above, the Court finds against Plaintiffs on their claims of hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Accordingly,

    **IT IS ORDERED**:

    1. That judgment shall be entered in favor of Defendant and against Plaintiffs on both the hostile work environment race discrimination claim and the retaliation claim; and

    2. That Defendant's Motion for Judgment on Partial Findings, Doc. 148, is denied.

Dated this 13th  day of May, 2020.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK